**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| IN RE 2U, INC. SECURITIES CLASS ACTION | Consolidated Case Nos. TDC-19-3455 and TDC-20-10006<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................................. 1

II.     JURISDICTION AND VENUE ..................................................................... 2

III.    VIOLATIONS OF THE EXCHANGE ACT .................................................. 3

        A.      Summary of the Exchange Act Claims ............................................ 3

        B.      The Exchange Act Parties ............................................................... 15

                1.      The Exchange Act Plaintiffs ................................................ 15

                2.      The Exchange Act Defendants ............................................. 16

        C.      Exchange Act Allegations .............................................................. 17

                1.      2U's Graduate Division Was the Company's Purported Growth
                        Engine .................................................................................... 17

                2.      The Aggressive Growth of the Graduate Division in 2018 Strained
                        the Company's Business Model .............................................. 20

                3.      The Exchange Act Defendants Claimed 2U's Student Acquisition
                        Program Could Keep Up With the Growth Plan ..................... 23

                4.      The Exchange Act Defendants Concealed That 2U's Business
                        Model Began to Break in 2018 and Broke by 2019 ................. 27

                        (a)     The Exchange Act Defendants Saw Enrollment Forecasts
                                Decline in 2017 and 2018 ......................................... 28

                        (b)     2U's Student Acquisition Program Could Not Keep Up
                                With Enrollment Needs .............................................. 30

                                (i)     2U's Marketing Department Could Not Keep Up
                                        With the Company's Enrollment Needs in 2018 ............. 30

                                (ii)    Converting Leads to Enrolled Students Became
                                        Increasingly Difficult Throughout 2018 .......................... 33

                                (iii)   The Admissions Counselors Were Unable to Keep
                                        Up With 2U's Growth .......................................... 37

                        (c)     Despite Internally Planning for Lower Enrollment, the
                                Exchange Act Defendants Continued to Report Positive
                                Results ..................................................................... 39

(d)     2U's Marketing Problems Impacted a Significant Amount of Revenue ................................................................. 40

5.     The Exchange Act Defendants Touted 2U's Growth Despite Knowing It Was Unsustainable ............................................. 41

(a)     July 19, 2018 – A Short Report Questions 2U's Growth ............ 45

(b)     2U Forcefully Defends Its Business Model .................................. 48

(c)     November 2018 – The Exchange Act Defendants Again Claim Accelerated Growth ........................................................ 53

(d)     February 2019 – The Exchange Act Defendants Double Down on Growth........................................................................ 58

6.     Weaknesses in 2U's Business Model Begin to Appear ........................... 61

7.     The Exchange Act Defendants Finally Admits That 2U's Growth Plans Were Failing And That It Needed To Reduce Revenue Expectations Going Forward .................................................................. 64

D.     False and Misleading Statements for the Exchange Act Claims ......................... 66

1.     February 26, 2018 – Fourth Quarter and Full Year 2017 Financial Results.................................................................................. 67

2.     February 28, 2018 KeyBank Capital Markets Emerging Technology Summit............................................................................... 70

3.     May 3, 2018 – First Quarter 2018 Financial Results ............................... 73

4.     June 5, 2018 – Robert W. Baird & Co. Global Consumer, Technology & Services Conference ......................................................... 76

5.     August 2, 2018 – Second Quarter 2018 Financial Results ....................... 79

6.     August 8, 2018 – Oppenheimer Technology, Internet & Communications Conference................................................................... 84

7.     August 14, 2018 – KeyBanc Capital Markets Technology Leadership Forum .................................................................................. 87

8.     November 5, 2018 – Third Quarter 2018 Financial Results..................... 90

9.     November 28, 2018 – Credit Suisse Technology, Media & Telecom Conference ................................................................................ 93

10. February 25, 2019 – Fourth Quarter and Full Year 2018 Financial Results ................................................................................. 96

11. May 7, 2019 – First Quarter 2019 Financial Results ................................. 99

12. The Exchange Act Defendants' Misleading Risk Disclosures .............. 106

13. 2U's Class Period SEC Filings Did Not Comply with SEC Disclosure Requirements ........................................................................ 109

E. Additional Scienter Allegations for the Exchange Act Claims ......................... 111

1. The Executive Defendants Had Actual Knowledge That 2U's Student Acquisition Model Was Insufficient to Sustain the Company's Growth .................................................................................... 111

(a) Defendants Paucek and Graham Had Access to and Monitored 2U's Enrollment Numbers ........................................ 111

(b) Defendants Paucek and Mokkarala Were Aware Of Declining Enrollment in Early 2018 .......................................... 114

(c) The Executive Defendants' Own Statements Support a Strong Inference of Scienter ...................................................... 115

(d) Defendant Paucek's Suspicious Stock Sales During The Class Period Support A Strong Inference Of Scienter ............... 118

(e) The Timing and Circumstances of Defendant Graham's Resignation Supports a Strong Inference of Scienter ............... 119

2. Student Enrollment Is Critical To 2U's Core Operations ...................... 120

3. Corporate Scienter Allegations for the Exchange Act Claims ............... 121

F. Loss Causation for the Exchange Act Claims .................................................... 121

1. May 7, 2019 ............................................................................................ 122

2. July 30, 2019 .......................................................................................... 126

G. Applicability of the Fraud on the Market Presumption ...................................... 130

H. Class Action Allegations for the Exchange Act Claims ..................................... 132

I. Safe Harbor ........................................................................................................ 133

J. Exchange Act Causes of Action ......................................................................... 134

COUNT I For Violations of §10(b) of the Exchange Act and Rule 10b-5 Against the Exchange Act Defendants ................................................................ 134

COUNT II For Violation of §20(a) of the Exchange Act Against the Executive Defendants ......................................................................................... 135

IV.   SECURITIES ACT ALLEGATIONS ........................................................... 137

A.   The Securities Act Parties ................................................................... 137

1.   The Securities Act Plaintiff ......................................................... 137

2.   The Securities Act Defendants ..................................................... 138

(a)   Corporate and Executive Defendants ................................. 138

(b)   Director Defendants .......................................................... 138

(c)   Underwriter Defendants ..................................................... 139

3.   2U Conducts the Offering ............................................................ 140

4.   The Securities Act Defendants' Untrue or Misleading Statements and Omissions of Material Facts .................................................... 141

5.   The Offering Materials Omitted Information that Was Required to Be Disclosed Under Item 503 ...................................................... 144

B.   Facts and Trends Present at the Time of the Offering Rendered the Offering Materials Materially False and Misleading ............................. 145

1.   Enrollment Forecasts Declined in 2017 and 2018 ....................... 145

2.   2U's Student Acquisition Program Could Not Keep Up With Enrollment Needs ....................................................................... 146

(a)   2U's Marketing Department Could Not Keep Up With the Company's Enrollment Needs at the Time of the Offering ........ 146

(b)   Converting Leads to Enrolled Students Became Increasingly Difficult Throughout 2018 ..................................................... 148

(c)   The Admissions Counselors Were Unable to Keep Up With 2U's Growth ....................................................................... 151

3.   2U's Marketing Problems Impacted a Significant Amount of Revenue ...................................................................................... 153

4.      2U's Stock Price Declines as Investors Learn of the Company's Problems .................................................................................... 153

C.      Class Action Allegations for Securities Act Claims ........................................... 155

COUNT III For Violation of Section 11 of the Securities Act Against All of the Securities Act Defendants.................................................................................... 157

COUNT IV For Violation of Section 12(A)(2) of the Securities Act Against All of the Securities Act Defendants.................................................................................... 159

COUNT V For Violation of Section 15 of the Securities Act Against Paucek, Graham, and the Director Defendants .................................................................. 161

PRAYER FOR RELIEF ............................................................................................ 163

JURY DEMAND....................................................................................................... 163

## I.    INTRODUCTION

1.     Lead Plaintiff Fiyyaz Pirani ("Pirani" or "Lead Plaintiff") and Additional Named Plaintiff Oklahoma City Employee Retirement System ("OKCERS" or "Additional Named Plaintiff") (collectively, "Plaintiffs") bring this class action for violations of the federal securities laws.

2.     Plaintiffs bring this federal class action under Section 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder, on behalf of all persons and entities that purchased or acquired publicly traded securities of 2U, Inc. ("2U" or the "Company") during the period from February 26, 2018 through July 30, 2019, inclusive (the "Class Period"), and who were damaged thereby.  The Exchange Act claims are brought against Defendants 2U, Christopher Paucek ("Paucek"), Catherine Graham ("Graham"), and Harsha Mokkarala ("Mokkarala") (Paucek, Graham, and Mokkarala are referred to herein as the "Executive Defendants," and with 2U, the "Exchange Act Defendants").

3.     Separately, OKCERS brings this federal class action under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act"), and rules promulgated thereunder, on behalf of all persons and entities that purchased or acquired 2U's common stock pursuant or traceable to the Company's Preliminary Prospectus Supplement dated May 21, 2018 and Prospectus Supplement filed with the U.S. Securities Exchange Commission ("SEC") May 23, 2018, which are part of the Registration Statement on Form S-3 (collectively, the "Registration Statement").  OKCERS brings these Securities Act claims against 2U, Paucek, Graham, the Director Defendants (as defined in Section IV.A.2 below) and the Underwriter Defendants (as defined in Section IV.A.2 below) (collectively, "Securities Act Defendants," and, together with the Exchange Act Defendants, "Defendants").

4.     Plaintiffs make the following allegations upon personal knowledge as to those allegations concerning Plaintiffs and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by 2U and other related parties and non-parties with the SEC; (b) review and analysis of press releases and other publications disseminated by certain of the Exchange Act Defendants and other related non-parties; (c) review of news articles and shareholder communications; (d) review of other publicly available information concerning 2U, the other Exchange Act Defendants, and related non-parties; and (e) interviews with factual sources, including individuals formerly employed by the Company.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## II.     JURISDICTION AND VENUE

5.     The Exchange Act claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

6.     The Securities Act claims asserted herein arise under and pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§77k, 77l, and 77o, and rules promulgated thereunder by the SEC.

7.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337, and Section 22 of the Securities Act, 15 U.S.C. §77v, and/or Section 27 of the Exchange Act, 15 U.S.C. §78aa.

8.     Venue is proper in this District pursuant to 28 U.S.C. §1391(b)-(c), and Section 22 of the Securities Act, and/or Section 27 of the Exchange Act, because 2U conducts substantial business in this District, and many of the acts and practices complained of herein occurred in substantial part in this District.

9.      In connection with the acts, conduct and other wrongs alleged in this Complaint, the Exchange Act Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III.    VIOLATIONS OF THE EXCHANGE ACT

### A.    Summary of the Exchange Act Claims

10.     At the beginning of 2018, 2U appeared to present investors with a once-in-a-lifetime growth story.  The Company was focused on growing rapidly as it expanded its core business of partnering with universities to offer online graduate degree programs, and by the end of 2017, the Company had grown to nearly $300 million in yearly revenues, after launching 10 new graduate degree programs in 2017 alone, bringing the total number of active programs to 37. The Executive Defendants projected launching 14 new graduate programs for 2018 and 16 in 2019, and in February 2018, the Exchange Act Defendants told investors that 2U's expansion would continue apace with revenue growth of at least 30% per year for the "foreseeable future" as the Company continued to accelerate program launches until it reached its steady state target of 193 programs and $3 billion in yearly revenue, a target 2U increased to 250 programs and $4 billion in yearly revenue midway through the Class Period. According to Defendant Paucek, 2U was the first for-profit Company to "crack[] the code" of the $80 billion U.S. graduate education market, and it was poised to do in the education market what Apple and Amazon had done in retail.

11.     Defendants Paucek and Graham emphasized that 2U's steady growth was all but assured—it had a proven model, a healthy pipeline of new customers, a huge addressable market, and no serious competition.  Not only that, but the Executive Defendants underlined to investors that 2U's business was highly predictable.  On multiple occasions during the Class Period,

3

Defendant Paucek noted that it was unusual for a Company of 2U's size to project such tremendous growth so far into the future, but assured investors that 2U's business model and long sales cycle allowed the Executive Defendants to make their projections with a unique degree of confidence.  Further, the Executive Defendants repeatedly told investors that they had the cash necessary to fund this growth, and that it was "fully funded"—all 2U had to do was defer profitability while it took advantage of this singular growth opportunity.

12.     Finally, the Executive Defendants framed their business model as leading a revolution that put students first, saying there was "no back row" in the online classrooms, and that "[o]ur model delivers great outcomes for more students" and makes universities "a more sustainable institution.  Our model works."  According to the Executive Defendants, these great outcomes meant that universities were lining up to partner with 2U, and its current university customers were happy and committed to long-term partnerships—another fact that made 2U's business model predictable and sustainable.

13.     Investors and analysts believed 2U's growth story, and the Executive Defendants' claims that they were executing their growth plan successfully.  For example, onMarch 26, 2018, analysts at Credit Suisse explicitly linked their valuation of 2U to its growth story, stating:

"***Given our increased confidence in TWOU's ability to generate sustained >+30% revenue growth*** while expanding margins over the medium-term, and the [C]ompany's highly recurring and disruptive business model ***with long-term visibility into 2020+***, we raise our TP to $100."

14.     Eager to get in on the ground floor of the self-proclaimed "Amazon" of higher education, investors drove 2U's stock price to many multiples of its then-current revenues during the Class Period—prices that analysts following the Company explicitly acknowledged could only be justified by the Company's incredible growth story.  For example, on April 24, 2018,

Barrington Research wrote that "[a]t current levels, 2U's stock is trading at 10.2x our estimate of 2018 revenue, compared to an average of 6.2x for its Ed Tech peers and 6.3x for its vertical-focused SaaS [software-as-a-service] peer group. ***We view this premium as warranted given that 2U's projected growth rate is much higher at 40%/32% in 2018/2019***, compared to an average of 18%/19% for the Ed Tech peer group and 15%/14% for the vertical-focused SaaS peer group."

15.     Internally, however, the Company's growth trajectory was subject to significant undisclosed risks.  Each new graduate degree program represented a significant increase in the Company's operations, not just in setting up the program—which required $5 to $10 million in up-front investment by 2U—but in the Company's ongoing commitment to recruit students to apply for and enroll in the program, with target enrollments of 300 to 500 a year.  The Executive Defendants touted their marketing efforts as "data driven" and "high-touch" and described the process by which students are recruited, from a prospect's clicking on an online advertisement, to being contacted by 2U sales staff, termed "admissions counselors," through their eventual application to a program, as the "marketing funnel," and assured investors that the funnel was working as intended throughout the Class Period.

16.     But in reality, as described in Section III.C.4, below, from the very beginning of the Class Period, the Executive Defendants were concerned about low enrollments.  In 2017, after years of rapid growth, the Company's internal projections began to show declining enrollment forecasts.  According to former 2U employees, Defendant Paucek was concerned, and Defendant Mokkarala was stressed, about the declining enrollment forecasts, and all the Executive Defendants were working together to figure out the problem.  But they did not find a solution, and the forecasts worsened throughout 2018.  By the beginning of 2019, multiple

former 2U employees confirm, it was clear internally that 2U would not hit its 2019 enrollment targets.

17.     Though the Exchange Act Defendants concealed it from investors, their much-touted "data-driven" approach was showing them clearly that the online education market was changing throughout the Class Period.  2U had been on the vanguard of online education, and its previous growth occurred at a time when students had fewer options for obtaining an online graduate degree program.  Beginning in 2017, however, the growing number of programs provided students with many choices, some with lower tuition, and former 2U admissions counselors confirmed that the Company's higher-priced programs lost students to competitors, both from non-2U powered programs and from 2U's other programs.  Multiple former employees reported that as 2U added lower cost degree programs in its multi-program verticals, 2U actually cannibalized its higher cost programs.  The growing number of online degree programs also led to ever increasing competition for advertising space, and 2U was unable to capture the marketing efficiencies that 2U had promised to investors.

18.     In the midst of this shifting market, the Exchange Act Defendants were publicly promising investors growth that 2U could not handle.  According to numerous former employees, throughout 2018, 2U's rapid growth was straining its marketing operation to the breaking point.  The Executive Defendants were trying to scale the Company too quickly, stretching its marketing staff too thin, imposing unrealistic quotas on admissions counselors, and failing to spend enough money to make sales.  This strain led to poor execution and increased turnover in the admissions staff, further exacerbating the Company's growth problems.

19.     Even as these clear facts and trends worsened throughout 2018 and into 2019, the Exchange Act Defendants assured investors that 2U's growth strategy was being realized, that

2U was growing efficiently, and that nothing had changed regarding the Company's purported marketing efficiencies. And rather than revealing the enrollment challenges posed by the increasingly saturated market, the Exchange Act Defendants publicly claimed that the addressable market for graduate degrees was so vast that there was plenty to go around, and they viewed competitors not as a threat, but as "fellow travelers" working alongside them to improve education.

20.     And as the Exchange Act Defendants misled investors about the Company's growth prospects, Defendant Paucek personally enriched himself by selling *over $22 million* worth of stock at inflated prices during the Class Period, *a 50% increase in proceeds over his stock sales in the equal length period immediately preceding the Class Period*.

21.     The Exchange Act Defendants continued to push this narrative throughout the Class Period, even as their internal projections worsened. At key moments in 2018, when the Exchange Act Defendants faced questions regarding 2U's business model, or were forced to disclose information that seemed to contradict 2U's growth story, the Exchange Act Defendants affirmed their earlier claims, and made increasingly specific claims about the predictability of the business, their confidence in the numbers and close attention to marketing details, and the strength and resilience of the business.

22.     For example, when Spruce Point Capital Management ("Spruce Point") published a short report in July of 2018 claiming that 2U was deliberately becoming less transparent and questioning, among other things, the Company's ability to continue growing in the increasingly saturated market for online graduate programs—a problem that former employees confirm 2U was, in fact, encountering—Defendants Paucek and Graham forcefully rejected the thesis of the report. Defendant Paucek kicked off his remarks by saying "don't let the skeptic win," before

defending 2U's business model and growth story.  Regarding 2U's growth story, Defendant

Paucek claimed that 2U was growing with careful deliberation, saying, "we don't want to sign all

programs.  Signing a program is not the important thing.  ***Scaling it at quality is.  And 2U has a***

***track record of scaling enrollments that's better than anyone in the space.***"

23. Regarding Spruce Point's claims that competition would impact 2U's

assumptions, Defendant Paucek insisted that competitors were not impacting 2U's business and

he viewed potential competitors as "***fellow travelers, like you're talking about improving***

***preconceived notions of online education by having high-quality schools go online***."

24. Following the August 2, 2018 conference call, analysts sided with the Exchange

Act Defendants' portrayal of the short report.  For example, BMO Capital Markets analysts

wrote, "[w]ithout specifically addressing it, management countered many of the points in the

recent 'short report.'  Though we doubt this will quiet the bears, management passionately

defended its business model highlighting its portfolio approach and acknowledging there are lots

of models serving this market (fee-for-service, revenue share), but believes in the advantages of

its approach."  Macquarie Research also published a report on August 12, 2018 reporting that

Defendant Paucek had visited their offices with 2U's vice president of investor relations and

"confidently" refuted the short report.

25. Over the next several weeks, Defendants Paucek and Graham appeared at

numerous investor events to talk up 2U's business, and rolled out a string of positive updates for

investors.  On August 14, 2018, Defendant Paucek appeared at the KeyBanc Capital Markets

Technology Leadership Forum.  Before his appearance, the Exchange Act Defendants

announced that 2U was again increasing the number of new programs it would be launching in

2019, 2020, and 2021.  At the conference, Defendant Paucek claimed that 2U was "***a story of***

*just an increasingly expanding pipeline.  Our pipeline is stronger than it's ever been, and it's not close.  It is the best we've ever seen it*."

26.     To double down on the Company's growth story, Defendant Paucek announced that they had raised 2U's target growth size from $3 to $4 billion, saying during the same call, "[w]e think our current framework at our current economics with our current cadence and you get out to the 250 total [Domestic Graduate Programs] that we think we can do, *that puts 2U's top line at close to [$]4 billion for the core business alone, but more importantly, when you start talking about share, something between 80,000 or 85,000 students*."

27.     Defendant Paucek's announcement sent a strong message to investors that the Company was scaling as expected and the growth story was intact.

28.     Analysts approved of these new targets.  For example, on August 14, 2018, Macquarie Research noted that 2U was "accelerating its graduate program launch schedule" and "now expects to expand its graduate degree portfolio by ~2.3x vs. the 48 programs it plans to finish launching by the end of 2018," and wrote "*[w]e are encouraged by these raised launch targets as the [Company] executes on the most robust graduate program pipeline in its history* and as it establishes a strong foundation for long-term FY'20+ growth as a category winner in the online education marketplace."

29.     Then, on November 5, 2018, the Company disclosed that two of the Company's largest university partners, USC and UNC, were tightening admissions standards in some programs, which would impact 2019 revenues.  During the same call, however, Defendant Paucek again reaffirmed the Company's growth trajectory, telling investors that he was "confident enough in the overall portfolio and the strength of the pipeline" to project that 2U could "*keep consolidated revenue growth above 30% for at least the next 5 years*."  Defendant

9

Paucek further claimed that, "[b]ased on these current growth expectations, *2U expects to hit $1 billion in revenue in a little over 3 years. That used to be a long-range goal. Now it's right in front of us. We can see it*."

30.     Defendants Paucek and Graham also declared that the growth story was so compelling that they planned to sacrifice short term margins in 2019 to further invest in growth by increasing the Company's marketing for new students. Defendant Paucek made sure to clarify, falsely, that the additional marketing spend would be efficient, stating, "*[b]ut regardless, the [multi-program vertical] strategy is clearly what drives our marketing efficiency. So today, we don't have a marketing efficiency issue*."

31.     As described below, in Section III.C.4, information provided by former employees directly contradicts this statement, including information that the multi-program vertical was actually hurting enrollment in the Company's largest programs, and that 2U was encountering marketing efficiency problems throughout the funnel.

32.     Then, on February 25, 2019, despite clear indications internally that the Company was not going to hit its projected enrollments for 2019, the Exchange Act Defendants once again increased guidance and announced still more graduate programs. On a conference call to discuss the fourth quarter and full year 2018 results, Defendant Paucek opened by stating in unequivocal terms that the Company had a sound business model: "*I'm telling you our business is resilient, it's diversified, and it's growing*." Defendant Paucek also reaffirmed that "*the [C]ompany is fully funded*," and Defendant Graham explained that the Company's revenue was on track to grow, from $411.8 million in fiscal 2018 to $546.6 to $550.8 million in fiscal 2019, and she assured investors that, "[o]ur revenue and adjusted earnings measure expectations for the year are up, but more importantly, *we remain confident in our ability to continue delivering 30%-*

*plus top line growth, get to $1 billion in revenue within 3 years and leverage a business model that we've proven can deliver profitability as programs mature*."

33.     On the same call, Defendant Paucek also claimed that the Company's "diversified grad portfolio is strong," that its "[n]ewer programs are scaling well," and that 2U's "expanding selection of programs continues to drive growth in the grad segment."

34.     Misled, analysts were pleased with the increase in guidance, and continued to believe that the Company's model was working well and would only improve with time, as the Exchange Act Defendants claimed.  On February 25, 2019, Macquarie Research wrote, "2U reported a solid quarter and guide, and we anticipate shares will re-rate higher on the back of results and outlook as the [Company] was able to slightly beat and raise despite weakness at two large programs due to strength in the portfolio elsewhere. . . . Lastly, [management] was clear that they are working on issues at UNC and USC."

35.     Eventually, however, the combination of worsening trends in student acquisition and 2U's creaking student acquisition machinery resulted in lower enrollments in 2U programs, forcing the Exchange Act Defendants to admit weaknesses in enrollments on May 7, 2019.  On that day, the Exchange Act Defendants revealed deepening losses, with net losses for the first quarter increasing $6.7 million year over year to $21.6 million.  Defendant Graham also admitted that 2U was seeing "some decline in expected graduate program enrollments beginning in the second quarter and continuing through the rest of the year."  Defendant Graham reminded investors that "our graduate program business is a long-cycle accumulating revenue business and enrollment changes in any period impact revenue for multiple future periods."  Consequently, the Exchange Act Defendants reduced 2019 revenue guidance—less than three months after raising that guidance.

36.     The Executive Defendants did not remind investors, however, that the admissions cycle was on average seven months from contact to enrollment.  2U had therefore been working on second quarter enrollments since late 2018, a fact that corroborates information from former employees that it was clear by the end of 2018 that the Company would not hit its enrollment targets for 2019.

37.     Nor did the Exchange Act Defendants admit any concerns with the growth story they had been telling.  In fact, the Exchange Act Defendants made sure to misleadingly frame these disappointing results as a consequence of a confluence of one-time factors rather than a fundamental problem with its business model.  On a conference call on May 7, 2019, Defendant Paucek opened his remarks by stating, "[a]s I take you through the specifics, ***you'll see there are still plenty of structural positives to report.  Let's turn to 3 factors at play in our new 2019 expectations for the grad business***.  Number one, our partners are getting more selective, which impacts admit rate; number two, we're seeing some pressure mid-funnel on the rate at which prospective students are submitting their applications for review; and number three, we're seeing some slowness in the 2019 cohort, most importantly, one of our largest projected programs for the 2019 cohort had its launch date slip to later in the year for reasons beyond the control of the school and 2U."

38.     Defendant Paucek made very clear, multiple times during the conference, that the model was still performing as expected.  For example, in his opening remarks he stated, "[b]efore I get into specifics on each of these, I want to make one thing clear.  ***We do not believe the challenges we're seeing are attributable to weakness in our marketing efficiency at the top of the funnel***.  We've said that before and are reiterating it again today.  ***Our data shows we're driving significant growth in the quantity of prospective students and started applications***.

We're doing so at an average cost that has remained consistent with historicals.  It's actually down in many spots.  Across the portfolio, applicant quality remains steady."  Defendant Paucek explained, however, that they were seeing some "changes in the rate of application submission," and one issue they were seeing was that "more people are moving through our funnel without speaking to a counselor."  This admission corroborates information provided by former employees that the Company had imposed unrealistic quotas on admissions counselors and was expecting them to do more with less.

39.    During the question and answer section, Defendant Paucek also admitted that the Company had pushed the growth story a little too aggressively, but cabined his admission to the effect of university admission decisions, stating "[i]t has become clear in the rearview mirror that we were prioritizing growth a bit too much based on the feeling -- on feeling the need to meet past expectations.  *I should have seen these admit challenges more broadly and simply taken some air out of the balloon.*  It would have been better for my team and my clients.  I didn't do that.  Call it a lesson learned in the life of a public company CEO."  These comments had the effect of misleading investors into believing that 2U's fundamental model was still working— that the reduced guidance was a mere bump in the road.

40.    Most importantly to investors, given that the Company's share price reflected 2U's projected growth, Defendant Paucek strongly reaffirmed the growth story, saying "*2U is still very much a growth story*" and claiming that "*we continue to see programs across the portfolio scale toward our target ranges for new student enrollments.  We still firmly believe in our runway of 250 DGPs. Pipeline for those programs is strong.*  We've got a bunch of announcements coming, but that's for another day."

41.     Despite the spin, the price of 2U stock declined over 25 percent in a single trading day, on abnormally high volume of over 7 million shares traded, to close at $44.77 per share on May 8, 2019.  The price of 2U stock, however, remained artificially inflated as the Exchange Act Defendants insisted that the Company's business model and growth trajectory remained intact.

42.     Then, two months later, on July 30, 2019, after the close of trading, the Exchange Act Defendants shocked investors and analysts alike by revealing that 2U's growth model was fundamentally broken.  The Company significantly reduced its guidance, and finally admitted that its growth plans—which had underpinned its stock value—were failing and needed to be abandoned as costs ballooned.  In particular, 2U's projected net loss for 2019 had increased by over $70 million.  In addition, these projected losses for the year, which included certain costs related to the recent acquisition of a short course provider, Trilogy, represented a 300 percent year-over-year increase.  On the Company's conference call accompanying the release, Defendant Paucek disclosed that 2U was "moderating [its] outlook for the business in the short term" and, "[e]xcluding the expected financial impact of Trilogy, this implies *a step down in revenue expectations for the rest of the business*."

43.     In his explanation for the poor outlook for the Graduate Division, Defendant Paucek admitted that the marketing funnel did not work as well anymore, saying "competition for students has increased," and that 2U now expected "smaller average steady-state program[s]" (meaning less profitable programs) and that "our guidance presumes lower conversion rates on a go-forward basis" (meaning higher marketing costs).  In effect, Defendant Paucek admitted that 2U had experienced the facts and trends that former employees reported seeing throughout 2018, including increasing competition for students, marketing efficiency problems, the multi-program

14

vertical strategy failing to increase conversion rates, and unrealistic expectations for admissions counselors.

44.     Defendant Paucek revealed that, due to these problems, 2U's business model would need to undergo substantial adjustment to compete in an increasingly saturated online education market and that the Company's cash flow was inadequate for purposes of maintaining the Company's present strategies.  He described the Company's prior growth story as a "***mistake***" and stated that he needed to "***level set***" with the investment community.

45.     On this news, the price of 2U stock declined ***65 percent*** in a single trading day, on extremely high volume of over 54 million shares traded, to close at $12.80 per share on July 31, 2019.

46.     Analysts, even those that had praised 2U throughout the Class Period, were shocked.  Macquarie Research wrote, "***[t]his is clearly a breaking of the [C]ompany's model***" and downgraded the stock from outperform to neutral.  Oppenheimer called 2U's stock "***[u]ninvestable, [n]ear [t]erm***" citing a "***[m]ajor story change***" and ***"[l]ow management sentiment after resetting expectations, shifting the business strategy, poor execution, and overpaying for Trilogy***."

47.     All told, the trading price of 2U's stock fell from a high of more than $98 per share to just $12.80 per share following the announcement of 2U's second quarter 2019 financial results and adjusted outlook for 2019.  In total, 2U's stock declined a total of ***over 87 percent*** from its highpoint during the Class Period.

**B.      The Exchange Act Parties**

**1.      The Exchange Act Plaintiffs**

48.     Lead Plaintiff Pirani was appointed to serve as Lead Plaintiff in this action by Order of this Court dated June 1, 2020.  ECF No. 86.  As set forth in his Certification previously

filed with the Court on October 7, 2019 (ECF No. 43-3), Lead Plaintiff purchased 2U common stock at artificially inflated prices during the Class Period.

49.     Additional Named Plaintiff OKCERS was created under the authority granted by Chapter 11 of the Oklahoma State Statutes on January 21, 1958, to provide pension and survivor benefits to all full-time civilian employees of The City of Oklahoma City.  OKCERS purchased 2U securities during the Class Period at artificially inflated prices.

### 2.     The Exchange Act Defendants

50.     Defendant 2U is incorporated under the laws of Delaware with its principal executive offices located in Lanham, Maryland.  2U's common stock trades on the NASDAQ exchange under the symbol "TWOU."

51.     Defendant Christopher J. Paucek ("Paucek") is co-founder of 2U and served as the Company's Chief Executive Officer throughout the Class Period.  He also sits on the Company's Board of Directors. During the Class Period, Defendant Paucek sold approximately 270,000 shares at prices ranging from $72.02 per share to $85.03 per share to realize proceeds of $22,835,947, an increase in gains over previous period sales of more than 50%.

52.     Defendant Catherine A. Graham ("Graham") served as the Company's Chief Financial Officer during the Class Period.  2U announced Defendant Graham's retirement from 2U on August 22, 2019, a few weeks after the close of the Class Period.

53.     Defendant Harsha Mokkarala ("Mokkarala") served as 2U's Chief Marketing Officer from January 2016 to April 2018, and as 2U's Chief Revenue Officer since April 2018.

54.     Defendants Paucek, Graham, and Mokkarala are sometimes referred to herein as the "Executive Defendants."  Defendant 2U and the Executive Defendants are referred to herein, collectively, as "the Exchange Act Defendants."

C.      **Exchange Act Allegations**

1.      **2U's Graduate Division Was the Company's Purported Growth Engine**

55.     2U is an education technology company that partners with universities to provide online degree programs.  At the start of the Class Period, 2U had two reportable business segments, the Graduate Program Segment (the "Graduate Division") and the Short Course Segment, launched by 2U in mid-2017, via the acquisition of GetSmarter.

56.     During the Class Period, the Graduate Division generated the lion's share of 2U's revenue and was more profitable than the Short Course Segment, accounting for 84.6% of revenue and 95% of profit in 2018 and 80% of revenue in the first six months of 2019.  In the first six months of 2019, the Company generated a loss of $18 million, 60% of which was generated by the Short Course Segment—by then renamed as the "Alternative Credential Segment."

57.     The primary business of the Graduate Division is to provide university customers with the infrastructure to run online degree programs and to solicit students to apply to the degree programs.  According to the Company, 2U partners with top-tier universities to provide online programs that result in degrees that are indistinguishable from the degree awarded to an on-campus student.  Consequently, students enrolled in 2U courses pay the same tuition that they would pay on campus.  While 2U assumes responsibility for targeting potential students and guiding them through the application process, the universities maintain full control of the admissions, and apply the same admissions standards as they would for on-campus students.

58.     To be profitable, the Graduate Division business model requires that partnerships with universities be long-lasting.  Starting a program requires substantial investment on the part of 2U, on average $5 to $10 million per program, and university customers commit to initial

17

terms of 10 to 15 years.  Universities then pay 2U a percentage of the tuition and fees students pay to obtain the degree.

59.     Despite the Exchange Act Defendants' claims that 2U's "model delivers great outcomes for more students," this revenue-sharing model gave 2U a perverse financial incentive to make its programs larger and more costly.  As The Century Foundation described in a September 12, 2019 article titled "Dear Colleges: Take Control of Your Online Courses," such companies are "wolves in sheep's clothing," interested only in reaping profits at the expense of students and schools.  And though the Exchange Act Defendants did not disclose particular contracts during the Class Period, they informed investors that they target a share of **60%** of the money students paid.  In fact, this avaricious business model ultimately drove one of 2U's largest and most important programs—the USC Master of Social Work—into the ground, with The Century Foundation noting that "the program's reputation, as well as that of the USC School of Social Work, are sullied."

60.     The Exchange Act Defendants told investors that the Company had very specific criteria for launching a new graduate degree program.  In a June 7, 2018 investor conference, Defendant Paucek described the ideal program, saying that, "2U is definitively not trying to run every program the university has.  We're trying to build programs that can scale to 300 to 500 students annual, sort of steady-state new enrollments per year at an average tuition of about USD 75,000.  That's the way the U.S. business works.  And each one of those represents what we call a DGP, a Domestic Graduate Program.  And that represents financially $16 million in revenue when it hits steady-state and mid-30s adjusted EBITDA margins when they hit steady-state."  In an August 8, 2018 investor conference, Defendant Graham explained that a program with those

attributes would get to the mid-30s adjusted EBITDA margin "about halfway through the first term of the contract, roughly."

61.     Once a graduate program has been established, 2U has primary responsibility for recruiting students, and continues to solicit potential students throughout the life of the program. Costs related to these efforts, which 2U refers to as "student acquisition" are the Company's most significant costs in each fiscal period.  The Form 10-K for the year ended December 31, 2017 ("2017 10-K") reported that total marketing and sales costs for 2017 were $150.9 million, out of total costs of $316.9 million, and in a year with total revenue of $286.75 million. According to the 2017 10-K, marketing and sales costs included "the cost of online advertising and student generation, as well as cash and non-cash compensation and benefit costs (including stock-based compensation) for our graduate program and short course marketing, search engine optimization, marketing analytics and admissions application counseling personnel."

62.     Also in the 2017 10-K, the Company represented that for currently enrolled students, the average time between first contact and enrollment was approximately seven months, and that "[t]he number of students who enroll in our graduate programs and short courses in any given period is significantly dependent on the amount we have spent on these student acquisition activities in prior periods."  2U collects revenue for each enrolled student over the course of that student's enrollment in the program, which the Company estimated at the start of the Class Period would be two years, on average.

63.     There is therefore a significant lag between the time when the Company incurs the cost of acquiring a student, and when 2U receives the revenue that student generates. Therefore, Company filings claim that contemporaneous comparisons of revenue to costs within a period are not meaningful.  To address this, the Company monitored the cost of student

acquisition by comparing the total revenue generated by a student, which the Exchange Act Defendants referred to as Lifetime Revenue ("LTR"), to the total cost of acquiring a student, called Total Cost of Acquisition ("TCA").  To generate the ratio, the Company divided LTR by TCA; a higher ratio represented higher average profit per student.  During the Class Period, the Exchange Act Defendants told investors that the Company targeted a ratio of between 3 and 3.2 to 1, meaning that each student generated 3.2 times more revenue than 2U invested in soliciting that student.

64.     The Exchange Act Defendants monitored the number of students currently generating revenue (*i.e.*, paying tuition and fees) using a metric called Full Course Equivalents, or FCE, which 2U defined as "the number of students enrolled in all of the courses offered during a particular period, multiplied by the percentage of each course completed during that period."  The Company presented this number to investors in the aggregate, along with the amount of revenue the Company was generating for every FCE.

### 2.     The Aggressive Growth of the Graduate Division in 2018 Strained the Company's Business Model

65.     Founded as a startup in 2008, 2U became a public company in 2014.  Like many startups, 2U was not profitable.  Throughout the Class Period, the Exchange Act Defendants pitched 2U to investors as a growth story, telling shareholders that the Company would spend more money than it made for a period of time to invest in growth.  The Exchange Act Defendants told investors that the demand for 2U's product from universities was enormous and growing, that the Company had the capacity and expertise to scale quickly, and that its model would continue to work as the Company rapidly added additional graduate programs, with a goal of growing from revenues of under $300 million in 2017 to an eventual goal of $4 billion in steady state revenue.  All investors need to do was sit tight as the Company deferred reaching

profitability in favor of investing in ever increasing growth.  Investors believed in 2U's growth story, and its share price reflected investor belief that the Company was sustainably managing growth.

66.     The Exchange Act Defendants presented investors with a disarmingly straightforward growth story: The Company would increase revenues by 30% or more every year by adding more degree and certificate programs with new and existing university customers.  2U would then recruit students to enroll in these programs and each additional student would increase 2U's revenue as 2U collected its share of the tuition and fees those students paid to the university partners.

67.     The Company's plan to increase revenues focused on dramatically increasing the size of its domestic graduate business.  At the start of the Class Period, Defendant Paucek projected growth to $3 billion in steady state annual revenue.  Then, when the Company faced skepticism of its model in the second half of 2018, Defendant Paucek raised that number to $4 billion, saying in an August 14, 2018 investor conference, "[j]ust in graduate education, there's something like 3 million enrollments and there's something on the order of 1 million graduates. We think our current framework at our current economics with our current cadence and you get out to the 250 total [Domestic Graduate Programs] that we think we can do, that puts 2U's top line at close to 4 billion for the core business alone, but more importantly, when you start talking about share, something between 80,000 or 85,000 students."

68.     Defendant Paucek's plan to get to $4 billion in revenue required the Company to aggressively add new domestic graduate programs to its portfolio.  In 2017, the Company launched 10 new graduate degree programs, bringing the Company's total number of active

programs to 37.  At the beginning of 2018, the Exchange Act Defendants projected 14 new graduate programs for the year.

69.     This represented an enormous expansion of the Company's operations, not just in up-front investment of $5 to $10 million, but also in the Company's vaunted "high-touch" student recruitment efforts.  As discussed below, each new program would need prospective students to be guided through the Company's marketing funnel, from clicking on an online advertisement to being walked through the application process by one of 2U's admissions counselors.  And because established programs still needed a constant supply of new enrollments as students graduated, the Company's marketing needs grew just as quickly as its program offerings.

70.     Throughout the Class Period, the Exchange Act Defendants claimed that the Company's student recruitment program would not need to grow at the same rate as its program offerings.  Instead, the Exchange Act Defendants told investors that the Company would capture efficiencies as it grew and that, in fact, the Executive Defendants were already seeing those efficiencies.  The efficiencies would be captured all along the funnel.  At the front end, the Exchange Act Defendants claimed that as the Company grew and collected more data from prospective students, it could target its advertising more efficiently and that it could negotiate better rates as a bulk buyer.  Then, once students were in the funnel, the Exchange Act Defendants told investors that 2U's multi-program vertical strategy, where the Company had multiple programs in the same degree field, lead to a higher percentage of students in the funnel ending up in a 2U program.  By converting a higher percentage of prospective students in the funnel to students in a 2U program, the Exchange Act Defendants claimed they were creating an additional layer of efficiency.

71.     As discussed below, the problem was that, by the Class Period start, it was clear that these assumptions were wrong, and 2U's student recruitment infrastructure couldn't keep pace with the additional programs on top of the 37 existing programs.  It was also clear that the market for online education was becoming increasingly crowded and the model that 2U developed in the early days of online learning no longer worked.

72.     Despite these clear facts and trends, the Exchange Act Defendants assured investors throughout the Class Period that 2U was growing efficiently and sustainably and that it faced no real competition.  Indeed, the Exchange Act Defendants continuously increased the projected pace of growth, and the Company's projected revenues, throughout the Class Period.

### 3.     The Exchange Act Defendants Claimed 2U's Student Acquisition Program Could Keep Up With the Growth Plan

73.     The Exchange Act Defendants and investors understood that adding new programs alone would not sustain revenue growth—2U had to find students to attend the programs.  In the Graduate Division, 2U received substantially all of its revenue as a percentage of what its university customers collected in fees from students enrolled in 2U-affiliated programs, and 2U was contractually committed to finding prospective students and guiding them through the application process.  The more students 2U could attract to its programs, the more revenue 2U would generate.  Throughout the Class Period, the Exchange Act Defendants touted 2U's expertise at finding prospective students, and its continued success at doing so efficiently and at scale to meet the needs of its growing number of programs.

74.     Defendant Mokkarala succinctly stated the importance of student acquisition during a presentation at the June 5, 2018 Robert W. Baird & Co. Global Consumer, Technology & Services Conference, saying: "***Why do universities partner with us?  We help universities reach scale, reach large numbers of students.  For more than a decade, we've been working***

*with universities to find great students for them*."  During the same presentation, Defendant

Mokkarala provided an overview of 2U's marketing ability, claiming 2U uses "the best-in-class

in terms of digital marketing, data and analytics, machine learning, AI, *all these tools to find the*

*most qualified prospective students in a sustainable manner at scales that have never been*

*seen in higher ed before.*"

75.     Technology was only part of the equation.  2U also employed a large marketing

staff to reach out to prospective students and guide them through the application process.  In the

2016 Investor Day Presentation, the Exchange Act Defendants touted 2U's "high touch"

marketing: "Our admissions teams use a high touch outreach strategy informed by data driven

decision making.  More efficient outreach ultimately provides an even better student

experience."  2U referred to the process by which 2U reaches out to a student and guides them

through the application process as the marketing funnel.

76.     As discussed above, cutting edge technology and "high touch" marketing are

expensive, and 2U's single biggest cost during the Class Period was student acquisition.  For that

reason, 2U's ability to attract students efficiently bore directly on the profit margins the

Company could achieve in its graduate degree programs.  On February 28, 2018, Defendant

Graham touted the Company's ability to manage costs related to acquiring students at the

KeyBank Capital Markets Emerging Technology Summit, claiming "we manage to a ratio of

lifetime revenue of a student to the total cost to acquire, and we basically manage that to about a

3.2:1 is our target ratio."

77.     According to Defendant Graham, that ratio would achieve 2U's "long-term target

margins."  Defendant Graham was not shy about 2U's purported expertise, claiming "the people

who are key to our marketing department come from Capital One and other places like that and

are more data-driven, started off as actuaries and data analysts as opposed to more traditional

marketers.  But we forecast that, and we test it, and we tested and we've gotten very, very good

at that.  So, that is really – that's a definite key to the business and that's how we manage it."

78.     The Exchange Act Defendants assured investors that 2U controlled costs and

would continue to recruit students as the Company rapidly expanded.  Indeed, the Exchange Act

Defendants argued that adding additional programs would create efficiencies, allowing the

Company to *reduce* per-student marketing expenses as the Company grew.  For example, the

2017 10-K stated that, "[t]o support our anticipated growth, we expect to continue to hire new

employees (which will increase both our cash and non-cash compensation and benefit costs,

including stock-based compensation), increase our promotion and student acquisition efforts,

expand our technology infrastructure and increase our other support capabilities.  As a result, we

expect our costs to increase in absolute dollars, ***but to decrease as a percentage of revenue over***

***time as we achieve economies of scale through the expansion of our business***."

79.     The Exchange Act Defendants continued to claim that 2U's marketing efforts

were scaling well and that it was capturing marketing efficiencies throughout the Class Period.

For example, on the August 2, 2018 conference call accompanying the Company's release of its

second quarter 2018 financial results, Defendant Paucek claimed that "***2U has a track record of***

***scaling enrollments that's better than anyone in the space***."  Later, in response to an analyst

questions regarding marketing efficiency and scalability, Defendant Paucek responded: "***Our***

***marketing has gotten more efficient.  We don't have a marketing efficiency problem***."

Similarly, in response to a question about whether the cost to acquire students was rising, he

stated that, "***as we get greater scale, we are able to be more effective there, not less***."

80.     As the Exchange Act Defendants added more and more programs, many of the programs offered the same degrees, such as masters of business administration or masters of social work.  The Exchange Act Defendants claimed, however, that these programs did not compete with each other for students.  On the contrary, they referred to these as multi-program verticals, or "MPVs" for short, and told investors that they actually created marketing efficiencies by allowing 2U to offer more choices to prospective students entering the marketing funnel.

81.     At the August 8, 2018 Oppenheimer Technology, Internet & Communications Conference, Defendant Graham explained the logic behind this claim:

> If you think about it because higher education is, actually, intensely regionally biased, if you have 100 people who ask about a specific program, 1, 1.5 of them actually go to that program, what do the other 99% do?  Well, they -- some of them may go to a second or a third program if you have that to offer them. So there is marketing efficiency that comes out of that.

82.     On August 14, 2018, Defendant Paucek reiterated this point at an investor conference, but claimed the same theory could create efficiencies with the short course offerings:

> We spend a tremendous amount of capital, building a marketing funnel across our portfolio. We convert very small percentages. If we're converting 1% or 1.5% of a particular prospect volume, what are the other 98.5% doing? Typically, something less expensive, typically, something shorter, and we think that there's value there.

83.     On November 5, 2018, Defendant Paucek claimed that 2U's scale was already working, in response to a question from an analyst during the third quarter 2018 earnings call. Ryan MacDonald of Needham & Company asked, in the context of both 2U's rapid growth and the rapid growth of the online education in general, "when you think longer term, is the impact on terms of being able to provide partners with a broader pool of prospective students and then

converting them, just given the broader adoption of online across multiple universities?"

Defendant Paucek responded that:

> At this point, I feel like we are dealing with a scale that people in this business have not really seen yet, ***and we do think the opportunity is there for prospects coming into the funnel to be deployed across a bunch of different potential opportunities***. ***And you're starting to see some of the benefits of that scale in various places across the portfolio***. So we like our chances, be a more comprehensive solution to both the student and the university.

### 4.    The Exchange Act Defendants Concealed That 2U's Business Model Began to Break in 2018 and Broke by 2019

84.    Contrary to what the Exchange Act Defendants were representing to investors, the Company's student acquisition efforts were not scaling as expected to meet the growing need for students in the Company's expanding portfolio of programs.  First, the pool of potential students coming into the marketing funnel was not keeping pace with the degree programs being offered by 2U.  Second, 2U's programs were facing increasing competition for students as more and more universities launched online degree programs, many of which charged less than 2U's programs.  Third, the Company's multi-program vertical strategy was not leading to additional conversions from the marketing funnel as expected.  Instead, as 2U launched more programs, and the total pool of candidates did not grow at the same pace, the Company began to cannibalize its own market share, including from its most profitable programs.  Fourth, 2U was unable to generate marketing efficiencies as planned, and the overall cost of marketing increased much faster than anticipated.  Finally, rather than invest enough in growth, the Exchange Act Defendants imposed ever-more unrealistic quotas on 2U's admissions counselors, leading to high turnover and poor execution.

### (a)    The Exchange Act Defendants Saw Enrollment Forecasts Decline in 2017 and 2018

85.    Information provided by former employees demonstrates that the Executive Defendants were concerned about low enrollment at the start of the Class Period.  Disclosing these challenges, however, would undermine the Company's growth story.  If 2U could not efficiently scale its ability to acquire enough students for the degree programs it was offering, then the Company's pipeline of new programs and the size of the addressable market meant little.  The Company simply could not continue to grow at more than 30% a year, as promised to investors, by adding programs if it could not fill those programs with students, or if recruiting students became too expensive.

86.    The fact that the Executive Defendants were concerned about enrollment from the very beginning of the Class Period was made clear by information provided by FE-1.  FE-1 worked in the Office of the CEO until Spring of 2019.  In that role, FE-1 worked directly with Defendant Paucek.  A few months into 2018, she recalled concern about low enrollment becoming a topic and remaining one.[1] FE-1 first started hearing Defendant Paucek mention concern about enrollment not too far into 2018.  FE-1 recalled that Defendant Paucek was working closely with the Chief Marketing Officer, Defendant Mokkarala to figure out how to enroll more students.

87.    As Chief Marketing Officer until April 2018, Defendant Mokkarala was responsible for the student acquisition program, and would have been the natural point person to address problems with student acquisition.  In April 2018, he was promoted to Chief Revenue Officer.

_____

[1] All former employees are referred to herein by the pronoun "she" to further protect their identities.

88.     Information provided by FE-2 demonstrates that Defendant Mokkarala was concerned about enrollment during the Class Period.  FE-2 worked at 2U from 2017 until Spring of 2020.  She served as a manager and a senior manager until early 2019.  As a manager and a senior manager, FE-2 led a team that was responsible for detecting trends and forecasting 2U's growth based on seasonality and demand from quarterly reports of past numbers of enrollments and degrees received by students, lead generations and historical sales, and sales funnels (the number of students who completed applications, put down deposits, registered, etc.).  She worked with many different teams within 2U, including the marketing team, where she helped with demand generation and observed that 2U was not spending enough money to make sales in 2017 through 2019.

89.     FE-2 explained that 2U's forecasting was typically six-months in advance.  FE-2 recounted that once a forecast was complete, she would turn over a Google spreadsheet that she used to record her teams' data to her supervisor, who would provide them to Defendant Mokkarala, who reported those numbers to Defendant Paucek.  FE-2 explained that Defendant Mokkarala often wanted to see forecast numbers earlier than they were due, and that he was stressed about enrollment numbers throughout the period.  According to FE-2, prior to 2017, the Company had seen growth year after year, but enrollment projections began to slowly stall in 2017, and the problem worsened in 2018 and 2019.

90.     That the Executive Defendants were concerned about enrollment early in the Class Period was further confirmed by information provided by FE-3.  FE-3 was one of four organic social media strategists during her tenure at 2U.  FE-3 said that Defendant Paucek was a highly engaged executive and she interacted with him on several occasions.  FE-3 said she was sure the CEO received information about enrollment on an ongoing basis.  FE-3 recalled that

when she left the Company in July 2018 it was apparent the company was desperate for students to enroll in its programs.

91.     Despite concerns among senior management and in the C-Suite, the Exchange Act Defendants did not disclose these challenges and reset investor expectations.

### (b)     2U's Student Acquisition Program Could Not Keep Up With Enrollment Needs

92.     The Company's student acquisition efforts were simply unable to scale to meet the Company's growing enrollment needs.  As discussed above, the heart of the Company's student acquisition program was the "marketing funnel," the track a prospective student follows from first responding to an online advertisement, speaking with a 2U admission counselor, and eventually applying to a program and "converting" from a prospective student to an enrolled student.  2U's admissions counselors contacted prospective students from "lead lists" of students who had responded to online advertisements provided by the Company's marketing department, and were then expected to reach out to the leads to convert them to applications.

93.     According to former employees who worked on programs across the Company's portfolio, by 2018, the front-end of the funnel was no longer generating leads sufficient to meet the needs of 2U's programs.  Throughout 2018, 2U's admissions staff struggled to meet their quotas and by the end of 2018, it was clear that the Company was not going to be able to meet its enrollment projections for 2019.

### (i)     2U's Marketing Department Could Not Keep Up With the Company's Enrollment Needs in 2018

94.     Former employees in the marketing department confirmed that, beginning in 2018, the Company was no longer able to generate leads reliably using the methods it had used before, due to increased competition for students combined with a change in 2U's strategy, from

partnering with well-known universities to adding programs from lesser-known universities that were harder to market.

95.     That 2U was unable to achieve marketing efficiencies is evident from information provided by FE-4.  FE-4 worked as a Senior Digital Media Specialist from July 2018 through March 2019 and a Manager of Digital Media Strategy from March 2019 through July 2019 out of 2U's Denver, Colorado location.  According to her, the primary function of both jobs was to increase 2U's ad-spend efficiency and cut costs while trying to reach cost-per-lead and cost-per-good lead goals.

96.     FE-4 recounted that the growth 2U said they were experiencing was related to the Company's addition of new school programs enlarging 2U's portfolio of school offerings.  But, she explained, 2U was stretched thin by the new programs because the Company did not have the systems to support the addition of new programs and the marketing department was understaffed.

97.     FE-4 explained that her team could never get costs down because the price of ads continued to increase as the audience pool continued to lessen.  Furthermore, FE-4 stated that 2U would have the marketing team run the same ads over and over to the point that there was fatigue in the audience and the ads were inefficient.

98.     Another former employee in the marketing department, FE-5, confirmed that various changes to the advertising and competitive climate in the online graduate degree market made it impossible for 2U to hit the overly optimistic targets they had set for 2019.  FE-5 worked at 2U from 2014 until Spring of 2019, most recently in the role of senior brand marketing manager.  As a senior brand marketing manager for 2U, FE-5 led a cross-functional marketing team focused on driving enrollment for 2U's online graduate programs.  FE-5's team worked in

various channels, including conversion rate optimization, SEO, demand generation, inbound marketing, PR, and email.

99.     According to FE-5, competition was growing for years, and over 2018, they saw more and more programs.  FE-5 explained that universities got more competitive, hiring advertising agencies and spending their own money to market programs, which bid up media costs.  Meanwhile, she noted, the online education market continued to expand.  When 2U launched, according to FE-5, they were the only place to go for online degrees from top tier universities.  By 2019, she explained, students had more online program choices and a lot were cheaper than the 2U powered programs.  Homegrown programs developed and administered by universities were the biggest competition, FE-5 explained.  As the channels became popular and mature, FE-5 relayed, costs went up.  According to FE-5, all the other online graduate programs advertising drove up the cost of the relevant keywords.

100.     This information makes clear that, contrary to what 2U told investors, the growing competition in the online degree market was impacting 2U's business in 2018, as 2U faced competition for students and advertising space.

101.     FE-6 also noticed a change in 2018.  FE-6 worked at 2U from 2014 until the end of 2018, most recently in the position of senior brand marketing coordinator.  She said she loved working at 2U for most of her tenure and at the end of 2017 she thought she would work for the Company forever.  However, a change in corporate culture and philosophy in 2018 left FE-6 disillusioned with the Company and she quit at the end of 2018.

102.     FE-6 explained that the company model had completely changed in 2018.  Before then, 2U had always been focused on quality and on the caliber of the university, and had been focused on exploring expansion opportunities with their top-tier university partners, vetting the

interest level in various programs at schools within a select group of elite institutions.  Then, all

of a sudden, the Company began rapidly increasing the number of schools it partnered with, and

added universities that FE-6 had never heard of, and that she felt would not be competitive.

103.    In 2018, FE-6 said, 2U's cyber security, computer science, and computer

engineering programs were struggling to entice students.  When FE-6 left 2U at the end of 2018,

it was clear the Company was facing enrollment challenges in 2019.  She had low expectations

for the upcoming cohort and the following cohort.[2]

### (ii)    Converting Leads to Enrolled Students Became Increasingly Difficult Throughout 2018

104.    At the same time that 2U was seeing its marketing costs increase and a decreased

pool of interested students, more and more universities were launching online degree programs.

Indeed, many of these degree programs were being launched in partnership with 2U, a fact that

2U touted throughout the Class Period.  Contrary to the Exchange Act Defendants' claims during

the Class Period, the growing number of new programs, however, were competing for a limited

pool of students that were open to online learning and willing to pay full price for it.

105.    According to former employees that worked on numerous 2U programs, the lack

of marketing efficiencies and increased competition for students manifested both in insufficient

leads coming into the funnel and in students that do come in opting for competing programs mid-

funnel.

106.    Information provided by FE-7 demonstrates that problems with the marketing

funnel translated into enrollment problems.  FE-7 served as a director of sales at 2U, from April

2018 to October 2019.  In that role, FE-7 ran a sales team with two managers and 20 admissions

---

[2] 2U referred to each starting class of students as a "cohort" and most programs had multiple
cohorts starting each year.

counselors that solicited students to sign up for 2U's University of Dayton MBA program.  She

had previously worked as a senior admissions counselor the Syracuse MBA program.  According

to FE-7, 2U had oversaturated the market for MBAs and was competing with its own programs

at different universities.

107.    FE-7 said it did not come as a surprise when it was confirmed after the first cohort

started in 2019 that enrollment numbers were down.  FE-7 pulled reports daily, and knew exactly

what her team was facing and how far down they were.  FE-7 recalled being pretty vocal about

not having what her team needed to be successful.

108.    FE-7 and her team received leads generated by 2U's marketing team and they

were expected to convert as many of those leads as possible into students.  FE-7 explained that

the amount of leads coming in was inadequate because her team converted around two percent,

and just doing that math would show that they needed a lot more leads coming in for the

admissions counselors to convert.

109.    This was corroborated by FE-2, who explained that 2U was not spending enough

on marketing to make sales in 2017 and 2018.

110.    FE-7 said that with the trickle of leads coming through the door it was obvious

before 2019 that her team would not be able to meet 2019 enrollment goals.  FE-7 said 2U was

trying different marketing to address the issue, involving search engine optimization for certain

Google searches.

111.    FE-7 participated in meetings with Defendant Paucek every month or so, and met

more frequently with vice presidents from admissions who had meetings with Defendant Paucek

more frequently.

112.     Another significant challenge the admissions teams were facing was the failure of the Exchange Act Defendants' multi-program vertical strategy to translate to a higher conversion rate.  This failure falsified the claim by the Exchange Act Defendants—central to their growth story—that adding additional, competing programs to its portfolio would lower marketing costs.

113.     That the multi-program vertical model was broken is also evident from information provided by FE-8, who served as an executive admissions counselor for 2U from September 2018 to June 2019 for the American University and as an admissions counselor from March 2015 to August 2018 in the USC Social Work program.  FE-8 explained that the multi-program vertical strategy was built around the idea that if 2U built another university partnership around the same sort of program they had already developed for an existing-client university, they could save marketing money.

114.     In fact, FE-8 explained that 2U was effectively undermining its biggest programs with cheaper offerings in the same vertical.  According to FE-8, it became tougher for USC to enroll students in its MSW program when competing options with far more reasonable tuition rolled out.  FE-8 explained that the price difference became a point of contention for 2U employees who worked for the pricey programs.  FE-8 provided the example of the USC program being over $115,000, while other social work programs at 2U range from $70,000 to $90,000.  FE-8 said that the same issue existed in the MBA vertical.  Tuition for the MBA program at Syracuse University was in the $80,000 to $90,000 range while UNC Chapel Hill was $120,000.

115.     As a result, as noted by The Century Foundation in its September 12, 2019 article, the combined student debt for graduates of the USC's Master of Social Work program stands out

as within the top two nationwide student loan debts—and the largest for any graduate program, of any type, in the country—amounting to a combined total of $277, 547,010.

116.     The failure of the MPV to lead to a higher conversion rate was further corroborated by information provided by FE-9.  FE-9 served as a sales manager for 2U from August 2017 to March 2019 and as a senior sales representative for the Company from June 2014 to August 2017.  FE-9 explained that the program she worked on, USC's Master of Education in School Counseling, was extremely expensive, costing over $92,000, but students could apply somewhere else and pay half the amount of money for the same degree.  She further observed that the market was getting more and more saturated as 2U partnered with other universities offering similar school counseling programs, and found that many of the prospective students were shopping around looking for the cheapest programs.

117.     FE-9 joined 2U right after its IPO.  She stated that there was a lot of excitement earlier on when they began adding different programs, but then she discovered that the Company did not have an infrastructure in place to support them.  She also explained that 2U's program was a tough sell, and stated that because of that, the Company had a high turnover rate of admissions counselors, who were essentially sales representative.

118.     FE-10, an admissions counselor recruiting for Rice's MBA program from May 2018 to June 2019, confirmed that 2U programs were competing with other 2U programs at other schools all the time.  FE-10 didn't recall 2U addressing the challenges that its admissions staff faced due to the increasingly crowded verticals.  FE-10 recalled losing students to the 2U-powered online MBA programs at The University of North Carolina at Chapel Hill and Syracuse University.

119.    FE-11, an admissions counselor responsible for contacting students who had expressed interest in the Master of Legal Studies or Master of Dispute Resolution programs at Pepperdine University from March 2018 to November 2019, similarly expressed that the other 2U programs were the primary competitors that she dealt with in her role.  FE-11 said that 2U had been expanding and was continuing to expand very rapidly while she worked there.  According to FE-11, 2U started growing too quickly.  FE-11 recalled that from early in 2019 the admissions staff were falling short of hitting the established targets.

120.    Similarly, FE-12 grew frustrated with the level of competition her programs faced from 2U offerings within the same vertical but offered in partnership with different 2U partners.  FE-12 served as a senior admissions counselor for the Master of Science in Education program at the University of Dayton from March 2019 to November 2019, and as an admissions counselor for the Washington University legal studies program from January 2018 to February 2019.  FE-12 stated that she felt constant pressure to compete against her own company.  The 2U admissions teams "lead share" within verticals, explained FE-12, which meant that 2U gave the admissions staff for each program in a vertical access to one another's leads, a practice that was frustrating for the admissions staff and the prospective students.

### (iii)    The Admissions Counselors Were Unable to Keep Up With 2U's Growth

121.    According to multiple former employees in the admissions department, 2U did not provide adequate additional resources to the marketing funnel to match the Company's ever-increasing enrollment needs.  Instead, employees were expected to do more with less, and the Company steadily raised the enrollment quotas that employees were expected to reach throughout 2018.  According to these employees, these quotas were unreachable and not based on any prior metric.  These changes greatly impacted employee morale, and the Company

experienced unprecedented turnover in its admissions staff, making it still harder to reach the numbers that executives were demanding.

122.    That 2U imposed ever-increasing and unrealistic quotas during the Class Period is evident from information provided by FE-13.  FE-13 served as a placement specialist for the Simmons MSW program at 2U, Inc. from July 2018 to November 2019 and as an admissions counselor for the Harvard Business Analytics Program from October 2017 to July 2018. According to FE-13, at 2U, everything was tied to numbers.  She was expected to meet daily, weekly, and monthly goals that had been established for different parts of the placement process. Before she moved over to the placement specialist role, FE-13 was expected to recruit students for the Harvard Business Analytics Program.  The challenge of the position became quickly apparent as the enrollment numbers she was expected to hit grew substantially each cohort, becoming increasingly unrealistic.

123.    FE-13 said that when she started, her team was expected to get 10 students per cohort.  When the team achieved that, 2U wanted 20 students.  When they got 20, the Company wanted 40, and then went to 80, and then 100.  FE-13 said the drastic increases in expectations for the team occurred from one cohort to the next and they weren't given any additional resources to grow enrollment in line with expectations.  By summer 2018, her enrollment target numbers had become impossible to achieve, and she noted that if you didn't hit your numbers you were fired.  FE-13 explained that the Company was projecting numbers that didn't add up with the market and were not realistic expectations.

124.    Another former employee, FE-14, confirmed that the projections for enrollment did not accurately predict achievable enrollment levels.  FE-14 served as an executive admissions counselor for Rice's MBA program from February 2018 to September 2019.

125.    FE-14 explained that selling students on enrolling in the pricey online MBA program at Rice University was a high-touch endeavor and that the sales cycle was long and labor intensive.  She said that the time devoted to enrolling each new student was significant and the sales cycle typically stretched about six months from initial student contact through enrollment.  Though the flow of leads was steady, the expectations always seemed unrealistic given the particulars of the sales process.

126.    FE-14 said that for one cohort, 20 new students would have been a realistic goal for a five-person admissions team.  Even five students per person would be realistic.  But, FE-14 explained, enrolling seven or 10 students in a three-month period, as was sometimes asked of the admissions counselors, was not realistic given the resources available.  According to FE-14, these goal enrollment numbers were set by the 2U higher-ups and upper management such as Gabriel Bustamante ("Bustamante") and Defendant Paucek.

127.    Similarly, according to FE-10, an admissions counselor for the Rice MBA program, when that program debuted in July 2018, the sales quota numbers FE-10 and her peers were expected to hit were not realistic.

128.    FE-2 also explained that as early as February 2018, the Company's sales goals were unreachable.  According to FE-2, 2U expected larger growth than it had historically experienced while competition was increasing.  This was corroborated by FE-5, who noted that the Company always set the application targets much higher than the admissions teams felt was realistic.

> **(c)    Despite Internally Planning for Lower Enrollment, the Exchange Act Defendants Continued to Report Positive Results**

129.    As discussed above, it was clear internally throughout 2018 that 2U's student recruitment efforts were not scaling to meet the needs of the Company's growing portfolio of

programs.  By the end of 2018, that trend had become so pronounced that it was obvious internally that 2U was not going to meet its enrollment projections for 2019.  Indeed, the Company was internally planning for slower growth by January 2019.

130.    That the Company was internally preparing for slower growth is evident from information provided by FE-9.  In January 2019, management informed her that her team was going to be reduced and the surplus counselors reassigned to other enrollment teams in January 2019.  FE-9 understood from her supervisor, Evan Siegal, that the demand generation team had forecast too high earlier.  According to FE-9, other programs faced a similar problem.

131.    The above information provided by former employees with direct knowledge of the facts and circumstances at 2U during the Class Period demonstrates that it was clear to the Exchange Act Defendants that central claims of their growth story were false: 2U was not able to achieve the marketing efficiencies it claimed would allow it to scale its business model at any part of the funnel—at the front end of the funnel, the Company was not able to achieve planned efficiencies in lead generation and in the middle of the funnel, the multi-program vertical strategy was not leading to an increased conversion rate. Because 2U was unable to achieve these efficiencies, the Company did not have sufficient resources in its student recruitment efforts to drive the enrollment necessary to support its rapid growth.  Furthermore, the Company faced increasingly negative trends in its enrollment forecasts throughout the Class Period, rendering false and misleading the Exchange Act Defendants' claims that current internal results provided confidence in future forecasts.

        **(d)**　　**2U's Marketing Problems Impacted a Significant Amount of Revenue**

132.    The above former 2U employees provide allegations related to programs that contributed a material amount to 2U's revenue during the Class Period.  For example, multiple

former employees reported particularized problems recruiting students for USC and Simmons programs.  USC programs accounted for 27% of 2U's revenue in 2017, 21% in 2018, and 15% in 2019.  Simmons programs accounted for 17% of 2U's revenues in 2017, 13% in 2018, and 8% in 2019.  Those two schools alone contributed 44%, 34%, and 23% of revenue in 2017, 2018, and 2019, respectively.

133.    Furthermore, while the Exchange Act Defendants do not provide revenue numbers by program, the Exchange Act Defendants did provide a list of the top 20 programs by enrollment during the February 25, 2019 earnings call.  The above former employees reported particularized problems recruiting students for  USC Master of Social Work (#1), USC Rossier Online (#3), Simmons MSW (#6), University of Dayton MBA (#12), Harvard Business Analytics (#17), and the Washington University Legal Studies program (#19).

134.    Though problems in just the above programs would have been material to investors and should have been disclosed, it can also be inferred that the Company was encountering similar problems in other programs, both because of the structural problems underlying the enrollment issues and by the fact that the Exchange Act Defendants disclosed widespread problems at the end of the Class Period.

> **5.    The Exchange Act Defendants Touted 2U's Growth Despite Knowing It Was Unsustainable**

135.    Despite widespread knowledge within 2U that its business model was not scaling as claimed, the Exchange Act Defendants not only continued to tout the success of 2U's model, they repeatedly raised guidance and accelerated their growth plans by announcing additional partnerships throughout the Class Period.  As online learning grew more popular, and the Company faced competition from universities and other service providers, some observers began to question whether 2U could sustain its aggressive growth trajectory.  When faced with these

questions about competition, 2U's business model, or its ability to scale that model efficiently to recruit students for its growing portfolio of programs, the Exchange Act Defendants denied there were any problems at all.

136.    This pattern began in February 2018, and continued throughout the Class Period. On January 17, 2018, BMO Capital Markets ("BMO") published a mostly positive earnings preview report that praised 2U's "program launch 'cadence' of 58 new partner programs to be launched between 2018 and 2020.  This provides a framework for the company to generate its '30% or better revenue growth' targets for the foreseeable future.  We believe this reflects management's confidence in the company's pipeline and trajectory and do not believe this announcement has altered 2U's path to profitability."  BMO did note, however that, "[t]here are some concerns regarding whether the demand for these programs will (and has) outstripped the potential supply.  While we were unable to find data to support either position, we do envision some pricing pressure over time[.]"

137.    Shortly after BMO published its report, Defendants Paucek and Graham hosted a conference call to discuss the Company's full year and fourth quarter 2017 results.  During the call, Defendants Paucek and Graham highlighted that the Company's 2017 revenue results of $286.8 million represented growth of 39% over the prior year's results, with the Graduate Division growing 31% over the prior year.

138.    Defendant Paucek linked the growth to the Company's launch of new domestic graduate programs, saying "[w]hat's driving our progress?  Well, in the graduate program segment, which we now refer to as our 2U Grad division, we began the acceleration of our new DGP launch cadence.  Ten new programs launched in 2017.  We increased our 2018 slate from 13 to 14 new programs, and we've now announced 3 of the 16 new programs for 2019."

139.    Defendant Graham also argued that the results that 2U was currently achieving "***strongly validates***" the Company's business model, and made the Company "***very comfortable that increasing our investment in new programs to drive growth is a wise, strategic decision***."

140.    Also during the call, and in an accompanying press release, the Exchange Act Defendants raised guidance for 2018, telling investors that they expected revenues of between $397.7 million and $402.7 million for the full year, expected growth of 40.9% for the first quarter and 39.6% for the full year over 2017.  Defendant Graham noted that "we've raised our expectations for full year revenue significantly since the November preview and that the majority of this increase relates to the first quarter.  Greater visibility into first quarter start dates and first-time course enrollments in our short course segment, along with some smaller benefit from changes in exchange rate assumptions are the primary drivers of this increase."

141.    Analysts, including BMO, were thrilled.  BMO wrote "2U beat expectations once again, driven by better-than-expected margins."  Though BMO noted that "[e]nrollment growth did slow a bit," BMO accepted this, stating that "management previously attributed this to quarterly fluctuations."  Believing the Exchange Act Defendants, BMO raised its target price for the stock "to reflect updated guidance" and stated "TWOU remains our favorite growth story across our coverage universe, and we believe there is a tremendous amount of runway ahead."  That is, BMO believed 2U that there was no demand problem.  Similarly, Barrington Research ("Barrington") cited 2U's current and projected growth in a glowing report, writing, "[g]iven 2U's superior growth rate, revenue growth visibility/predictability and the size of its potential market, which is enhanced by the recent acquisition of GetSmarter and its entry into the international graduate program market, we are reiterating our OUTPERFORM investment rating

and raising our 12-month price target to $92 (from $80), which assumes a 8.7x multiple on our forward revenue estimate a year from now."

142.    On May 3, 2018, the Exchange Act Defendants released 2U's financial results for the first quarter 2018 and again raised 2018 guidance, this time based on the Company's short course offerings.  On the accompanying earnings call with analysts and investors, Defendant Paucek stated that, "[w]ith 3 quarters of short course operating history under our belt, we have enough confidence in the short course business to raise full year revenue guidance significantly by over $8 million.  This represents an increase in our expected revenue growth rate of almost 3 percentage points compared to our previous guidance."

143.    Defendant Paucek again touted the superiority of 2U's model, claiming that it faced little competition, stating:

> Other companies in this space might like to argue they can compete, but our business model is robust for our partners and in turn for 2U. ***No other companies in the space invest like 2U. No one builds the scale like 2U. No one has a comprehensive approach to quality like 2U.*** We do a ton of work for our schools that others in the space simply don't and often can't do.

144.    During the question and answer session, Defendant Paucek was asked about enrollment in new programs by George Tong of Goldman Sachs, who asked, "your earlier graduate degree programs have obviously seen significant growth and success with respect to enrollments and revenues per program.  Looking ahead, you have a very strong pipeline of new programs.  Can you discuss how average enrollments and revenues per program at your newer launches are performing?  And how they compare with your earlier launches?"

145.    Defendant Paucek replied that new programs were no different than previous programs, and what 2U had previously said regarding "what to expect at steady-state for our program, is still consistent.  The notion of $16 million at steady-state on average and mid-30s

44

margin we feel like is consistent."  Defendant Paucek further underlined that management was very comfortable with 2U's rate of growth, stating "[n]ow over time, as we add more and more programs, we feel like sort of perspective that people should move too gradually is just believing what we're telling you, just on our growth rates, and so on and so forth.  And a little bit less on a per program basis only because [we'll] have a lot of them over time.  But we feel pretty strongly. Right now, what we've told you is still good.  So we like what we see.  We're being very scientific about the ones we're going after.  And we feel like they are -- they're performing."

146.     Analysts were again pleased, raising their price targets to reflect the raise in guidance.  For example, an analyst at Barrington wrote, "[m]anagement said it expects full-year 2018 revenue in a range of $406.6-410.6 million (+41.8-43.2% YOY), above its prior guidance of $397.7-402.7 million; adjusted EBITDA in a range of $16.1-18.0 million (4.0-4.4% margin), above its prior guidance of $15.0-17.3 million; and an adjusted net loss per share in a range of $0.13-0.10, slightly above its prior guidance of $0.14-0.10.  The increase in guidance is attributable to higher-than-expected enrollments in new short courses, which has led to the company increasing its expectations for course offerings over the balance of the year."

### (a)     July 19, 2018 – A Short Report Questions 2U's Growth

147.     Then, on July 19, 2018, Spruce Point released a direct challenge to 2U's narrative in the form of a "short report" disclosing that it was betting against the Company's stock price, and arguing that 2U's stock was overpriced (the "Spruce Point Report").  In the report, Spruce Point argued that its proprietary research had uncovered that a significant number 2U's programs were underperforming the Company's steady state enrollment expectations, including "eight of the 14 programs launched between 2013 and 2015," and four of the top seven programs, which Spruce Point argued had reached peak or declining enrollments.  Spruce Point further argued that

2U was facing a host of factors that would hurt the Company's growth plans, including, among other problems, that:

  (a) declining tuition costs in rival programs will put pressure on tuition in 2U programs, undercutting 2U's assumption that it will reach steady state revenues of $16 million per programs;

  (b) competition for students was increasing, which would lead to pressure on 2U's margins as the Company would be forced to spend more to acquire students, which was an ongoing cost for 2U;

  (c) 2U had acquired GetSmarter in May 2017 to conceal slowing growth domestically; and

  (d) the Company's May 23, 2018 secondary stock offering, which disclosed the possibility of potential future acquisitions, raised additional concerns about the Company's organic growth prospects.

 148. Spruce Point further argued that four out of the top seven of 2U's top programs were declining, including (a) Simmons College Nursing; (b) Simmons College Social Work; (c) UNC's Master of Business Administration; and (d) USC Rossier Online / Education.

 149. Spruce Point also argued that to cover up these problems, 2U's executives had deliberately made 2U less transparent, writing that "a continuation of some of its historical disclosure practices about cohort performance would lead investors to our conclusions" and "would have alerted investors to the existence of at least eight underperforming programs."

 150. According to Spruce Point, 2U stopped disclosing a metric called "Platform Revenue Retention Rate" beginning with its Form 10-Q for the third quarter of 2017, which was filed on November 7, 2017.  The Exchange Act Defendants justified removing the metric, which

allowed investors to compare changes in revenue across its programs, by stating among other things, that the Company had never seen a program have a "material" decline in year-over-year revenues.  From that statement, Spruce Point inferred that 2U may have seen some declines.

151.    Several aspects of the Spruce Point Report have since been confirmed by Plaintiffs investigation.  As discussed above, in Section III.C.4, Plaintiffs' investigation has uncovered that the decision to exclude information regarding year-over-year change in graduate program revenues came at a time that Defendants Paucek and Mokkarala were concerned about enrollment seeing internal enrollment projections trending downward.  Further, as also discussed in Section III.C.4, former employees that worked on enrolling students confirmed problems recruiting students at programs highlighted by Spruce Point, including USC's MSW and Rossier programs, and Simmons.

152.    The Exchange Act Defendants, however, forcefully denied the allegations in Spruce Point's report and investors and analysts believed 2U, without being aware of the internal trends and facts that 2U employees were seeing at the time.

153.    Shortly after the report was published, on August 1, 2018, Macquarie Research ("Macquarie") issued a response to the Spruce Point Report based largely on the Exchange Act Defendants' previous representations, including an argument that Spruce Point failed to understand how 2U's MPV's would lead to marketing efficiencies.  The report stated that "we believe the company can achieve program marketing margin leverage both from the natural maturing of individual degree programs beyond initial costly investment periods and as the company adds more programs in each degree vertical (e.g. MBA programs, nursing programs, etc.), which lets the company share the pipeline of students it develops during marketing for a

vertical across partners offering similar degree programs, ***driving improved efficiency in the company's marketing cycle***."

### (b)  2U Forcefully Defends Its Business Model

154.     The next day, the Exchange Act Defendants responded forcefully to these criticisms without naming Spruce Point or the Spruce Point Report.  On August 2, 2018, in his opening remarks on the a conference call to discuss Q2 2018 earnings, Defendant Paucek provided a lengthy defense of the Company's model, and reaffirmed the Company's growth prospects.  He began his prepared remarks by stating, "***[d]on't let the skeptic win,*** that's one of our guiding principles and one that I love.  2U is creating a long-term sustainable engine of social mobility.  We're doing it with a shared success model.  When students win, the university wins, and that's how we win."

155.     Defendant Paucek continued on to emphasize the Company's results and growth, and once again, raised the Company's revenue projections, claiming, "[w]e had another outstanding quarter. . . . Revenue for Q2 was $97.4 million, a 50% improvement year-over-year. The outperformance on the top line was driven by the short course segment with $16.2 million in revenue.  ***This performance is leading us to raise full year revenue guidance this quarter by over $2 million***.  At the midpoint of the new range, we expect year-over-year revenue growth of 43%."

156.     He also emphasized that 2U was not only executing its growth plan, it was planning on launching programs at an even faster pace, saying, "***[t]his is the beginning of the reacceleration in the grad business we told you about***."

157.     Defendant Paucek cited "***enrollments and pipeline***" as reasons that the Company was "***confident in the reacceleration over the next few years.***"  On enrollments, he claimed "[m]ost of the [Domestic Grad Programs] launched in 2018 have had their first class starts, and

we're deep into the application cycle for all fall starts.  So we now have high visibility into how we believe the 2018 cohort will scale."  Defendant Paucek also emphasized that its programs were scaling as expected, on average, saying that "*we're still expecting enrollment growth in some of our oldest programs*" and that 2U's new programs were scaling even better than expected, saying "*the 2018 launch cohort might be the best in our history*."

158.    Defendant Paucek also claimed that, for programs that had reached steady state, the average revenue was *higher* than 2U's target of $16 million, stating:

> As we've said in the past, we target around $16 million of revenue on average across our portfolio for programs that have actually reached steady state. Today, when we look at the DGPs in our portfolio with at least 4 years of operating history, so most not at steady state, *the average revenue across those programs is higher than $16 million today*, slightly better than our long-term model. Let me reiterate that, higher than $16 million today.

159.    Defendant Paucek was also asked by Matthew Tarkan from Compass Point Research & Trading ("Compass Point"), "[a]re you noticing any changes in the cost to acquire a student?  I appreciate all the context around the marketing channel.  But just -- and on an underlying basis, are there any changes in that student acquisition cost?"

160.    In response, Defendant Paucek made sure to clarify, falsely, that the additional marketing spend was not driven by any problems with scale or marketing efficiency, stating, "Google click inflation is 1 example of something that we've dealt with our entire history as a company.  And as we get greater scale, we are able to be more effective there, not less.  Our relationship with the large companies that have channels, that we're working through has substantially improved over the last couple of years.  And as of late, actually, Google click inflation has gone a positive direction.  *But regardless, the MPV strategy is clearly what drives our marketing efficiency.  So today, we don't have a marketing efficiency issue*."

161.    Regarding Spruce Point's claims that competitors would impact the Company's
pipeline or take-rate, Defendant Paucek again dismissed competition, stating, "[t]hese other
models are not impacting our new program pipeline.  Quite the opposite.  We're taking over do-
it-yourself programs, and we're winning contracts from competitors.  ***Do-it-yourself programs
don't have the benefit of a world-class digital marketing shop or the leverage created by our
multiple program verticals.  When we take them over, they scale, often quickly***."

162.    On the same call, during the question and answer session, Defendant Paucek
again insisted that 2U viewed potential competitors as "fellow travelers, like you're talking about
improving preconceived notions of online education by having high-quality schools go online."
He then claimed that 2U was the "right model" and that "what has happened as of late is we are
starting to see contracts come to us either from schools that were running them themselves or
from competitors."  He continued to downplay potential competition, stating, "[s]o it's not just
about being big.  It's being good.  And we do both.  And to do that, you have to invest.  And we
invest heavily in this full system, that I just don't think anybody is close to comparable.  So net-
net, we feel really good about our competitive position."

163.    Finally, Defendant Paucek called the DGP the "organic growth engine" of the
Company and reiterated 2U's expectation to reach multi-billion dollar revenues, and highlighted
that the Company had recently set an even more ambitious target for its growth based on the
DGP:

> We recently updated our long-term DGP target to 250 programs.
> ***But the important part is what that 250 number represents,
> somewhere around 80,000 to 85,000 conferrals per year.*** To set
> the stage, there are thousands of college and universities in the
> United States, and the Department of Ed identifies over 1,700
> verticals. There's obviously a lot of program options. It's early
> days.

Now to be clear, we don't want to sign all programs. Signing a program is not the important thing. ***Scaling it at quality is. And 2U has a track record of scaling enrollments that's better than anyone in the space.***

164.    Analysts noted the Exchange Act Defendants' responses to the short report, and approved.   On August 2, 2018, BMO analysts wrote, "[w]ithout specifically addressing it, management countered many of the points in the recent 'short report.'   Though we doubt this will quiet the bears, ***management passionately defended its business model highlighting its portfolio approach*** and acknowledging there are lots of models serving this market (fee-for-service, revenue share), but believes in the advantages of its approach."

165.    On August 2, 2018, analysts from Credit Suisse noted that based on the Exchange Act Defendants representations, they believed 2U's growth model remained intact, writing, "[w]hile some may harp on the 2.2% decline in revenue per [Full Course Equivalent] we note some Street mismodelling off a tough y/y compare and some lower credit counts within courses that can impact any given quarter.   2H DGP revenue reacceleration will primarily be driven by FCE growth and management believes it has strong visibility into the Fall class enrollment based on admission trends."

166.    The Exchange Act Defendants continued to refute the Spruce Point Report throughout August.   In the analyst report dated August 12, 2018, Marcquarie Research wrote, "[w]e hosted CEO Chip Paucek and VP of IR Ed Goodwin in NYC."   Macquarie Research further reported that:

The [Company] was asked to refute recent short report arguments, which it did confidently, with discussions including: 1) the [Company] highlighted its strong DGP launch progress and pipeline, with 15 of 16 targeted 2019 DGP launches announced, providing significant time for the [Company] to build large student funnels, and as 14 are MPVs, the [Company] can see marketing efficiencies and quicker DGP ramp up, supporting growth; 2) ***2U's leading reputation among universities and its defensive array of***

*difficult-to-replicate services like its data driven marketing funnel*, ~200 marketing content creators, ex-Capital One data/ML team, and >37k clinical placement agencies under contract; 3) consistent partnership economics, with all new contracts signed in its 60%+ rev. share range, and the [Company] noting no declines in rev. share; 4) while concerns on underperforming DGPs exist, the [Company] stated >4 year old DGPs are operating with revs. on avg. at the high end of steady-state targets; 5) *while some raised fears over competition, the [Company] welcomes additional quality participants as they believe this aids acceptance of the online education marketplace*; 6) the Fordham MSW program's expected first cohort of ~450 students was highlighted as an example of the [Company]'s DGP selection algorithm and data-driven investment process. The [Company] noted that all of these students are NEW 2U acquired enrolments in response to questions about a prior online program, while also noting strong early starts at several other new DGPs; 7) growth runway with many untapped schools, verticals (e.g. pharmacist, dentistry, veterinary), countries (int'l very early days) and markets (e.g. undergrad, short courses, etc.) left to tap; and 8) enrolments are inflecting higher to drive the [Company]'s 32-34% targeted DGP rev. growth in FY'19." (emphasis added)

167. On August 14, 2018, Defendant Paucek appeared at the KeyBanc Capital Markets Technology Leadership Forum. Before his appearance, the Company announced that it was again increasing the number of new programs it would be launching in 2019, 2020, and 2021. At the conference, Defendant Paucek claimed that the new programs would "represent similar economics to what we've run to date," and that "[o]ur pipeline is stronger than it's ever been, and it's not close. It is the best we've ever seen it."

168. To further underline the Company's growth potential, Defendant Paucek again analogized 2U to Amazon's position when the internet behemoth first started adding additional product verticals in "tabs" on its website. Defendant Paucek said, "[s]o we have to continue to drive the story of growth. We feel like, right now, we're kind of in this Amazon adding the tab space, where we're throwing up the tabs of high-quality verticals where students have a great outcome."

169.    Following this appearance, Macquarie wrote on August 14, 2018 that 2U "now expects to expand its graduate degree portfolio by ~2.3x vs. the 48 programs it plans to finish launching by the end of 2018. ***We are encouraged by these raised launch targets*** as the [Company] executes on the most robust graduate program pipeline in its history and as it establishes a strong foundation for longterm FY'20+ growth as a category winner in the online education marketplace."

170.    Then, during an appearance at the BMO Capital Markets Back to School Conference on September 13, 2018, Defendant Paucek again responded to the Spruce Point Report, arguing that 2U was having no trouble maintaining its economics, stating:

> One of the parts of the most recent [short] report that was the most untrue is that we weren't -- we've not been able to maintain our economics and that somehow the world will come crashing down. ***Sorry, it's just not accurate.*** We've done a good job convincing our partners that we're creating newer schools, that we're creating value. Well, how do we do that? We're showing them the value that's been created from the older schools.

171.    Though analysts and investors were satisfied with the Exchange Act Defendants' rebuttal of the short report, as discussed above, the Exchange Act Defendants' rosy projections ignored internal information that made it clear that the Company was facing an increasingly competitive market for students and the Company's marketing was not able to scale to accommodate even the current rate of growth.

        (c)      **November 2018 – The Exchange Act Defendants Again Claim Accelerated Growth**

172.    On November 5, 2018, the Exchange Act Defendants released 2U's third quarter 2018 financial results and adjusted 2018 guidance, and projected that the Company would hit $1 billion in revenue in a little over three years.  In the press release Defendant Paucek was quoted stating that "***[s]trong year-over-year growth combined with [the Company's] stepped-up***

*program launch targets for 2019, 2020 and 2021, have put 2U on the path to $1.0 billion in*

*revenue, which [the Company] expect[ed] to hit in a little over three years*."

173.    On the accompanying earnings call with analysts and investors, Defendant Paucek

touted the Company's continued growth rate, and explained that confidence in the "overall

portfolio" made them "confident" in setting a timeline to reach $1 billion in revenue:

> Now looking ahead to 2019. We're expecting consolidated revenue
> growth of 33.2% at the midpoint of our range. We're pleased with
> the resiliency of our grad portfolio and the power of our short
> course business, resulting in the type of expected growth that puts
> us in rarefied air among software companies. ***Look, it isn't
> common that a company keeps growing north of 30% off of a
> base of over $400 million in revenue***. We said in the past that we
> expect to keep revenue growth above 30% for the "foreseeable
> future". We're now confident enough in the overall portfolio and
> the strength of the pipeline to put a timeline on it. ***We think we can
> keep consolidated revenue growth above 30% for at least the next
> 5 years. Based on these current growth expectations, 2U expects
> to hit $1 billion in revenue in a little over 3 years. That used to be
> a long-range goal. Now it's right in front of us. We can see it.***

174.    During the call, the Exchange Act Defendants informed investors that the USC

Social Work and UNC MBA programs, two of the more profitable programs, were making some

changes to enrollment criteria that would impact revenues in 2019.  Defendant Paucek told

investors that the Company was "taking a cautious approach towards our 2019 expectations.  As

such, we've taken down our enrollment forecast for [USC] for next year."  Defendant Paucek

assured investors that the Company had taken this negative news into account in its projections,

stating, "[w]hat's unusual is that 2 of our larger programs are being impacted negatively, but we

believe we've taken this into account, the challenges specific to USC and UNC, in our 2019

forecast."

175.    Defendant Paucek then pivoted to positive news, stating, "[o]n balance, our

portfolio is strong, diversified and resilient and not riding on any one customer.  We have 13

business programs, 5 Social Work programs and more coming on both. ***The fact that overall we're doing as well as we are, with consolidated growth expectations at 33% for 2019 and in the 30s for at least the next 5 years is notable given the challenges in those large customers***."

176.    Also during the call, Defendant Graham told investors that the Company expected its margins to narrow in 2019, as it needed to spend more on driving enrollment. Crucially, Defendant Graham framed the additional spend as investing in faster growth and capitalizing on future revenue opportunities, explaining:

> During the second half of 2017, we were marketing 22 new programs in addition to the 24 already operating. This was a big step up from the prior year where during the same relative time frame, we were marketing 8 new programs on top of the 18 we had in operation. In retrospect, and in an attempt to keep our commitment to advance adjusted EBITDA margins by low single-digit percentages annually, we did not deploy enough marketing spend to take advantage of all of the opportunities we had to acquire profitable enrollments, given the significant ramp up in new programs. In doing so, we generated an adjusted EBITDA margin increase of approximately 2.8 percentage points for '17 but cost ourselves revenue growth in 2018 and expected revenue growth for 2019.

177.    Defendant Graham told investors to be patient, stating:

> We continue to believe that demonstrating the earnings power of our business model is essential. However, in this period of rapid program launch expansion, we are going to ask you to assess this more through cohort profitability margins than through consolidated margin advancement. Until the balance of existing and new programs and marketing shifts further out on the maturity curve, we will weight our spend choices more heavily towards maximizing profitable individual program spend than optimizing short-term consolidated margins.

178.    Defendant Graham similarly assured investors that the additional marketing spend was a slight bump in an otherwise smooth road, explaining that "[a]t the midpoint to the full year revenue and adjusted EBITDA ranges we've provided, it implies that we will invest only slightly more than 6.5% of our expected 2019 year-over-year revenue increase in rightsizing our

marketing spend, making a significant technology transition, matching course production to our increasing launch cadence and driving continued growth in quality in years to come."  Defendant Graham also noted that "***these additional expenditures have no impact on our belief that our current business plan is fully funded***."

179.    Most analysts believed the Exchange Act Defendants that the additional spending would be efficient and would help to keep the Company on its growth trajectory, and were largely positive following the call.  For example, BMO wrote on November 6, 2018 that "[m]anagement stated the negative Y/Y margins are the results of new investments in marketing in order to acquire profitable enrollments and meet the demands of scale."

180.    Some analysts, however, were more circumspect.  For example, Oppenheimer wrote on November 6, 2018, that though they were "long-term" positive on 2U, they were lowering their price target from $91 to $70, "as 2U's reported results have become squishier."

181.    A few days later, on November 9, 2018, Defendant Paucek participated in the Baron Investment Conference.  During the question and answer session, referring to the reduced margins, an analyst asked him, "what Wall Street missed this week after you came out with your announcement?"  In response, Defendant Paucek stated that there should have been nothing unexpected in the announcement:

> I would tell you that we, in some ways, doubled down on the long-term growth story this week. We simultaneously guided to revenue growth at 33% and a 5-year, 30-plus-percent guide, but we also brought down margin for next year in the current period for 2019 to invest more in growth for our programs where there were profitable students. So this week, there are some on The Street that didn't like that.

182.    Defendant Paucek also highlighted that the reduced margins were because of investment in growth, and underlined that 2U is "inherently [] a long-term story.  From a Wall

Street education standpoint, I could tell you, that we do believe the cohort margins, fully

allocated on a GAAP basis, tell the story of the inherent profitability that's in the system."

183.    On November 28, 2019, Defendant Paucek appeared at the Credit Suisse

Technology, Media & Technology Conference, where he again defended the Company's growth

plan, and told investors to be patient, stating:

> ***We feel like the portfolio is super strong and growing rapidly***,
> and as CEO, I have to be focused on the long term. We're
> obviously excited to have investors with us on the journey, and
> we're looking for those that are thinking long-term about what's
> happening in this space. We're the market leader in a rapidly
> evolving, but a very big market, that ***we think over time can turn
> 2U into one of the largest education companies on the planet***.
> You have to have a bit of a long-term perspective when you look at
> our model.

184.    In the same appearance, Defendant Paucek again clarified that the projected

margin decrease was about investing in growth, and that the Company was achieving marketing

efficiency, stating, "[s]o what we didn't do, we did not conflate the USC problem with the

margin decrease.  And clearly, the world did, and they're not related at all.  The USC is a very

specific issue related to leadership change in a complicated moment at USC, having nothing to

do with 2U.  And margin, we brought down to invest more in programs that we thought we had

room to run.  Folks put those together and presumed that, that meant there's a marketing

efficiency issue, and ***I would tell you definitively, the story is not marketing efficiency***.  That

you shouldn't conflate those two."

185.    Defendant Paucek emphasized later in the conference that 2U's growth was

predictable and clear, claiming regarding the Company's long marketing cycle, "[t]he positive of

that, ***it is predictable, and it gives me really high confidence to say that in a little over 3 years,

we hit $1 billion in revenue***.  So we're focused on this path to $1 billion.  Not that many

companies that can get to that kind of scale and grow at that rate, and ultimately, the whole thing

is about delivering for the student.  82% to 84% retention every quarter since we've been public, even though we've launched a large number of programs."

186.     Finally, Defendant Paucek returned to free cash flow, arguing that if the Company was not expanding so rapidly, they would achieve profitability relatively quickly, stating, "[t]he reality is, our [launch] cadence increasing has a direct impact on what happens on free cash flow. Now if we stayed at our cadence in 2016, it would have been 1.5 years to 2 years till we got to free cash.  We've gone from 6 per year to a guide of 25 per year.  So you're talking about the kind of scale no one else has seen."

### (d)     February 2019 – The Exchange Act Defendants Double Down on Growth

187.     Following the lukewarm response to 2U's November 5, 2018 call, the Exchange Act Defendants again made sure to announce positive news in February 2019.  The Exchange Act Defendants did this even though it was by then crystal clear that the Company would not hit its enrollment projections for 2019, as discussed above.

188.     On February 25, 2019, the Exchange Act Defendants released the Company's fourth quarter and full year 2018 financial results and provided financial projections and guidance for fiscal 2019.  Specifically, the Exchange Act Defendants projected revenues of $121.5 to $122.1 million for the first quarter 2019, and $546.6 to $550.8 for the fully year 2019. The Exchange Act Defendants also increased guidance for margins, implying that they were more bullish on the state of the Company's marketing budget than they were just a few months prior.

189.     On the Company's conference call accompanying these results, Defendant Paucek opened by stating in unequivocal terms that the Company had a sound business model: "***I'm telling you our business is resilient, it's diversified, and it's growing***."  Defendant Paucek also

reaffirmed that "the [C]ompany is fully funded," and Defendant Graham explained that the

Company's revenue was on track to further grow, from $411.8 million in fiscal 2018 to $546.6 to

$550.8 million in fiscal 2019.

190.    On the call, Defendant Paucek also claimed that the Company's "***diversified grad***

***portfolio is strong***," that its "***[n]ewer programs are scaling well***," and that 2U's "***expanding***

***selection of programs continues to drive growth in the grad segment***."

191.    To highlight the Company's rapid and purportedly successful growth, Defendant

Paucek presented a list of the top 20 programs.  Prior to 2017, the Company had presented a list

of the top 10 programs, but in 2017, the Exchange Act Defendants increased the list to 15, and

then 20 in 2019.  According to Defendant Paucek, "[w]e believe the expanded list better

demonstrates the progress of our newer programs and the strength of the overall portfolio."

192.    Defendant Paucek then explained that, "[w]hile we don't give the exact

enrollment numbers, that's the partners' call, I can share that the entire top 20 is above 200 new

student enrollments and so are some of the programs outside of the top 20.  Notably, there's a

program from every single cohort in the top 20.  Mature programs continue to enroll new

students.  Newer programs are scaling well, and the 2018 cohort continues to be excellent.  In

fact, 7 programs on the list were launched in the past 2 years.  Let that land for a second, 7.  So

much for the theory that all of the new ones will be small and suboptimal."

193.    Defendant Paucek also stated that there was no need to be concerned about

oversaturation and competition in the online education sector, stating in pertinent part:

> This is my 5th year as a public company CEO. ***I can easily say last***
> ***quarter was the most complicated we had. It was a whirlwind.***
> ***But this whirlwind was not related to fundamental issues [with]***
> ***our business model or overstated fears of competitive pressures.***

194.    The Exchange Act Defendants similarly stated that investors need not be concerned with cash flows as the Company continued its growth plans.  For example, Defendant Graham pointed to "higher margin[s]" in more mature cohorts as a "significant part of our decision to expand marketing spend and take somewhat lower margins for 2019 to attract additional students and drive additional revenue."  She continued by stating that historical and observable data and industry trends had "validate[d]" the Company's recent decision to expand its growth strategy, stating in pertinent part:

> ***What we're seeing now across all our program*** cohorts strongly validates the typical program economic life cycle we've consistently discussed with you and ***makes us very comfortable that to drive growth, increasing our investments in both new program launches and current program marketing are wise strategic decisions.***
>
> * * *
>
> Our revenue and adjusted earnings measure expectations for the year are up, but more importantly, ***we remain confident in our ability to continue delivering 30%-plus top line growth***, get to $1 billion in revenue within 3 years and leverage a business model that we've proven can deliver profitability as programs mature***.***

195.    Analysts were pleased with the increase in guidance, and continued to believe that the Company's model was working well and would only improve with time, as the Exchange Act Defendants claimed.

196.    On February 25, 2019, Macquarie wrote, "2U reported a solid quarter and guide, and we anticipate shares will re-rate higher on the back of results and outlook as the [Company] was able to slightly beat and raise despite weakness at two large programs due to strength in the portfolio elsewhere. . . . Lastly, [management] was clear that they are working on issues at UNC and USC."

### 6.    Weaknesses in 2U's Business Model Begin to Appear

197.    Then, on May 7, 2019, 2U surprised the market when it reported disappointing first quarter 2019 financial results and lowered the Company's financial guidance.  Specifically, the Exchange Act Defendants revealed that the Company was likely to achieve $13 million less in revenues than previously represented.

198.    During the subsequent earnings call that same day ("1Q Earnings Call"), Defendant Graham disclosed that the reduction in guidance was because 2U was seeing "some decline in expected graduate program enrollments beginning in the second quarter and continuing through the rest of the year."  She reminded investors that "our graduate program business is a long-cycle accumulating revenue business and enrollment changes in any period impact revenue for multiple future periods."

199.    On this news, the price of 2U stock declined over the next day by $15.16 per share, or **over 25%**, to close at $44.77 per share on May 8, 2019 on unusually high trading volume of over 7.3 million shares.  Analysts directly attributed the decline in 2U's stock price to the Exchange Act Defendants' disclosures.  For example, on May 8, 2019, Barrington Research reported that "the stock sold off sharply in in the after-market trading" after "[m]anagement [] reduced its full-year 2019 revenue guidance."  On the same date, analyst BMO Capital Markets also "***admit[ed its] surprise***" and noted that the reset in the Company's expectations for 2019 graduate program growth "***will disappoint much of the investor base***."  Oppenheimer further observed that "[t]he DGP [Domestic Graduate Program] enrollment challenges feeds a bear case, and will pressure the name until confidence returns to the forecast via future results."

200.    Still, the Company's stock price remained artificially inflated even after these disclosures because, rather than admit that the Company's disappointing financial results and

lowered guidance were due to a fundamental problem with its business model, the Exchange Act

Defendants framed these disappointing results as the result of a confluence of one-time factors.

201.    Defendant Paucek attributed the enrollment to three factors:

> Number one, our partners are getting more selective, which
> impacts admit rate; number two, we're seeing some pressure mid-
> funnel on the rate at which prospective students are submitting
> their applications for review; and number three, we're seeing some
> slowness in the 2019 cohort, most importantly, one of our largest
> projected programs for the 2019 cohort had its launch date slip to
> later in the year for reasons beyond the control of the school and
> 2U.

202.    Of the three, Defendant Paucek indicated that tightened admission standards was

the most significant reason for the decline—in other words, something unpredictable and out of

the Exchange Act Defendants' control.

203.    And while Defendant Paucek also admitted that the Company had pushed the

growth story a little too aggressively, he cabined his admission to the effect of university

admission decisions, stating, "[i]t has become clear in the rearview mirror that we were

prioritizing growth a bit too much based on the feeling – on feeling the need to meet past

expectations.  ***I should have seen these admit challenges more broadly and simply taken some***

***air out of the balloon***.  It would have been better for my team and my clients.  I didn't do that.

Call it a lesson learned in the life of a public company CEO."

204.    Moreover, the Exchange Act Defendants continued to reassure the market that the

Company's overall business model was still performing as expected.  For example, in his

opening remarks during the 1Q Earnings Call, Defendant Paucek stated,

> I want to make one thing clear. ***We do not believe the challenges***
> ***we're seeing are attributable to weakness in our marketing***
> ***efficiency at the top of the funnel***. We've said that before and are
> reiterating it again today. Our data shows we're driving significant
> growth in the quantity of prospective students and started
> applications. We're doing so at an average cost that has remained

consistent with historicals. It's actually down in many spots. Across the portfolio, applicant quality remains steady.

205.     Moreover, he stated, "we continue to see programs across the portfolio scale toward our target ranges for new student enrollments.  *We still firmly believe in our runway of 250 DGPs.  Pipeline for those programs is strong*."  He later reiterated that "*we aren't seeing declines in front-end marketing efficiency*."

206.     And despite admitting that the Company had pushed the growth story a little too aggressively, Defendant Paucek also continued to insist that "*2U is still very much a growth story*.

207.     Analysts were reassured by the Exchange Act Defendants' statements, with Macquarie noting on May 8, 2019 that "despite these challenges, the [Company], *importantly*, noted that this *is NOT weakness in marketing efficiency at the top of the funnel*.  The [Company] is driving significant growth in the quantity of prospective students and started applications at an average cost that remains consistent with historical levels or is down in many spots."  Macquarie went on to report that "[w]e believe that 2U has multiple strong levers for expanding margins and cash flows as it matures existing programs and gains efficiencies in marketing by launching new programs into the same verticals as existing programs where established student pipelines exist."  BMO also further noted on the same date that "[d]espite this news, we believe TWOU's long-term growth trajectory and its eventual path to profitability remain in sight."  Credit Suisse agreed, observing that "*[m]anagement remains confident that marketing efficiency and the quality of candidates is not changing.*"

### 7. The Exchange Act Defendants Finally Admit That 2U's Growth Plans Were Failing And That It Needed To Reduce Revenue Expectations Going Forward

208.    Then, two months later, on July 30, 2019, after the close of trading, 2U shocked the investing public by revealing that the Company's growth plans were failing and needed to be abandoned as costs ballooned, and that the Company was significantly reducing its 2019 guidance.  In particular, 2U's projected net loss for 2019 had increased by over $70 million.  In addition, these projected losses for the year, which included certain costs related to the Trilogy acquisition, represented a 300 percent year-over-year increase.

209.    On the Company's conference call accompanying the release, Defendant Paucek disclosed that 2U was "moderating [its] outlook for the business in the short term" and, "[e]xcluding the expected financial impact of Trilogy, this implies *a step down in revenue expectations for the rest of the business*"—clearly in contrast to the Company's frequently touted growth trajectory.

210.    In his explanation for the poor outlook for the Graduate Division, Defendant Paucek admitted that the marketing funnel did not work as well anymore, saying "[c]ompetition for students has increased," and that 2U now expected "smaller average steady-state program[s]" and that "our guidance presumes lower conversion rates on a go-forward basis."

211.    In addition, Defendant Paucek revealed that, due to these problems, 2U's business model would need to undergo substantial adjustment to compete in an increasingly saturated online education market and that the Company's cash flow was inadequate for purposes of maintaining the Company's present strategies.  He described the Company's prior growth story as a "*mistake*" and stated that he needed to "*level set*" with the investment community.

212.    On this news, the price of 2U stock fell precipitously by $23.70 per share, or *65 percent*, to close at $12.80 per share on July 31, 2019, on unusually high trading volume of over

54 million shares.  All told, the trading price of 2U's stock fell from a high of more than $98 per

share to just $12.80 per share following the announcement of 2U's second quarter 2019 financial

results and adjusted outlook for 2019.  In total, 2U's stock declined a total of ***over 87%*** from its

highpoint during the Class Period.

213.    Analysts were shocked by this revelation, and directly connected the stock price

decline to the Exchange Act Defendants' announcements.  For example, in a July 31, 2019

report, analyst Oppenheimer noted that given the uncertainty over its business model, 2U's stock

is now "***uninvestable***."  Specifically, Oppenheimer based this opinion on three factors,

including: "1) ***Business model/enrollment concerns***.  We question whether there are enough

graduate students to fully scale 2U's DGP business (not demand for OPM) given more

competition, a healthy US macro, and an increasingly negative spotlight on 2U's take-rate;

2) ***Low management sentiment*** after resetting expectations, shifting the business strategy, poor

execution, and overpaying for Trilogy; and 3) High cash burn/unclear path to profitability."

Citing this "***[m]ajor story change***," Oppenheimer downgraded its investment rating, reporting

that "[w]e believe ***2U's business has been secularly challenged after giving high expectations***

***at its investor days that never really materialized*** and we do not expect meaningful change to

this near term."

214.    On the same date, Macquarie noted that this "***unexpected***" announcement "***is***

***clearly a breaking of the [Company]'s model and we expect shares to be under material near-***

***term pressure***."  BMO Capital Markets also downgraded 2U stock as a result of management's

disclosure that they would "'reset the velocity' for growth," which was likely to result in "a

massive sell-off."  Later, on August 12, 2019, William Blair reported that given that

"management has reduced expectations twice this year alone," the Company's outlook was "[d]ecelerating."

> **D.      False and Misleading Statements for the Exchange Act Claims**

215.    The Exchange Act Defendants made materially false and misleading statements to investors during the Class Period in violation of Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Among other things:

(a)      beginning in 2017, and continuing through the Class Period, the Exchange Act Defendants saw projected enrollment numbers declining across the board, and did not know how to fix them;

(b)      the Company's student acquisition model was unable to scale to match the enrollment needs of the Company's rapidly growing portfolio of programs;

(c)      the Company's multi-program vertical strategy was not leading to a higher conversion rate in the marketing funnel as promised, but was instead causing the Company to cannibalize enrollment from its most expensive, and most profitable, programs;

(d)      the Company would not be able to take advantage of promised economies of scale, as the cost of attracting and retaining students increased, rather than diminished, as the Company grew in size and complexity;

(e)      the Company's business model needed to undergo substantial adjustment to compete in an increasingly saturated online education market and the Company's purported growth trajectory was not fully funded;

(f)      contrary to the Company's statements regarding competition, the Company was facing intense competition in the market for students to attend programs;

(g)      the growth rate in revenue from enrollments was decelerating and had plateaued at the Company's largest programs; and

(h)     as a result of the foregoing, the growth plan that justified its stock price was fundamentally broken.

### 1.     February 26, 2018 – Fourth Quarter and Full Year 2017 Financial Results

216.     The Class Period begins on February 26, 2018, when 2U filed a press release on Form 8-K reporting fourth quarter and full-year 2017 ("FY 2017") financial results.  In the press release, the Company provided revenue guidance for the coming period, including anticipated full year revenue of between $397.7 and $402.7 million, 2017 full year revenue of $286.8 million, a growth rate of 39% from 2016, and anticipated first quarter 2018 revenue of between $91.1 and $91.6 million.

217.     Also on February 26, 2018, Defendants Graham and Paucek hosted a conference call to discuss 2U's FY 2017 financial results.

218.     In his opening remarks, Defendant Paucek touted the Company's accelerated growth, noting that the bulk of the growth was in the Graduate Division, and stating:

> ***What's driving our progress?*** Well, in the graduate program segment, which we now refer to as our 2U Grad division, we began ***the acceleration of our new DGP launch cadence***. Ten new programs launched in 2017. We increased our 2018 slate from 13 to 14 new programs, and we've now announced 3 of the 16 new programs for 2019.

219.     Defendant Paucek's statement that the "acceleration of our new DGP launch cadence" was "driving [2U's] progress" was materially false and misleading when made because it omitted that the Company was already encountering material problems scaling its marketing funnel to serve the additional programs, a fact that undermined the Exchange Act Defendants' growth story.

220.     On the call, Defendant Graham explained that the results 2U was seeing internally was consistent with the growth plan the Exchange Act Defendants had presented to investors, stating:

> This time period corresponds to our period of heaviest net negative cash investment in new program launch and scaling. And for 2017, these programs had a combined loss margin of 400%. And while this represents an increased loss for this cohort compared to the prior year period, *the increase is driven primarily by the continuing expansion of our annual launch calendars*. *What we're seeing now across all our program cohorts* strongly validates the typical program economic life cycle we've discussed with you and *makes us very comfortable that increasing our investment in new programs to drive growth is a wise, strategic decision*.

221.     The above statement that "what [2U was] seeing" validated the previously-discussed economic life cycle, and "makes us very comfortable" investing in growth, was materially false and misleading because the Company was in fact seeing that its marketing funnel could not scale to serve the additional programs, a fact that undermined the Exchange Act Defendants' growth story and the "typical program economic life cycle" that the Exchange Act Defendants claimed underpinned growth.

222.     During the question and answer session, Defendant Paucek discussed the Company's purported strength in attracting students, explaining:

> But at this point, the growth you're seeing in GetSmarter is being driven by effectively our, I think, very strong expertise in the direct-to-consumer world. At this point, the machine learning that we're applying in the marketing business on both sides is really strong. *And machine learning is machine learning, whether it's applied to our DGPs and IGP or short courses.*

223.     The above statements that "the machine learning that we're applying in the marketing business on both sides is really strong" and that 2U's "very strong expertise in the direct-to-consumer world" was driving the growth in GetSmarter were materially false and

misleading when made because it presented front end technology of the marketing funnel as working as expected, when in fact the Company was already finding that its marketing efforts were not yielding results, and the Company had been imposing unrealistic quotas on the marketing department to try and achieve expected numbers. Consequently, the statement that "machine learning is machine learning" was also materially false and misleading, it omitted that marketing efforts were not working as described in Section III.C.4.

224.    Defendant Paucek also touted the Company's program selection algorithm, explaining that, "***our program selection algorithm is being used really wisely by the team. We're grading every single opportunity and being surgical in our choices as to how to deploy capital***."  Consequently, Defendant Paucek claimed that "***in general, the portfolio is not only not surprising us, if anything, it's surprising us to the positive.  So we feel very strongly about it***."

225.    The above statements that the program selection algorithm is being used "wisely," that 2U was being "surgical in our choices as to how to deploy capital," and that "in general, the portfolio is not only not surprising us, if anything, it's surprising us to the positive" were materially false and misleading when made because it presented 2U as managing its growth well, and was able to predict with accuracy which programs would be successful, and omitted the fact that the Company did not have the infrastructure in place to support the addition of new programs and the Company's business model needed to undergo substantial adjustment to compete in an increasingly saturated online education market, as described in Section III.C.4, and it was only a matter of time before the Company could no longer grow at the promised 30% per year.

226.    The following day, the Company filed a Form 10-K for the year ended December 31, 2017 (the "2017 10-K") with the SEC, which contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Paucek and Graham, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

### 2.    February 28, 2018 KeyBank Capital Markets Emerging Technology Summit

227.    On February 28, 2018, Defendant Graham appeared at the KeyBank Capital Markets Emerging Technology Summit.  During her remarks, Defendant Graham touted the Company's "data driven" approach to student acquisition, saying that student acquisition costs were "one of the tricks [of the] business," and claiming that "*what will kill the business is if you don't get very, very good and very data-driven at projecting how many students you're going to get off of specific marketing channels*."  Defendant Graham further stated that 2U carefully managed its student acquisition costs, stating:

> We manage to a ratio of lifetime revenue of a student to the total cost to acquire, and we basically manage that to about a 3.2:1 is our target ratio. At various times, we may be aggregating to a little lower, a little higher depending on where our programs are in the cycles. *But we pretty much manage in that sort of 3.1, 3.2 because we know that that's what will allow us to get to our long-term target margins.* So, it is not in any way an accident that our -- the people who are key to our marketing department come from Capital One and other places like that and are more data-driven, started off as actuaries and data analysts as opposed to more traditional marketers. *But we forecast that, and we test it, and we tested and we've gotten very, very good at that. So, that is really – that's a definite key to the business and that's how we manage it.*

228.    Defendant Graham's statements that student acquisition was "one of the tricks in this business," that companies have to be "very, very good and very data-driven at projecting how many students you're going to get," that 2U manages "in that sort of 3.1, 3.2 [ratio]," and

that 2U "forecast[s] that, and we test it, and we tested and we've gotten very, very good at that"
were materially false and misleading when made because they conveyed the impression that 2U
was effectively managing its student acquisition costs, and would continue to do so in the range
of the "3.1, 3.2" ratio, when in fact the Exchange Act Defendants were concerned about
enrollment and the student acquisition model was not scaling as expected due to: (1) the
Company being unable to achieve predicted marketing cost efficiencies as it scaled; (2) the MPV
strategy resulting in the Company cannibalizing its own programs rather than converting a higher
number of students from the funnel; (3) the inability of the Company to scale its high touch
marketing efforts by simply imposing unrealistic quotas on admissions staff; and (4) the
Company's business model no longer working in the increasingly saturated market for online
education.

229.    Defendant Graham continued to discuss 2U's management of its student
acquisition costs during the presentation, and explained that one way the Company managed its
student acquisition costs was through the multi-program vertical, explaining:

> So, it's a combination of things, some of it is when you add
> second, third, and fourth programs in a degree vertical, *so a second
> MBA at another university and third MBA at another university,
> you actually get marketing efficiency off of that* because you can
> market the vertical, you can move your money around in the
> vertical to get the best possible results for all of the programs, and
> then just scale on the marketing budget.

230.    Defendant Graham's statement that adding additional programs to a degree
vertical creates "marketing efficiency" and that the Company achieved savings with "scale on
the marketing budget" were materially false and misleading when made because they reinforced
the narrative that 2U was able to scale its marketing budget to meet growth when in fact the
Exchange Act Defendants were concerned about enrollment and the student acquisition model
was not scaling as expected due to: (1) the Company being unable to achieve predicted

marketing cost efficiencies as it scaled; (2) the MPV strategy resulting in the Company

cannibalizing its own programs rather than converting a higher number of students from the

funnel; (3) the inability of the Company to scale its high touch marketing efforts by simply

imposing unrealistic quotas on admissions staff; and (4) the Company's business model no

longer working in the increasingly saturated market for online education.

231.     Defendant Graham also made statements regarding competition, noting that 2U

had competitors, but emphasized that none had the same model, which she explained gave 2U a

"moat" around the business:

> This type of business model is to invest a lot less money, do a lot
> more programs, and so it's more horizontal. ***They'll invest
> $750,000 instead of $7 million or $8 million or $10 million and
> they'll get 100 students instead of 500 students per year.*** So,
> there's a sort of different flavor to it. There are a couple of
> companies that are out there, HotChalk being, Everspring being
> another, that we particularly thought those two might look more
> like us particularly after HotChalk took a very large investment
> from Bertelsmann, but we haven't seen them move in that
> direction. ***And I would say the moat that we built around our
> business is multifaceted, the first is obviously the investment***. You
> have to have a lot of capital to get into this business if you're going
> to do it the way we're going to do it, investing that kind of money
> per program.

232.     The above statements regarding 2U's competition were materially false and

misleading when made because they intentionally gave investors the impression that the

increasingly saturated market for online degree programs did not impact 2U's growth plans

when, in fact, the Exchange Act Defendants were concerned about enrollment and the student

acquisition model was not scaling as expected due to, among other reasons: (1) the Company

being unable to achieve predicted marketing cost efficiencies as it scaled; (2) the MPV strategy

resulting in the Company cannibalizing its own programs rather than converting a higher number

of students from the funnel; (3) the inability of the Company to scale its high touch marketing

efforts by simply imposing unrealistic quotas on admissions staff; and (4) the Company's business model no longer working in the increasingly saturated market for online education.

### 3.    May 3, 2018 – First Quarter 2018 Financial Results

233.    On May 3, 2018, the Company filed a Form 10-Q for the quarter ended March 31, 2018 (the "1Q2018 10-Q") with the SEC, which contained signed certifications pursuant to the SOX by Defendants Paucek and Graham, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

234.    That same day, the Company also filed a press release on Form 8-K reporting first quarter 2018 financial results ("1Q 2018").

235.    In the press release, Defendant Paucek was quoted as saying "Our short course business has emerged as a powerful contributor to our growth story.  When combined with the expected growth of our Graduate Program Segment, revenue guidance is up about $8 million over our prior guidance.  In addition, the annual number of launched graduate programs has increased substantially over the past few years and shows no signs of slowing down. ***Our pipeline also continues to be strong, giving us confidence in our revenue expectations in that core segment in future years***."

236.    Defendant Paucek's statements regarding 2U's pipeline and the pace of launches in the Graduate Division were materially false and misleading when made because they reinforced the narrative that 2U could continue to grow rapidly, and that the Company's student marketing efforts could scale sufficiently to support 2U's growth, and omitted the fact that the Exchange Act Defendants were concerned about the marketing funnel and had continued to increase quotas for admission counselors in order to meet the numbers necessary to drive the Company's growth story.

237.    That same day, Defendants Graham and Paucek participated in a conference call with investors to discuss the 1Q 2018 financial results.

238.    During the question and answer session, Defendant Paucek fielded a question regarding whether 2U's customers were interested in "fee for service" rather than the all-inclusive package that 2U offers.  In response, Defendant Paucek stated:

> And so our pipeline is excellent for a reason. ***We are able to prove that our value is really strong, and it is getting stronger. The portfolio of tech and service that we provide our clients is better than it used to be***. And we just have a tremendous amount of data to share with them about all aspects of it. We are in the process of rebranding our stack as 2U OS for a reason. It's a really comprehensive approach to building quality. And the reason we gave some color on the surplus is, specifically, that whether you're revenue share or fee for service, there is no moral superiority to it. It is fundamentally, are you good? Are you delivering? And some of the newer folks are going to have to figure that out, and it's not easy, ***it took us a long time to get really, really good. And guess what, we're really good.***

239.    Defendant Paucek's statement that 2U's value "is really strong, and it is getting stronger" and that 2U's services are "really good" were materially false and misleading when made because they furthered the narrative that 2U's model was working, and omitted the then present fact that the Exchange Act Defendants were concerned about the marketing funnel, had imposed unrealistic quotas on admissions staff to meet numbers, and employees were modifying numbers to please executives.

240.    Also on the call, Henry Chien, an analyst from BMO Capital Markets Equity Research asked Defendant Paucek for more detail regarding the "marketing side."  Specifically, he asked, "since you're very good at the marketing process, just wondering if you could share a little bit more detail around that.  Are you able to get enrollments faster and get students faster? Are you able to scale that more efficiently, just any color you can provide there would be great?"

241.     In response, Defendant Paucek deflected the question and instead focused on other benefits of scale, stating:

> I think, overall, I guess, that's a pretty broad question. So I would say, *I would argue that sort of overall ecosystem that we operate now is at scale. And we're seeing real benefit from that*. The quality of the people that we're able to hire, the quality of the growth of those people, whether it be Michael Kurbjeweit or some of the folks that are sort of running the, [Brian Lane], the folks that are running the opportunity for the company are just doing a tremendous job. So we are certainly getting better.

242.     Defendant Paucek's statements that 2U operates "at scale" and was "seeing real benefit from that" were materially false and misleading when made because they reinforced the narrative that the Company was able to scale its marketing operations to support its growth in programs when in fact the Exchange Act Defendants were concerned about enrollment and the student acquisition model was not scaling as expected due to: (1) the Company being unable to achieve predicted marketing cost efficiencies as it scaled; (2) the MPV strategy resulting in the Company cannibalizing its own programs rather than converting a higher number of students from the funnel; (3) the inability of the Company to scale its high touch marketing efforts by simply imposing unrealistic quotas on admissions staff; and (4) the Company's business model no longer working in the increasingly saturated market for online education.

243.     Also on the call, in response to a question from an analyst regarding whether competitors are moving into 2U's space, Defendant Paucek again claimed that competition only validated 2U's model:

> So in general, I feel like the folks moving into our space, we've had people moving into our space for what is now over 10 years. So while -- I don't want to sound like I take competition that I think of them, that we think it's trivial. We're always looking at our service offering and our tech offering.

* * *

> *And in general, we think competition, overall in the space, is
> positive thing, not a negative thing,* because the biggest issue we
> still have is preconceived notions of online education. So as more
> high-quality brands -- and even sort of broad more mainstream
> brands come into the space like the Purdue and Kaplan
> relationship, *we see that as generally more of a positive than a
> negative*.

244.    The above statements that 2U has "had people moving into [its] space for what is
now over 10 years" and that "competition, overall in the space, is [a] positive thing, not a
negative thing" were materially false and misleading when made, because competition was in
fact, a threat to 2U's business model, as the increasingly saturated market for online education
materially impacted the Company's ability to scale its marketing program efficiently, as
discussed in Section III.C.4.

### 4.    June 5, 2018 – Robert W. Baird & Co. Global Consumer, Technology & Services Conference

245.    On June 5, 2018, Defendant Mokkarala gave a presentation at the Robert W.
Baird & Co. Global Consumer, Technology & Services Conference.  In his remarks, and in an
accompanying presentation, Defendant Mokkarala made multiple statements about the efficacy
and success of the Company's marketing efforts.  His role was described as: "Harsha is 2U's
Chief Revenue Officer, which includes marketing responsibilities.  He was previously Chief
Marketing Officer, which for those that don't know, a very important role at 2U in two regards.
One, Chief Marketing Officers help decide what programs they should target, so what business
they should greenfield; and two, digital marketing or marketing spend is the single largest
expense category for just running 2U.  But Harsha is mostly going to give a formal presentation,
kind of run through his role in the marketing function at 2U."

246.    During the conference, Defendant Mokkarala cited 2U's superior ability to market
to potential students, stating:

It's really a needle in a haystack. There is a small community of people who are interested in this and ***finding these people and making sure we are supporting them through the process of both becoming a student***, as well as graduating from these programs, ***is really what we bring to the table***. And data and analytics are a key guide to getting that right.

***And we are able to find these audiences at scale with bespoke campaigns and spend for each university program.*** Like I said, all of our marketing is directed at specific brands, specific universities. The fact that we're able to do this at scale across lots of verticals and lots of programs within each of those verticals -- we define a vertical as business is a vertical, law is a vertical, [indiscernible] subject area. The fact that ***we are able to do this across verticals and with lots of programs with no verticals*** helps us create a certain amount of leverage and a network effect that is super important.

247.    Defendant Mokkarala's statements that 2U is "able to find these audiences at scale with bespoke campaigns and spend for each university program" and that "we are able to do this across verticals and with lots of programs with no verticals" and that doing so creates "a certain amount of leverage and a network effect" were materially false and misleading when made because they omitted that Defendant Mokkarala was stressed about worsening enrollment projections throughout 2018, and the student acquisition model was not scaling as expected due to: (1) the Company being unable to achieve predicted marketing cost efficiencies as it scaled; (2) the MPV strategy resulting in the Company cannibalizing its own programs rather than converting a higher number of students from the funnel; (3) the inability of the Company to scale its high touch marketing efforts by simply imposing unrealistic quotas on admissions staff; and (4) the Company's business model no longer working in the increasingly saturated market for online education, as described in Section III.C.4.

248.    Defendant Mokkarala further stated:

***Another thing that we bring that is unique to the table is multi-program verticals.*** This is the notion of doing multiple programs within a given vertical. We power 12 different MBAs across the

country and now 1 in the United Kingdom with University College London. And each of these gives us an opportunity to build a custom higher education audience and leverage it in the sense that we gather a ton of data on sort of what this market looks like and the ability to apply that data that we gather across this network to the betterment of each of these individual programs. That means finding more students for each of these programs and improving the efficiency, which means you can do more of it. It's super, super critical. . . . ***So multi-program verticals are a great way for us to grow the pie overall both for individual program as well as for the network.***

249.    Defendant Mokkarala's statement that 2U's "multi-program verticals are a great way for us to grow the pie overall both for individual program as well as for the network" is materially false and misleading when made because the MPV strategy had resulted in newer, cheaper programs that were cannibalizing enrollments from older, more expensive programs and if he had been analyzing the data, Defendant Mokkarala knew this statement was false.

250.    Defendant also Mokkarala stated:

And, of course, it's our responsibility to continue growing these audiences. So through site acquisitions, through new media partnerships, through testing offline channels, we are constantly going to be finding these new channels and using our data and our frameworks to evaluate and continue to scale those. And, of course, we can also grow our audiences through product marketing, through improving our product. New degree offerings, concentrations program announcements. All of those are key ways in which we do this as well. And what does all this meant, what does all of this alignment and sort of growth meant, it[] meant significant growth for the business, right. CAGR of 39.4%, 5% over time and significant growth and scale to our university partners is what this [] meant.

251.    Defendant Mokkarala's statements regarding the "significant growth for the business" based on "[n]ew degree offerings, concentrations program announcements" were materially false and misleading at the time because they reinforced the Exchange Act Defendants' growth narrative, and gave the impression that the Company was smoothly scaling as anticipated, when, in fact, the Exchange Act Defendants were concerned about enrollment and

the student acquisition model was not scaling as expected due to: (1) the Company being unable to achieve predicted marketing cost efficiencies as it scaled; (2) the MPV strategy resulting in the Company cannibalizing its own programs rather than converting a higher number of students from the funnel; (3) the inability of the Company to scale its high touch marketing efforts by simply imposing unrealistic quotas on admissions staff; (4) beginning in 2017 and continuing throughout the Class Period, the Exchange Act Defendants saw 2U's projected enrollment numbers decline across the board; and (5) the Company's business model no longer working in the increasingly saturated market for online education.

### 5.    August 2, 2018 – Second Quarter 2018 Financial Results

252.    On August 2, 2018, the Company filed a Form 10-Q for the quarter ending June 30, 2018 ("2Q2018 10-Q") with the SEC, which contained signed certifications pursuant to the SOX by Defendants Paucek and Graham, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

253.    That same day, the Company also filed a press release regarding the results on Form 8-K, that disclosed that 2U was raising full year 2018 projections to between $409.7 and $412.2 million and provided third quarter 2018 revenue projections of between $106 and $107 million.

254.    Also on August 2, 2018, Defendants Paucek and Graham hosted a conference call to discuss the Company's 2Q 2018 financial results.  The call was the Exchange Act Defendants' first public appearance after a short report raised multiple questions about the Company's business model and growth plans.  On the call, the Exchange Act Defendants forcefully reaffirmed 2U's model and its execution and though they did not mention the short report, they addressed issues raised by the report.

255.    In his opening remarks, Defendant Paucek defended 2U's business model, and indirectly rejected the short thesis.  He opened the call by saying, "***Don't let the skeptic win***. That's one of our guiding principles and one that I love," before telling investors that 2U had an "outstanding" quarter, and explaining that 2U's performance "is leading us to raise full year revenue guidance this quarter by over $2 million.  At the midpoint of the new range, we expect year-over-year revenue growth of 43%."

256.    Defendant Paucek further announced that the Company was in the midst of a "reacceleration of the grad business," before stating:

> The swing is indeed happening. Cathy will give some additional details and walk you through the pattern in regards to revenue in a moment.
>
> ***Let's talk about why we're confident in the reacceleration over the next few years: enrollments and pipeline.*** First, enrollments. Most of the DGPs launched in 2018 have had their first class starts, and we're deep into the application cycle for all fall starts. So now we -- ***we now have high visibility into how we believe the 2018 cohort will scale.***
>
> * * *
>
> So what about the other 34 programs? We believe most of them are still years away from reaching steady-state enrollments. These things take time. The first program in a vertical typically takes 5 to 6 years to achieve our projected steady-state enrollments. Subsequent programs typically take 4 to 5 years. ***So we're still expecting enrollment growth in some of our oldest programs.***

257.    Defendant Paucek's statements that he was "confident in the reacceleration" because of "enrollments" that "we [] have high visibility into how we believe the 2018 cohort will scale" and "we're still expecting enrollment growth in some of our oldest programs" were materially false and misleading when made because at the time, as described in Section III.C.4, Defendant Paucek was concerned about low enrollments, tracked enrollments closely, and was aware: (1) that the Company's marketing and student acquisition infrastructure was unable to

80

keep pace with 2U's growth; (2) that the MPV strategy had resulted in cheaper programs cannibalizing enrollments from more expensive programs; and (3) that beginning in 2017 and continuing throughout the Class Period, the Exchange Act Defendants saw 2U's projected enrollment numbers decline across the board.

258.    Also during the conference call, Defendant Paucek reaffirmed the Company's growth plans, saying, "[t]he second reason we're confident in the reacceleration over the next few years is our pipeline," and stating:

> Our pipeline is simply stronger than it's ever been. The 2019 cohort is nearly slotted. The 16th program is coming very soon. And in August of 2018, our new partnerships team is now deep in the process of signing programs for 2020. ***Next year, we expect at least 14 of our new programs will be MPV. Now you'll remember, these programs ramp enrollments faster than programs in new verticals.*** So we believe that the 2019 cohort will be an important contributor to the acceleration of revenue growth in the years to come.

> \* \* \*

> Now to be clear, we don't want to sign all programs. Signing a program is not the important thing. Scaling it at quality is. ***And 2U has a track record of scaling enrollments that's better than anyone in the space.***

> In 2016, there were roughly 950,000 masters and doctorates degrees conferred by U.S. universities. ***Our target of 80,000 to 85,000 conferrals implies an 8.5 percentage market share for 2U at steady state, single digits, folks.*** That's without accounting for any growth in conferrals, and our programs are clearly making market.

259.    Defendant Paucek's statements that the Company had "room left to run," was "confident in the reacceleration over the next few years [due to] our pipeline," and had "updated our long-term DGP target to 250 programs" with "80,000 to 85,000" conferrals per year were materially false and misleading when made because they omitted that 2U could not scale its operations to service its current program offerings, and could not continue to grow to the size

necessary to service 250 programs and recruit 80,000 students.  Similarly, Defendant Paucek's

statements that "2U has a track record of scaling enrollments that's better than anyone in the

space," that 2U was "indeed scaling, and our partners are happy," and that steady state

enrollments represented a "single digit" share of total graduate enrollment were materially false

and misleading when made because they omitted that, as described in Section III.C.4, Defendant

Paucek was concerned about low enrollments, tracked enrollments closely, and was aware: (a)

that the Company's marketing and student acquisition infrastructure was unable to keep pace

with 2U's growth of new programs; (b) that the MPV strategy had resulted in cheaper programs

cannibalizing enrollments from older, more expensive programs; and (c) that beginning in 2017

and continuing throughout the Class Period, the Exchange Act Defendants saw 2U's projected

enrollment numbers decline across the board.

260.     During the question and answer session, Defendant Paucek denied that the

Company was experiencing any problems marketing to students, after an analyst asked whether

2U was seeing "any changes in the cost to acquire a student?"  Defendant Paucek replied:

> ***Yes. I mean, student acquisition is -- it's inherently embedded in
> our LTR-TCA ratio.*** And clearly, our current financial statement
> shows expenses related to future periods of revenue. So that's kind
> of an irrelevant discussion, not your discussion, Mike. But -- so
> we've actually -- ***I mean, Google click inflation is 1 example of
> something that we've dealt with our entire history as a company.
> And as we get greater scale, we are able to be more effective
> there, not less***. Our relationship with the large companies that have
> channels, that we're working through has substantially improved
> over the last couple of years. And as of late, actually, Google click
> inflation has gone a positive direction. ***But regardless, the MPV
> strategy is clearly what drives our marketing efficiency. So today,
> we don't have a marketing efficiency issue***.

261.     The above statements that "as we get greater scale, we are able to be more

effective," and that the "[Multiple Program Vertical] strategy is clearly what drives" marketing

efficiency," and that "today, we don't have a marketing efficiency issue" were materially false

and misleading when made because 2U had been finding that its marketing funnel was not

scaling to meet the needs of its growing portfolio, the Exchange Act Defendants were concerned

about enrollment, and the Company had imposed unrealistic and unsustainable expectations on

its marketing staff in order to support its growth story, counter to available evidence.

262.     Defendant Paucek touted the benefit of the 2U model versus the competitors,

highlighting the Company's digital marketing expertise:

> Our model delivers great outcomes for more students. Our model
> extends the mission and reach of the university. ***Our model makes
> it a more sustainable institution. Our model works.***
>
> ***The graduate segment is the organic growth engine powering
> 2U. FCE growth is beginning to reaccelerate. New student
> enrollments are strong across the portfolio.*** Pipeline is excellent.
> 2019 is nearly locked. And we're way ahead on 2020 pipeline
> progress. There's a lot of room to run, but most importantly, our
> partners are happy. They continue to extend existing contracts and
> add new programs. Our revenue share is simply not in question.
> Everything else on that is noise.

263.     Defendant Paucek's statements that 2U's "model works," that "the graduate

segment is the organic growth engine powering 2U" and that "new student enrollments are

strong across the portfolio" were materially false and misleading when made because at the time,

as described in Section III.C.4, Defendant Paucek was concerned about low enrollments, tracked

enrollments closely, and was aware: (1) that the Company's marketing and student acquisition

infrastructure was unable to keep pace with 2U's growth of new programs; (2) that the MPV

strategy had resulted in cheaper programs cannibalizing enrollments from more expensive

programs; and (3) that beginning in 2017 and continuing throughout the Class Period, the

Exchange Act Defendants saw 2U's projected enrollment numbers decline across the board.

### 6.   August 8, 2018 – Oppenheimer Technology, Internet & Communications Conference

264.    On August 8, 2018, Defendant Graham appeared at the Oppenheimer

Technology, Internet & Communications Conference.  During an exchange at that conference,

Defendant Graham connected 2U's eventual profitability to the Company's growth plan:

> So globally, higher education overall is a $1.9 trillion market and increasing in annual spend. ***Higher education in the U.S. is about $550 billion, and of that, graduate education is $80 billion. So we have -- it's a very large market that we are attacking.*** The reality is we don't want to do every single program within that and the reason being that we have -- we provide a lot of services, we have a not cheap model to run, and therefore, it really makes sense if a program can get to a certain size. If -- there are something like 1,700 different degrees that are granted by U.S. universities. We have said that we are targeting roughly 250 verticals -- or sorry, roughly 250 programs within, say, 90 verticals or something like this. ***So we don't need to like penetrate all 1,700 of those degree verticals in order for us to get to be a fairly large company.*** If you looked at that -- if you looked at the programs and they were all to get to an average steady state, now the reality is some will be larger and some will be smaller, but if they were all to get to, sort of, what we think that average is, that's approaching $4 billion in top line at steady-state just from those sorts of programs.

265.    Defendant Graham's statements regarding the size of the higher education market,

and the Company's ability to scale to 250 programs were materially false and misleading at the

time because they reinforced the Exchange Act Defendants' growth narrative, and gave the

impression that the Company was smoothly scaling as anticipated, when, in fact, the Exchange

Act Defendants were concerned about enrollment and the student acquisition model was not

scaling as expected due to: (1) the Company being unable to achieve predicted marketing cost

efficiencies as it scaled; (2) the MPV strategy resulting in the Company cannibalizing its own

programs rather than converting a higher number of students from the funnel; (3) the inability of

the Company to scale its high touch marketing efforts by simply imposing unrealistic quotas on

admissions staff; (4) beginning in 2017 and continuing throughout the Class Period, the

Exchange Act Defendants saw 2U's projected enrollment numbers decline across the board; and (5) the Company's business model no longer working in the increasingly saturated market for online education.

266.    In response to a question regarding the economics of 2U's business and how investors should think about long term profitability, Defendant Graham said that 2U was closely monitoring its student acquisition costs:

> One of the interesting things that we've been talking about most recently, and we mentioned this on our recent call, is that with our growth profile in new programs, ***we've been managing our overall portfolio pretty close to the percentage of the marketing cost per student on a portfolio basis that we would expect to see,*** which is somewhere in the 3 to 3.2:1 lifetime revenue of a student to the cost to acquire that student. Now we've been having discussions about whether or not that actually makes sense at this kind of growth rate, because in effect what we are doing is we are not capturing all of the profitable students on some of the older programs so that we can fund the newer programs.

267.    Defendant Graham's statements regarding the Company's management of its marketing costs were materially false and misleading when made because they omitted that the Exchange Act Defendants were concerned about enrollment and the student acquisition model was not scaling as expected or achieving projected efficiencies due to: (1) the Company being unable to achieve predicted marketing cost efficiencies as it scaled; (2) the MPV strategy resulting in the Company cannibalizing its own programs rather than converting a higher number of students from the funnel; (3) the inability of the Company to scale its high touch marketing efforts by simply imposing unrealistic quotas on admissions staff; and (4) the Company's business model no longer working in the increasingly saturated market for online education.

268.    Also during the conference, Defendant Graham was asked about a reduction in revenue per full course equivalent.  In response, Defendant Graham acknowledged that the

average revenue per full course equivalent declined about 2 percent year over year, but argued

that it was just normal variation, stating:

> Now the reality is, *we often see 1 to 2 percentage points tick around in -- from quarter-to-quarter*, because you have different mixes of number of days and classes and which programs and those program prices and the like. What we saw was that there were some admit rate changes, and changes is probably the wrong word, schools make the admissions decision. And what we see is they admit, it tends to be within a band and sometimes they're admitting at the top end of the band and sometimes it's at the bottom, but it can be a fairly wide range. *And usually, some are up and some are down, and it all, kind of, washes out in the middle.*

269.    Defendant Graham further argued that, though some of the more expensive

programs saw lower admissions, and the lower priced programs saw higher admissions, the

Company investigated and determined it was not systemic:

> *And what we saw this time, in the last couple of months . . . was that some of our more expensive programs, actually kind of all had admit rates that were at the lower end of their band at the same time.* Now the fact that the 2018 cohort was actually growing very, very well, those tended to be lower priced than these over here. So while we saw a little reduction in admit rate, the dollars that came out from there weren't made up for by the dollars that were coming in here. It's why what we said was we're still expecting for 30% year-over-year full course equivalent growth, but the revenue growth will be a little bit lower than that. *We've dug into it, we don't see anything systemic about it.* It is the, sort of, aberrations of occasionally, even in a portfolio which tends to wash out those effects periodically, you get some that come in on the top and some that come in a little bit lower. *And that's what we're, sort of, seeing wash its way through now. We have said that we do think it'll be relatively stable through the remainder of this year and early next.*

270.    Defendant Graham's claim that "we dug into" the lower admit rate and "don't see

anything systemic about it" was materially false and misleading because, as described in

Section III.C.4, the Company was facing systemic challenges in its student recruitment

infrastructure, increasing competition for students, and lower cost 2U programs cannibalizing the Company's higher-priced offerings as a result of the multi-program vertical strategy.

271.    Defendant Graham concluded her answer by emphasizing again that the Company was still achieving the marketing efficiencies necessary to support its growth, stating:

> Just to be clear, we're not seeing any change in our revenue share. **We're signing new programs in the same range as we've been signing before and we're not seeing changes in marketing efficiency.** So in other words, we're still able to acquire students at the same kinds of prices that we were able to acquire students previously. **So if we're not seeing pressure in marketing and efficiency and we're not seeing pressure in take rate, then the rest is mix**.

272.    Defendant Graham's statements that "we're still able to acquire students at the same kinds of prices that we were able to acquire students previously" and "if we're not seeing pressure in marketing and efficiency and we're not seeing pressure in take rate, then the rest is mix" were materially false and misleading when made because, as described in Section III.C.4, the Exchange Act Defendants were concerned about enrollment and the student acquisition model was not scaling as expected due to: (1) the Company being unable to achieve predicted marketing cost efficiencies as it scaled; (2) the MPV strategy resulting in the Company cannibalizing its own programs rather than converting a higher number of students from the funnel; (3) the inability of the Company to scale its high touch marketing efforts by simply imposing unrealistic quotas on admissions staff; and (4) the Company's business model no longer working in the increasingly saturated market for online education.

### 7.    August 14, 2018 – KeyBanc Capital Markets Technology Leadership Forum

273.    Following the Company's August 2, 2018 conference call, investors remained wary, and 2U's stock price remained down.  On August 14, 2018, however, Defendant Paucek appeared at the KeyBanc Capital Markets Technology Leadership Forum.  Before his

appearance, the Company announced that it was increasing the number of new programs it

would be launching in 2019, 2020, and 2021.  At the outset of the conference, Defendant Paucek

made the following comments about the launch:

> [W]e're going to have a 16th for next -- 17th for next year and then
> upping the cadence for the year after, from 19 programs to 21, and
> then, for the first time, giving an actual sort of target for 2021,
> which would be 25 DGPs.
>
> ***And important to note that we believe those all represent similar
> economics to what we've run to date.  So it's all a story of just an
> increasingly expanding pipeline.*** Our pipeline is stronger than it's
> ever been, and it's not close. It is the best we've ever seen. It's
> because I fundamentally believe it's a simple business. If the
> student wins, the university wins. If the university wins, we win.
> And we're winning. The schools are doing great, and most
> importantly, the students are having a really strong outcome.

274.    Defendant Paucek's statement that "those all represent similar economics to what

we've run to date" was materially false and misleading because changing market conditions

threatened the "economics" of the graduate programs and the Exchange Act Defendants were

concerned about low enrollment at the time as internal forecast continued to trend downward,

and 2U faced increasing competition for students.

275.    Also during the conference, Defendant Paucek was asked what the launch of new

programs meant for revenue targets in 2019 and 2020.  Defendant Paucek began his response by

stating:

> ***Well, I mean, what I would say is I think it's pretty rare that a
> public company CEO is sitting on stage and gets asked about
> something about 2021, right, that kind of visibility or that kind of
> runway. Fortunately, our business actually has the kind of
> predictability where we can talk about out-years***. At the time
> when we announced that, it was simply because we had also
> announced our first acquisition, which, at that time, no one loved,
> now everybody loves it. That's a different story.

88

276.     Defendant Paucek's statement that 2U's business "actually has the kind of

predictability where we can talk about out-years" was materially false and misleading because it

the Company could not actually present solid, realistic forecasts to investors. As described in

Section III.C.4, the Exchange Act Defendants were concerned about enrollment due to internal

forecasts trending downward, and the student acquisition model was not scaling as expected due

to: (1) the Company being unable to achieve predicted marketing cost efficiencies as it scaled;

(2) the MPV strategy resulting in the Company cannibalizing its own programs rather than

converting a higher number of students from the funnel; (3) the inability of the Company to scale

its high touch marketing efforts by simply imposing unrealistic quotas on admissions staff; and

(4) the Company's business model no longer working in the increasingly saturated market for

online education.

277.     Defendant Paucek continued to discuss the impact of the launches on future

revenues, stating:

> With our now most recent quarter and ***with our guide for next
> year, we feel very comfortable that we believe that the core
> business is super strong and continues to grow. So it's
> reasonable to expect that more than 30% revenue growth, we've
> already told you 32% and 34% for next year.***
>
> The reality is the core business has a huge amount of runway. It is
> in a momentum phase. It is getting more momentum. ***And one of
> the sort of false notions out there is that there is a marketing
> efficiency challenge. There is not. We're not having a marketing
> efficiency challenge.*** If anything, candidly, my regret, as a public
> company CEO, is over the last year, we had room to run in some of
> the older cohorts from a positive LTR-TCA standpoint. We had
> efficient marketing to deploy and ultimately chose the path of
> increasing margins on a fully allocated basis at the bottom line.
>
> * * *
>
> We feel like the proof is in the pudding. They're fully allocated.
> They come out every year, and they prove that the core model is
> generating results. ***And the reality is many of our older programs***

> *not only have room to run from a marketing efficiency standpoint, but we're continuing to build more and more offerings into those programs to drive growth.*

278.    Defendant Paucek's statements that "with our guide for next year . . . we believe that the core business is super strong" and that "it's reasonable to expect [] more than 30% revenue growth" were materially false and misleading because, as described in Section III.C.4, beginning in 2017 and continuing throughout the Class Period, the Exchange Act Defendants saw 2U's projected enrollment numbers decline across the board.  Defendant Paucek's further statements that "we're not having a marketing efficiency challenge" and that "older programs . . . have room to run from a marketing efficiency standpoint" were materially false and misleading because, as described in Section III.C.4, the Company's marketing and student acquisition infrastructure was not realizing expected marketing efficiency the Exchange Act Defendants claimed scale would bring.

### 8.    November 5, 2018 – Third Quarter 2018 Financial Results

279.    On November 5, 2018, the Company filed a Form 10-Q for the quarter ended September 30, 2018 (the "3Q2018 10-Q") with the SEC, which contained signed certifications pursuant to the SOX by Defendants Paucek and Graham, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

280.    That same day, the Company also filed a press release on Form 8-K reporting third quarter 2018 ("3Q 2018") financial results.

281.    In the press release, Defendant Paucek is quoted as saying:

> *Strong year- over- year growth combined with our stepped- up program launch targets for 2019, 2020 and 2021, have put 2U on the path to $1.0 billion in revenue, which we expect to hit in a little over three years*. Higher education is fully embracing the power of online, and 2U's size, scale and track record put us in the

pole position to seize new growth opportunities and further solidify
our market leadership globally.

282.    The press release also included updated revenue projections for full year 2018 of

between $411 and $411.9 million, and fourth quarter 2018 revenue projections of between

$114.4 and $115.3 million.

283.    That same day, Defendants Graham and Paucek hosted a conference call to

discuss the Company's 3Q 2018 financial results.  During the call, Defendant Paucek addressed

growth in his opening remarks, stating:

> We're expecting consolidated revenue growth of 33.2% at the
> midpoint of our range. We're pleased with the resiliency of our
> grad portfolio and the power of our short course business, resulting
> in the type of expected growth that puts us in rarefied air among
> software companies. ***Look, it isn't common that a company keeps
> growing north of 30% off of a base of over $400 million in
> revenue.*** We said in the past that we expect to keep revenue
> growth above 30% for the "foreseeable future". ***We're now
> confident enough in the overall portfolio and the strength of the
> pipeline*** to put a timeline on it. We think ***we can keep consolidated
> revenue growth above 30% for at least the next 5 years***. Based on
> these current growth expectations, ***2U expects to hit $1 billion in
> revenue in a little over 3 years***. That used to be a long-range goal.
> Now it's right in front of us. We can see it. You'll hear more about
> the path to $1 billion in the coming quarters.

284.    Defendant Paucek's statements in the press release and on the conference call

regarding the Company's projected results and "path to $1 billion" were materially false and

misleading because, as described in Section III.C.4, the path to $1 billion faced numerous

undisclosed risks. The Exchange Act Defendants were concerned about enrollment due to

internal forecasts trending downward, and the student acquisition model was not scaling as

expected due to: (1) the Company being unable to achieve predicted marketing cost efficiencies

as it scaled; (2) the MPV strategy resulting in the Company cannibalizing its own programs

rather than converting a higher number of students from the funnel; (3) the inability of the

Company to scale its high touch marketing efforts by simply imposing unrealistic quotas on admissions staff; and (4) the Company's business model no longer working in the increasingly saturated market for online education.

285.    Also during the call, Defendant Paucek discussed the Company's plan to increase marketing spending in 2019, and framed it as driving future increased profitability, rather than as something the Company needed to maintain current growth, stating:

> So let's talk about our overall marketing spend levels. It's clear to me today that we weren't investing enough across the entire grad portfolio as we rapidly accelerated new program launches.
>
> The portfolio nearly doubled from second half '16 to second half '17. ***It's now obvious to us, in hindsight of course, that this should have driven a larger step up in marketing spend than we actually had. On a portfolio basis, this would have resulted in little to no margin expansion from 2016 to 2017***. Instead, grad segment profitability increased by 2.6 percentage points over that time period. So while the portfolio is strong, we had plenty of opportunities to see additional enrollment growth, which would have driven some additional revenue growth in the grad segment in both 2018 and 2019.

286.    Defendant Paucek's statements regarding the Company's marketing spending was materially false and misleading when made because they framed the discussion in terms of a decision to invest in increased profitability in the future and omitted that the Company needed to increase marketing spending going forward not to increase profitability, but to maintain the baseline growth they had projected due to the Company's failure to achieve marketing efficiencies and the increasingly saturated market for online education.

287.    Defendant Graham also discussed the Company's plan to increase marketing spending in 2019, again framing it in terms of increased profitability in the future, stating:

> [I]n this period of rapid program launch expansion, we are going to ask you to assess this more through cohort profitability margins than through consolidated margin advancement. Until the balance of existing and new programs and marketing shifts further out on

the maturity curve, we will weight our spend choices more heavily towards maximizing profitable individual program spend than optimizing short-term consolidated margins. ***This is a meaningful factor in why we now expect a year-over-year decline in margins across our earnings measures for 2019.***

288.    Defendant Graham's statements regarding the Company's marketing spending were materially false and misleading when made because they framed the discussion in terms of a decision to invest in increased profitability in the future and omitted that the Company needed to increase marketing spending going forward not to increase profitability, but to maintain the baseline growth they had projected due to the Company's failure to achieve marketing efficiencies and the increasingly saturated market for online education.

### 9.    November 28, 2018 – Credit Suisse Technology, Media & Telecom Conference

289.    On November 28, 2018, Defendant Paucek appeared at the Credit Suisse Technology, Media & Telecom Conference.  During the conference, he answered a question regarding USC's tightened admissions standards and the Company's margin projections for 2019.  In his response he stated:

> ***So we had some leadership change, and the school decided to sort of become more selective.*** That is their prerogative, and ultimately, therefore, that program will decline slightly. ***And we've baked that into our numbers.***
>
> Now with that said, we still guided the overall revenue growth rate for the company in line at 33%, and still show our core grad business growing at what we think is an impressive rate given our scale. So you're talking about long term, we think we can keep the overall company at a 30-plus percent growth rate for 5 years. ***Pretty rare you see that when you pass -- we just passed 400 and what, 12 million (sic) [$412 million]. So you're talking about pretty heady growth.***

290.    Defendant Paucek's statement that USC's admissions decision was "baked [] into [2U's] numbers" and his statements regarding future projected growth were materially false and

misleading when made because they supported the Exchange Act Defendants' growth story but

omitted to disclose that beginning in 2017, and continuing throughout the Class Period, the

Exchange Act Defendants saw 2U's projected enrollment numbers decline across the board.

291.   Also during the conference, Defendant Paucek addressed negative reactions to

2U's disclosure of the USC admissions decision.  In his response, he highlighted that 2U was

"the market leader in a rapidly evolving, but a very big market, that we think over time can turn

2U into one of the largest education companies on the planet."  He then clarified that the USC

admissions change was a limited issue that did not impact the Company's business model,

emphasizing:

> So what we didn't do, we did not conflate the USC problem with
> the margin decrease. And clearly, the world did, and they're not
> related at all. The USC is a very specific issue related to leadership
> change in a complicated moment at USC, having nothing to do
> with 2U. And margin, we brought down to invest more in
> programs that we thought we had room to run. ***Folks put those
> together and presumed that, that meant there's a marketing
> efficiency issue, and I would tell you definitively, the story is not
> marketing efficiency.*** That you shouldn't conflate those two. We
> believe long-term, ***we've got great long-term efficiency built into
> the model*** and how can you see that? You can see that in our
> annual cohort margins. They're fully allocated, and they show you
> sort of maturity of programs and profitability based on maturity.
> And we did disclose that our greater than 4-years programs would
> be in the low 40s, so fully allocated. So we believe investors
> should value the profitability in the program through the lens of
> those cohort margins.

292.   Defendant Paucek's statements regarding the Company's increased investment in

marketing and his statement that "I would tell you definitively, the story is not marketing

efficiency" were materially false and misleading when made because the Company was

experiencing marketing efficiency problems, as discussed in Section III.C.4, and the Exchange

Act Defendants were concerned about enrollment and the student acquisition model was not

scaling as expected due to: (1) the Company being unable to achieve predicted marketing cost

efficiencies as it scaled; (2) the MPV strategy resulting in the Company cannibalizing its own programs rather than converting a higher number of students from the funnel; (3) the inability of the Company to scale its high touch marketing efforts by simply imposing unrealistic quotas on admissions staff; and (4) the Company's business model no longer working in the increasingly saturated market for online education.

293.    Also during the conference, Defendant Paucek underlined the Company's history of being transparent with investors and the predictability of the Company's model, which Defendant Paucek claimed allowed them to make revenue projections with a high degree of certainty:

> Well, look, I have a great Board and one of my Board members, Sallie Krawcheck said, these are your shareholders, if you know something, tell them. ***So we've been pretty transparent as a company.*** We've tried to provide detail, particularly when our model is not always fully understood by folks, like I still feel like folks don't understand that the current period marketing has very little impact on any current period revenue.
>
> ***[W]e still feel today that, that's a pretty underappreciated aspect of the model. It's a long play.***
>
> ***Now the positive of that -- the negative is, it's a bit steering a battleship. The positive of that, it is predictable, and it gives me really high confidence to say that in a little over 3 years, we hit $1 billion in revenue.*** So we're focused on this path to $1 billion. Not that many companies that can get to that kind of scale and grow at that rate, and ultimately, the whole thing is about delivering for the student. 82% to 84% retention every quarter since we've been public, even though we've launched a large number of programs.

294.    Defendant Paucek's statements that "we're been pretty transparent" and that the positive of 2U's long term model is that "it is predictable, and it gives me really high confidence to say that in a little over 3 years, we hit $1 billion in revenue" were materially false and misleading when made because, by claiming that he had been transparent and that 2U's model

was "predictable" and gave him a "high confidence," Defendant Paucek gave the impression that the Company was well-positioned to achieve its projected revenue growth in 2019 and beyond when, in fact, beginning in 2017 and continuing throughout the Class Period, the Exchange Act Defendants saw 2U's projected enrollment numbers decline across the board and it was clear by the end of 2018 that the Company was not going to hit its projected enrollment numbers in 2019 due to the reasons discussed in Section III.C.4.

295.    Also in his remarks, Defendant Paucek again touted how 2U's model was durable, scalable, and predictable, saying:

> Because with that long-term model, **_as long as I keep the cadence going, the increase in the number of programs I launch per year, you can model it per program at an average of $15 million or $16 million steady state and mid-30%s margins, and you can roll that out and you can see the power of the model_**. You can see yourself how long we can keep revenue growth really high. And the reality is, we don't get questions about pipeline anymore, but we should, because it's spectacular.

296.    Defendant Paucek's statement that 2U can "keep revenue growth really high" "as long as [it] keep[s] the cadence" of launches going was materially false and misleading when made because 2U could not achieve its projected revenue growth in 2019 and beyond. Beginning in 2017 and continuing throughout the Class Period, the Exchange Act Defendants saw 2U's projected enrollment numbers decline across the board and it was clear by the end of 2018 that the Company was not going to hit its projected enrollment numbers in 2019 due to the reasons discussed in Section III.C.4.

### 10.    February 25, 2019 – Fourth Quarter and Full Year 2018 Financial Results

297.    On February 25, 2019, the Company filed a press release on Form 8-K reporting fourth quarter and full-year 2018 ("FY 2018") financial results.  In press release, the Company provided revenue guidance for coming period, including anticipated full year revenue of between

$546.6 and $550.8 million, and anticipated first quarter 2018 ("1Q 2018") revenue of between

$121.5 and $122.1 million.

298.    Also on February 25, 2019, Defendants Graham and Paucek hosted a conference

call to discuss the Company's FY 2018 financial results.

299.    In his opening remarks, Defendant Paucek stated that, "I'm telling you, our

business is resilient, it's diversified, and it's growing.  Fourth quarter was rock solid.  On the top

line, revenue for the fourth quarter was $115.1 million, 33% growth over Q4 of 2017.  And for

2018, we finished with $411.8 million in revenue, 44% growth over last year.  Over 10 years in,

we grew this company 44%."

300.    Defendant Paucek continued to discuss the Company's new programs, stating:

> Notably, there's a program from every single cohort in the top 20.
> ***Mature programs continue to enroll new students. Newer
> programs are scaling well, and the 2018 cohort continues to be
> excellent.*** In fact, 7 programs on the list were launched in the past
> 2 years. Let that land for a second, 7. ***So much for the theory that
> all of the new ones will be small and suboptimal***.

301.    Defendant Paucek's statements regarding enrollment in 2U programs and the

quality of new programs were materially false and misleading when made because they gave the

impression that 2U was well-positioned to achieve its projected revenue growth in 2019 and

beyond when, in fact, by 2019, the Exchange Act Defendants saw 2U's projected enrollment

numbers decline across the board and it was clear by the end of 2018 that the Company was not

going to hit its projected enrollment numbers in 2019 due to the reasons discussed in

Section III.C.4.

302.    During her prepared remarks, Defendant Graham made the following statement

regarding economics of its graduate programs:

> ***What we're seeing now*** across all our program cohorts strongly
> validates the typical program economic life cycle we've

consistently discussed with you and makes us very comfortable that to drive growth, increasing our investments in both new program launches and current program marketing are wise strategic decisions.

303. Defendant Graham's above statements that "what we're seeing now across all our program cohorts strongly validates" 2U's existing business model, and made the Exchange Act Defendants "comfortable" investing in more growth were materially false and misleading when made because what the Exchange Act Defendants were "seeing" internally undermined 2U's growth story, as the Exchange Act Defendants had been concerned about downward trends in enrollments since 2017, and it was clear by the beginning of 2019 that 2U would not meet its projected enrollment targets for 2019, due to the trends and facts discussed in Section III.C.4.

304. During the question and answer portion of the call, Defendant Graham made the following comments about marketing spend and margins:

> **So kind of what we have said is that you shouldn't think of this as being a continual degradation of margins on a year-over-year and continuing basis. This is kind of getting us back onto the right glide path from where such a number of our programs should be.** And I can't tell you, at this point, whether 2020 will sort of flatten out in margin or step up a little. But over time, I would say that our intention is to return to the kind of patterns that we had been seeing, which is you will see slow and -- slow but perhaps steady increases in margin over time as we move towards steady state. **You should keep in mind that for us, margins are, in many ways, a matter of choice as to how much investment we're making in growth, and I just want you guys to remember that, that this is very much within our control based on how quickly we decide to grow and what opportunities there are in front of us.**

305. Defendant Graham's statements that "investors shouldn't think of this as being a continual degradation of the margins" and that investors should "keep in mind that for [2U], margins are, in many ways, a matter of choice" were materially false and misleading when made because the Company was already seeing the impact of the increased competition for students as the market for online graduate education became more saturated, including increased costs that

would force the Exchange Act Defendants to pay more for marketing and, therefore, 2U *was* facing continuing degradation of margins and margins were not a "choice."

306.    The following day, the Company filed a Form 10-K for the year ended December 31, 2018 (the "2018 10-K") with the SEC, which contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Paucek and Graham, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

**11.    May 7, 2019 – First Quarter 2019 Financial Results**

307.    On May 7, 2019 the Company filed a Form 10-Q for the quarter ended March 31, 2019 (the "1Q 2019 10-Q") with the SEC, which contained signed certifications pursuant to the SOX by Defendants Paucek and Graham, attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

308.    That same day, the Company filed a press release on Form 8-K reporting first quarter 2019 ("1Q 2019") financial results.  In the press release, the Company provided revenue guidance for the coming period, including a reduction in projected revenue for full year 2019.

309.    Also that day, Defendants Paucek and Graham hosted a conference call to discuss the financial results.

310.    In his prepared remarks, Defendant Paucek addressed the reduction in 2019 full year revenue projections, stating:

> As I take you through the specifics, you'll see there are still plenty of structural positives to report. Let's turn to 3 factors at play in our new 2019 expectations for the grad business. Number one, our partners are getting more selective, which impacts admit rate; number two, we're seeing some pressure mid-funnel on the rate at which prospective students are submitting their applications for review; and number three, we're seeing some slowness in the 2019

cohort, most importantly, one of our largest projected programs for the 2019 cohort had its launch date slip to later in the year for reasons beyond the control of the school and 2U.

Before I get into specifics on each of these, ***I want to make one thing clear. We do not believe the challenges we're seeing are attributable to weakness in our marketing efficiency*** at the top of the funnel. We've said that before and are reiterating it again today***. Our data shows we're driving significant growth in the quantity of prospective students and started applications***. We're doing so at an average cost that has remained consistent with historicals. It's actually down in many spots. Across the portfolio, applicant quality remains steady.

311.    Defendant Paucek's above statements regarding marketing efficiency, including that "we do not believe the challenges we're seeing are attributable to weakness in our marketing efficiency at the top of the funnel" and "applicant quality remains steady," were materially false and misleading when made because the student acquisition model was not scaling as expected due to: (1) the Company being unable to achieve predicted marketing cost efficiencies as it scaled; (2) the MPV strategy resulting in the Company cannibalizing its own programs rather than converting a higher number of students from the funnel; (3) the inability of the Company to scale its high touch marketing efforts by simply imposing unrealistic quotas on admissions staff; and (4) the Company's business model no longer working in the increasingly saturated market for online education.

312.    Defendant Paucek further highlighted one purported problem that 2U had been encountering in its marketing funnel, but said it was being addressed:

One example of an issue we're seeing, more people are moving through our funnel without speaking to a counselor. ***We're addressing these in a variety of ways, which involves lots of blocking and tackling, but I can assure you, we're all over it.***

313.    Defendant Paucek's statements that 2U was "addressing" issues with the middle of the funnel and that "I assure you, we're all over it" were materially false and misleading when

made because the Exchange Act Defendants had been imposing unrealistic quotas on the sales

staff throughout 2018, and it was clear at the beginning of 2019 that the Company would not hit

its 2019 enrollment projections.

314.   Defendant Paucek further stated:

> So what does this all mean for the grad segment moving forward? ***As I mentioned earlier, we aren't seeing declines in front-end marketing efficiency***. We're generating more prospects and application starts than ever and doing so at a quality level and average cost that has been consistent over time. ***And the rate of admitted students that choose to enroll or yield has remained steady year-over-year.*** However, increased selectivity does put some pressure on total average spend per student. Now despite that, on average, our programs are generally more profitable than we anticipated.

315.   Defendant Paucek's above statement that "we aren't seeing declines in front-end

marketing efficiency," was materially false and misleading when made because the student

acquisition model was not scaling as expected due to: (1) the Company being unable to achieve

predicted marketing cost efficiencies as it scaled; (2) the MPV strategy resulting in the Company

cannibalizing its own programs rather than converting a higher number of students from the

funnel; (3) the inability of the Company to scale its high touch marketing efforts by simply

imposing unrealistic quotas on admissions staff; and (4) the Company's business model no

longer working in the increasingly saturated market for online education.

316.   Also on the call, Defendant Paucek provided more positive details regarding

enrollment, stating:

> Looking at the top 15 programs by new student enrollments, the average in 2019 is actually projected to be 3% higher than the 2017 average. So we believe that the average will go up even with the decline in our largest programs. ***In fact, if you exclude the top 5 programs from the calculation, enrollments for 6 through 15 are projected to be up 32%.***

> *So we continue to see programs across the portfolio scale toward our target ranges for new student enrollments.* We still firmly believe in our runway of 250 DGPs. Pipeline for those programs *is strong.* We've got a bunch of announcements coming, but that's for another day.

317.     Defendant Paucek's statements regarding the Company's growth trajectory were materially false and misleading when made because internal information undermined 2U's business model and growth trajectory, as it was clear internally by the end of 2018 that the Company would not meet its expected enrollments in 2019, and that 2U's model was no longer effective due to the saturated market for online degree programs.

318.     During the question and answer section, Defendant Paucek attributed the decline in revenue projections primarily to admission decisions by the universities:

> Well, we're not going to -- we can't go through intimate details about each. We sort of put them -- *the selectivity question we spent more time on for a reason. It's pretty significant.* The cohort -- it's interesting. The UC Davis MBA has started superstrong sort of validating the fact that we obviously wanted it for a reason and expected originally to be in '18, and then it went through a pretty long approval process that we didn't expect. So that's a good chunk of students right there that just comes out of the forecasts. *And then the submit rates or the mid-funnel stuff is it's really quite a long list of individual program-related details and then a couple that go across the system. But we're not overstating on that one when we say it's really -- it's a lot of different things that are often program-specific.* So I would say there's a reason we focused more on selectivity. That's a big component of it. And that more than anything is what caused us to sort of call it and effectively reset this segment.

319.     Defendant Paucek's claim that university admit rates and program-specific issues were the cause of the disappointing results was materially false and misleading when made because, at the time, it was clear internally that the Company would not meet its expected enrollments for 2019 and that 2U's model was no longer effective due to the saturated market for online degree programs, due to the issues discussed in Section III.C.4.

320.     Also during the question and answer section, Corey Greendale of First Analysis

Securities Corporation asked, "are you still comfortable with a model that says that maturity

programs are doing the 300 to 500 per year[?]"

321.     In response Defendant Paucek stated:

> *Yes*, we thought that was a really interesting part of the analysis of
> the whole thing. It's clear that like on some level, some of the
> programs that got really big, probably in our best interest overall to
> hit our 300 to 500 and not drive every program to its maximum
> size. *And it's clear that the top ones have come down. Now at the
> same time, if you exclude the top 5, it's also clear that the next 10
> are really going great.* So you end up with this sort of clarity that
> the average, we like. *We feel very good about the 250 still*. We
> don't feel like we have any reason to not believe that that's well
> within our opportunity set. *We feel strong about the ranges*. But
> it's clear that the big ones did come down. So once again, felt like
> we should call it.

322.     Defendant Paucek's response that he was still "comfortable" with modeling

maturity at 300 to 500 students per year, and his statements that "[w]e feel very good about the

250 [steady state programs] still" and "feel strong about the ranges" was materially false and

misleading when made because internal information undermined 2U's narrative about its

business model and growth trajectory, the Exchange Act Defendants had been concerned about

worsening enrollment forecasts since 2017, it was clear at the time of the conference call that the

Company would not hit its enrollment projections, and the Company's student acquisition efforts

were no longer keeping pace with 2U's growth for the reasons described in Section III.C.4.

323.     Also during the question and answer portion of the call, Jeffrey Meuler of Robert

W. Baird & Co. ("Meuler") asked, "what gives you confidence that not only is the cost per lead

at the top of the funnel not eroding, but I'm more focused on the quality of the students coming

in to the top end of the funnel that they're as good of a quality of prospect as they've historically

been[?]"

324.    In response Defendant Paucek stated:

> ***So we hit those -- both those points pretty hard because we have really good data for both.*** And not only is prospect generation solid and high, it's at a cost that's totally within line and in a lot of places, lower.

325.    Defendant Paucek's response that 2U had "really good data" on student quality and cost per lead not eroding were materially false and misleading when made because, as described in Section III.C.4, the Company was not achieving marketing efficiencies at the top of the funnel.

326.    Meuler also noted "new enrollment trends are softening" and asked Defendant Paucek whether he expected "multiyear growth targets" to "reset lower." Defendant Paucek responded:

> Well, Jeff, we've kind of reset the number at 25%. And in part, we are dealing with the fact that, long ago, we gave long-term expectations on a segment basis because we were worried about a reaction to an acquisition. ***And the reality is, at this point, we do feel like we've reset them solidly.*** You can obviously see the cadence. And with that cadence, you can have your own estimates as to what you believe will happen. But at this point, giving outyear guidance on a segment basis, we believe, is not the right call. ***Now to be clear, we do feel like we did reset this in a way that we feel very solid about.***

327.    Following Defendant Paucek's answer, Meuler asked him to clarify whether the reset to 25% growth in 2019 applied to ongoing growth.  In response, Defendant Paucek affirmed that the reset did impact future years, stating:

> Yes. That is only a comment for 2019. It is not a recalibration for the future. ***And to be clear, our launch cadence is a factor in what we will think will happen in the outyears.***

328.    Defendant Paucek's response that "we do feel like we've reset them solidly" in reference to growth and that the reset did not apply to outyears was materially false and misleading when made because it was clear internally 2U's model no longer worked, and the

student acquisition model was not scaling as expected due to: (1) the Company being unable to achieve predicted marketing cost efficiencies as it scaled; (2) the MPV strategy resulting in the Company cannibalizing its own programs rather than converting a higher number of students from the funnel; (3) the inability of the Company to scale its high touch marketing efforts by simply imposing unrealistic quotas on admissions staff; and (4) the Company's business model no longer working in the increasingly saturated market for online education.

329.    Also during the question and answer section, Defendant Paucek had the following exchange with analyst Brian Schwartz of Oppenheimer & Co. asked if the business remained "a 30%-plus grower here for the foreseeable future."  In his response Defendant Paucek said it was, explaining:

> **Yes.** I mean we did give consolidated guidance of 30%. So we still feel like that's where we are. You obviously heard a lot of commentary, Brian, about consolidated because we are -- we think kind of, overnight, we became the market leader in Alternative Credential and we feel like people may just not understand what that is when we had them just labeled as short courses and do feel like we haven't really had much investor focus on that segment.
>
> * * *
>
> Now at the same time, grad segment growing at 25% this year, off of the base that it is, still higher growth than most people in our segment, most people in our space. So we do think it's right to sort of give this reset, **but we feel very bullish about the long-term prospects for the company on both sides, grad and Alternative Credential**.

330.    Defendant Paucek's response that "we feel very bullish about" the Graduate Division was materially false and misleading when made because it was internally clear 2U's model no longer worked, and the student acquisition model was not scaling as expected due to: (1) the Company being unable to achieve predicted marketing cost efficiencies as it scaled; (2) the MPV strategy resulting in the Company cannibalizing its own programs rather than

converting a higher number of students from the funnel; (3) the inability of the Company to scale its high touch marketing efforts by simply imposing unrealistic quotas on admissions staff; and (4) the Company's business model no longer working in the increasingly saturated market for online education.

### 12.     The Exchange Act Defendants' Misleading Risk Disclosures

331.    The 2017 10-K contained a section entitled "Risk Factors."  Among those provided, the Company included the following potential risk warning: "Our financial performance depends heavily on our ability to acquire qualified potential students for our offerings, and our ability to do so may be affected by circumstances beyond our control."  Under that heading, the Company elaborated:

> A substantial portion of our expenses is attributable to marketing and sales efforts dedicated to attracting potential students to our offerings. Because we generate revenue based on a portion of the tuition and fees that students pay, it is critical to our success that we identify qualified prospective students for our offerings in a cost-effective manner, and that enrolled students remain active in our offerings until graduation or completion.

332.    The Company then specifically listed factors that "may prevent us from successfully driving and maintaining student enrollment in our offerings in a cost-effective manner or at all," including:

> *Ineffective marketing efforts.* We invest substantial resources in developing and implementing data-driven marketing strategies that focus on identifying the right potential student at the right time. These marketing efforts make substantial use of search engine optimization, paid search and custom website development and deployment and we rely on a small number of internet search engines and marketing partners. ***If our execution of this strategy proves to be inefficient or unsuccessful in generating a sufficient quantity of qualified prospective students, or if the costs associated with the execution of this strategy increase, our revenue could be adversely affected***.

333.     The representation in the 2017 10-K that "*[i]f*" the Company's "execution of this strategy proves to be inefficient or unsuccessful" 2U's revenue "***could*** be adversely affected" was materially false and misleading when made because the Company was, at the time, aware of facts and trends that indicated the Company's marketing efforts could not keep pace with 2U's projected growth, and the Executive Defendants were concerned, at the time, about low enrollment.  2U's presentation of a then-occurring problem as a potential and as-yet-unrealized risk was therefore materially false and misleading.

334.     The Form 10-K further also included the following potential risk warning:

> Our student acquisition efforts depend in large part upon the availability of advertising space through a variety of media.
>
> We depend upon the availability of advertising space through a variety of media, including third party applications on platforms such as Facebook and LinkedIn, to direct traffic to our offerings and acquire new students for our offerings. The availability of advertising space varies, and a shortage of advertising space in any particular media or on any particular platform, or the elimination of a particular medium on which we advertise, could limit our ability to direct traffic to our offerings and acquire new students on a cost-effective basis, any of which could have a material adverse effect on our business, results of operations and financial condition.

335.     The representation in the Form 10-K that "a shortage of advertising space . . . ***could*** have a material adverse effect on our business, results of operations and financial condition" was materially false and misleading when made because the Company was, at the time, encountering competition for advertising space in the increasingly saturated online education market, which was impacting 2U's ability to drive enrollments at the time of the warning.  2U's presentation of a then-occurring problem as a potential and as-yet-unrealized risk was therefore materially false and misleading.

336.     The Form 10-K included the following additional risk disclosure:

*If new offerings do not scale efficiently and in the time frames we expect, our reputation and our revenue will suffer.*

Our continued growth and profitability depends on our and our university clients' ability to successfully scale newly launched offerings. As we continue aggressively growing our business, we plan to continue to hire new employees at a rapid pace, particularly in our marketing and sales team and our technology and content development teams. If we cannot adequately train these new employees, we may not be successful in acquiring potential students for our offerings, which would adversely impact our ability to generate revenue, and our university clients and the students in their programs and courses could lose confidence in the knowledge and capability of our employees. If we cannot quickly and efficiently scale our technology to handle growing student enrollment and new offerings, our university clients' and their students' experiences may suffer, which could damage our reputation among colleges and universities and their faculty and students.

337.    The representations in the Form 10-K regarding the negative impact on 2U's business that could be caused by rapid growth, including negative impacts that ***could*** occur "[*i*]*f new offering don't scale*" or "*[i]f we cannot adequately train these new employees*" were materially false and misleading when made because 2U's inability to scale its student acquisition operation was causing negative impacts on the Company's student acquisition efforts at the time the statements were made.  2U's presentation of a then-occurring problem as a potential and as-yet-unrealized risk was therefore materially false and misleading.

338.    The above purported disclosure regarding marketing efforts, was repeated in the 1Q2018 10-Q, 2Q2018 10-Q, 3Q2018 10-Q, 1Q2019 10-Q, and in the 2018 10-K, and were materially false and misleading for the substantially the same reason.  The disclosures were materially false and misleading in the 3Q2018 and 1Q2019 10-Qs and the 2018 10-K for the additional reason that, at the time of the disclosures, it was clear that the Company would not meet its enrollment projections for 2019.

### 13.   2U's Class Period SEC Filings Did Not Comply with SEC Disclosure Requirements

339.   Item 7 of Form 10-K and Item 2 of Form 10-Q require SEC registrants to furnish the information called for under Item 303 of Regulation S-K [17 C.F.R. §229.303] ("Item 303"), Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A").  Among other things, Item 303 required that 2U's Class Period Forms 10-K and 10-Q disclose known trends or uncertainties that had, or were reasonably likely to have, a material impact on its revenues or income from continuing operations.

340.   In 1989, the SEC issued interpretative guidance associated with the requirements of Item 303 concerning the disclosure of material trends or uncertainties.

341.   In 2003, the SEC issued additional interpretative guidance relating to the requirements of Item 303.  Such guidance states, in pertinent part:

> We believe that management's most important responsibilities include communicating with investors in a clear and straightforward manner.  MD&A is a critical component of that communication.  The Commission has long sought through its rules, enforcement actions and interpretive processes to elicit MD&A that not only meets technical disclosure requirements but generally is informative and transparent.

342.   Thus, the MD&A disclosures in 2U's Forms 10-K and 10-Q it filed with the SEC during the Class Period were materially false and misleading because the Exchange Act Defendants failed to disclose the known uncertainties associated with: (1) the increasing competition for students as the market for online graduate degrees became increasingly saturated; (2) the increasingly saturated market for online degrees driving up the marketing costs; and (3) the Company's inability to scale its operations to meet the needs of its growing portfolio of programs, leading to poor execution in the mid-point of the marketing funnel, and lower enrollment.   As a result, these were events presenting known trends and uncertainties that were

reasonably likely to—and, when they came to fruition during the Class Period, did—adversely

affect 2U's financial condition and results.  The omission of this information violated the

disclosure obligation imposed by Item 303.

343.    In addition, Item 1A of both Form 10-K and Form 10-Q requires SEC registrants

to furnish the information called for under Item 105 (formerly Item 503) of Regulation S-K [17

C.F.R. §229.105], Risk Factors ("Item 105").  Item 105 required that 2U's Class Period Forms

10-K and 10-Q disclose the most significant matters that make an investment in 2U risky.

Specifically, Item 105 requires registrants to:

> Where appropriate, provide under the caption "Risk Factors" a
> discussion of the most significant factors that make an investment
> in the registrant or offering speculative or risky.  This discussion
> must be concise and organized logically.  Do not present risks that
> could apply generically to any registrant or any offering.  Explain
> how the risk affects the registrant or the securities being offered.
> Set forth each risk factor under a subcaption that adequately
> describes the risk. . . .  The registrant must furnish this information
> in plain English.

344.    As detailed herein, during the Class Period, 2U's Forms 10-K and 10-Q failed to

disclose that: (1) beginning in 2017 and continuing throughout the Class Period, the Exchange

Act Defendants saw 2U's projected enrollment numbers decline across the board; (2) the

Company's student acquisition model was unable to scale to match the enrollment needs of the

Company's rapidly growing portfolio of programs; (3) the Company's multi-program vertical

strategy was not leading to a higher conversion rate in the marketing funnel as promised, but was

instead causing the Company to cannibalize enrollment from its most expensive, and most

profitable, programs; (4) the Company would not be able to take advantage of promised

economies of scale, as the cost of attracting and retaining students increased, rather than

diminished, as the Company grew in size and complexity; (5) the Company's business model

needed to undergo substantial adjustment to compete in an increasingly saturated online

education market and the Company's purported growth trajectory was not fully funded; (6) contrary to the Company's statements regarding competition, the Company was facing intense competition in the market for students to attend programs; and (7) the growth rate in revenue from enrollments was decelerating and had plateaued at the Company's largest programs.

### E.  Additional Scienter Allegations for the Exchange Act Claims

345.    The Exchange Act Defendants were active and culpable participants in the fraud, as evidenced by their knowing or reckless issuance and/or ultimate authority over their materially false and/or misleading statements and omissions alleged above in Section III.D.  The Executive Defendants acted with scienter in that they knew or recklessly disregarded that the public statements set forth in Section III.D were materially false or misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws.  As detailed above, the Exchange Act Defendants' scienter is evidenced by the following facts.

### 1.  The Executive Defendants Had Actual Knowledge That 2U's Student Acquisition Model Was Insufficient to Sustain the Company's Growth

#### (a)  Defendants Paucek and Graham Had Access to and Monitored 2U's Enrollment Numbers

346.    According to multiple former employees, Defendants Paucek and Graham had access to and closely monitored 2U's enrollment numbers.  In particular, information provided by FE-16 demonstrates that both Defendants were hands-on executives.  FE-16 served as an executive assistant to Defendant Graham and other 2U senior executives from September 2017 to April 2019 and reported directly to Defendant Graham.  In that position, FE-16 scheduled and planned the quarterly earnings release meetings and the annual stockholder meeting.

347. According to FE-16, both Defendants Paucek and Graham were heavily involved in the day-to-day operations at 2U, and there was a lot of interaction between the top executives. FE-3 corroborates this, explaining that Paucek was a highly engaged executive.

348. This included involvement in the status of student enrollment.  Specifically, FE-14 stated that Defendant Paucek definitely stayed abreast of the upcoming enrollment outlook, and that he always expressed that he was aware of the state of the business through emails, company meetings, and one-off meetings.  Similarly, FE-13 explained that once a quarter, Defendant Paucek participated in Company calls over Zoom where leadership talked about which programs were doing really well and which were not.

349. Moreover, multiple former employees confirm that Defendants Paucek and Graham had access to enrollment information.  According to FE-16, over a two week period prior to earnings day, the investor relations team, which consisted of the CEO, the CFO, and the general counsels, would meet for hours to get ready.  She observed that at the start of this period, the team met for two hours daily, and as it got closer to earnings day the meeting times would be longer and eventually turn into an all-day meeting.  FE-16 explained that during the preparation for earnings day, someone from finance would put various specs on a white board in the board room, which included enrollment figures and other non-public information.

350. According to FE-8, an executive admissions counselor for the USC MSW program, 2U executives also received reports on program status, including projections of the ups and downs of each programs.  FE-8 further noted that these reports had also previously been provided to other 2U employees, but around late 2017 or early 2018 the Company suddenly stopped providing the reports to the admissions staff.

351.    Defendants Paucek, Graham, and Mokkarala also had access to enrollment information and status through Gabriel Bustamante, 2U's Executive Vice President of Global Sales and Admissions.

352.    Information provided by FE-17 demonstrates that Bustamante had regular access to this information.  FE-17 worked as a Director of Admissions for 2U throughout the Class Period.  In that role, FE-17 managed two sales teams responsible for admissions in a speech program with a partner university.  According to FE-17, enrollment numbers were shared with her supervisor and general manager weekly, and then her supervisor and general manager met with Executive Vice President of Global Sales and Admissions, Gabriel Bustamante, also weekly, to report on enrollment numbers.

353.    That Bustamante was aware of enrollment numbers is corroborated by FE-16, who further explained that Bustamante tracked enrollment and provided three years of future projections for the Company, and FE-14, who noted that the admissions department kept close track of enrollment and that Bustamante discussed enrollment projections for the entire admissions department.

354.    Bustamante's involvement is further evident from information provided by FE-15. FE-15 worked at 2U from January 2017 until September 2019, where she served as an admissions counselor and a senior admissions counselor.  In those roles, FE-15 was responsible for getting prospective students to enroll in 2U programs and worked closely with the admissions managers and director to define weekly goals and objectives for the admissions team.  FE-15 also observed that Bustamante kept careful tabs on prospective students over the course of the sales cycle and that he met with the directors of admissions and finance weekly to review and

discuss enrollment forecasts and to forecast for the upcoming quarter.  In fact, according to FE-9, the Company held annual meetings where Bustamante actually discussed enrollment.

355.    FE-16 explained that Bustamante would then provide his enrollment numbers and projections to the finance team, who in turn would present them to Defendant Graham. Moreover, after FE-1 started working in the office of the CEO (which she commenced prior to the Class Period and continued through the Spring of 2019), she observed that Defendants Paucek and Mokkarala met with Bustamante and the leadership team frequently.

### (b)    Defendants Paucek and Mokkarala Were Aware Of Declining Enrollment in Early 2018

356.    According to FE-1, who worked directly with Defendant Paucek to prepare him for meetings, organize the information that was submitted to the board for each board meeting and handle his personal projects, there was an ongoing conversation about enrollment that began by February 2018.  Indeed, she observed that while enrollment was not a concern when she first started at 2U, by February 2018 low enrollment became a topic and remained one.

357.    Critically, FE-1 explained that not too far into 2018, she first started hearing Defendant Paucek mention concerns about enrollment.  While she did not attend meetings where Paucek discussed initiatives to improve enrollment, she understood that he was trying to figure out what to do to enroll more students.  According to FE-1, Defendant Paucek and 2U leadership were approaching the enrollment issue as something they should think about addressing.  In this regard, she explained that Defendant Paucek was working closely with then-Chief Marketing Officer, Defendant Mokkarala.  This was corroborated by FE-2, who explained that Defendant Paucek was unhappy with the "dropping numbers."

358.    Likewise, FE-2 explained that Defendant Mokkarala became stressed about enrollment numbers after enrollment projections began to slowly stall in 2017, in contrast to the

year after year growth the Company had previously experienced, and, as a result, he often wanted to see forecast numbers earlier than when they were due.

          **(c)**      **The Executive Defendants' Own Statements Support a Strong Inference of Scienter**

    359.    During the Class Period, the Executive Defendants were the primary executives at 2U who spoke at length about the marketing efficiencies created by its multi-program vertical strategy.  For example, Defendant Graham stated on February 28, 2018 that "one of the tricks in this business" is that companies have to be "very, very good and very data-driven at projecting how many students you're going to get," and that as a result, 2U "*forecast[s] that, and we test it, and we tested and we've gotten very, very good at that*."  She went on to assure investors that when you "*add second, third, and fourth programs in a degree vertical, so a second MBA at another university and third MBA at another university, you actually get marketing efficiency off of that because you can market the vertical, you can move your money around in the vertical to get the best possible results for all of the programs, and then just scale on the marketing budget*."

    360.    Then, in direct response to an analyst on August 2, 2018 asking whether the Company had seen any changes in the cost to acquire students, Defendant Paucek responded that "*as we get greater scale, we are able to be more effective there, not less*," and that "*regardless, the [multi-program vertical] strategy is clearly what drives our marketing efficiency.  So today, we don't have a marketing efficiency issue*."

    361.    Similarly, Defendant Mokkarala explained on June 5, 2018 that "we are able to find these audiences at scale with bespoke campaigns and spend for each university program," and that "[t]he fact that we are able to do this across verticals and with lots of programs with no verticals helps us create a certain amount of leverage and a network effect that is super

important."  These Class Period statements, and numerous others like them, indicated that the

Executive Defendants either knew that the Company's multi-program vertical strategy was not

leading to a higher conversion rate in the marketing funnel and that it was unable to take

advantage of promised economies of scale, as the cost of attracting and retaining students

increased as the Company grew in size, or were reckless in failing to ascertain this information

before making these statements to investors.

362.    The Executive Defendants also regularly assured investors regarding the

Company's ability to scale enrollment growth for its ever-increasing portfolio of Graduate

division programs.  For example, Defendant Paucek assured investors on February 26, 2018 that

the "*acceleration of our new [Graduate division program] launch cadence,*" including "*[t]en

new programs launched in 2017*" and an additional "*13 to 14 new programs*" in 2018  was

"*driving our progress*."  Likewise, Defendant Graham stated on February 26, 2018 that "*what

[2U was] seeing . . . makes us very comfortable that increasing our investment in new

programs to drive growth is a wise, strategic decision.*"

363.    Defendant Paucek further stated on May 3, 2018 that "the annual number of

launched graduate programs has increased substantially over the past few years and shows no

signs of slowing down.  Our pipeline continues to be strong, giving us confidence in our revenue

expectations in that core segment in future years."  On the same call he then reiterated that "I

would argue that sort of overall ecosystem that we operate now is at scale.  And we're seeing

real benefit from that."

364.    Later, on August 2, 2018, Defendant Paucek also represented that "2U has a track

record of scaling enrollments that's better than anyone in the space," and that "we are indeed

scaling, and our partners are happy."  He went on to inform investors that "[n]ew student

enrollments are strong across the portfolio."  These Class Period statements, and numerous others like them, indicated that the Executive Defendants either knew that the Company was unable to scale its marketing efforts to keep pace with 2U's expanded portfolio of programs, or were reckless in failing to ascertain this information before making these statements to investors.

365.    Then, on August 8, 2018, in response to lower admit rates than the Company had been experiencing, Defendant Graham directly assured investors that the issues 2U was seeing were "aberrations" and that there was nothing "systemic about it."  Specifically, she stated that "*[w]e've dug into it, we don't see anything systemic about it.  It is the, sort of, aberrations of occasionally, even in a portfolio which tends to wash out those effects periodically, you get some that come in on the top and some that come in a little bit lower.  And that's what we're, sort of, seeing wash its way through now.  We have said that we do think it'll be relatively stable through the remainder of this year and early next.*"

366.    Through the remainder of the Class Period, the Executive Defendants continued to make similar representations.  For example, on August 14, 2018, in response to an analyst question regarding the impact of new program launches on revenue targets, Defendant Paucek represented that "*one of the sort of false notions out there is that there is a marketing efficiency challenge.  There is not.  We're not having a marketing efficiency challenge*."  Similarly, on February 25, 2019, Defendant Graham noted, "*[w]hat we're seeing now across all our program cohorts strongly validates the typical program economic life cycle we've consistently discussed with you and makes us very comfortable that to drive growth, increasing our investments in both new program launches and current program marketing are wise strategic decisions*."

367.     Taken together, these detailed statements on the very topics about which the market were misled raise a strong inference that the Exchange Act Defendants knew or were reckless in not knowing about the false and misleading nature of their statements when they made them.  By repeatedly insisting—often in response to analysts' questions addressing these issues—that the Company was able to scale enrollment and that its business plan led to marketing efficiencies, the Exchange Act Defendants either: (1) knew that the Company was unable to scale enrollment to keep up with its increasing portfolio of programs and that, in fact, rather than creating marketing efficiencies, its continued addition of programs within the same vertical was detrimental to the Company's growth; or (2) were reckless in not knowing or investigating that this was the case.  Under either scenario, there is a strong inference that the Exchange Act Defendants made these statements with scienter.

> **(d)     Defendant Paucek's Suspicious Stock Sales During The Class Period Support A Strong Inference Of Scienter**

368.     During the Class Period, Defendant Paucek realized substantial benefits from his personal disposal of 2U common stock while the Exchange Act Defendants continued to conceal material facts from investors concerning the inability of 2U's student enrollment model to match the enrollment needs of the Company's rapidly growing portfolio of programs, among other things.

369.     Throughout the Class Period, Defendant Paucek sold approximately 270,000 shares at prices ranging from $72.02 per share to $85.03 per share to realize proceeds of $22,835,947.  By comparison, over the period of time equal in length to the Class Period but immediately preceding it, Defendant Paucek realized only $11,316,471 in sales of 2U common stock.  Thus, Defendant Paucek' realized a more than 50% increase in proceeds from Class Period sales over sales in the period immediately preceding it.

370.    Accordingly, Defendant Paucek's behavior in entering into the Class Period stock sales further raises a strong inference of scienter.

### (e)    The Timing and Circumstances of Defendant Graham's Resignation Supports a Strong Inference of Scienter

371.    The timing and circumstances of Defendant Graham's resignation, a key executive at 2U involved in the Company's financial projections based on its ability to scale enrollment to the Company's expanding business model are highly suspicious.  That this resignation is temporally connected to the alleged corrective disclosure of the Company's failing growth plans and decreased financial projections further supports that inference.

372.    Specifically, on August 22, 2019—only three weeks after the end of the Class Period, when the full truth of the Exchange Act Defendants' fraud was revealed—2U issued a press release announcing the abrupt resignation of Defendant Graham from 2U the day before with no further explanation.  As discussed above, given Defendant Graham's direct involvement in reviewing enrollment data and presenting to investors on the Company's financial status and projections, her sudden departure just after the end of the Class Period, when the Company was forced to admit that its growth plans were failing and the Company needed to revise its revenue expectations, supports a strong inference of scienter.

373.    Analysts connected Defendant Graham's resignation to the Company's recent disclosure only three weeks prior that its growth plans were failing.  For example, in a report dated August 28, 2019, analyst William Blair noted that "given ***recent trends in [2U's] business***," investors would view Defendant Graham's resignation as a "***welcome [ ] change in leadership at 2U***."

## 2.    Student Enrollment Is Critical To 2U's Core Operations

374.    The Exchange Act Defendants' knowledge of the number of students 2U was able to enroll in its Graduate division programs and thus the overall health of those programs—both individually and in the aggregate—can be inferred because these facts were critical to 2U's operations and the success of the Company.  The Graduate Division was 2U's chief revenue generator and the most important driver of the Company's earnings during the Class Period. Indeed, as alleged above, the ***Graduate Division generated the lion's share of 2U's revenue, accounting for 84.6% of revenue and 95% of profit in 2018, and 80% of revenue in the first six months of 2019.***

375.    Moreover, 2U operates on a revenue-sharing model, wherein the universities with which the Company partners pay 2U a significant percentage—up to 60%—of the tuition and fees that students who enroll in the partnership programs pay to obtain their degrees.  In order to ensure that students enroll in the programs and therefore generate revenue for 2U, the Company takes on the primary responsibility for recruiting students, and continues to solicit students throughout the life of the program.  As a result, 2U's revenue is almost entirely dependent upon its ability to recruit and enroll students in its Graduate division partnership programs.

376.    Thus, the Company's continued ability to enroll students in its partner university programs, and its ability to increase enrollment to match the enrollment needs of the Company's rapidly growing portfolio of programs was critical to 2U's financial success and raises a strong inference that the Exchange Act Defendants knew, or were deliberately reckless in not knowing or disregarding, that their statements regarding the Company's growth, as set forth *supra* Section III.D, were materially false or misleading when made.

### 3. Corporate Scienter Allegations for the Exchange Act Claims

377.    Further, 2U knowingly and/or with deliberate recklessness made, controlled, or had ultimate authority over the materially false and/or misleading statements and omissions alleged herein based on the fact that the Executive Defendants and 2U's senior management, including Gabriel Bustamate, Executive Vice President of Global Sales and Admissions and the Company's vice presidents in admissions, knew and/or were deliberately reckless in not knowing or disregarding that the Company's statements set forth in Section III.D were materially false and/or misleading, and/or omitted material facts at the times that such statements were made, as alleged *supra* Section III.D.  Each of the Executive Defendants, Mr. Bustamante and other senior management was among the most senior employees of the Company throughout the Class Period, was acting within the scope of their authority, and was a member of the Company's senior management.  Their scienter may therefore be imputed to the Company.

### F. Loss Causation for the Exchange Act Claims

378.    During the Class Period, as detailed herein, the Exchange Act Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of 2U common stock and operated as a fraud or deceit upon Class Period purchasers of 2U common stock by failing to disclose and misrepresenting the adverse facts detailed herein.

379.    Exchange Act Class members unknowingly and in reliance upon the Exchange Act Defendants' materially false or misleading statements and/or omissions purchased 2U common stock at artificially inflated prices.  But for the Exchange Act Defendants' misrepresentations, omissions, and fraudulent scheme, Plaintiffs and other Exchange Act Class members would not have purchased 2U stock at the artificially inflated prices at which it traded during the Class Period.

380.    The truth regarding the Exchange Act Defendants' fraud was revealed in a series of partial corrective disclosures and/or materializations of concealed risk that occurred between May 7, 2019 and July 30, 2019.  During this period, 2U's stock fell precipitously as the artificial inflation caused by the Exchange Act Defendants' unlawful conduct exited 2U's stock price.  It was not until the final partial corrective disclosure and/or materialization of concealed risk on July 30, 2019 that the full truth was known to the market, such that there was no longer any artificial inflation in 2U's stock price attributable to the fraud.

381.    The declines in 2U's stock price during this period, including the declines summarized below, are directly attributable to the market absorbing information that corrected and/or reflected the materialization of risks concealed by the Exchange Act Defendants' material misrepresentations or omissions.

382.    As a result of their purchases of 2U common stock during the Class Period, Plaintiffs and other Exchange Act Class members suffered economic loss (*i.e.*, damages) under the federal securities laws.  The Exchange Act Defendants' materially false and misleading statements had the intended effect and caused 2U common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $98.58 per share on May 14, 2018.

383.    By concealing from investors the adverse facts detailed herein, the Exchange Act Defendants presented a misleading picture of 2U's business.  As the truth about the Company and the extent of the fraud was revealed to the market, the price of 2U common stock fell significantly.  These declines removed the inflation from the price of 2U common stock, causing real economic loss to investors who had purchased 2U common stock during the Class Period.

### 1.    May 7, 2019

384.    On May 7, 2019, the relevant truth and foreseeable risks concealed by the Exchange Act Defendants' misconduct and their false representations and omissions during the

Class Period were revealed and/or partially materialized after the close of trading, when 2U reported disappointing first quarter 2019 financial results and lowered the Company's financial guidance.  Specifically, the Exchange Act Defendants revealed for the first time that the Company was likely to achieve $13 million less in revenues than previously represented.

385.    During the subsequent earnings call on May 7, 2019, Defendant Graham admitted that 2U was seeing "some decline in expected graduate program enrollments beginning in the second quarter and continuing through the rest of the year."  She further reminded investors that "our graduate program business is a long-cycle accumulating revenue business and enrollment changes in any period impact revenue for multiple future periods."

386.    The May 7, 2019 disclosures, that the Company was likely to achieve significantly less in revenue than previously represented and that the Company's growth story and trajectory was not as strong as they had otherwise consistently assured investors, were foreseeable consequences of, and within the zone of risk concealed by, the Exchange Act Defendants' misrepresentations and omissions that, *inter alia*, 2U's student enrollment model was able to match the enrollment needs of the Company's rapidly growing portfolio of programs and that its multi-program vertical strategy was leading to a high conversion rate in the marketing funnel.  Moreover, the May 7, 2019 disclosures revealed new information that the Exchange Act Defendants' misstatements, omissions and fraudulent course of conduct previously concealed and/or obscured from the market.  These disclosures partially (but incompletely) revealed some of the relevant truth concealed and/or obscured by the Exchange Act Defendants' prior misstatements and omissions surrounding the Company's growth plan and the success of its business model.

387.    As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by the Exchange Act Defendants' fraud, the price of 2U common stock declined over the next day by $15.16 per share, or ***over 25%***, to close at $44.77 per share on May 8, 2019 on unusually high trading volume of over 7.3 million shares.

388.    Analysts were surprised, and attributed the decline to the Exchange Act Defendants' disclosures.  For example, on May 8, 2019, Barrington Research reported that "the stock sold off sharply in in the after-market trading" after "[m]anagement [] reduced its full-year 2019 revenue guidance."  On the same date, analyst BMO Capital Markets also "***admit[ed its] surprise***" and noted that the reset in the Company's expectations for 2019 graduate program growth "***will disappoint much of the investor base***."  Oppenheimer further observed that "[t]he DGP [Domestic Graduate Program] enrollment challenges feeds a bear case, and will pressure the name until confidence returns to the forecast via future results."

389.    Still, the Company's stock price remained artificially inflated even after these disclosures, because, rather than admit that the Company's disappointing financial results and lowered guidance were due to a fundamental problem with its business model, the Exchange Act Defendants framed these disappointing results as the result of a confluence of one-time factors. Specifically, the Exchange Act Defendants attributed the Company's poor performance to three factors: (1) that 2U's university partners were "getting more selective, which impacts admit rate"; (2) that the Company was "seeing some pressure mid-funnel on the rate at which prospective students are submitting their applications for review"; and (3) that "one of [2U's] largest projected programs for the 2019 cohort had its launch date slip to later in the year for reasons beyond the control of the school and 2U."

390.     And while Defendant Paucek also admitted that the Company had pushed the growth story a little too aggressively, he cabined his admission to the effect of university admission decisions, stating, "[i]t has become clear in the rearview mirror that we were prioritizing growth a bit too much based on the feeling – on feeling the need to meet past expectations. *I should have seen these admit challenges more broadly and simply taken some air out of the balloon*. It would have been better for my team and my clients. I didn't do that. Call it a lesson learned in the life of a public company CEO."

391.     Moreover, the Exchange Act Defendants continued to reassure the market that the Company's model was still performing as expected. For example, in his opening remarks during the May 7, 2019 call to discuss 1Q 2019 financial results, Defendant Paucek stated:

> I want to make one thing clear. *We do not believe the challenges we're seeing are attributable to weakness in our marketing efficiency at the top of the funnel.* We've said that before and are reiterating it again today. Our data shows we're driving significant growth in the quantity of prospective students and started applications. We're doing so at an average cost that has remained consistent with historicals. It's actually down in many spots. Across the portfolio, applicant quality remains steady.

392.     Moreover, he stated, "*we continue to see programs across the portfolio scale toward our target ranges for new student enrollments. We still firmly believe in our runway of 250 DGPs.* Pipeline for those programs is strong." He later reiterated that "we aren't seeing declines in front-end marketing efficiency."

393.     And despite admitting that the Company had pushed the growth story a little too aggressively, Defendant Paucek also continued to insist that "*2U is still very much a growth story.*" He further stated, "[m]oving forward, we now have exciting new growth levers, and our grad business is still growing really nicely and probably, more importantly, appropriately, given the positioning and needs of our clients." These comments had the effect of misleading investors

into believing that 2U's fundamental model was still working—that the disappointing financial results and reduced guidance were mere bumps in the road.

394.    Analysts were reassured by the Exchange Act Defendants' statements, with Macquarie noting on May 8, 2019 that "despite these challenges, the [Company], ***importantly***, noted that this ***is NOT weakness in marketing efficiency at the top of the funnel***.  The [Company] is driving significant growth in the quantity of prospective students and started applications at an average cost that remains consistent with historical levels or is down in many spots."  Macquarie went on to report that "[w]e believe that 2U has multiple strong levers for expanding margins and cash flows as it matures existing programs and gains efficiencies in marketing by launching new programs into the same verticals as existing programs where established student pipelines exist."  BMO further noted on the same date that "[d]espite this news, we believe [2U]'s long-term growth trajectory and its eventual path to profitability remain in sight."  Credit Suisse agreed, observing that "***[m]anagement remains confident that marketing efficiency and the quality of candidates is not changing.***"

### 2.    July 30, 2019

395.    On July 30, 2019, the relevant truth and foreseeable risks concealed by the Exchange Act Defendants' misconduct and their false representations and omissions during the Class Period were fully revealed and/or materialized.  On that date, after the close of trading, 2U admitted that the Company's growth plans were failing and needed to be abandoned as costs ballooned, and that the Company was significantly reducing its 2019 guidance.  In particular, 2U's projected net loss for 2019 had increased by over ***$70 million***.  In addition, these projected losses for the year, which included certain costs related to the Trilogy acquisition, represented a ***300 percent*** year-over-year increase.

396.     On the Company's conference call accompanying the press release, Defendant Paucek gave further details about this disclosure, explaining that 2U was "moderating [its] outlook for the business in the short term" and, "[e]xcluding the expected financial impact of Trilogy, this implies *a step down in revenue expectations for the rest of the business*"—clearly in contrast to the Company's frequently touted growth trajectory.

397.     In his explanation for the poor outlook for the Graduate Division, Defendant Paucek admitted that the marketing funnel did not work as well anymore, saying "[c]ompetition for students has increased," and that 2U now expected "smaller average steady-state program[s]" and that "our guidance presumes lower conversion rates on a go-forward basis."

398.     In addition, Defendant Paucek revealed that, due to these problems, 2U's business model would need to undergo substantial adjustment to compete in an increasingly saturated online education market and that the Company's cash flow was inadequate for purposes of maintaining the Company's present strategies.  He described the Company's prior growth story as a "*mistake*" and stated that he needed to "*level set*" with the investment community.

399.     The July 30, 2019 disclosures that the Company's growth plans were failing and needed to be abandoned as costs ballooned, and that as a result the Company was significantly reducing its 2019 guidance were foreseeable consequences of, and within the zone of risk concealed by, the Exchange Act Defendants' misrepresentations and omissions that, *inter alia*, they were confident in their projections, 2U's student enrollment model was able to match the enrollment needs of the Company's rapidly growing portfolio of programs and that its multi-program vertical strategy was leading to a high conversion rate in the marketing funnel. Moreover, the July 30, 2019 disclosures revealed new information that the Exchange Act Defendants' misstatements, omissions and fraudulent course of conduct previously concealed

and/or obscured from the market.  These disclosures revealed the relevant truth concealed and/or obscured by the Exchange Act Defendants' prior misstatements and omissions surrounding the Company's growth plan and the success of its business model.

400.    On this shocking news, the price of 2U stock fell precipitously by $23.70 per share, or **65%**, to close at $12.80 per share on July 31, 2019, on unusually high trading volume of over 54 million shares.  All told, the trading price of 2U's stock fell from a high of more than $98.58 per share to just $12.80 per share following the announcement of 2U's second quarter 2019 financial results and adjusted outlook for 2019.  In total, 2U's stock declined a total of ***over 87%*** from its highpoint during the Class Period.

401.    Analysts were shocked by this revelation, and directly connected the stock price decline to the Exchange Act Defendants' announcements.  For example, in a July 31, 2019 report, analyst Oppenheimer noted that given the uncertainty over its business model, 2U's stock is now "***uninvestable***."  Specifically, Oppenheimer based this opinion on three factors, including: "1) ***Business model/enrollment concerns***.  We question whether there are enough graduate students to fully scale 2U's DGP business (not demand for OPM) given more competition, a healthy US macro, and an increasingly negative spotlight on 2U's take-rate; 2) ***Low management sentiment*** after resetting expectations, shifting the business strategy, poor execution, and overpaying for Trilogy; and 3) High cash burn/unclear path to profitability."  Citing this "***[m]ajor story change***," Oppenheimer downgraded its investment rating, reporting that "[w]e believe ***2U's business has been secularly challenged after giving high expectations at its investor days that never really materialized*** and we do not expect meaningful change to this near term."

402.    On the same date, Macquarie noted that this "***unexpected***" announcement "***is clearly a breaking of the [Company]'s model and we expect shares to be under material near-term pressure***."  BMO Capital Markets also downgraded 2U stock as a result of management's disclosure that they would "'reset the velocity' for growth," which was likely to result in "a massive sell-off."  Later, on August 12, 2019, William Blair reported that given that "management has reduced expectations twice this year alone," the Company's outlook was "[d]ecelerating."

403.    Each decline in the price of 2U common stock, as detailed above, was a direct or proximate result of the nature and extent of the Exchange Act Defendants' fraudulent misrepresentations and/or omissions being revealed to investors and the market.

404.    The economic loss, *i.e.*, damages, suffered by Plaintiffs and other Exchange Act Class members was a direct result of the Exchange Act Defendants' fraudulent scheme to artificially inflate the price of 2U common stock and the subsequent significant decline in the value of 2U common stock when the Exchange Act Defendants' prior misrepresentations and other fraudulent conduct were revealed.

405.    The market for 2U common stock was open, well-developed, and efficient at all relevant times, with average daily trading volume of approximately 706,563 shares during the Class Period.  As a result of the Exchange Act Defendants' misstatements and material omissions, as alleged herein, 2U's common stock traded at artificially inflated prices.  Plaintiffs and the other Exchange Act Class members purchased 2U common stock relying upon the integrity of the market relating to 2U common stock and suffered economic losses as a result thereof.

406.     The declines in 2U's common stock price on May 8, 2019 and July 31, 2019 were a direct result of the nature and extent of the Exchange Act Defendants' prior misstatements and omissions being revealed to investors after the markets closed on May 7, 2019 and July 30, 2019. The timing and magnitude of 2U's stock price declines evidence the impact the Exchange Act Defendants' statements had on the Company's stock price during the Class Period and negate any inference that the loss suffered by Plaintiffs and other Exchange Act Class members was caused by changed market conditions or macroeconomic, industry, or Company-specific factors unrelated to the Exchange Act Defendants' fraudulent conduct.

### G.     Applicability of the Fraud on the Market Presumption

407.     Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     the Exchange Act Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's stock traded in an efficient market;

(d)     the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)     Plaintiffs and other Exchange Act Class members purchased 2U securities between the time the Exchange Act Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

408.     At all relevant times, the market for 2U's common stock was an efficient market for the following reasons, among others:

(a)     2U's common stock met the requirements for listing and was listed and actively traded on the NASDAQ Exchange, a highly efficient and automated market;

(b)     as a regulated issuer, 2U filed periodic public reports with the SEC and the NASDAQ;

(c)     2U communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d)     2U was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period.  Each of these reports was publicly available and entered the public marketplace; and

(e)     unexpected material news about 2U was reflected in and incorporated into the Company's stock price during the Class Period.

409.    As a result of the foregoing, the market for 2U's common stock promptly digested current information regarding 2U from all publicly available sources and reflected such information in 2U's stock price.  Under these circumstances, all purchasers of 2U's common stock during the Class Period suffered similar injury through their purchase of 2U's common stock at artificially inflated prices, and a presumption of reliance applies.

410.    Plaintiffs are also entitled to a presumption of reliance under the United States Supreme Court's decision in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), and its progeny, as the Exchange Act Defendants misstatements throughout the Class

Period were primarily ones of omission, in that they failed to disclose material adverse

information regarding the Company's business operations and financial prospects.

### H.    Class Action Allegations for the Exchange Act Claims

411.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure on behalf of all persons and entities that purchased or acquired publicly

traded 2U securities during the Class Period (the "Exchange Act Class").  The following are

excluded from the Exchange Act Class: (i) Defendants; (ii) members of the immediate family of

any Defendant who is an individual; (iii) any person who was an officer or director of 2U during

the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or

had a controlling interest; (v) 2U's affiliates, including its employee retirement or benefit plan(s)

and their participants or beneficiaries to the extent they purchased or otherwise acquired 2U

securities through any such plans; and (vi) the legal representatives, affiliates, heirs, successors-

in-interest, or assigns of any such excluded person.

412.    The members of the Exchange Act Class are so numerous that joinder of all

members is impracticable.  The disposition of their claims in a class action will provide

substantial benefits to the parties and the Court.  2U has approximately 63.33 million shares of

stock outstanding, owned by thousands of investors.

413.    There is a well-defined community of interest in the questions of law and fact

involved in this case.  Questions of law and fact common to the members of the Exchange Act

Class that predominate over questions which may affect individual Exchange Act Class members

include:

> (a)    whether the Exchange Act was violated by the Exchange Act Defendants;

> (b)    whether the Exchange Act Defendants omitted and/or misrepresented

material facts;

(c)     whether the Exchange Act Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether the Exchange Act Defendants knew or deliberately disregarded that their statements were false and misleading;

(e)     whether the price of 2U common stock was artificially inflated; and

(f)     the extent of damage sustained by Class members and the appropriate measure of damages.

414.    Plaintiffs' claims are typical of those of the Exchange Act Class because Plaintiffs and the Exchange Act Class sustained damages from the Exchange Act Defendants' wrongful conduct.

415.    Plaintiffs will adequately protect the interests of the Exchange Act Class and have retained counsel who are experienced in class action securities litigation.  Plaintiffs have no interests which conflict with those of the Exchange Act Class.

416.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

**I.     Safe Harbor**

417.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the material misrepresentations and omissions alleged in this Complaint.

418.    To the extent certain of the statements alleged to be misleading or inaccurate may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors

that could cause actual results to differ materially from those in the purportedly forward-looking statements.

419.   The Exchange Act Defendants are also liable for any false or misleading "forward-looking statements" pleaded because, at the time each "forward-looking statement" was made, the speaker knew the "forward-looking statement" was false or misleading and the "forward-looking statement" was authorized and/or approved by an executive officer of 2U who knew that the "forward-looking statement" was false.  Alternatively, none of the historic or present-tense statements made by the Exchange Act Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by the Exchange Act Defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

### J.   Exchange Act Causes of Action

### COUNT I

**For Violations of §10(b) of the Exchange Act and Rule 10b-5
Against the Exchange Act Defendants**

420.   Plaintiffs incorporate ¶¶ 1-419 herein by reference.

421.   During the Class Period, the Exchange Act Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

422.    The Exchange Act Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    employed devices, schemes and artifices to defraud;

(b)    made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of 2U common stock during the Class Period.

423.    As set forth above, the Exchange Act Defendants made their false and misleading statements and omissions and engaged in the fraudulent activity described here in knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Plaintiffs and the other members of the Exchange Act Class who purchased 2U common stock during the Class Period.

424.    Plaintiffs and the other members of the Exchange Act Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for 2U common stock.  Plaintiffs and the other members of the Exchange Act Class would not have purchased 2U common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by the Exchange Act Defendants' misleading statements.

**COUNT II**

**For Violations of §20(a) of the Exchange Act
Against the Executive Defendants**

425.    Plaintiffs incorporate ¶¶ 1-419 herein by reference.

135

426. The Executive Defendants acted as controlling persons of 2U within the meaning of §20(a) of the Exchange Act.  By virtue of their positions with the Company, ownership of 2U stock, and participation in and/or awareness of the Company's operations and finances, the Executive Defendants had the power and authority to cause 2U to engage in the wrongful conduct complained of herein.

427. The Executive Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged herein to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

428. The Executive Defendants had direct and supervisory involvement in the day-to-day operations of the Company and regularly spoke on behalf of the Company.  They exercised control over the operations of 2U and had the power to control the public statements about 2U giving rise to the securities violations as alleged herein, and exercised the same.

429. 2U violated §10(b) and Rule 10b-5 by its acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Executive Defendants are liable pursuant to §20(a) of the Exchange Act for 2U's violations of §10(b).  As a direct and proximate result of the Executive Defendants' wrongful conduct, Plaintiffs and other members of the Exchange Act Class suffered damages in connection with their purchases of the Company's stock during the Class Period.

## IV.   SECURITIES ACT ALLEGATIONS

430.   The claims addressed in this section (Counts III, IV and V, below) are brought pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act.  Counts III and IV are brought against all Securities Act Defendants (defined in Section IV.A.2 below), and Count V is brought against Paucek, Graham, and the Director Defendants (defined in Section IV.A.2 below).  These claims are, in effect, a separate complaint.  In the allegations and claims set forth herein, OKCERS asserts strict liability claims pursuant to the Securities Act on behalf of itself and the Securities Act Class (defined in Section IV.C below).  OKCERS's claims are not based on any allegations of intentional, knowing, or reckless misconduct on behalf of any Defendants.  OKCERS's claims do not, and are not intended to, allege fraud or sound in fraud, and OKCERS specifically disclaims any allegations of fraud, scienter, or recklessness in connection with these non-fraud claims.

### A.   The Securities Act Parties

#### 1.   The Securities Act Plaintiff

431.   Additional Named Plaintiff OKCERS was created under the authority granted by Chapter 11 of the Oklahoma State Statutes on January 21, 1958, to provide pension and survivor benefits to all full-time civilian employees of The City of Oklahoma City.  OKCERS purchased shares pursuant and/or traceable to the Registration Statement in connection with 2U's stock offering on or around May 23, 2018 ("Offering").  OKCERS suffered economic losses when the true facts about the Company's financial condition were disclosed and the artificial inflation was removed from the price of the shares.

## 2. The Securities Act Defendants

### (a) Corporate and Executive Defendants

432. Defendant 2U is incorporated under the laws of Delaware with its principal executive offices located in Lanham, Maryland. 2U's common stock trades on the NASDAQ exchange under the symbol "TWOU."

433. Defendant Christopher J. Paucek ("Paucek") is co-founder of 2U and served as the Company's Chief Executive Officer at the time of the Offering. He also sits on the Company's Board of Directors.

434. Defendant Catherine A. Graham ("Graham") served as the Company's Chief Financial Officer at the time of the Offering. 2U announced Defendant Graham's retirement from 2U on August 22, 2018.

### (b) Director Defendants

435. Paul A. Maeder has served on 2U's Board of Directors since 2010 and as Chairman of the Board of Directors since November 2012.

436. Mark J. Chernis has served on 2U's Board of Directors from 2009 until May 20, 2018, when he was appointed Chief Operating Officer.

437. Timothy M. Haley has served on 2U's Board of Directors since 2010.

438. John M. Larson has served on 2U's Board of Directors since 2009.

439. Robert M. Stavis has served on 2U's Board of Directors since 2011.

440. Sallie L. Krawcheck has served on 2U's Board of Directors since April 2014.

441. Earl Lewis has served on 2U's Board of Directors since April 2014.

442. Edward S. Macias has served on 2U's Board of Directors since November 2014.

443. Gregory K Peters has served on 2U's Board of Directors since March 2018.

444. Coretha M. Rushing has served on 2U's Board of Directors since 2016.

445.    Valerie B. Jarrett has served on 2U's Board of Directors since December 2017.

446.    The Director Defendants participated in the drafting, preparation, and/or approval of various untrue and misleading statements contained or incorporated in the Offering Materials (defined in Section IV.A.3 below).  Each Director Defendant was a Director at the time of the Offering, or signed the Registration Statement, attesting to the truth and accuracy of the various statements contained and incorporated therein, and that the Registration Statement and materials incorporated therein were free from misstatements or omissions of material fact.

### (c)    Underwriter Defendants

447.    Goldman Sachs & Co. LLC ("Goldman") is an investment bank located in New York, New York.  Goldman acted as an underwriter of the Offering, and pursuant to an underwriting agreement, agreed to purchase 1,133,334 shares in the Offering.

448.    Credit Suisse Securities (USA) LLC ("Credit Suisse") is an investment bank located in New York, New York.  Credit Suisse acted as an underwriter of the Offering, and pursuant to an underwriting agreement, agreed to purchase 1,133,334 shares in the Offering.

449.    Citigroup Global Markets, Inc. ("Citigroup") is an investment bank located in New York, New York.  Citigroup acted as an underwriter of the Offering, and pursuant to an underwriting agreement, agreed to purchase 666,667 shares in the Offering.

450.    Compass Point Research & Trading, LLC ("Compass Point") is an investment bank located in Washington, D.C. Compass Point acted as an underwriter of the Offering, and pursuant to an underwriting agreement, agreed to purchase 133,333 shares in the Offering.

451.    KeyBanc Capital Markets Inc. ("KeyBanc") is an investment bank located in Cleveland, Ohio.  KeyBanc acted as an underwriter of the Offering, and pursuant to an underwriting agreement, agreed to purchase 133,333 shares in the Offering.

452.    Macquarie Capital (USA) Inc. ("Macquarie") is an investment management company located in New York, New York.  Macquarie acted as an underwriter of the Offering, and pursuant to an underwriting agreement, agreed to purchase 133,333 shares in the Offering.

453.    The Underwriter Defendants participated in the drafting and dissemination of the Offering Materials and collectively received discounts and commissions of approximately $14,524,503 in connection with the Offering.  The Underwriter Defendants failed to perform adequate due diligence in connection with their role as underwriters and were negligent in failing to ensure that the Offering Materials were prepared properly, accurately, and free from misstatements or omissions of material fact.  The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

### 3.    2U Conducts the Offering

454.    2U filed a Preliminary Prospectus Supplement with the SEC on May 21, 2018, and on May 23, 2018, 2U filed a Prospectus Supplement with the SEC (the "Prospectus Supplement").  The Prospectus Supplement consists of two parts, the Prospectus Supplement and a Prospectus dated September 23, 2015, and incorporated by reference certain additional documents.  The Prospectus Supplement and Prospectus comprised part of a Registration Statement.  The Registration Statement and documents incorporated therein by reference are referred to herein as the "Offering Materials."

455.    The Registration Statement was signed by Paucek, Graham, and the Director Defendants.  Pursuant to the Registration Statement and other Offering Materials, the Company completed the Offering on May 25, 2018, issuing shares to the Securities Act Class in the aggregate principal amount of $300 million.

### 4. The Securities Act Defendants' Untrue or Misleading Statements and Omissions of Material Facts

456. The Offering Materials included publicly filed 2U documents containing false and misleading statements and omissions of material fact, and provided investors with an inaccurate and incomplete picture of 2U's growth prospects.

457. For example, the Offering Materials incorporated by reference the Company's Form 10-K reporting financial results for the fourth quarter and fiscal year 2017, filed with the SEC on February 27, 2018 ("2017 10-K"). The 2017 10-K purported to describe the Company's growth strategy as being "to add graduate programs and short courses with new and existing university clients, and increase student enrollments across our entire portfolio of offerings."

458. The 2017 10-K also described how the Company had grown rapidly since 2008, stating "from one client with one program in one academic discipline in 2008 to 24 clients with 51 programs in 23 degree verticals today, 37 of which have launched and have students enrolled. A full listing of all 51 announced programs, including the programs we plan to launch in 2018, can be found at investor.2u.com."

459. The 2017 10-K represented that, since its founding in 2008, the Company had grown better at student acquisition, and that had led to increased demand for its services and increased growth, stating:

> Over the past decade, we have developed new and innovative tools within our platform to enhance the effectiveness of instructional methods and improve student outcomes and the student experience. ***During that time, we have also refined our program selection algorithm and improved our data-driven digital marketing capabilities across our ecosystem of offerings to generate increased student enrollments in a cost effective manner***. As a result, demand for our comprehensive platform of integrated technology and services has increased significantly. ***Since 2008, we have expanded our university client base from one to 24 across our entire portfolio of offerings, increased the***

*number of 2U-powered graduate programs from one to 37, and enrolled over 33,000 graduate students.*

460.    In the context of the growth story presented in the 2017 10-K, the statement that "we have also refined our program selection algorithm and improved our data-driven digital marketing capabilities across our ecosystem of offerings to generate increased student enrollments in a cost effective manner" and the statements regarding the Company's program growth were materially false and misleading when made because, at the time of the Offering, 2U's internal projections showed enrollment declining in future periods, and the Company was unable to scale its student acquisition infrastructure to keep pace with 2U's growth (*see, infra,* Section IV.B).

461.    The 2017 10-K further stated that 2U provided "the following back end technology and services to launch and operate our offerings" and included:

> *Student Acquisition.* **Leveraging data analytics and machine learning techniques, we develop targeted, offering-specific digital marketing campaigns that can reach and engage interested and qualified prospective students in a cost-effective manner.** Our marketing teams also develop creative assets, such as websites related to the graduate program and short course fields of study, and execute search engine optimization and paid search campaigns aimed at acquiring students cost-effectively.

462.    The statement that 2U "develop[ed] . . . marketing campaigns that can reach and engage interested and qualified prospective students in a cost effective manner" was materially false and misleading when made because, at the time of the Offering, 2U's internal projections showed the enrollment declining in future periods (*see, infra,* Section IV.B) and the Company's student acquisition efforts were not scaling to keep pace with the Company's growth.

463.    The 2017 10-K further described "Competition" and stated that "[w]e expect that the competitive landscape will expand as the market for online education offerings at nonprofit institutions matures.  We believe the principal competitive factors in our market include the

following" and presented a list of competitive factors, including, "expertise in marketing, student acquisition and student retention."  The 2017 10-K further stated that "***We believe we compete favorably on the basis of these factors.***"

464.    The statement in the 2017 10-K regarding competition and 2U's ability to compete on the listed factors, was materially false and misleading when made because the Securities Act Defendants did not have a reasonable basis for claiming to believe that 2U competed "favorably" in marketing and student acquisition in light of the then-present facts that: (a) the Company's internal enrollment forecasts had been declining since 2017, and the decline was worsening throughout 2018; (b) the Company's marketing and student acquisition efforts could not keep pace with the Company's  increasing number of programs; (c) the Company's growth model was not compatible with the increasing saturation of the market for online graduate courses; and (d) the Company's student acquisition teams were losing students to competing programs (*see* Section IV.B)

465.    The 2017 10-K also had a section purporting to disclose risks to the business.  In that section, the following risk was identified:

> We have grown rapidly and expect to continue to invest in our growth for the foreseeable future. If we fail to manage this growth effectively, the success of our business model will be compromised.
>
> We have experienced rapid growth in a relatively short period of time, which has placed, and will continue to place, a significant strain on our administrative and operational infrastructure, facilities and other resources. Our ability to manage our operations and growth will require us to continue to expand our marketing and sales personnel, technology team, finance and administration teams, as well as our facilities and infrastructure. We will also be required to refine our operational, financial and management controls and reporting systems and procedures. ***If we fail to manage this expansion of our business efficiently, our costs and expenses may increase more than we plan and we may not successfully*** expand our university client base, enhance our

platform, develop new offerings with new and existing university clients, ***attract a sufficient number of qualified students in a cost-effective manner***, satisfy the requirements of our existing university clients, ***respond to competitive challenges or otherwise execute our business plan***. Accordingly, our historical revenue growth rate may not continue in the future.

466.    The statements that "if" 2U did not "manage growth effectively" its "business model will be compromised" and "[i]f we fail to manage this expansion of our business efficiently" 2U "may not successfully" "attract a sufficient number of qualified students in a cost-effective manner" or "respond to competitive challenges or otherwise execute our business plan" were materially false and misleading at the time of the Offering because, as demonstrated in Section IV.B, 2U had already failed to manage growth effectively, as its student acquisition efforts failed to scale with its growth, and 2U had already failed to respond to competitive challenges to its student recruitment efforts. Describing these presently occurring facts as unrealized potentialities was materially false and misleading.

467.    The 2017 10-K also warned that "[w]e face competition from established and emerging companies, which could divert university clients or students to our competitors, result in pricing pressure and significantly reduce our revenue." This statement was materially false and misleading when made because, as described in Section IV.B, 2U was already encountering growing competition for students that had at the time of the Offering caused students to enroll with competitors. Describing these presently occurring facts as unrealized potentialities was materially false and misleading.

### 5.    The Offering Materials Omitted Information that Was Required to Be Disclosed Under Item 503

468.    The Offering Materials failed to comply with Item 503 of Regulation S-K, 17 C.F.R. §229.503(c) ("Item 503"), including, among other things, a "discussion of the most significant factors that make the offering speculative or risky." Here, the most significant factors

that made the Offering speculative or risky to investors included, at the time of the Offering that: (1) the Company had been seeing enrollment forecasts decline since 2017, a trend that was worsening in 2018; (2) the Company was failing to adapt to an increasingly saturated market for online degree programs; (3) the Company was failing to successfully scale its marketing operations to keep pace with its growth in programs; (4) 2U was failing to achieve projected marketing efficiencies at the front end of the funnel as costs for online marketing rose; and (5) the Company was failing to execute at the mid-point in the funnel, as the understaffed admissions department was unable to keep up with unrealistic quotas, and as 2U's multi-program vertical strategy resulted in the Company's own programs competing for the same students.

469.    Nowhere within the Offering Materials did 2U disclose to investors that, as of the date of the Offering, these material known trends were occurring, resulting in a host of financial problems.  Accordingly, disclosure of this material fact was required under Item 503.

**B.     Facts and Trends Present at the Time of the Offering Rendered the Offering Materials Materially False and Misleading**

**1.     Enrollment Forecasts Declined in 2017 and 2018**

470.    Information provided by former employees demonstrates that 2U's internal projections in 2017 and 2018 showed enrollment declining.

471.    Information provided by FE-2 demonstrates that enrollment forecasts had been trending down at the time of the Offering.  FE-2 worked at 2U from 2017 until Spring of 2020. She served as a manager and a senior manager until early 2019.  As a manager and a senior manager, FE-2 led a team that was responsible for detecting trends and forecasting 2U's growth based on seasonality and demand from quarterly reports of past numbers of enrollments and degrees received by students, lead generations and historical sales, and sales funnels (the number of students who completed applications, put down deposits, registered, etc.).  She worked with

many different teams within 2U, including the marketing team, where she helped with demand generation and observed that 2U was not spending enough money to make sales in 2017 and through 2018.

472.    FE-2 explained that 2U's forecasting was typically six months in advance.  FE-2 explained that Defendant Mokkarala often wanted to see forecast numbers earlier than they were due, and that he was stressed about enrollment numbers throughout the Class Period.  According to FE-2, prior to 2017, the Company had seen growth year after year, but enrollment projections began to slowly stall in 2017, and the problem worsened in 2018.

## 2.    2U's Student Acquisition Program Could Not Keep Up With Enrollment Needs

473.    According to former employees who worked on programs across the Company's portfolio, by 2018, the front-end of the funnel was no longer generating leads sufficient to meet the needs of 2U's programs and 2U's admissions staff struggled to meet their quotas.

### (a)    2U's Marketing Department Could Not Keep Up With the Company's Enrollment Needs at the Time of the Offering

474.    Former employees in the marketing department confirmed that, by 2018, the Company was no longer able to generate leads reliably using the methods it had used before, due to increased competition for students combined with a change in 2U's strategy, from partnering with well-known universities to adding programs from lesser-known universities that were harder to market.

475.    That 2U was unable to achieve marketing efficiencies is evident from information provided by FE-5.  FE-5 worked at 2U from 2014 until Spring of 2019, most recently in the role of senior brand marketing manager.  As a senior brand marketing manager for 2U, FE-5 led a cross-functional marketing team focused on driving enrollment for 2U's online graduate

programs.  FE-5's team worked in various channels, including conversion rate optimization, SEO, demand generation, inbound marketing, PR, and email.

476.    According to FE-5, competition was growing for years, and over 2018, they saw more and more programs.  FE-5 explained that universities got more competitive, hiring advertising agencies and spending their own money to market programs, which bid up media costs.  Meanwhile, she noted, the online education market continued to expand.  When 2U launched, according to FE-5, they were the only place to go for online degrees from top tier universities.

477.    FE-6 also noticed a change in 2018.  FE-6 worked at 2U from 2014 until the end of 2018, most recently in the position of senior brand marketing coordinator.  She said she loved working at 2U for most of her tenure and at the end of 2017 she thought she would work for the Company forever.  However, a change in corporate culture and philosophy in 2018 left FE-6 disillusioned with the Company and she quit at the end of 2018.

478.    FE-6 explained that the Company model had completely changed in 2018.  Before then, 2U had always been focused on quality and on the caliber of the university, and had been focused on exploring expansion opportunities with their top-tier university partners, vetting the interest level in various programs at schools within a select group of elite institutions.  Then, all of the sudden, the Company began rapidly increasing the number of schools it partnered with, and added universities that FE-6 had never heard of, and that she felt would not be competitive.

479.    In 2018, FE-6 said, 2U's cyber security, computer science, and computer engineering programs were struggling to entice students.

**(b)  Converting Leads to Enrolled Students Became Increasingly Difficult Throughout 2018**

480.    At the same time that 2U was seeing its marketing costs increase and a decreased pool of interested students, more and more universities were launching online degree programs. Indeed, many of these degree programs were being launched in partnership with 2U, a fact that 2U touted throughout the Class Period.  Contrary to the Securities Act Defendants' claims during the Class Period, the growing number of new programs were competing for a limited pool of students that were open to online learning and willing to pay full price for it.

481.    According to former employees that worked on numerous 2U programs, the lack of marketing efficiencies and increased competition for students manifested both in insufficient leads coming into the funnel and in students that did come in opting for competing programs mid-funnel.

482.    Information provided by FE-7 demonstrates that problems with the marketing funnel translated into enrollment problems.  FE-7 served as a director of sales at 2U, from April 2018 to October 2019.  In that role, FE-7 ran a sales team with two managers and 20 admissions counselors that solicited students to sign up for 2U's University of Dayton MBA program.  She had previously worked as a senior admissions counselor the Syracuse MBA program.  According to FE-7, 2U had oversaturated the market for MBAs and was competing with its own programs at different universities.

483.    FE-7 said it did not come as a surprise when it was confirmed after the first cohort started in 2019 that enrollment numbers were down.  FE-7 pulled reports daily, and knew exactly what her team was facing and how far down they were.  FE-7 recalled being pretty vocal about not having what her team needed to be successful.

484.     FE-7 and her team received leads generated by 2U's marketing team and they were expected to convert as many of those leads as possible into students.  FE-7 explained that the amount of leads coming in was inadequate because her team converted around two percent, and just doing that math would show that they needed a lot more leads coming in for the admissions counselors to convert.

485.     This was corroborated by FE-2, who explained that 2U was not spending enough on marketing to make sales in 2017 and 2018.

486.     Another significant challenge the admissions teams were facing was the failure of 2U's multi-program vertical strategy to translate to a higher conversion rate.

487.     That the multi program vertical model was broken is also evident from information provided by FE-8, who served as an executive admissions counselor for 2U from September 2018 to June 2019 for the American University and as an admissions counselor from March 2015 to August 2018 in the USC Social Work program.  FE-8 explained that the multi-program vertical strategy was built around the idea that if 2U built another university partnership around the same sort of program they had already developed for an existing-client university, they could save marketing money.

488.     In fact, FE-8 explained that 2U was effectively undermining its biggest programs with cheaper offerings in the same vertical.  According to FE-8, it became tougher for USC to enroll students in its MSW program when competing options with far more reasonable tuition rolled out.  FE-8 explained that the price difference became a point of contention for 2U employees who worked for the pricey programs.  FE-8 provided the example of the USC program being over $115,000, while other social work programs at 2U range from $70,000 to $90,000.  FE-8 said that the same issue existed in the MBA vertical.  Tuition for the MBA

program at Syracuse University was in the $80,000 to $90,000 range while UNC Chapel Hill was $120,000.

489.     The failure of the MPV to lead to a higher conversion rate was further corroborated by information provided by FE-9.  FE-9 served as a sales manager for 2U from August 2017 to March 2019 and as a senior sales representative for the Company from June 2014 to August 2017.  FE-9 explained that the program she worked on, USC's Master of Education in School Counseling, was extremely expensive, costing over $92,000, but students could apply somewhere else and pay half the amount of money for the same degree.  She further observed that the market was getting more and more saturated as 2U partnered with other universities offering similar school counseling programs, and found that many of the prospective students were shopping around looking for the cheapest programs.

490.     FE-9 joined 2U right after its IPO.  She stated that there was a lot of excitement earlier on when they began adding different programs, but then she discovered that the Company did not have an infrastructure in place to support them.  She also explained that 2U's program was a tough sell, and stated that because of that, the Company had a high turnover rate of admissions counselors, who were essentially sales representative.

491.     Similarly, FE-12 grew frustrated with the level of competition her programs faced from 2U offerings within the same vertical but offered in partnership with different 2U partners.  FE-12 served as a senior admissions counselor for the Master of Science in Education program at the University of Dayton from March 2019 to November 2019, and as an admissions counselor for the Washington University legal studies program from January 2018 to February 2019.  FE-12 stated that she felt constant pressure to compete against her own Company.  The 2U admissions teams "lead share" within verticals, explained FE-12, which meant that 2U gave the

admissions staff for each program in a vertical access to one another's leads, a practice that was frustrating for the admissions staff and the prospective students.

### (c)   The Admissions Counselors Were Unable to Keep Up With 2U's Growth

492.   According to multiple former employees in the admissions department, 2U did not provide adequate additional resources to the marketing funnel to match the Company's ever-increasing enrollment needs.  Instead, employees were expected to do more with less, and the Company steadily raised the enrollment quotas that employees were expected to reach throughout 2018.  According to these employees, these quotas were unreachable and not based on any prior metric.  These changes greatly impacted employee morale, and the Company experienced unprecedented turnover in its admissions staff, making it still harder to reach the numbers that executives were demanding.

493.   That 2U imposed ever-increasing and unrealistic quotas in 2018 is evident from information provided by FE-13.  FE-13 served as a placement specialist for the Simmons MSW program at 2U, Inc. from July 2018 to November 2019 and as an admissions counselor for the Harvard Business Analytics Program from October 2017 to July 2018.  According to FE-13, at 2U, everything was tied to numbers.  She was expected to meet daily, weekly, and monthly goals that had been established for different parts of the placement process.  Before she moved over to the placement specialist role, FE-13 was expected to recruit students for the Harvard Business Analytics Program.  The challenge of the position became quickly apparent as the enrollment numbers she was expected to hit grew substantially each cohort, becoming increasingly unrealistic.

494.   FE-13 said that when she started, her team was expected to get 10 students per cohort.  When the team achieved that, 2U wanted 20 students.  When they got 20, the Company

wanted 40, and then went to 80, and then 100. FE-13 said the drastic increases in expectations for the team occurred from one cohort to the next and they were not given any additional resources to grow enrollment in line with expectations. By summer 2018, her enrollment target numbers had become impossible to achieve, and she noted that if you did not hit your numbers you were fired. FE-13 explained that the Company was projecting numbers that did not add up with the market and were not realistic expectations.

495.    Another former employee, FE-14, confirmed that the projections for enrollment did not accurately predict achievable enrollment levels. FE-14 served as an executive admissions counselor for Rice's MBA program from February 2018 to September 2019.

496.    FE-14 explained that selling students on enrolling in the pricey online MBA program at Rice University was a high-touch endeavor and that the sales cycle was long and labor intensive. She said that the time devoted to enrolling each new student was significant and the sales cycle typically stretched about six months from initial student contact through enrollment. Though the flow of leads was steady, the expectations always seemed unrealistic given the particulars of the sales process.

497.    FE-14 said that for one cohort, 20 new students would have been a realistic goal for a five-person admissions team. Even five students per person would be realistic. But, FE-14 explained, enrolling seven or 10 students in a three-month period, as was sometimes asked of the admissions counselors, was not realistic given the resources available.

498.    FE-2 also explained that as early as February 2018, the Company's sales goals were unreachable. According to FE-2, 2U expected larger growth than it had historically experienced while competition was increasing. This was corroborated by FE-5, who noted that

the Company always set the application targets much higher than the admissions teams felt was realistic.

### 3.    2U's Marketing Problems Impacted a Significant Amount of Revenue

499.    The above former 2U employees provide allegations related to programs that contributed a significant amount of 2U's revenue at the time of the Offering.  For example, multiple former employees reported particularized problems recruiting students for USC and Simmons programs.  USC programs accounted for 27% of 2U's revenue in 2017, 21% in 2018, and 15% in 2019.  Simmons programs accounted for 17% of 2U's revenues in 2017, 13% in 2018, and 8% in 2019.  Those two schools alone contributed 44%, 34%, and 23% of revenue in 2017, 2018, and 2019, respectively.

500.    Furthermore, while 2U did not provide revenue numbers by program, the Securities Act Defendants did provide a list of the top 20 programs by enrollment during the February 25, 2019 earnings call.  The above former employees reported particularized problems recruiting students for USC Master of Social Work (#1), USC Rossier Online (#3), Simmons MSW (#6), University of Dayton MBA (#12), Harvard Business Analytics (#17), and the Washington University Legal Studies program (#19).

### 4.    2U's Stock Price Declines as Investors Learn of the Company's Problems

501.    Eventually, however, the combination of worsening trends in student acquisition and 2U's creaking student acquisition machinery resulted in lower enrollments in 2U programs.

502.    On May 7, 2019, the Defendants 2U, Paucek, and Graham revealed deepening losses, with net losses for the first quarter increasing $6.7 million year over year to $21.6 million. Defendant Graham also stated that 2U was reducing 2019 guidance after seeing "some decline in expected graduate program enrollments beginning in the second quarter and continuing through

the rest of the year" and lowered 2019 guidance as a result.  Defendants Paucek and Graham attributed the decline primarily to admission decisions made by universities, and Defendants Paucek told investors that 2U's growth story remained intact and that "we continue to see programs across the portfolio scale toward our target ranges for new student enrollments.  We still firmly believe in our runway of 250 DGPs. Pipeline for those programs is strong.  We've got a bunch of announcements coming, but that's for another day."

503.    On this news, the price of 2U stock declined over 25 percent in a single trading day, on abnormally high volume of over 7 million shares traded, to close at $44.77 per share on May 8, 2019.

504.    Because the decline in enrollment was attributed to admission decisions, investors could not have discovered that the actual causes of the enrollment decline were facts and trends present at the time of the Offering such as increasing competition for students and problems with 2U's student acquisition program.  Nor could investors have discovered that 2U's internal enrollment projections had been trending materially downward at the time of the Offering.

505.    Then, two months later, on July 30, 2019, after the close of trading, the Company significantly reduced its guidance in its earnings release, and disclosed that its growth plans—which had underpinned its stock valuate—were failing and needed to be abandoned as costs ballooned.  In particular, 2U's projected net loss for 2019 had increased by over $70 million.  In addition, these projected losses for the year, which included certain costs related to the recent acquisition of a short course provider, Trilogy, represented a 300 percent year-over-year increase.  On the Company's conference call accompanying the release, Defendant Paucek disclosed that 2U was "moderating [its] outlook for the business in the short term" and,

"[e]xcluding the expected financial impact of Trilogy, this implies *a step down in revenue expectations for the rest of the business*."

506.   In his explanation for the poor outlook for the Graduate Division, Defendant Paucek disclosed that the marketing funnel did not work as well anymore, saying "competition for students has increased," and that 2U now expected "smaller average steady-state program[s]" (meaning less profitable programs) and that "our guidance presumes lower conversion rates on a go-forward basis" (meaning higher marketing costs).  In effect, Defendant Paucek disclosed that 2U had experienced the facts and trends that former employees reported seeing before and at the time of the Offering, including downward trending enrollment projections, increasing competition for students, marketing efficiency problems, the multi-program vertical strategy failing to increase conversion rates, and unrealistic expectations for admissions counselors.

507.   Defendant Paucek revealed that, due to these problems, 2U's business model would need to undergo substantial adjustment to compete in an increasingly saturated online education market and that the Company's cash flow was inadequate for purposes of maintaining the Company's present strategies.  He described the Company's prior growth story as a "*mistake*" and stated that he needed to "*level set*" with the investment community.

508.   On this news, the price of 2U stock declined *65 percent* in a single trading day, on extremely high volume of over 54 million shares traded, to close at $12.80 per share on July 31, 2019.

### C.   Class Action Allegations for Securities Act Claims

509.   OKCERS brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure alleging violations of Sections 11, 12(a)(2), and 15 of the Securities Act, and rules promulgated thereunder by the SEC, on behalf of all persons and entities that purchased or acquired 2U common stock pursuant or traceable to the Registration

Statement ("Securities Act Class").  The following are excluded from the Securities Act Class: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer or director of 2U during the Class Period; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling interest; (v) 2U's affiliates, including its employee retirement or benefit plan(s) and their participants or beneficiaries to the extent they purchased or otherwise acquired 2U common stock pursuant or traceable to the Registration Statement; and (vi) the legal representatives, affiliates, heirs, successors-in-interest, or assigns of any such excluded person.

510.    Members of the Securities Act Class are so numerous that joinder of all members is impracticable.  2U sold 3,333,334 shares of common stock in the Offering.  While the exact number of Securities Act Class members can only be determined by appropriate discovery, OKCERS believes that the Securities Act Class members number at least in the hundreds, if not the thousands, and that they are geographically dispersed.

511.    OKCERS's claims are typical of the claims of the members of the Securities Act Class because OKCERS and all of the Securities Act Class members sustained damages arising out of the Securities Act Defendants' wrongful conduct complained of herein.

512.    OKCERS will fairly and adequately protect the interests of the Securities Act Class members and have retained counsel experienced and competent in class actions and securities litigation.  OKCERS has no interests that are contrary to, or in conflict with, the members of the Securities Act Class that OKCERS seeks to represent.

513.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Securities Act Class may be relatively small,

the expense and burden of individual litigation make it impossible for the members of the

Securities Act Class to individually redress the wrongs done to them.  There will be no difficulty

in the management of this action as a class action.

514.    Questions of law and fact common to the members of the Securities Act Class

predominate over any questions that may affect only individual members in that the Securities

Act Defendants have acted on grounds generally applicable to the entire Securities Act Class.

Among the questions of law and fact common to the Securities Act Class are:

(a)    whether the Securities Act Defendants violated the federal securities laws

as alleged herein;

(b)    whether the Offering Materials contained or incorporated material

misrepresentations;

(c)    whether the Securities Act Defendants failed to convey material facts in

the Offering Materials or to correct material facts previously disseminated;

(d)    whether the price of 2U's common stock was artificially inflated due to

the material nondisclosures and/or misrepresentations contained or incorporated in the Offering

Materials; and

(e)    whether the members of the Securities Act Class have sustained damages

as a result of the decline in value of 2U common stock when the truth was revealed and the

artificial inflation came out, and, if so, what is the appropriate measure of damages.

### COUNT III

**For Violations of Section 11 of the Securities Act
Against All of the Securities Act Defendants**

515.    OKCERS repeats and realleges the allegations set forth in ¶¶ 430-514 above as

though fully set forth herein.

516.    This Count is brought pursuant to Section 11 of the Securities Act on behalf of the Securities Act Class against all of the Securities Act Defendants.

517.    The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

518.    This cause of action does not sound in fraud. OKCERS does not allege that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent, which are not elements of a Section 11 claim. OKCERS expressly disclaims any allegations of scienter or fraudulent intent in these non-fraud claims except that any challenged statements of opinion or belief made in connection with the Offering are alleged to have been materially misstated statements of opinion or belief when made.

519.    The Securities Act Defendants are strictly liable to OKCERS and the other members of the Securities Act Class for the misstatements and omissions.

520.    None of the Securities Act Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

521.    By reason of the conduct herein alleged, the Securities Act Defendants each violated, and/or controlled a person who violated, Section 11 of the Securities Act.

522.    OKCERS purchased shares in the Offering.

523.    OKCERS and the other members of the Securities Act Class have sustained damages.  The value of 2U common stock has declined substantially subsequent to and due to the violations of the Securities Act Defendants.

524.    At the time of their purchases of 2U common stock, OKCERS and the other members of the Securities Act Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.  Less than one year has elapsed from the time OKCERS discovered or reasonably could have discovered the facts upon which this Complaint is based to the time OKCERS commenced this action.  Fewer than three years has elapsed between the time the common stock upon which this Count is brought were offered to the public and the time OKCERS commenced this action.

## COUNT IV

### For Violations of Section 12(a)(2) of the Securities Act
### Against All of the Securities Act Defendants

525.    OKCERS repeats and realleges the allegations set forth in ¶¶ 430-514 above as though fully set forth herein.

526.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act on behalf of the Securities Act Class against all of the Securities Act Defendants.

527.    The Prospectus Supplement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

528.    This cause of action does not sound in fraud. OKCERS does not allege that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim. This Count is based solely on negligence and/or strict liability. OKCERS expressly disclaims any allegations of scienter or fraudulent intent in these non-fraud claims except that any challenged statements of

opinion or belief made in connection with the Offering are alleged to have been materially misstated statements of opinion or belief when made .

529.    None of the Securities Act Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Prospectus Supplement were true and without omissions of any material facts and were not misleading.

530.    By reason of the conduct herein alleged, the Securities Act Defendants each violated, and/or controlled a person who violated, Section 12(a)(2) of the Securities Act.

531.    OKCERS purchased shares in the Offering.

532.    OKCERS and the other members of the Securities Act Class have sustained damages.  The value of 2U common stock has declined substantially subsequent to and due to the violations of the Securities Act Defendants.

533.    At the time of their purchases of 2U common stock, OKCERS and the other members of the Securities Act Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.  Less than one year has elapsed from the time OKCERS discovered or reasonably could have discovered the facts upon which this Complaint is based to the time OKCERS commenced this action.  Fewer than three years has elapsed between the time the common stock upon which this Count is brought were offered to the public and the time OKCERS commenced this action.

## COUNT V

### For Violations of Section 15 of the Securities Act
### Against Paucek, Graham, and the Director Defendants

534.    OKCERS repeats and realleges the allegations set forth in ¶¶ 430-514 above as though fully set forth herein.

535.    This Count is brought pursuant to Section 15 of the Securities Act on behalf of the Securities Act Class against Defendants Paucek, Graham, and the Director Defendants.

536.    Defendants Paucek, Graham, and the Director Defendants each were control persons of 2U by virtue of their positions as directors and/or senior officers of 2U.  Defendants Paucek, Graham, and the Director Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of 2U.

537.    Defendants Paucek, Graham, and the Director Defendants each were culpable participants in the violations of Section 11 of the Securities Act alleged in Count III above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which allowed the Offering to be successfully completed.

538.    The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

539.    Defendants Paucek, Graham, and the Director Defendants are strictly liable to OKCERS and the other members of the Securities Act Class for the misstatements and omissions.

540.    None of the Securities Act Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the

Registration Statement were true and without omissions of any material facts and were not misleading.

541.     By reason of the conduct herein alleged, Defendants Paucek, Graham, and the Director Defendants each violated, and/or controlled a person who violated, Section 15 of the Securities Act.

542.     OKCERS purchased shares in the Offering.

543.     OKCERS and the other members of the Securities Act Class have sustained damages.  The value of 2U common stock has declined substantially subsequent to and due to the violations of Defendants Paucek, Graham, and the Director Defendants.

544.     At the time of their purchases 2U common stock, OKCERS and the other members of the Securities Act Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.  Less than one year has elapsed from the time OKCERS discovered or reasonably could have discovered the facts upon which this Complaint is based to the time OKCERS commenced this action.  Fewer than three years has elapsed between the time the common stock upon which this Count is brought were offered to the public and the time OKCERS commenced this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.      Determining that this action is a proper class action, certifying Lead Plaintiff and Additional Named Plaintiff as class representatives under Rule 23 of the Federal Rules of Civil Procedure, and appointing Plaintiffs' counsel as class counsel;

B.      Awarding Plaintiffs and the members of the Exchange Act and Securities Act Classes damages in an amount to be proven at trial, including interest;

C.      Awarding rescission or a rescissionary measure of damages;

D.      Awarding Plaintiffs' reasonable costs and attorneys' fees; and

E.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: July 30, 2020                    Respectfully Submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman (admitted *pro hac vice*)
Emma Gilmore (admitted *pro hac vice*)
Heather Volik (admitted *pro hac vice*)
600 Third Avenue, 20th Floor
New York, NY  10016
Tel:  (212) 661-1100
Fax: (917) 463-1044
Email: jalieberman@pomlaw.com
        egilmore@pomlaw.com
        hvolik@pomlaw.com

*Counsel for Lead Plaintiff Fiyyaz*
*Pirani and Lead Counsel for the Class*

**GOLDMAN & MINTON, P.C.**
Thomas J. Minton – No. 03370

3600 Clipper Mill Rd., Suite 201
Baltimore, MD 21211
Tel: (410) 783-7575
Fax: (410) 783-1711
Email: tminton@charmcitylegal.com

*Counsel for Lead Plaintiff Fiyyaz Pirani*

**LABATON SUCHAROW LLP**
James W. Johnson (*pro hac vice* pending)
Serena P. Hallowell (*pro hac vice* pending)
Lara A. Goldstone (*pro hac vice* pending)
Thomas W. Watson (*pro hac vice* pending)
Margaret A. Schmidt (*pro hac vice* pending)
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
Email: jjohnson@labaton.com
        shallowell@labaton.com
        lgoldstone@labaton.com
        twatson@labaton.com
        mschmidt@labaton.com

*Counsel for Additional Named Plaintiff*
*Oklahoma City Employee Retirement System*
*and Additional Counsel for Lead Plaintiff*
*Fiyyaz Pirani and for the Class*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on July 30, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

*/s/ Jeremy A. Lieberman*
JEREMY A. LIEBERMAN
