**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND**

| |
|---|
| IN RE 2U, INC. SECURITIES CLASS ACTION |

Consolidated Case No. 8:19-cv-03455-TDC

## <u>MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................1

FACTUAL BACKGROUND ........................................................................................4

    A.    Successful Execution Of 2U's Business Model Is Dependent Upon Factors Outside Of Its Control ........................................................................................4

    B.    2U Was Successful Historically In Increasing Enrollments And Meeting Its Revenue Projections ........................................................................................7

    C.    2U Faced Unexpected Headwinds In The Second Quarter Of 2019 .......................9

    D.    Plaintiffs Allege That 2U's Failure To Predict The Future Is Fraud ....................10

I.    EXCHANGE ACT CLAIMS ........................................................................................11

    A.    The Complaint Fails To Plead Particularized Facts Giving Rise To A Strong Inference That Each Exchange Act Defendant Had Scienter .................12

        1.    Former Employee Allegations Fail To Demonstrate Severe Recklessness ........................................................................................13

        2.    Mr. Paucek's Stock Sales Are Not Suspicious ...........................................18

        3.    Allegations Regarding 2U's "Core Operations" And Ms. Graham's Resignation Fail To Demonstrate Scienter .................................................20

        4.    The Non-Culpable Inference Is More Compelling ....................................20

    B.    The Complaint Fails To Plead A Material Misstatement Or Omission ................22

        1.    2U's Projections Are Immunized By The Safe Harbor .............................22

            a.    First, The Projections Are Immaterial ...........................................23

            b.    Second, The Projections Were Identified As Forward-Looking And Accompanied By Meaningful Cautionary Language ........................................................................................23

            c.    And Third, The Complaint Does Not Plead Particularized Facts Showing That Any Exchange Act Defendant Actually Knew Any Projection Was False Or Misleading ...........................26

        2.    The Corporate Puffery Statements Are Non-Actionable ...........................28

        3.    Many Of The Statements Are Non-Actionable Opinions ..........................29

        4.    In Any Event, Plaintiffs' Have Not Pled Facts To Show That Any Statement Was False Or Misleading ...........................................................32

        5.    The Section 20(a) Claim Fails .....................................................................37

II.    SECURITIES ACT CLAIMS ....................................................................................37

A.      OKCERS' Securities Act Claims Are Time-Barred ...............................................38

B.      OKCERS Fails To Plead An Actionable Misstatement.........................................41

C.      In Any Event, OKCERS Has Not Pled Facts To Show Any Statement Was
        False .......................................................................................................................43

D.      Persons Who Did Not Purchase In The Offering Lack Standing Under §
        11.............................................................................................................................46

E.      OKCERS Cannot Maintain A Section 12(a)(2) Claim Against The
        Securities Act Defendants .....................................................................................47

F.      OKCERS Fails To Plead A Violation Of Item 503 ...............................................49

G.      Plaintiffs Fail To Plead Control Person Liability Under Section 15(a)................50

CONCLUSION.............................................................................................................................50

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*In re Acterna Corp. Sec. Litig.*,
    378 F. Supp. 2d 561 (D. Md. 2005) .........................................................................18

*Ash v. PowerSecure Int'l, Inc.*,
    2015 WL 5444741 (E.D.N.C. Sept. 15, 2015).............................................7, 14, 36

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..................................................................................................11

*Barnes v. Osofsky*,
    373 F.2d 269 (2d Cir. 1967) .....................................................................................45

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ..................................................................................................11

*Bondali v. Yum! Brands, Inc.*,
    620 F. App'x 483 (6th Cir. 2015) ............................................................................41

*Brumbaugh v. Princeton Partners*,
    985 F.2d 157 (4th Cir. 1993) ..............................................................................37, 38

*Caviness v. Derand Res. Corp.*,
    983 F.2d 1295 (4th Cir. 1993) ..................................................................................37

*In re Century Aluminum Co. Sec. Litig.*,
    729 F.3d 1104 (9th Cir. 2013) ..................................................................................45

*In re Channeladvisor Corp., Sec. Litig.*,
    2016 WL 1381772 (E.D.N.C. Apr. 6, 2016), *aff'd*, 671 F. App'x 111 (2016).......41

*In re CIENA Corp. Sec. Litig.*,
    99 F. Supp. 2d 650 (D. Md. 2000) ...........................................................................18

*In re Constellation Energy Grp., Inc. Sec. Litig.*,
    738 F. Supp. 2d 614 (D. Md. 2010) ...................................................18, 28, 46, 47

*In re Conventry Healthcare, Inc. Sec. Litig.*,
    2011 WL 1230998 (D. Md. Mar. 30, 2011)..............................................................14

*Cozzarelli v. Inspire Pharms. Inc.*,
    549 F.3d 618 (4th Cir. 2008) ......................................................................... *passim*

iii

*In re Criimi Mae, Inc. Sec. Litig.*,
　94 F. Supp. 2d 652 (D. Md. 2000) ........................................................................21

*In re DXC Tech. Co. Sec. Litig.*,
　2020 WL 3456129 (E.D. Va. 2020) ............................................... *passim*

*In re E. Spire Commc'ns, Inc. Sec. Litig.*,
　127 F. Supp. 2d 734 (D. Md. 2001) ......................................................................20

*In re Eventbrite Sec. Litig.*,
　2020 WL 2042078 (N.D. Cal. Apr. 28, 2020) ......................................................34

*In re First Union Corp. Sec. Litig.*,
　128 F. Supp. 2d 871 (W.D.N.C. 2001) ................................................................28

*Frankfurt Tr. Inv. Luxemburg AG v. United Techs. Corp.*,
　336 F. Supp. 3d 196 (S.D.N.Y. 2018) ..................................................................31

*Hertzberg v. Dignity Partners, Inc.*,
　191 F.3d 1076 (9th Cir. 1999) ..............................................................................45

*Hillson Partners Ltd. Partnership v. Adage, Inc.*,
　42 F.3d 204 (4th Cir. 1994) ............................................................................21, 23

*Hirtestein v. Cempra, Inc.*,
　348 F. Supp. 3d 530 (M.D.N.C. 2018) ................................................................30

*In re Humphrey Hosp. Tr., Inc. Sec. Litig.*,
　219 F. Supp. 2d 675 (D. Md. 2002) ................................................................25, 26

*Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*,
　432 F. Supp. 2d 571 (E.D. Va. 2006) ..................................................................35

*Janies v. Cempra, Inc.*,
　816 F. App'x 747 (4th Cir. 2020) ........................................................................12

*Katyle v. Penn Nat'l Gaming, Inc.*,
　637 F.3d 462 (4th Cir. 2011) ..................................................................................4

*Knurr v. Orbital ATK Inc.*,
　272 F. Supp. 3d 784 (E.D. Va. 2017) ..................................................................18

*Lerner v. Nw. Biotherapeutics*,
　273 F. Supp. 3d 573 (D. Md. 2017) ....................................................................17

*Longman v. Food Lion, Inc.*,
　197 F.3d 675 (4th Cir. 1999) ..............................................................................28

iv

*Maguire Fin., LP v. PowerSecure Int'l, Inc.*,
  876 F.3d 541 (4th Cir. 2017) ........................................................................12, 21

*Malone v. Microdyne Corp.*,
  26 F.3d 471 (4th Cir. 1994) .......................................................................................23

*Marsh Grp. v. Prime Retail, Inc.*,
  46 F. App'x 140 (4th Cir. 2002) .................................................................................23

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011).......................................................................................................32

*In re Maximus, Inc. Sec. Litig.*,
  2018 WL 4076359 (E.D. Va. Aug. 27, 2018)..............................................................35

*Merck & Co., v. Reynolds*,
  559 U.S. 633 (2010).....................................................................................................37

*In re Mun. Mortg. & Equity, LLC, Sec. & Deriv. Litig.*,
  876 F. Supp. 2d 616 (D. Md. 2012) .....................................................................36, 47

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
  591 F.3d 250 (4th Cir. 2009) .....................................................................................11

*In re Neustar Sec.*,
  83 F. Supp. 3d 671 (E.D. Va. 2015) .....................................................................27, 28

*Okla. Firefighters Pension & Ret. Sys. v. K12, Inc.*,
  66 F. Supp. 3d 711 (E.D. Va. 2014) .............................................................21, 32, 33

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
  575 U.S. 175 (2015)...........................................................................................29, 30, 41

*Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*,
  918 F.3d 312 (4th Cir. 2019) ...........................................................23, 25, 29, 30

*Paskowitz v. Arnall*,
  2019 WL 3841999 (W.D.N.C. Aug. 15, 2019)............................................................34

*Pinter v. Dahl*,
  486 U.S. 622 (1988)...............................................................................................46, 47

*Pipefitters Local No. 636 Defined Benefit Plan v. Tekelec*,
  2013 WL 1192004 (W.D.N.C. March 22, 2013).....................................................15, 32

*Plymouth Cty. Ret. Ass'n v. Primo Water Corp.*,
  966 F. Supp. 2d 525 (M.D.N.C. 2013) .................................................................36, 48

*Proter v. Medifast, Inc.*,
2013 WL 1316034 (D. Md. Mar. 28, 2013)...............................................................17, 18, 19

*Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche LLP*,
551 F.3d 305 (4th Cir. 2009) ...................................................................................11

*Raab v. Gen. Physics Corp.*,
4 F.3d 286 (4th Cir. 1993) ...........................................................................2, 23, 27, 33

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
351 F. Supp. 2d 334 (D. Md. 2004)...............................................................................46, 47

*In re SCANA Corp. Sec. Litig.*,
2019 WL 1427443 (D.S.C. Mar. 29, 2019) ...............................................................35

*Shah v. GenVec, Inc.*,
2013 WL 5348133 (D. Md. Sept. 20, 2013) ...............................................................35

*Silverstrand Invs. v. AMAG Pharm., Inc.*,
707 F.3d 95 (1st Cir. 2013)...............................................................................48

*In re Sinclair Broadcast Grp., Inc. Sec. Litig.*,
2020 WL 571724 (D. Md. Feb. 4, 2020) ...................................................................*passim*

*Teachers' Ret. Sys. of La. v. Hunter*,
477 F.3d 162 (4th Cir. 2007) ...............................................................15, 16, 17, 18

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)...............................................................................4, 12, 13, 20

*TransEnterix Inv. Grp. v. TransEnterix, Inc.*,
272 F. Supp. 3d 740 (E.D.N.C. 2017)...............................................................45

*Tsirekidze v. Syntax-Brillian Corp.*,
2009 WL 2151838 (D. Ariz. July 17, 2009)...............................................................45

*In re Under Armour Sec. Litig.*,
342 F. Supp. 3d 658 (D. Md. 2018) ...................................................................*passim*

*In re Under Armour Sec. Litig.*,
409 F. Supp. 3d 446 (D. Md. 2010)...............................................................20

*In re USEC Sec. Litig.*,
190 F. Supp. 2d 808 (D. Md. 2002)...............................................................37

*Visual Networks Inc. Sec. Litig.*,
217 F. Supp. 2d 662 (D. Md. 2002)...............................................................18

vi

*Weller v. Scout Analytics, Inc.*,
   230 F. Supp. 3d 1085 (N.D. Cal. 2017) ...............................................................35

*In re XM Satellite Radio Holdings Sec. Litig.*,
   479 F. Supp. 2d 165 (D.D.C. 2007) ....................................................................40

*Yates v. Mun. Mortg. & Equity, LLC*,
   744 F.3d 874 (4th Cir. 2014) ...................................................................... *passim*

## STATUTES

15 U.S.C. § 77k(a) ............................................................................................36, 44

15 U.S.C. § 77*l*(a)(2)..........................................................................................36, 45

15 U.S.C. § 77m..........................................................................................................37

15 U.S.C. § 77o......................................................................................................36, 48

15 U.S.C. § 77z-2(i)(1) ..............................................................................................41

15 U.S.C. § 78u-4(b)(1)(B) .......................................................................................12

15 U.S.C. § 78u-4(b)(2)(A)...................................................................................12, 13

15 U.S.C. § 78u-5(i)(1) ..............................................................................................22

15 U.S.C. § 78u-5(c)(1) ..............................................................................................22

## RULES

Fed. R. Civ. P. 9(b) ....................................................................................................11

Fed. R. Civ. P. 12(b)(6)..............................................................................................11

Fed. R. Civ. P. 15(c)(1)..........................................................................................39, 40

Fed. R. Civ. P. 15(c)(1)(B) ........................................................................................39

## REGULATIONS

17 C.F.R. § 229.105 ...................................................................................................47

17 C.F.R. § 229.503(c)......................................................................................36, 47, 48

## OTHER AUTHORITIES

Final Rule, Modernization of Regulation S-K Items 101, 103, and 105 (Aug. 26, 2020), available
   at https://www.sec.gov/rules/final/2020/33-10825.pdf........................................47

H.R. Rep. No. 104-369 (1995), reprinted in 1995 U.S.C.C.A.N. 730...........................................12

Defendants submit this memorandum of law in support of their motion to dismiss the Consolidated Class Action Complaint ("Complaint" or "CC") with prejudice.[1]

## INTRODUCTION

Plaintiffs allege that 2U's failure to predict the future constitutes fraud. Plaintiffs' theory is that Defendants knew in February 2018 that at some unknowable point in the future 2U would report declining student enrollment and revenue, but did not disclose this supposed eventuality and instead continued to predict future successes. This is classic "fraud by hindsight" pleading because the only actual factual support for it is that enrollment and revenue declined seventeen months later. Moreover, it is irreconcilable with the reality that 2U recorded record performance during the very period in which Plaintiffs claim 2U was secretly failing. There was no fraud.

2U is a leading education technology company that partners with nonprofit colleges and universities to build, deliver, and support their online educational offerings. A principal piece of its business, and the focus of this action, is 2U's Graduate Program Segment through which 2U provides the technology and services necessary to enable its nonprofit university partners to deliver their degree programs online. 2U generates revenue from student enrollments in its university partners' programs, by receiving a portion of the tuition that enrolled students pay its partners.

Between February 2018 and May 2019, 2U reported six consecutive quarters of record number of enrollments and record revenue in its Graduate Program Segment. Relatedly, 2U met or exceeded its publicly disclosed revenue and Adjusted EBITDA predictions for each of these quarters. In May 2019, however, 2U candidly alerted investors that, for the first time, it expected enrollments to decline in the current quarter, and, for that reason, 2U lowered its revenue and Adjusted EBITDA guidance. As expected, enrollments declined in the second quarter of 2019 but

---

[1] Unless otherwise defined, this memorandum utilizes the defined terms from the Complaint.

2U's outlook for the remainder of 2019 had deteriorated further than expected, which it again candidly disclosed to investors in July 2019.  As a result, 2U announced reduced expectations in the Graduate Program Segment for the remainder of the year.  2U's stock price declined, and Plaintiffs filed this putative class action.

Plaintiffs cannot allege that 2U overstated its actual enrollments, revenue, or Adjusted EBITDA or any other financial metric during the Class Period.  So they allege that 2U should have been predicting its demise despite the undeniable fact that it continued to succeed.  That makes little sense because if 2U had predicted that enrollment, revenue and Adjusted EBITDA would decline as Plaintiffs suggest, those predictions would have been incorrect each and every quarter of the Class Period other than the last one.  This is precisely the predicament the Fourth Circuit identified as a justification for its decision that predictions (as opposed to historical facts) cannot form the basis for a securities claim:

> Predictions of future growth stand on a different footing, however, because they will almost always prove to be wrong in hindsight. If a company predicts twenty-five percent growth, that is simply the company's best guess as to how the future will play out. As a statistical matter, twenty percent and thirty percent growth are both nearly as likely as twenty-five. If growth proves less than predicted, buyers will sue; if growth proves greater, sellers will sue. Imposing liability would put companies in a whipsaw, with a lawsuit almost a certainty. Such liability would deter companies from discussing their prospects, and the securities markets would be deprived of the information those predictions offer. We believe that this is contrary to the goal of full disclosure underlying the securities laws, and we decline to endorse it.

*Raab v. Gen. Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993).

This fundamental disconnect between Plaintiffs' theory of predictable failure and 2U's objectively successful results pervades the Complaint.  Unable to identify errors in 2U's financial reporting, Plaintiffs are forced to allege that a variety of innocuous and vague statements peppered amongst the innumerable statements 2U made throughout the 17-month long Class Period misled investors by creating the impression that 2U was a growing company (which it objectively was).

Then to bridge the logical gap between that contention and 2U's historical results, the Complaint alleges that 2U's optimistic or forward-looking statements were inconsistent with or should have disclosed certain information Plaintiffs supposedly learned from some anonymous former low-level employees about their myopic views of the Company's business strategies and prospects. This convoluted approach leads to three fundamental defects that prevent Plaintiffs from stating a claim under the Exchange Act (*i.e.*, the first 136 pages of the Complaint).

First, Plaintiffs have not pled particularized facts to show that any Individual Defendant acted with the requisite fraudulent intent. None of the former employees upon whom Plaintiffs rely purport to know that any Exchange Act Defendant had information that conflicted with 2U's public statements. Indeed, only two of the former employees even purport to have spoken to any Individual Defendant, and their comments are completely generic and uninformative.

Second, the 50 challenged statements are not actionable as a matter of law. Rather than statements of objective historical facts, Plaintiffs identify forward-looking statements that are immunized by the Private Securities Litigation Reform Act ("PSLRA") safe harbor, vague statements of corporate optimism, and/or subjective opinions. As the Fourth Circuit has routinely recognized, such statements are actionable only in exceptional circumstances, which Plaintiffs fail to plead.

Third, Plaintiffs fail to show that any of the statements were actually false or misleading when made. The former employees offer only isolated anecdotes and broad characterizations, but not the specific facts necessary to plausibly show that their views of 2U's business prospects were superior to those of the Company's officers. Indeed, none of them had any visibility into the Company's full portfolio and they cannot credibly claim to know how 2U was performing overall. It thus comes as no surprise that these allegations lack specificity and detail. The Complaint does

not plead even a single objectively verifiable fact to create any reasonable doubt that the Exchange

Act Defendants' statements were completely true.

In addition to the Exchange Act claims, OKCERS asserts for the first time claims under

the Securities Act of 1933 (*i.e.*, the next 25 pages of the Complaint) based on five additional

statements.  These claims suffer from the same second and third defects plaguing the Exchange

Act claims—they are not actionable as a matter of law and, separately, OKCERS fails to show any

of those statements were false or misleading—and can be dismissed for those reasons.  Moreover,

these new claims are time-barred by the Securities Act's one-year statute of limitations.

For these reasons (and others discussed below), Defendants respectfully request that the

Court dismiss Plaintiffs' Complaint in its entirety, with prejudice.

## FACTUAL BACKGROUND

### A.   Successful Execution Of 2U's Business Model Is Dependent Upon Factors Outside Of Its Control

2U is a leading education technology company that partners with nonprofit universities to

build, deliver, and support their online educational offerings.  Ex. $1^2$ at 4.  Mr. Paucek co-founded

2U in 2008.  CC ¶¶ 51, 65.  At that time, the online higher education market was "in its infancy."

Ex. 2 at 4.  Since then, 2U has grown to become a leading education technology company that

well-recognized universities trust to bring them into the digital age.  CC ¶ 65; Ex. 3 at 40.  2U has

two reportable business segments: the Graduate Program Segment and the Short Course Segment

(renamed in 2019 as the "Alternative Credential" Segment).  CC ¶ 55; Ex. 4 at 7.  In the Graduate

---

[2] Citations to "Ex. __" refer to exhibits attached to the Declaration of J. Christian Word, submitted herewith.  These exhibits are properly considered as incorporated by reference into the CC, or matters of which this Court may take judicial notice, including SEC filings.  *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 466 (4th Cir. 2011) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)) ("We may consider . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.").

Program Segment, which accounts for the majority of 2U's consolidated revenue and is the focus of the Complaint (CC ¶ 56), 2U partners with nonprofit universities to build and run online degree programs (sometimes referred to by management as "Domestic Graduate Programs" or "DGPs"). Ex. 4 at 7.

A key component of 2U's value proposition to its university partners is the substantial upfront investment it makes in the technology, services, and marketing necessary to launch new programs and attract students.  Ex. 1 at 20.  2U has the primary responsibility for identifying qualified students for its partners' programs, generating potential student interest, and driving applications to the programs.  CC ¶ 61; Ex. 1 at 4.  2U describes the process by which it recruits students (from a prospect clicking on an online advertisement, to being contacted by an admission counselor, through the prospect submitting an application, and hopefully resulting in enrollment in a program) as the "marketing funnel."  CC ¶ 15.

In the Graduate Program Segment, 2U derives revenue primarily from a contractually specified portion of the tuition and fees students pay its university partners.  *Id.* ¶ 62; Ex. 3 at 41. 2U receives its portion of the tuition and fees from each university partner as students progress through programs and pay tuition, which generally occurs over a two-year period following initial enrollment.  *See* CC ¶ 62; Ex. 1 at 20, 57-58.  2U's student acquisition expenses[3] are the Company's most significant costs.  CC ¶ 61.  And, there is necessarily a lag between the time when 2U incurs the cost of acquiring a student and when 2U first begins to receive the revenue that student generates.  *Id.* ¶ 65.  In 2018, 2U disclosed that for currently enrolled students, the average time between first contact and enrollment was seven months.  *Id.* ¶ 62.  2U's student acquisition

---

[3] 2U's student acquisition expenses are, for the most part, recorded in its financial statements as "Marketing and sales" expenses.

expenses in any period are thus an investment to generate revenue in future periods (Ex. 3 at 42), and student enrollment changes (up or down) in any period impact revenue for future periods. *See* CC ¶ 198.

While 2U provides universities with the technology and services necessary to bring their on-campus programs online, 2U's university partners maintain complete independence over their core academic functions, including setting tuition prices, setting admissions criteria, making admissions decisions, and managing faculty and curriculum governance. *Id.* ¶ 57; Ex. 1 at 21. In general, 2U's university partners apply the same admissions standards to their online programs as they would for on-campus programs (CC ¶ 57), and can change their admissions standards in real time, at their discretion. Ex. 1 at 17. And of course, once admitted to a university partner's graduate program, the prospective student makes the ultimate decision on whether to enroll and how long to remain in the program. *Id.* at 21. As a result, 2U's financial success is dependent upon a number of factors beyond its control. Changed circumstances, decisions, or preferences by university partners or students can (and do) affect 2U's financial performance.

2U's business model is thus premised on significant upfront investments that achieve profitability over time, as 2U launches new programs (known as the "pipeline"), increases marketing efficiencies to generate a continuous flow of students in the funnel,[4] and grows enrollments and revenue as programs mature. *Id.* at 58. But this model is not without substantive and realistic risks, as 2U repeatedly informed its stockholders. For example, 2U stressed to investors that its university partners "retain complete discretion over admissions decisions," and

---

[4] As 2U launches new programs in similar disciplines (*i.e.*, a "multi-program vertical" or "MPV"), marketing efficiency necessarily improves because the Company has already incurred the marketing costs to attract the prospective students for the original program. *See* Ex. 5 at 7, 15, 18-19. In other words, the newer programs tend to scale more quickly than the first (or second) program in the vertical did.

that even if 2U identifies quality prospective students, "any changes to admissions standards, or inconsistent application of admissions standards," could "affect student enrollment" and undermine 2U's ability to generate revenue.  *Id.* at 17.  2U also warned of the risks associated with launching new programs, explaining that that there was "no guarantee" it would ever recoup its significant upfront investment in these programs or achieve revenue growth "if new offerings do not scale efficiently."  *Id.* at 19-20.  In addition, 2U cautioned that it could suffer enrollment and financial setbacks if its marketing strategy proved "inefficient or unsuccessful in generating a sufficient quantity of qualified prospective students."  *Id.* at 16.  2U also informed investors that it faced competition "from established and emerging companies"—including from companies with "significantly greater resources" than 2U—which could result in pricing pressure "and significantly reduce [2U's] revenue."  *Id*. at 25-26; *see also* App. B at p. 9.[5]

### B.    2U Was Successful Historically In Increasing Enrollments And Meeting Its Revenue Projections

Despite the nature and complexity of its business model, 2U was undeniably successful in growing the business and meeting or exceeding its financial expectations for almost the entire Class Period.  For the fourth quarter of 2017, the four quarters of 2018, and the first quarter of 2019 (six quarters in all), 2U reported increased enrollments in its Graduate Program Segment:

---

[5] For organizational purposes, Defendants submit three appendices.  Appendix A identifies the challenged statements, alleged speakers, and the reasons why each challenged statement is not actionable.  Appendix B identifies sample cautionary language accompanying the forward-looking statements.  Appendix C identifies each of the 17 former employees, their alleged dates of employment and positions at 2U, and the statements purportedly attributed to each of them.  *See, e.g.*, *Ash v. PowerSecure Int'l, Inc.*, 2015 WL 5444741 at *7 n.3 (E.D.N.C. Sept. 15, 2015) (accepting appendices that serve as organizational tools).

## Full course equivalent* enrollments.



*We measure full course equivalent enrollments for each of the courses offered during a particular period by taking the number of students enrolled in that course and multiplying it by the percentage of the course completed during that period.

Ex. 15 at 6.

2U also increased its total revenue and met or exceeded its quarterly revenue and Adjusted EBITDA projections in each quarter:[6]

| Year | Period | Revenue Projection | Revenue Actual | Adjusted EBITDA Projection | Adjusted EBITDA Actual |
|------|--------|--------------------|-----------------|-----------------------------|-------------------------|
| 2017 | Q4 | 84.60 - 85.60 | 86.7 | 11.80 - 12.50 | 12.7 |
| 2018 | Q1 | 91.10 - 91.60 | 92.29 | (2.30) - (1.90) | (1.52) |
| | Q2 | 95.10 - 96.10 | 97.42 | (6.20) - (5.70) | (5.56) |
| | Q3 | 106.00 - 107.00 | 106.96 | 4.20 - 4.80 | 4.68 |
| | Q4 | 114.40 - 115.30 | 115.1 | 19.80 - 20.40 | 20.06 |
| | FY 2018 | 411.00 - 411.90 | 411.77 | 17.40 - 18.00 | 17.66 |
| 2019 | Q1 | 121.50 - 122.10 | 122.23 | (4.60) - (4.20) | (3.21) |

---

[6] Dollars reflected in millions, *see* Exs. 6, 12, 16, 17, 18, 19, 20.

Throughout 2018 and 2019, 2U continued to focus on expanding its online degree programs, launching 14 new programs in 2018 (Ex. 7 at 22), and reporting that 2U had a healthy "pipeline" of new customers (*i.e.*, university partners) for 2019.  CC ¶ 363.  On November 5, 2018, 2U reported positive third quarter 2018 results and previewed its 2019 forecast.  *Id.* ¶ 29.  During its earnings call, 2U disclosed that new leadership at two of its largest university partners, the University of Southern California ("USC") and the University of North Carolina ("UNC"), had tightened admissions standards in certain programs at those schools.  *Id.* ¶¶ 29, 174; Ex. 8 at 5.  As a result, 2U had lowered its enrollment forecasts for 2019, but Mr. Paucek reiterated his confidence in 2U's overall portfolio and its ability to absorb these program-specific changes.  CC ¶ 174; Ex. 8 at 5.

### C.    2U Faced Unexpected Headwinds In The Second Quarter Of 2019

2U's enrollment forecasts began to soften early in the second quarter of 2019, more than it expected in November 2018.  This was due in part to many universities, beyond just USC and UNC, making their admissions standards more rigorous (*i.e.*, decisions that had an impact at the bottom of the marketing funnel), as well as "some pressure mid-funnel on the rate at which prospective students are submitting their applications" and "the delayed timing of the launch of the UC Davis MBA," meaning that there would only be one intake of new students in this program instead of multiple intakes.  Ex. 9 at 5; *see also id.* ("Our partners are becoming more selective across the board, particularly as programs scale."); CC ¶ 389.  As a result, 2U proactively informed the market in May of this new development and reduced its guidance for the second quarter and fiscal year 2019, to account for the potential declines in future student enrollments that had not yet impacted 2U's financial results.  Ex. 9 at 8.  Explaining this pre-emptive reset, Mr. Paucek reported that 2U was seeing some pressure "mid-funnel" on the rate at which prospective students are submitting applications for review, but that 2U did "not believe the challenges [it was] seeing are

attributable to weakness in [its] marketing efficiency at the top of the funnel." CC ¶¶ 389, 391 (emphasis omitted); Ex. 9 at 5. 2U's share price declined over the next day by $15.16 per share, or over 25%. CC ¶ 387.

Unfortunately, 2U's enrollment projections continued to decline as the second quarter progressed. *Id.* ¶ 147; Ex. 2 at 5. As a result, 2U announced on July 30, 2019, that, for the first time during the Class Period, enrollment and revenue for the Graduate Program Segment declined on a sequential basis (despite increasing year over year). CC ¶ 208. Accordingly, 2U simultaneously announced that it was further reducing its revenue and Adjusted EBITDA guidance for the third quarter and fiscal year 2019, to account for the further expected declines in enrollment. *Id.* ¶ 42; Ex. 2 at 5, 9 ("[O]ur guidance presumes lower conversion rates on a go-forward basis"). Mr. Paucek explained that the program-specific issues disclosed earlier had "mask[ed] this broader trend of the mainstreaming of online education" (Ex. 2 at 5), and that it was "not one particular" competitor, program, or "aspect of a program like cost" that was driving 2U's "new sort of reality." *Id.* at 11. Despite increased competition for students, however, Mr. Paucek reported that 2U's pipeline of university partners remained strong, and it was still "winning new deals." *Id.* at 7.

### D.   Plaintiffs Allege That 2U's Failure To Predict The Future Is Fraud

The Complaint does not allege that any of 2U's historical financial results were misstated in any way. Instead, the focus of Plaintiffs' 544-paragraph Complaint is 2U's failure to accurately predict the future by anticipating the timing and magnitude of the challenges that its business would face in the second quarter of 2019, due to events largely outside of its control. With the hindsight afforded by 2U's actual second quarter 2019 performance, Plaintiffs attack a hodgepodge of 55 unrelated, optimistic forward-looking statements and opinions discussing nearly every aspect of 2U's business model going back in time to February 2018, alleging (in a nutshell) that 2U knew but did not disclose that it could not achieve as much growth as it predicted.

10

To that end, Plaintiffs assert claims arising under Section 10(b) against the Exchange Act Defendants and claims arising under Section 20(a) against Mr. Paucek, Ms. Graham, and Mr. Mokkarala.  Newly added Plaintiff OKCERS also asserts for the first time in this action claims under Sections 11 and 12(a)(2) against the Securities Act Defendants and claims under Section 15 against the Director Defendants, Mr. Paucek, and Ms. Graham.

## ARGUMENT

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests whether the complaint is legally and factually sufficient.  *See* Fed. R. Civ. P. 12(b)(6); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Although a district court "accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff" it need not accept a complaint's "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement."  *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc*., 591 F.3d 250, 255 (4th Cir. 2009).  To survive dismissal, a complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Id.* (quotation omitted).  Neither the Exchange Act Claims nor the Securities Act Claims meet these standards.

## I.    EXCHANGE ACT CLAIMS

To state a claim for securities fraud under Section 10(b), a plaintiff must show that: "(1) the defendant made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages."  *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 623 (4th Cir. 2008) (citation omitted).  But unlike the "norm in federal civil procedure," such claims must meet the heightened pleading standards of both Federal Rule of Civil Procedure 9(b) and the PSLRA.  *Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche LLP*, 551 F.3d 305, 310-11 (4th Cir. 2009).  The former requires that a party alleging

fraud "state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b), while the latter requires plaintiffs to "specify each statement [or omission] alleged to have been misleading" and "the reason or reasons why the statement [or omission] is misleading," and "with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1)(B), (2)(A).

### A.       The Complaint Fails To Plead Particularized Facts Giving Rise To A Strong Inference That Each Exchange Act Defendant Had Scienter

The PSLRA's strict pleading standards are designed to curb "the routine filing" of securities fraud lawsuits "whenever there is a significant change in an issuer's stock price . . . with only the faint hope that the discovery process might lead eventually to some plausible cause of action." H.R. Rep. No. 104-369, at 31 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 730. As such, the burden to plead scienter is a heavy one: Plaintiffs must establish a "strong inference" that Defendants acted with an "intent to deceive, manipulate, or defraud" with respect to *each* alleged misstatement at the time it was made. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (citation omitted). To plead scienter in the Fourth Circuit, Plaintiffs must allege specific facts that constitute "intentional or severely reckless conduct." *Janies v. Cempra, Inc.*, 816 F. App'x 747, 749 (4th Cir. 2020). Severe recklessness has been defined as "a slightly lesser species of intentional misconduct," and that must be established with particularized facts demonstrating "such an extreme departure from the standard of ordinary care" that the danger of misleading the plaintiff must have been "either known to the defendant or so obvious that the defendant must have been aware of it." *Id* (citations omitted). For its part, the Court must determine "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 323. But this does not permit a plaintiff to "stack inference upon

12

inference." *Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 548-49 (4th Cir. 2017). Rather, to qualify as "strong," the inference of scienter must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314; *see also Cozzarelli*, 549 F.3d at 626.

Plaintiffs fall well short of clearing this purposely high bar.  This pleading defect alone requires complete dismissal of their Exchange Act claims.

### 1. Former Employee Allegations Fail To Demonstrate Severe Recklessness

The Complaint does not cite a single e-mail, report, presentation, internal document, or other particularized fact supporting Plaintiffs' conclusion that Mr. Paucek, Ms. Graham, and Mr. Mokkarala "knew" or "were [severely] reckless in failing to ascertain" that the challenged statements were false when made.  CC ¶¶ 361, 364.  These conclusory allegations do not come close to satisfying the heightened pleading standards of the PSLRA.

Lacking such evidence, Plaintiffs try to plead scienter almost exclusively on allegations from seventeen low-level former employees ("FEs").  Plaintiffs do not link specific FE allegations to any particular challenged statement or any particular Defendant.  Rather, these allegations are made and repeated (or even worse, loosely paraphrased) generally throughout the Complaint.  This alone makes it impossible for these allegations to properly plead that each Exchange Act Defendant acted with scienter "with respect to each act or omission."   15 U.S.C.  § 78u-4(b)(2)(A).  Nevertheless, Plaintiffs' contention appears to be that the Exchange Act Defendants were all severely reckless with respect to each challenged statement made during the 17-month-long Class Period, because the information gleaned from these FEs demonstrates that it was "clear" to the Exchange Act Defendants that 2U "was not able to achieve the marketing efficiencies it claimed would allow it to scale its business model at any part of the funnel," "did not have sufficient

13

resources in its student recruitment efforts to drive the enrollment necessary to support its rapid growth," and faced "increasingly negative trends in its enrollment forecasts throughout the Class Period." CC ¶ 131. Even if this pleading method were acceptable under the PSLRA (and it is not), Plaintiffs' reliance on these FEs is misplaced.

To start, the Complaint fails to describe the FEs with sufficient particularity to support the probability that "a person in the position occupied by the source would possess the information alleged." *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 885 (4th Cir. 2014). The former employees were not executives and instead occupied lower-level positions, such as "admissions counselor," "manager," "executive assistant," "director of sales," "placement specialist," "social media strategist," or "sales manager," and were only employed by 2U for a portion of the Class Period. *See, e.g.*, CC ¶¶ 90, 106, 113, 116, 118-20, 122, 124, 346, 354. Plaintiffs do not explain how any of these people fit into 2U's corporate structure or allege that any FE directly reported to any Defendant, other than one low-level executive assistant who reported to Ms. Graham. *See id.* ¶ 346 (FE-16). While each FE may have a myopic view of the particular aspect of 2U's business operations to which she was privy, Plaintiffs have not pled any facts to plausibly infer that any one of these FEs was in a position to have complete information about 2U's enrollments, revenue, or long-term business strategy, at a company-wide level, or any visibility into its overall portfolio.

Relatedly, the overwhelming majority of the FEs had no direct contact at all with Mr. Paucek, Ms. Graham, or Mr. Mokkarala, and thus cannot possibly demonstrate "what those defendants actually knew." *Ash v. PowerSecure Int'l, Inc.*, 2015 WL 5444741, at *13 (E.D.N.C. Sep. 14, 2015); *In re Coventry Healthcare, Inc. Sec. Litig.*, 2011 WL 1230998, at *6 (D. Md. Mar. 30, 2011) (anonymous witnesses lacking "direct contact with" defendants logically cannot know "what the Defendants knew or recklessly disregarded"). The only two FEs with any

purported direct contact with the individual Exchange Act Defendants at all are FE-1, who "worked in the Office of the CEO" (CC ¶ 86), and FE-16, who served as an "executive assistant" to Ms. Graham.  *Id.* ¶ 346.  But the allegations from these FEs, both of whom left 2U in Spring 2019, are innocuous and thereby irrelevant to scienter.

FE-1 allegedly worked "directly" with Mr. Paucek to prepare him for meetings, but admits that she "did not attend meetings where Paucek discussed initiatives to improve enrollment."  *Id.* ¶ 357 (in fact, FE-1 does not allege she attended *any* meetings with Mr. Paucek).  Instead she says she overheard Mr. Paucek mention "concern about enrollment not too far into 2018."  *Id.* ¶ 86. This is far too vague to be meaningful; she does not describe the nature of the supposed concern, how it affected the business, or suggest that the information Mr. Paucek discussed at "meetings" about enrollment was inconsistent with what 2U was reporting publicly.  *See Pipefitters Local No. 636 Defined Benefit Plan v. Tekelec*, 2013 WL 1192004, at *11 (W.D.N.C. March 22, 2013) (no strong inference of scienter based on meetings where "none of the confidential witnesses who attended the meetings allege[d] anything about what occurred at the[] meetings" or that "financial data or forecasts discussed at the[] meetings did not match what [the company] was reporting publicly").  According to FE-16, Mr. Paucek and Ms. Graham were "heavily involved" in 2U's "day-to-day operations" and attended meetings to prepare for earnings where "someone from finance" put enrollment figures on a white board, and the finance team would present annual enrollment numbers to Ms. Graham.  CC ¶¶ 346-47, 349, 355.  FE-16 does not, however, say what the enrollment numbers were, much less whether they were good, bad, or otherwise.

Plaintiffs' recitation of information from FE-2, a "manager" who worked with "many different teams at 2U," alludes to contact between her and Messrs. Paucek and Mokkarala, but does not say so expressly.  *Id.* ¶ 357 (Mr. Paucek was "unhappy with the 'dropping numbers'");

*id.* ¶ 358 (Mr. Mokkarala was "stressed about enrollment numbers").  Nor does FE-2 specify *when* Mr. Paucek was unhappy or *when* Mr. Mokkarala was stressed, *what* "numbers" supposedly caused unhappiness and stress, or *how much* those numbers were "dropping."  These vague allegations and others, such as FE-2's unsupported belief that "enrollment projections began to slowly stall in 2017 and the problem worsened in 2018 and 2019," lack particularity and cannot be credited.  *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 181 (4th Cir. 2007) (confidential witness statement too vague to plead scienter where the statement "provide[d] no particularized fact that supports the belief that [defendant] intentionally overpaid" and did not explain "how this person would know this information or would have expertise in valuing a business").

The information from the other FEs is likewise undeniably vague; lacking any details or specificity to reveal a company-wide problem that the Exchange Act Defendants knew about or were severely reckless towards.  For example, far from demonstrating widespread problems at any point of the "funnel" or that 2U's student acquisition efforts "were not scaling as expected to meet the growing need for students," the FEs show, at most, that individual employees had generalized concerns about their individual ability to execute 2U's student application and enrollment goals. For example, FE-4 contends that 2U was "stretched thin" by new programs (CC ¶ 96); FE-5 complains that 2U "set the application targets much higher than the admissions team felt was realistic" (*id.* ¶ 128); FE-7 believed that her team "would not be able to meet 2019 enrollment goals" (*id.* ¶ 110); and FE-10 thought that the sales quotas for the Rice MBA program in 2018 were "not realistic" (*id.* ¶ 127).  But none of these FEs even say that *they* missed their business targets, much less that *2U's* goals were unattainable or that 2U's funnel was not "keeping pace" with its growing portfolio.  *Id.* ¶ 84.  FE-14 even acknowledged that her program's "flow of leads was *steady*," but "the expectations always seemed unrealistic."  *Id.* ¶ 125.  These "generalized

subjective assessments from employees who disagree with managers' courses of conduct" are insufficient to demonstrate that the Exchange Act Defendants knew or were severely reckless in not knowing sooner that 2U could not achieve its projections for 2019.  *In re DXC Tech. Co. Sec. Litig.*, 2020 WL 3456129, at *11 (E.D. Va. 2020).

Similarly, the FEs provide no basis whatsoever for Plaintiffs' conclusion that 2U faced "increasingly negative trends in its enrollment forecasts throughout the Class Period," a conclusion which is incompatible with 2U's six straight quarters of increasing enrollment.  CC ¶ 131. Tellingly, none of the 17 FEs allege what 2U's internal enrollment forecasts were at any point in 2018 or early 2019, the severity or scope of the alleged negative "trends," when those trends first occurred or "increased," how they impacted 2U's revenue or Adjusted EBITDA projections, or any other particularized facts from which the Court can infer the Exchange Act Defendants' knowledge or reckless disregard of enrollment numbers or trends that contradicted their public statements or undermined their "confidence in future forecasts."  *Id.*  Absent these particularized facts, these FE allegations are not due any weight.  *Hunter*, 477 F.3d at 181 (confidential witness's "vague statement" with no "particularized fact[s]" did not support allegations of securities fraud).

At most, multiple FEs confirmed the common-sense (and completely expected) fact that Mr. Paucek and Ms. Graham (as CEO and CFO) "had access to and closely monitored 2U's enrollment numbers." CC ¶ 346.  Of course they did, but "[c]ourts have routinely held that corporate executives' access to information and internal affairs is not enough to demonstrate scienter under the PSLRA."  *Lerner v. Nw. Biotherapeutics,* 273 F. Supp. 3d 573, 593 (D. Md. 2017); *Proter v. Medifast, Inc.*, 2013 WL 1316034, at *11-12 (D. Md. Mar. 28, 2013) (allegations that defendants held executive positions "at the highest level of the Company" insufficient to support a strong inference of scienter).

For these reasons, either in isolation or when viewed holistically with the other allegations in the Complaint, the FE allegations are insufficient to support a strong inference of scienter.

### 2.     Mr. Paucek's Stock Sales Are Not Suspicious

Plaintiffs claim that Mr. Paucek had a motive to commit fraud because he sold stock during the Class Period.  CC ¶¶ 368-70.  Plaintiffs do not allege that Ms. Graham or Mr. Mokkarala had any motive and this failure "cuts against" any inference of scienter.  *In re Acterna Corp. Sec. Litig.*, 378 F. Supp. 2d 561, 577 (D. Md. 2005); *DXC*, 2020 WL 3456129, at *13 ("[T]he inferential weight attributable to motive must be evaluated in context of entire complaint."); *Knurr v. Orbital ATK Inc*., 272 F. Supp. 3d 784, 809 (E.D. Va. 2017) (sales by two insiders "carr[ied] only minimal weight in a scienter calculus").

In the Fourth Circuit, however, Mr. Paucek's "sale of merely some stock during the [Class Period] is not sufficient to give rise to an inference of fraudulent intent."  *Visual Networks Inc. Sec. Litig.*, 217 F. Supp. 2d 662, 668 (D. Md. 2002) (quoting *In re CIENA Corp. Sec. Litig.*, 99 F. Supp. 2d 650, 663 (D. Md. 2000)).  Rather, stock sales can support an inference of scienter only if the "timing and amount" of trading was "unusual or suspicious," in light of the amount of profit made, the amount of stock traded, the portion of stockholdings sold, the number of insiders involved, and whether the trades were executed pursuant to a 10b5-1 trading plan.  *Yates*, 744 F.3d at 890-91 (quoting *Hunter*, 477 F.3d at 184).  Mr. Paucek's Class Period sales of 2U shares were neither unusual nor suspicious, and add nothing to support an inference of scienter.

As an initial matter, all of Mr. Paucek's stock sales were prescheduled pursuant to a non-discretionary 10b5-1 trading plan adopted by Mr. Paucek at least 30 days prior to the execution of the trades (Exs. 10, 11), which substantially undermines an inference that the sales were timed to capitalize on an inflated price.  *See Yates*, 744 F.3d at 891 (that defendants' trades were made under non-discretionary Rule 10b5-1 plans "further weaken[ed]" any inference of scienter);

*Proter*, 2013 WL 1316034, at \*19 ("Stock sales pursuant to Rule 10b-5 trading plans can raise an inference that the sales were prescheduled and not suspicious.") (quoting *In re Constellation Energy Grp., Inc. Sec. Litig.*, 738 F. Supp. 2d 614, 638 (D. Md. 2010)).  And Plaintiffs do not allege any of the sales were timed "to profit from any particular disclosures." *Yates*, 744 F.3d at 891.

Moreover, while Plaintiffs allege that Mr. Paucek sold 300,290 shares during the Class Period, he also acquired 579,000 shares via the exercise of stock options, and as a result actually *increased* his net holdings in 2U throughout the Class Period.  This fact negates any inference of scienter. *Cozzarelli*, 549 F.3d at 628 (declining to find a strong inference of scienter in part because despite stock sales, all three defendants actually increased their net holdings in the company through the acquisition of vested stock options).

Further undermining any inference of scienter is the fact that Mr. Paucek's Class Period trading activity was consistent with his prior trading history.  *See Proter*, 2013 WL 1316034, at \*20 (class period sales of 22% of overall holdings were not unusual because defendant had sold 24% of his holdings in transactions prior to the class period); *DXC*, 2020 WL 3456129, at \*13 (no scienter where defendant "sold less stock during the Class Period than during the preceding 'Control Period'").  In fact, Mr. Paucek actually disposed of *fewer* shares during the eighteen-month Class Period (300,290) than in the eighteen months preceding the Class Period (316,620 shares sold between September 24, 2016 and February 25, 2018).  Ignoring the number of shares sold, Plaintiffs focus on the sale profits, observing that Mr. Paucek made approximately $22.8 million during the Class Period, which exceeds the alleged $11.3 million Mr. Paucek made on all

prior sales of 2U shares.  CC ¶ 369.  But the amount Mr. Paucek made was merely a function of

an increase in 2U's average share price over the prior period,[7] rather than increased trading activity.

### 3. Allegations Regarding 2U's "Core Operations" And Ms. Graham's Resignation Fail To Demonstrate Scienter

Plaintiffs' remaining scienter allegations can be dealt with in short order.  *First*, Plaintiffs

attempt to plead scienter based on the significance of enrollments to the success of 2U and its

ability to generate revenues in the Graduate Program Segment.  CC ¶¶ 374-76.  The Fourth Circuit

has largely rebuked this theory under the PSLRA, noting that "bare allegations" that executives

must have known information relating to the business's "core operations" are inadequate "without

additional detailed allegations establishing the defendants' actual exposure to the … problem."

*Yates*, 744 F.3d at 890.  *Second*, Plaintiffs allege that Ms. Graham's resignation as CFO shortly

after the Company announced revised guidance is "highly suspicious."  CC ¶ 371.  But the "mere

fact that" Ms. Graham "resigned as [an] executive officer… during the Class Period is hardly proof

of fraudulent intent."  *In re E. Spire Commc'ns, Inc. Sec. Litig.*, 127 F. Supp. 2d 734, 749 n.12 (D.

Md. 2001) (resignation of two executive officers and two Board of Directors members during the

Class Period did not create a strong inference of scienter); *see also Yates*, 744 F.3d at 889

(resignation "does not compel an inference that she and the other individual defendants were bent

on committing fraud").

### 4. The Non-Culpable Inference Is More Compelling[8]

The far more cogent inference from the Complaint is that for the vast majority of the Class

Period, the Exchange Act Defendants were able to set and meet financial expectations despite a

---

[7] 2U's average share price was approximately $67.93 per share during the Class Period, compared to approximately $47.80 per share during the eighteen-month period prior to the Class Period.

[8] Plaintiffs' failure to establish a strong inference of scienter for Mr. Paucek, Ms. Graham, Mr. Mokkarala—or for that matter, Gabriel Bustamante (CC ¶ 377)—forecloses liability against 2U. *Yates*, 744 F.3d at 885 (explaining that the plaintiff bears the burden to establish "facts that support

number of factors impacting 2U's actual results largely out of their control, and remained confident in their ability to do so—until they were not. *See Tellabs*, 551 U.S. at 314 (requiring courts to consider the "non-culpable inference" to be drawn from the facts alleged); *see also, e.g.*, *Cozzarelli*, 549 F.3d at 624-26 (affirming dismissal where "the inference that defendants acted with the nonfraudulent intent to protect their competitive advantage is more powerful and compelling than the inference that defendants acted with an intent to deceive").

As soon as it appeared the future would not play out as well as predicted, 2U promptly and publicly adjusted their expectations. It defies logic to infer that the Exchange Act Defendants would do so proactively in May 2019, if they knew they would have to further reduce their guidance just two months later. What public company executive would prefer to disappoint shareholders twice? The more compelling inference supported by the facts pled in the Complaint is that broader operational challenges and competitive headwinds did not exist until the second quarter, and as soon as Defendants became aware of them, they proactively told the market to expect a future impact. But the fact that Defendants had to adjust their forecasts in no way indicates that their initial projections were fraudulent. *In re Criimi Mae, Inc. Sec. Litig.*, 94 F. Supp. 2d 652, 662 (D. Md. 2000) ("Plaintiffs may not rely simply on the discrepancy between a company's optimistic outlook and subsequent disappointing results to support a claim of fraud. Such allegations of 'fraud by hindsight' do not satisfy the stringent pleading requirements of the PSLRA.") (citing *Hillson Partners Ltd. Partnership v. Adage, Inc.*, 42 F.3d 204, 209 (4th Cir.

---

a strong inference of scienter with respect to at least one authorized agent of the corporation," and dismissing corporate scienter claim where Plaintiffs did not allege a strong inference of scienter against an agent of the corporation); *In re Under Armour Sec. Litig.*, 409 F. Supp. 3d 446, 462 (D. Md. 2010) (allegations that non-defendant employees were in senior managerial positions *and* had knowledge that a statement was false were insufficient to plead scienter as to the company where there were no allegations that the employees "provided information that was used in a misleading public statement" or were "involved with the issuance of misstatements to the public").

1994)); *see also Maguire*, 876 F.3d at 548 ("The PSLRA reflects Congress's determination that liability for securities fraud should not be predicated solely on an overly optimistic view of a future which may, in fact, encounter harsh economic realities down the road."); *Okla. Firefighters Pension & Ret. Sys. v. K12, Inc.*, 66 F. Supp. 3d 711, 717 (E.D. Va. 2014) ("At most, [the] post-period comments suggest that, in hindsight, K12 realized that its marketing activities were not done in the most effective manner. They do not allow the inference that the February 5, 2013 statements were false or misleading or that Murray had the required degree of scienter."). On this basis alone, Plaintiffs' Exchange Act claims should be dismissed.

## B.   The Complaint Fails To Plead A Material Misstatement Or Omission

As identified in Appendix A, Plaintiffs' Section 10(b) claims are based on 50 statements made over the Class Period that touch upon varying aspects of the Exchange Act Defendants' expectations for the Company's future. In addition to Plaintiffs' failure to plead scienter with respect to a single one of these statements, these statements are subject to dismissal on multiple alternative grounds, including because they are immunized by the PSLRA's safe harbor, many are immaterial puffery and/or non-actionable opinions, and none of the statements are false or misleading by omission.

### 1.   2U's Projections Are Immunized By The Safe Harbor

The PSLRA's safe harbor is comprised of three alternative inlets which immunize forward-looking statements: if (1) the statement is "immaterial," or (2) is identified as forward-looking and "accompanied by meaningful cautionary statements," or (3) the plaintiff fails to plead particularized facts to establish that the person making the statement had actual knowledge that the statement was false or misleading when made. 15 U.S.C. § 78u-5(c)(1); *DXC*, 2020 WL 3456129, at *5. Because Plaintiffs' theory is that 2U failed to tell investors that it would one day miss its growth projections, it is unsurprising that most of the statements they challenge are eligible

for the safe harbor.  CC ¶ 419; App. A (Statements 2-9, 11, 13-17, 19-21, 23-27, 29-33, 35-36, 39-42, 44-50, 54-55 (the "Projections")).   Specifically, the PSLRA defines "forward-looking statements" to include, "the plans and objectives of management for future operations," "future economic performance," "a projection of revenues, income ..., [or] earnings," and the "assumptions underlying or relating" to such statements.  15 U.S.C. § 78u-5(i)(1).  And there can be no serious dispute that the Projections are "forward-looking statements."  The question is whether the Projections qualify for one of the three inlets.  The answer is they meet all three.

### a.      *First, The Projections Are Immaterial*

In a trilogy of cases that predate the PSLRA, the Fourth Circuit established that "projections of future performance not worded as guarantees are generally not actionable under the federal securities laws" because they are immaterial as a matter of law.  *See Raab*, 4 F.3d at 290 (citation omitted); *Malone v. Microdyne Corp.*, 26 F.3d 471, 479 (4th Cir. 1994); *Hillson Partners v. Adage*, 42 F.3d 204, 212 (4th Cir. 1994); *see also Marsh Grp. v. Prime Retail, Inc.*, 46 F. App'x 140, 145-46 (4th Cir. 2002) (post-dating PSLRA).  2U expressly and repeatedly stated that the Projections were not guarantees.  *See, e.g.*, Ex. 12 ("In light of these risks, uncertainties and assumptions, the forward-looking events and circumstances discussed in this press release may not occur and actual results could differ materially and adversely from those anticipated."); Ex. 4 at 2 ("In light of the significant uncertainties in these forward-looking statements, you should not regard these statements as a representation or warranty by us or any other person that we will achieve our objectives and plans in any specified timeframe, or at all.").  Thus, the Projections are immunized under the immaterial inlet.  *See DXC*, 2020 WL 3456129, at *6-8.

### b.      *Second, The Projections Were Identified As Forward-Looking And Accompanied By Meaningful Cautionary Language*

2U routinely identified as forward-looking:

23

statements regarding the company's future financial and operating results, future market conditions and the plans and objectives of management for future operations. These forward-looking statements are not historical facts but rather are based on our current expectations and beliefs and are based on information currently available to us.

*See, e.g.*, Ex. 13 at 4. The Projections are plainly such statements and thus were identified as forward-looking statements.

The Projections were also accompanied by explicit and specific warnings about the various factors that could cause 2U to perform worse than projected, including the very risks Plaintiffs claim were hidden from them. App. B; *see also Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 319-20 (4th Cir. 2019) (no misrepresentation where the company's warnings "address[ed] the very complaints" raised by plaintiffs"); CC ¶¶ 331-38.

For example, 2U cautioned throughout the Class Period that:

- Our financial performance depends heavily on our ability to acquire qualified potential students for our offerings, and our ability to do so may be affected by circumstances beyond our control. Ex. 1 at 16; Ex. 3 at 14.

- *Ineffective marketing efforts*. We invest substantial resources in developing and implementing data-driven marketing strategies that focus on identifying the right potential student at the right time. These marketing efforts make substantial use of search engine optimization, paid search and custom website development and deployment and we rely on a small number of internet search engines and marketing partners. If our execution of this strategy proves to be inefficient or unsuccessful in generating a sufficient quantity of qualified prospective students, or if the costs associated with the execution of this strategy increase, our revenue could be adversely affected. Ex. 1 at 16; Ex. 3 at 15.

- *Our lack of control over admissions decisions for our university clients' graduate programs*. Even if we are able to identify prospective students for a graduate program, there is no guarantee that students will be admitted to that program. In the Graduate Program Segment, the university clients retain complete discretion over admissions decisions, and any changes to admissions standards, or inconsistent application of admissions standards, could affect student enrollment and our ability to generate revenue. Ex. 1 at 17; Ex. 3 at 15.

- Of the graduate programs we operate, only a small number contribute a significant portion of our revenue, and loss or material underperformance of any one of these

programs could have a disproportionate effect on our business.  Ex. 1 at 22; Ex. 3 at 19.

- We have experienced rapid growth in a relatively short period of time, which has placed, and will continue to place, a significant strain on our administrative and operational infrastructure, facilities and other resources. Our ability to manage our operations and growth will require us to continue to expand our marketing and sales personnel, technology team, finance and administration teams, as well as our facilities and infrastructure.  Ex. 1 at 23; Ex. 3 at 20.

- Our ability to manage any significant growth of our business effectively will depend on a number of factors, including our ability to … effectively recruit, integrate, train and motivate a large number of new employees, including our marketing and technology teams, while retaining existing employees[.]  Ex. 1 at 24; Ex. 3 at 20.

- We face competition from established and emerging companies, which could divert university clients or students to our competitors, result in pricing pressure and significantly reduce our revenue.  Ex. 1 at 25; Ex. 3 at 22.

- As a result of these factors, we cannot assure you that the forward-looking statements in this Annual Report on Form 10-K will prove to be accurate. Furthermore, if our forward-looking statements prove to be inaccurate, the inaccuracy may be material. In light of the significant uncertainties in these forward-looking statements, you should not regard these statements as a representation or warranty by us or any other person that we will achieve our objectives and plans in any specified timeframe, or at all.  Ex. 1 at 3; Ex. 3 at 3.

These and other specific warnings communicated to investors the substantive and realistic risks facing 2U and its ability to meet the Projections.  Thus the Projections were accompanied by meaningful cautionary language and immunized by the safe harbor.  *See, e.g.*, *Paradise Wire*, 918 F.3d at 322-23 (holding similar language to be "clear warnings"); *DXC*, 2020 WL 3456129, at *8 (statements such as "[o]ur ability to provide customers with competitive services is dependent on our ability to attract and retain qualified personnel" were meaningful); *In re Sinclair Broadcast Grp., Inc. Sec. Litig.*, 2020 WL 571724, at *12 (D. Md. Feb. 4, 2020) (statement that "there can be no assurance that pending acquisitions will be approved by the FCC" was "sufficiently cautionary").

        **c.**      ***And Third, The Complaint Does Not Plead Particularized Facts Showing That Any Exchange Act Defendant Actually Knew Any Projection Was False Or Misleading***

Plaintiffs do not make any effort to meet their burden to demonstrate that the speaker of each Projection actually knew it was false when it was made. *In re Humphrey Hosp. Tr., Inc. Sec. Litig.*, 219 F. Supp. 2d 675, 684 (D. Md. 2002). Instead of particularized facts showing what each speaker knew and when they knew it, the Complaint is comprised of conclusory allegations that the speaker was "concerned about enrollment" and supposedly was aware of various information. *See, e.g.*, CC ¶¶ 86, 88, 232, 242, 251, 257, 261, 265, 267, 272, 276, 284, 292. But missing are the facts necessary to show the nature of that concern, when and how the speaker learned that information, how that information contradicted the Projection, and what the speaker believed about the Projection when made. This lack of particularity with respect to each speaker and each Projection alone is sufficient to trigger safe harbor immunity under this third prong.

Moreover, Plaintiffs' allegations do not show that any Defendant "actually knew" the Projections would not be achieved. First, these allegations are inadequate to create a strong inference of actual knowledge for all of the reasons they fail to suggest severe recklessness. For example, allegations that 2U's CEO and CFO "had access to and closely monitored 2U's enrollment numbers" and even spoke about them are completely innocuous and irrelevant to the issue of actual knowledge. *See id.* ¶¶ 346-355; 359-367. The plaintiffs in *DXC* made similar allegations and the court swiftly rejected them as insufficient to plead actual knowledge: "While Lead Plaintiffs have adequately supported factually that Defendants were focused on cost-cutting, those facts do not allow the inference that Defendants knew or thought that they would be unable

to reach DXC's fiscal year 2019 revenue projections of $21.5 to $22 billion at the time that they made those projections."[9]  2020 WL 3456129, at *7.

The only allegations that even purport to go to knowledge are those under the heading "Paucek and Mokkarala Were Aware Of Declining Enrollment in Early 2018."  CC at p. 114.[10] Plaintiffs base this contention exclusively on two anonymous former employees and grossly overstate what those witnesses (FE-1 and FE-2) supposedly said, as discussed at length above.  *See supra* Section I.A.1.  Neither witness purports to know what either Mr. Paucek or Mr. Mokkarala knew about the achievability of any of the Projections.  Indeed, neither FE even says that there actually was "declining enrollment in early 2018."  Plaintiffs also make no effort to reconcile what these anonymous FEs said with the undeniable fact that enrollment increased every quarter of 2018 and the first quarter of 2019, and only declined on a sequential basis in the second quarter after 2U proactively told the market that it would happen.  Just as the *DXC* court concluded, the actual facts refute any inference that anyone knew the Projections were false.  2020 WL 3456129, at *7 ("In that regard, Lead Plaintiffs do not allege facts that explain away those facts that are fundamentally inconsistent with any such inference, including that under Lawrie's cost-cutting strategy, DXC had realized in fiscal year 2018 $24.5 billion in revenue, earnings per share of $6.04, and more than $1.1 billion in cost savings, DXC was on track to realize the FY 2019 projected revenue through the first quarter of fiscal year 2019; and even after it reduced its fiscal year 2019 revenue

---

[9] *See also Humphrey*, 219 F. Supp. 2d at 684 (allegations that monthly reports given to defendants indicated company's declining financial condition were not "particularized facts" showing that defendants had "actual knowledge that the forward-looking statements" regarding the company's finances and performance "were false when made").

[10] Plaintiffs do not make any such allegations about Ms. Graham, which immunizes Statement 21 of Appendix A.

projections by $800 million, DXC raised its EPS projection range to $7.95 to $8.20, which Plaintiffs do not challenge.") (citations omitted)).

2.       **The Corporate Puffery Statements Are Non-Actionable**

Almost all of the statements Plaintiffs challenge should also be dismissed because they are the sort of vague and subjective statements of corporate optimism that are too indefinite to be demonstrably false or material to investors. *See, e.g.*, App. A (Statements 1-20, 23-27, 30-38, 40-45, 51-53); *In re Under Armour Sec. Litig.*, 342 F. Supp. 3d 658, 676 (D. Md. 2018) ("Indefinite statements of corporate optimism, also known as puffery, are generally non-actionable as they do not demonstrate falsity.") (quoting *In re Neustar Sec.*, 83 F. Supp. 3d 671, 680 (E.D. Va. 2015)); *Sinclair*, 2020 WL 571724, at *13 ("Puffery is generally defined as 'loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available.'"); *see also Raab*, 4 F.3d at 289 ("'Soft,' 'puffing' statements…generally lack materiality because the market price of a share is not inflated by vague statements predicting growth.").

For example, Plaintiffs challenge Mr. Paucek's statements during the May 3, 2018 earnings call that 2U's pipeline "continues to be strong"; that 2U's value "is really strong, and it is getting stronger"; that 2U's services were "really, really good"; and that 2U was "seeing real benefit" from a "sort of overall ecosystem" that was operating "at scale." CC ¶¶ 235-36, 238-39, 241-42, 363 (emphasis omitted). And from the August 2, 2018 earnings call, Plaintiffs challenge Mr. Paucek's statements that 2U's "model works"; that 2U was "confident in the reacceleration" of the graduate division; that "[n]ew student enrollments are strong across the portfolio"; and that "the graduate segment is the organic growth engine powering 2U." *Id.* ¶¶ 157, 262-64 (emphasis omitted). These statements are precisely the type of vague, feel-good speak from corporate executives that cannot support a securities fraud claim. *See, e.g.*, *Longman v. Food Lion, Inc.*, 197 F.3d 675, 685

28

(4th Cir. 1999) ("'We believe that Food Lion's Extra Low Prices and its clean and conveniently located stores are especially well suited to the demands of our customers'" was puffery); *Sinclair*, 2020 WL 571724, at *13 (description of the divestiture process as "robust" and a "significant step forward," and "healthy multiples" are inactionable puffery); *Under Armour*, at 342 F. Supp. 3d at 676 ("We believe that our growth in net revenues has been driven by a growing interest in performance products and the strength of the Under Armour brand in the marketplace" is puffery); *Constellation*, 738 F. Supp. 2d at 631 (same for "well positioned for the future"); *Neustar Sec.*, 83 F. Supp. 3d at 681 ("'[w]e continue to demonstrate the viability of our growth strategy,' '[w]e continue to enhance our position as a leader,'" and "'the Company is on target to achieve projected synergies and costs savings are . . . 'puffery'"); *In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 891-892 (W.D.N.C. 2001) ("very pleased" with its progress and that it expected "further improvement in efficiency" were puffery).  None of these statements contain any objectively measurable or verifiable fact and thus cannot support a securities fraud claim.

### 3.    Many Of The Statements Are Non-Actionable Opinions

As noted, Plaintiffs do not contend that 2U's statements about its historical financial results are false or misleading in any way.  Instead, many of the statements they challenge are also subjective opinions expressed by the Exchange Act Defendants about 2U's overall business and strategies that Plaintiffs alleged were misleading because they did not disclose certain supposed facts inconsistent with those opinions.  App. A (Statements 1-45, 53).  These include statements such as "I would argue that [the] sort of overall ecosystem that we operate now is at scale" (CC ¶ 241) (emphasis omitted); "we think competition, overall in the space, is [a] positive thing, not a negative thing" (*id.* ¶ 243) (emphasis omitted); "we believe those all represent similar economics to what we've run to date" (*id.* ¶ 273) (emphasis omitted); "we feel very comfortable that we believe the core business is super strong" (*id.* ¶ 277) (emphasis omitted).

The Supreme Court held in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, that to state a claim based upon an opinion, a plaintiff "must identify particular (and material) facts going to the basis for the [speaker's] opinion—facts about the inquiry the [speaker] did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context."  575 U.S. 175, 194 (2015); *see also Paradise Wire*, 918 F.3d at 322.  The Fourth Circuit has further explained:

> [d]espite that holding, *Omnicare* cautions that 'whether an omission makes an expression of opinion misleading always depends on context." An investor reads each statement "in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information."  "[A]n omission that renders misleading a statement of opinion when viewed in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame." *Id.* A reasonable investor is expected to understand a statement of opinion in its full context and there will only be liability for "the omission of material facts that cannot be squared with such a fair reading."

*Paradise Wire*, 918 F.3d at 322; *see also Sinclair*, 2020 WL 571724, at *8.

Just as Plaintiffs do, the plaintiff in *Paradise Wire* claimed that the defendants' opinions were "materially false and misleading because they omitted … negative financial information." 918 F.3d at 321.  The Fourth Circuit disagreed.  The court explained that this claim "must be considered in the context of the warning language presented with the [opinions]."  *Id.* at 322.  The court then recited the various warnings the defendants made about the opinions and concluded that "the omissions alleged by the [plaintiffs] can quite easily be squared with the language of the Proxy's extensive and tailored warnings.  In fact, those warnings addressed the very claims asserted by the [plaintiffs].  In light of the Proxy's clear warnings, the alleged improper omissions cannot plausibly be material."  *Id.* at 323.  This reasoning and holding apply to this case.  As explained in the safe harbor section (*see supra* Section I.B.1), 2U repeatedly warned investors of the specific risks it faced, including the very circumstances Plaintiffs claim undermine the

opinions.  In the context of this express cautionary language, a reasonable investor could not have been misled by these subjective opinions.

Moreover, "statements of opinion are generally actionable only if the plaintiff establishes that the statement was objectively false and the issuer lacked a rational belief in the veracity of the statement at the time it was made."  *Sinclair*, 2020 WL 571724, at *8 (quoting *Hirtestein v. Cempra, Inc.*, 348 F. Supp. 3d 530, 556 (M.D.N.C. 2018)).  The Complaint fails to plead both objective and subjective falsity.  Assuming for the moment that the negative financial circumstances Plaintiffs rely upon from the anonymous former employees existed from the first day of the Class Period (and for all the reasons discussed above this is an unreasonable assumption), Plaintiffs have failed to quantify the adverse effects on 2U's business in any way. This failure prevents them from showing any negative circumstances were sufficiently significant to render any opinion objectively or subjectively false.  As the Supreme Court explained in *Omnicare*, the mere existence of "some fact cutting the other way" is not enough to plead falsity of an opinion statement because "[a] reasonable investor does not expect that *every* fact known to a[] [speaker] supports its opinion."  575 U.S. at 194, 189-90.

Take for example, Mr. Paucek's opinions expressed during the May 3, 2018 earnings call that "**And in general, we think competition, overall in the space, is [a] positive thing, not a negative thing** because the biggest issue we still have is preconceived notions of online education."  CC ¶ 243 (emphasis in original).  Plaintiffs allege the bolded opinion is false "because competition was in fact, a threat to 2U's business model."  *Id.* ¶ 244.  However, Plaintiffs fail to allege particularized facts about "the severity or scope of the [alleged] problems."  *Frankfurt Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 230 (S.D.N.Y. 2018).  How was competition affecting 2U on May 3, 2018?  Was any adverse effect great enough to outweigh the

positives effect of competition cited by Mr. Paucek?  Without specific details about competition, there is no basis to assess the objective falsity of the opinion or whether Mr. Paucek rationally believed what he said was accurate.  This same lack of specificity dooms Plaintiffs' claims based on the other opinions as well.  *See* App. A (Statements 1-45, 53).[11]  The Complaint simply lacks sufficient detail to show that any of the negative circumstances were of a magnitude to call into doubt the objective and subjective truth of the opinions.

Indeed, Plaintiffs' conclusory allegation that the alleged problems had any adverse impact on 2U's business before it lowered its projections in May 2019 is refuted by the undisputed fact that 2U's enrollment numbers increased each preceding quarter of the Class Period, and 2U met or exceeded its guidance during that entire fourteen-month period.  In other words, subsequent events confirmed that the Exchange Act Defendants' opinions were correct when made.  And when circumstances changed during the first few weeks of the second quarter of 2019, 2U promptly informed the market that its opinions and expectations for the business had also changed.  Plaintiffs cannot state a claim based upon these opinions.

### 4.  In Any Event, Plaintiffs' Have Not Pled Facts To Show That Any Statement Was False Or Misleading

The Supreme Court has made it clear that "Section 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information.  Disclosure is required under these provisions only when necessary 'to make … statements made, in light of the circumstances under which they were made, not misleading.'"  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011).  Plaintiffs understand this and so they have attempted to link the information they gleaned

---

[11] And Plaintiffs also fail to plead that any speaker did not believe their stated opinions for the same reasons they failed to plead actual knowledge, *i.e.*, there is not a single allegation about what any Exchange Act Defendant knew or believed.  *See supra* Section I.A.1.

from the anonymous former employees to various statements made by the Exchange Act Defendants.   Indeed, most of the statements Plaintiffs challenge are alleged to be false and misleading because the speaker did not disclose one or more of the supposed negative circumstances Plaintiffs describe between Paragraphs 55 through 214.  *See, e.g.*, CC ¶¶ 224-225 (alleging statements false for failure to disclose various facts including those in Section III.C.4 of the Complaint).   In other words, Plaintiffs, for the most part, do not claim that anyone said something that was literally false.

The result is a hodge-podge of facially true statements that Plaintiffs nevertheless allege misled investors and which are only loosely related to the alleged omission.  *See* CC ¶¶ 229, 231, 235, 238, 246, 248, 250, 258, 260, 262, 264, 266, 273, 277, 285, 287, 289, 293, 310, 312, 314, 316, 318, 323-24, 326-27, 459.  Plaintiffs do not allege, and it is not obvious, why the allegedly omitted information caused any of these statements to be misleading.  *K12*, 66 F. Supp. 3d at 719 (plaintiff did not sufficiently plead falsity when the alleged omissions did "not contradict" defendant's statements); *Tekelec*, 2013 WL 1192004, at *17 ("nothing suggests that, based on successful contract bids, Plastina and Everett needed to explain the security clearance issues to make their statements about Tekelec's growth prospects in India not misleading.").  This same problem plagues Plaintiffs' contention that the former employee allegations demonstrate that other statements are false and misleading; *i.e.*, the alleged misstatement are not in conflict with the supposed true facts.  *See K12*, 66 F. Supp. 3d at 719 (statements not false or misleading when the alleged truth involved a "different" issue than the allegedly false statements and did not "contradict" those statements).[12]

---

[12] All of Plaintiffs' challenged statements are predicated on the circumstances supposedly described by the former employees.  However, the Complaint does not explain why some

For example, Plaintiffs' first alleged misstatement is from February 26, 2018:

> **What's driving our progress**? Well, in the graduate program segment, which we now refer to as our 2U Grad division, we began **the acceleration of our new DGP launch cadence**. Ten new programs launched in 2017. We increased our 2018 slate from 13 to 14 new programs, and we've now announced 3 of the 16 new programs for 2019.

CC ¶ 218 (emphasis in original).  Plaintiffs do not allege that 2U did not actually increase its program launch cadence exactly as stated or that this did not drive progress.  Instead, Plaintiffs claim this statement was misleading because "it omitted that the Company was already encountering material problems scaling its marketing funnel to serve the additional programs, a fact that undermined the Exchange Act Defendants' growth story."  *Id.* ¶ 219.[13]  The statement, however, makes no mention of the marketing funnel or the "growth story" at all.  This accurate statement of 2U's progress in launching new programs did not require it to "speculate on the effect that" hypothetical problems scaling its marketing funnel "would have on its future earnings." *Raab*, 4 F.3d at 289.

It simply is not the law that the Exchange Act Defendants were obligated to discuss every tangentially related aspect of 2U's performance every time they mentioned anything about its business.  As one court recently explained, "companies routinely present a wealth of information on revenue, expenses, employee counts and many other aspects of their operations without explaining in detail why each number went up or down.  To hold that a fraudulent omission sufficient to create potential liability can be created from a Company's failure to explain why an

---

challenged statements are allegedly misleading due to omission of these circumstances and other challenged statements are false in light of these circumstances.

[13] Of course, this allegation is premised upon the faulty and inadequately pled contention that 2U was having problems scaling its marketing funnel on February 26, 2018, or ever.  As described above, what Plaintiffs claim were the "problems scaling the marketing funnel" are found in Section III.C.4 of the Complaint and based exclusively on the myopic and innocuous statements of the former employees.  *See supra* Section I.A.1.

accurately stated operational statistic has changed from a previous public securities filing would greatly expand the scope of potential liability under Section 10(b) contrary to the letter and spirit of the PSLRA and the Court declines to do so." *Paskowitz v. Arnall*, 2019 WL 3841999, at *8 (W.D.N.C. Aug. 15, 2019); *see* CC ¶¶ 218-19, 222-23, 227-28, 231, 235-44, 246-51, 264-66, 271-72, 300-01, 304-05.

> In another example, Plaintiffs challenge Ms. Graham's August 8, 2018, statements that:

> So globally, higher education overall is a $1.9 trillion market and increasing in annual spend. **Higher education in the U.S. is about $550 billion, and of that, graduate education is $80 billion. So we have -- it's a very large market that we are attacking.** The reality is we don't want to do every single program within that and the reason being that we have -- we provide a lot of services, we have a not cheap model to run, and therefore, it really makes sense if a program can get to a certain size. If -- there are something like 1,700 different degrees that are granted by U.S. universities. We have said that we are targeting roughly 250 verticals -- or sorry, roughly 250 programs within, say, 90 verticals or something like this. **So we don't need to like penetrate all 1,700 of those degree verticals in order for us to get to be a fairly large company.** If you looked at that -- if you looked at the programs and they were all to get to an average steady state, now the reality is some will be larger and some will be smaller, but if they were all to get to, sort of, what we think that average is, that's approaching $4 billion in top line at steady-state just from those sorts of programs.

CC ¶ 264 (emphasis in original).  Plaintiffs claim the bolded statements are misleading because:

> they reinforced the Exchange Act Defendants' growth narrative, and gave the impression that the Company was smoothly scaling as anticipated, when, in fact, the Exchange Act Defendants were concerned about enrollment and the student acquisition model was not scaling as expected due to: (1) the Company being unable to achieve predicted marketing cost efficiencies as it scaled; (2) the MPV strategy resulting in the Company cannibalizing its own programs rather than converting a higher number of students from the funnel; (3) the inability of the Company to scale its high touch marketing efforts by simply imposing unrealistic quotas on admissions staff; (4) beginning in 2017 and continuing throughout the Class Period, the Exchange Act Defendants saw 2U's projected enrollment numbers decline across the board; and (5) the Company's business model no longer working in the increasingly saturated market for online education.

*Id.* ¶ 265.  Wow.  No reasonable investor would be misled by Ms. Graham's completely accurate and innocuous statements about the size of the potential opportunity to believe that 2U was "smoothly scaling as anticipated."  She said nothing at all about "scaling," smooth or otherwise.

*See, e.g.*, *In re Eventbrite Sec. Litig.*, 2020 WL 2042078, at *13 (N.D. Cal. Apr. 28, 2020) (finding

that plaintiffs failed to adequately plead falsity where the reasons offered to show falsity "[bore]

no connection to the substance of the statements themselves" (quoting *Weller v. Scout Analytics,*

*Inc.*, 230 F. Supp. 3d 1085, 1094 (N.D. Cal. 2017)).

> A final example from May 7, 2019:

> Before I get into specifics on each of these, **I want to make one thing clear. We do not**
> **believe the challenges we're seeing are attributable to weakness in our marketing**
> **efficiency** at the top of the funnel. We've said that before and are reiterating it again today.
> **Our data shows we're driving significant growth in the quantity of prospective**
> **students and started applications.** We're doing so at an average cost that has remained
> consistent with historicals. It's actually down in many spots. Across the portfolio, applicant
> quality remains steady.

CC ¶ 310 (emphasis in original).   Plaintiffs allege statements are false because:

> the student acquisition model was not scaling as expected due to: (1) the Company being
> unable to achieve predicted marketing cost efficiencies as it scaled; (2) the MPV strategy
> resulting in the Company cannibalizing its own programs rather than converting a higher
> number of students from the funnel; (3) the inability of the Company to scale its high touch
> marketing efforts by simply imposing unrealistic quotas on admissions staff; and (4) the
> Company's business model no longer working in the increasingly saturated market for
> online education.

*Id.* ¶ 311.  But again, Mr. Paucek is not describing the scaling of the student acquisition model or

any of these factors.  The unbolded phrase at the end of the first sentence makes clear that Mr.

Paucek's statement is about "the top of the funnel," *i.e.*, long before a person has even begun an

application.  He is not talking about marketing cost efficiencies, MPV (multi program vertical)

effects, quotas or the saturated market.  He simply and accurately states that 2U's efforts to attract

prospective students into the funnel does not appear to be a problem.  Indeed, 2U has never

suggested it had a problem at the "top of the funnel" and none of the former employees contend

otherwise.[14]

---

[14] Plaintiffs also assert claims for violation of Items 303 and 105 of SEC Regulation S-K.  CC ¶¶
339-44.  A failure to comply with Item 303 does not independently give rise to liability under

5.        **The Section 20(a) Claim Fails**

Because Plaintiffs fail to plead a primary securities violation under Section 10(b) and Rule

10b-5, their Section 20(a) claim should be dismissed as well.  *Cozzarelli*, 549 F.3d at 628.

## II.    SECURITIES ACT CLAIMS

That brings us to Page 137, Paragraph 430 of the Complaint, and to the Securities Act

Claims asserted by OKCERS under Sections 11, 12(a)(2), and 15.  Section 11 provides a private

right of action for purchasers if the Offering Materials (1) "contained an untrue statement of a

material fact," (2) "omitted to state a material fact required [by law] to be stated therein," or (3)

"omitted to state a material fact … necessary to make the statements therein not misleading."  15

U.S.C. § 77k(a); *see also Under Armour*, 342 F. Supp. 3d at 670.  Section 12(a)(2) overlaps but is

more limited.  A plaintiff must allege that (1) it purchased stock directly in the offering from a

statutory seller; (2) the sale was effected by means of a prospectus or oral communication; and (3)

the prospectus or oral communication contained "an untrue statement of a material fact or omit[ted]

to state a material fact necessary in order to make the statements, in the light of the circumstances

under which they were made, not misleading."  15 U.S.C. § 77*l*(a)(2); *see In re Mun. Mortg. &*

*Equity, LLC, Sec. & Deriv. Litig.*, 876 F. Supp. 2d 616, 659 (D. Md. 2012) ("Section 12(a)(2)

requires a plaintiff to plead and prove that it purchased a security directly from the issuer as part

---

Section 10(b).  *See In re SCANA Corp. Sec. Litig.*, 2019 WL 1427443, at *11 (D.S.C. Mar. 29, 2019); *Shah v. GenVec, Inc.*, 2013 WL 5348133, at *15 n.16 (D. Md. Sept. 20, 2013) (quoting *Iron Workers Local 16 Pension Fund v. Hilb Rogal & Hobbs Co.*, 432 F. Supp. 2d 571, 583 (E.D. Va. 2006)); *see also In re Maximus, Inc. Sec. Litig.*, 2018 WL 4076359, at *15 (E.D. Va. Aug. 27, 2018) ("Regulation S-K does not create an independent cause of action.").  In any event, Plaintiffs fail to adequately plead any false or misleading statement or omission, and so any hypothetical claim based on those allegations likewise fails.  *Ash*, 2015 WL 5444741, at *11.  And Plaintiffs' Item 105 claim fails for the independent reason that 2U disclosed the very risks alleged to have been omitted.  *Plymouth Cty. Ret. Ass'n v. Primo Water Corp.*, 966 F. Supp. 2d 525, 559-60 (M.D.N.C. 2013) (finding company's discussion of risks adequate under Item 503 (the predecessor to Item 105)).

of the … offering.") (citation omitted).  Section 15 makes a "control person" liable for someone else's violation of Sections 11 and 12.  *See* 15 U.S.C. § 77o; *Under Armour*, 342 F. Supp. 3d at 674.

### A.    OKCERS' Securities Act Claims Are Time-Barred

Section 13 of the Securities Act provides that no plaintiff can maintain any action under Sections 11, 12(a)(2) or 15 "unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence."  15 U.S.C. § 77m.[15]  Because Section 13 "conditions [the Securities Act's] enforcement on commencement of the action within specified time periods, the plaintiff bears the burden of establishing that his action meets the statutory requirements[, and it] is the general rule that in these circumstances the plaintiff must plead and prove facts that show that his action was filed within the time periods specified by statute."  *Caviness v. Derand Res. Corp.*, 983 F.2d 1295, 1302 (4th Cir. 1993).  OKCERS fails to meet its burden.

OKCERS first asserted the Securities Act claims on July 30, 2020, and offers the conclusory allegation that "[l]ess than one year has elapsed from the time OKCERS discovered or reasonably could have discovered the facts upon which this Complaint is based to the time OKCERS commenced this action."  CC ¶¶ 524, 533, 544.  But the Complaint expressly contradicts

---

[15] The latter of these triggers is known as "inquiry notice."  The Fourth Circuit has historically held that inquiry notice "is triggered by evidence 'of the possibility' of a claim of misrepresentation and not by complete exposure of the alleged scam." *In re USEC Sec. Litig.*, 190 F. Supp. 2d 808, 819 (D. Md. 2002) (quoting *Brumbaugh v. Princeton Partners*, 985 F.2d 157, 162 (4th Cir. 1993)).  However, the Fourth Circuit has not yet determined whether the Supreme Court's interpretation of the Exchange Act's statute of limitation in *Merck & Co., v. Reynolds*, 559 U.S. 633, 653 (2010) (requiring discovery of the violation), impacts its interpretation of Section 13.  *See Under Armour*, 342 F. Supp. 3d at 671-72.  This motion does not require the Court to resolve the issue because, as shown below, a reasonably diligent stockholder would have inquired and discovered the facts underlying OKCERS' claims more than a year before OKCERS asserted them.

that assertion when it alleges that OKCERS discovered or could have discovered the alleged false

statements as early as May 7, 2019.  Specifically, OKCERS alleges:

> [T]he May 7, 2019 disclosures revealed new information that the Exchange Act
> Defendants' misstatements, omissions and fraudulent course of conduct previously
> concealed and/or obscured from the market.  These disclosures partially (but
> incompletely) revealed some of the relevant truth concealed and/or obscured by the
> Exchange Act Defendants' prior misstatements and omissions surrounding the
> Company's growth plan and the success of its business model.

*Id.* ¶ 386.  In other words, OKCERS could have discovered the "relevant truth" by May 7 simply

by reading 2U's earnings release or listening to the earnings conference call.  *Id.*

In apparent recognition that this means its Securities Act claims are too late, OKCERS

asserts that it could not have learned all the reasons why the statements were false:

> Because the decline in enrollment was attributed to admission decisions, investors
> could not have discovered that the actual causes of the enrollment decline were
> facts and trends present at the time of the Offering such as increasing competition
> for students and problems with 2U's student acquisition program.  Nor could
> investors have discovered that 2U's internal enrollment projections had been
> trending materially downward at the time of the Offering.

*Id.* ¶ 504.[16]  These are assertions, not facts.  OKCERS does not explain at all why it could not have

discovered this information before July 30, 2019, if it tried.  Indeed, its claims are based upon

review of public information and "interviews with factual sources, including individuals formerly

employed by the Company."  *Id.* ¶ 4.  Nothing prevented OKCERS from reading that information

and speaking to former employees in May.  *See Under Armour*, 342 F. Supp. 3d at 672-73.

Moreover, "[m]erely bringing suit after the scheme has been laid bare ... will not satisfy

the requirements of due diligence when there have been prior warnings that something was amiss."

*Brumbaugh*, 985 F.2d at 162.  The statute does not wait for a plaintiff to discover each and every

---

[16] This is, at best, only a partial excuse.  OKCERS cannot deny that its claims based upon
statements allegedly corrected by the May disclosure are untimely.

reason why it alleges a statement may be false or misleading.  *See Under Armour*, 342 F. Supp. 3d at 672.  Indeed, if this were the case, the running of the statute of limitations would be within the exclusive control of the plaintiff.  This principle underlies this Court's holding in *Under Armour*.  There, the plaintiffs claimed that earlier corrective disclosures were insufficient to trigger the limitations period because the company diminished their impact with a "countervailing narrative" and it was not until subsequent disclosures caused a ratings downgrade that the one-year period commenced.  *Id.* at 674.  The Court disagreed, explaining that the earlier disclosures (including "forecast [of] the slowest quarterly growth in over six years") and the stock price decline following the disclosures, "were sufficient triggers to allow Securities Act Plaintiffs to have investigated and reasonably have discovered . . . facts adequate for pleading a Section 11 cause of action."  *Id.* at 673.

OKCERS is in exactly the same situation.  On May 7, 2019, 2U announced that, for the first time, it expected slower enrollment growth during the remainder of 2019 and would not meet its previously stated annual guidance, which is precisely what OKCERS claims it was misled about.  *See, e.g.*, CC ¶ 456 ("The Offering Materials included publicly filed 2U documents containing false and misleading statements and omissions of material fact, and provided investors with an inaccurate and incomplete picture of 2U's growth prospects.").  The one-year limitations period expired a year later, months before OKCERS asserted the Securities Act claims.  For that reason, those claims are time-barred.

OKCERS cannot rely on Rule 15(c) to revive the Securities Act claims.  Fed. R. Civ. P. 15(c)(1)(B).  OKCERS cannot show that the Director Defendants and the Underwriter Defendants, who were added as Defendants for the first time in the Complaint, both "(i) received such notice of the action that [they] will not be prejudiced in defending on the merits; and (ii) knew or should

have known that the action would have been brought against [them], but for a mistake concerning the proper party's identity." Fed. R. Civ. P. 15(c)(1); *see also Under Armour*, 342 F. Supp. 3d at 673. And with respect to 2U, Mr. Paucek and Ms. Graham, the Securities Act claims do not arise out of the same "conduct, transactions or occurrence" as the original complaints filed and consolidated against them in this matter, because the Securities Act Claims are based upon entirely different alleged misstatements by a new plaintiff. Fed. R. Civ. P. 15(c)(1). Indeed, the original complaints filed within the limitations period did not mention 2U's Offering Materials at all, much less identify any false and misleading statements in them. *See, e.g.*, *Under Armour*, 342 F. Supp. 3d at 673 (Securities Act claims did not relate back where the offering was not mentioned in the initial complaints, false statements in the offering documents were not previously alleged, and a new plaintiff asserted the claims).

### B.     OKCERS Fails To Plead An Actionable Misstatement

OKCERS' Securities Act claims are based upon just five vague and general statements in 2U's 112-page Form 10-K for 2017, which was incorporated into the Offering Materials. CC ¶¶ 457-467; App. A, Statements 51-55. These statements are not actionable as a matter of law.

The first two statements are obviously inactionable puffery. *See* App. A (Statements 51-52). Investors simply do not rely on soft expressions of optimism like 2U "refined our program selection algorithm and improved our data driven digital marketing capabilities to generate increased student enrollments in a cost effective manner," and "engage[s] interested and qualified prospective students in a cost-effective manner." CC ¶¶ 459-462 (emphasis omitted); *see also supra* Section I.B.2; *In re XM Satellite Radio Holdings Sec. Litig.*, 479 F. Supp. 2d 165, 179 (D.D.C. 2007) ("the language XM used to describe what the plaintiffs call its 'cost effective growth strategy' was merely puffery"). Moreover, Plaintiffs claim each statement is false because "2U's internal projections showed enrollment declining in future periods, and the Company was unable

to scale its student acquisition infrastructure to keep pace with 2U's growth."[17]  CC ¶¶ 460, 462.
Neither of these two statements, however, mentions enrollment or scaling of student acquisition
infrastructure.  *See supra* Section I.B.2.

The third statement ("[w]e believe we *compete favorably* on the basis of these factors") is
puffery *and* an opinion.  App. A, Statement 53.  As explained above, such statements are actionable
only if shown to be objectively and subjectively false.  OKCERS has expressly disclaimed "any
allegations of fraud, scienter or recklessness in connection with" the Securities Act claims (*see* CC
¶ 430), so it cannot have pled that any Securities Act Defendant did not personally believe this
opinion.  *See Omnicare*, 575 U.S. at 180 (disclaimer of "any allegation that could be construed as
alleging fraud or intentional or reckless misconduct" precluded any claim that the defendants knew
an opinion was false when made) (citation omitted).[18]  OKCERS also fails on objective falsity
because in 2017 and 2018, enrollment grew in every period on a sequential basis, and 2U met or
exceeded its projections.  It is illogical to suggest that 2U was not "competing favorably" in light
of these objectively verifiable successes.

Finally, the fourth and fifth statements are forward-looking statements immunized by the
safe harbor. *See* App. A, Statements 54-55.  They are forward-looking because they concern future
"potentialities" and are also assumptions underlying the projections.  CC ¶ 466; 15 U.S.C. § 77z-
2(i)(1); *see also Bondali v. Yum! Brands, Inc*., 620 F. App'x 483, 491 (6th Cir. 2015) (risk factors
"are inherently *prospective* in nature.  They warn an investor of what harms *may* come to their
investment.  They are not meant to educate investors on what harms are currently affecting the

---

[17] In making this allegation, Plaintiffs refer to "*infra*, Section IV.B" of the Complaint, but that
Section spans 31 paragraphs and it is unclear which of those paragraphs OKCERS contends shows
these statements to be false or misleading.

[18] Moreover, OKCERS does not plead any facts about what any Securities Act Defendant believed
about how favorably 2U competed.

company") (emphasis in original); *In re Channeladvisor Corp., Sec. Litig.*, 2016 WL 1381772, at *5-6 (E.D.N.C. Apr. 6, 2016) (following *Bondali*), *aff'd*, 671 F. App'x 111 (2016).  As discussed above, the first two inlets immunize these statements because 2U's cautionary language is meaningful and neither statement is worded as a guarantee.  *See supra* Section I.B.1 (applying PSLRA's safe harbor).[19]  And the third inlet is unquestionably satisfied.  OKCERS cannot plead that each Securities Act Defendant knowingly lied since it "does not allege that any of the Defendants committed intentional or reckless misconduct or … acted with scienter or fraudulent intent."[20]  CC ¶ 158.

### C.    In Any Event, OKCERS Has Not Pled Facts To Show Any Statement Was False

OKCERS claims that the five challenged statements were false and misleading when made for the reasons set forth in Section IV.B of the Complaint.  *See, e.g.*, CC ¶ 464.  The allegations in that Section are drawn exclusively from the anonymous former employees' statements, but none of these people actually provides information that undermines any challenged statement.  *See* App. C.

The first subsection claims that 2U's internal enrollment forecasts declined in 2017 and 2018 and is based on FE-2.  CC § IV.B.1.  The conclusory and vague statement attributed to this former employee cannot be reconciled with the fact that 2U's actual enrollment increased in 2017, in the quarter preceding the Offering, and in the four quarters following the Offering.  FE-2 does not provide any specific details about the forecasts (for example, what was being forecasted and

---

[19] 2U also disclosed that it "expect[s] that the competitive landscape will expand as the market for online education offering at nonprofit institutions matures."  Ex. 1 at 9.  No one was misled about competitive pressures facing the business.

[20] Moreover, the Complaint does not even attempt to allege what any Director Defendant or Underwriter Defendant knew about anything and none of the FEs mentions them.

for what period) or explain how these internal forecasts compare to 2U's public forecasts or results. In other words, the inference that OKCERS attempts to draw is not credible or reasonable.

The next subsection claims that that "2U's Marketing Department Could Not Keep Up With the Company's Marketing Needs at the Time of the Offering" (*id.* § IV.B.2(a)), but is based solely on FEs who do not say anything about the marketing department's ability to keep up. FE-5 claims only that competition was increasing in 2018 (as 2U predicted), not that 2U was not competing favorably or that this was impacting 2U's financial performance at the time of the Offering. *Id.* ¶ 476 ("According to FE-5 competition was growing for years, and over 2018, they saw more and more programs."). And "FE-6 explained that the Company model had completely changed in 2018" and were signing up more schools as partners that "she felt would not be competitive." *Id.* ¶ 478. OKCERS offers no explanation for why the opinion of this unnamed "former senior brand marketing coordinator" about 2U's business strategy is relevant at all to the veracity of the statements in the Offering Materials. Nor does FE-6, much less OKCERS, quantify any financial impact from the supposed change to the business model.[21]

OKCERS then claims that "Converting Leads to Enrolled Students Became Increasingly Difficult Throughout 2018." *Id.* § IV.B.2(b). This allegation is also not supported by the former employees' statements. FE-8 was not even employed at 2U at the time of the Offering, so her allegations should be disregarded. *Id.* ¶ 487 (FE-8 employed from September 2018 to June 2019). FE-7 does not state that in May 2018 she knew enrollments would decline in July 2019, only that she was not surprised when it happened. *See id.* ¶ 483. Indeed, no one should have been surprised by that because 2U had warned investors in May that it would happen. FE-9 does not say anything

---

[21] Moreover, 2U consistently disclosed which new schools it had partnered with, so investors were free to reach their own conclusion. *See, e.g.*, Ex. 8 at 5.

about any period specifically and does not mention May 2018 at all.  *See id.* ¶¶ 489-490.  Similarly, FE-12 does not say when she became frustrated with internal competition, that it was happening at the time of the Offering, or even how it adversely impacted enrollment.  *See id.* ¶ 491.  The only remaining former employee is FE-2, who supposedly said "2U was not spending enough on marketing to make sales in 2017 and 2018."  *Id.* ¶ 485.  This statement is too vague to be comprehensible.  2U undeniably made sales in 2017 and 2018; in fact, 2U set a new record for enrollments and revenue in each quarter of the Class Period.  Thus, none of the anonymous FEs' statements support OKCERS' conclusory allegation that "converting leads to enrolled students" became more difficult in 2018.  *Id.* § IV.B.2(b).

Finally, OKCERS claims that "[a]dmissions counselors were unable to keep up with 2U's growth." *Id.* § IV.B.2(c); *see also id.* ¶ 493.  FE-13, however, claims only "by Summer 2018, her enrollment target numbers had become impossible to achieve." *Id.* ¶ 494.[22]  This is just her subjective opinion about her ability to execute goals for one program and says nothing about the Company as a whole (which continued to show increasing enrollment).  Indeed, she does not even say that she missed her numbers.  The same is true of FE-14 (who was not employed at 2U until February 2018).  *Id.* ¶ 495.  FE-14 worked on one program and does not claim that 2U was missing its enrollment targets.[23]  FE-5 only says that 2U set application targets higher than the "admissions teams felt was realistic." *Id.* ¶ 498.  FE-2 again claims that the "Company's sales goals were unreachable." *Id.*  Despite this "manager's" pessimistic views, 2U consistently met or exceeded

---

[22] FE-13 also supposedly said that "if you did not hit your numbers you were fired."  CC ¶ 494. That allegation is impossible to reconcile with supposedly "impossible to hit numbers" in summer 2018 and her continued employment to November 2019.  One of her statements must be false.

[23] FE-14, however, confirms that 2U was not having problems at the top of the funnel.  CC ¶ 496 ("Though the flow of leads was steady….").

its revenue guidance and increased enrollment every quarter during the Class Period until the second quarter of 2019.

In sum, none of the former employees actually provides credible information that, despite its stellar financial performance, 2U was suffering behind the scenes and poised for failure *in May 2018*. None even profess to have visibility of 2U's entire business, rather than just their small piece. OKCERS' self-serving gloss aside, there is no well-pled factual allegation to support any reasonable inference that the Offering Materials were false or misleading in any way.

### D.     Persons Who Did Not Purchase In The Offering Lack Standing Under § 11

Section 11 standing is limited persons to who purchased the particular security issued pursuant to the registration statement at issue. *See* 15 U.S.C. § 77k(a). In other words, a person must be able to "trace" the shares she purchased to the registration statement alleged to contain the misstatements. *See, e.g.*, *TransEnterix Inv. Grp. v. TransEnterix, Inc.*, 272 F. Supp. 3d 740, 761-62 (E.D.N.C. 2017) (citing *Yates*, 744 F.3d at 899-900). This is easily done when a company has issued stock only once because every share available for purchase was issued pursuant to the same registration statement. However, where a company has issued shares in multiple offerings, "[c]ourts have long noted that tracing shares … is 'often impossible,' because 'most trading is done through brokers who neither know nor care whether they are getting newly registered or old shares,' and 'many brokerage houses do not identify specific shares with particular accounts but instead treat the account as having an undivided interest in the house's position.'" *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1107 (9th Cir. 2013) (quoting *Barnes v. Osofsky*, 373 F.2d 269, 271-72 (2d Cir. 1967)).

The Registration Statement OKCERS challenges was a secondary offering of approximately 3.333 million new shares that would be added to the over 12.175 million shares that were already trading and issued under different registration statements. OKCERS has not alleged

how the proposed Class Members who did not purchase in the Offering can "trace" their shares to the Registration Statement.  *See TransEnterix*, 272 F. Supp. 3d at 761.  And Defendants are not aware of any way for it to be done.[24]  Accordingly, OKCERS' Section 11 claims brought on behalf of persons who did not purchase in the Offering should be dismissed for lack of standing.

> ### E.   OKCERS Cannot Maintain A Section 12(a)(2) Claim Against The Securities Act Defendants

Like Section 11, Section 12(a)(2) of the Securities Act has a very narrow scope.  Section 12(a)(2) provides that "any person who offers or sells a security" by means of a materially false or misleading prospectus is liable "to the person purchasing the security *from him*."  5 U.S.C. § 77*l*(a)(2) (emphasis added).  The Supreme Court in *Pinter v. Dahl* interpreted the phrase "offers or sells" to limit liability to persons who pass title of the security to the plaintiff (so called immediate sellers) or who directly solicited the plaintiff's purchase "motivated at least in part by a desire to serve his own financial interests or those of the securities owner."  486 U.S. 622, 644 (1988); *see also In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 401 (D. Md. 2004).  Such persons are known as "statutory sellers."  The Complaint, however, contains no facts demonstrating any Securities Act Defendant is a statutory seller.

The 2018 Offering was a typical firm commitment offering—"where the issuer of securities sells shares to underwriters who in turn resell the shares to the public."  *Royal Ahold*, 351 F. Supp. 2d at 401.  This means that 2U (as well as the Individual Defendants) did not pass title to OKCERS or any other putative Class Member.  Similarly, the Complaint does not contain a single fact demonstrating that OKCERS purchased a single 2U security from any of the six

---

[24] Indeed, individual questions regarding each Class Member's standing would overwhelm the common questions and preclude certification of a class including secondary-market purchasers. *Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1080 (9th Cir. 1999); *Tsirekidze v. Syntax-Brillian Corp.*, 2009 WL 2151838 *7 (D. Ariz. July 17, 2009).

Underwriter Defendants.  *Id.* at 406-07 (dismissing Section 12(a)(2) claims against underwriter defendants because, among other things, plaintiff did not allege it purchased any security directly from the underwriters); *see also Constellation*, 738 F. Supp. 2d at 632-33 (same).

Thus, the Securities Act Defendants can be statutory sellers only if OKCERS alleged facts to show that each of them directly solicited its purchase, which OKCERS fails to do.  OKCERS alleges only that "[t]he Director Defendants participated in the drafting, preparation, and/or approval of various untrue and misleading statements contained or incorporated in the Offering Materials," the Individual Defendants each signed the Registration Statement, 2U "completed the Offering," and "the Underwriter Defendants participated in the drafting and dissemination of the Offering Materials and collectively received discounts and commissions of approximately $14,524,503 in connection with the Offering."  CC ¶¶ 446, 453, 455.  This is woefully inadequate to trigger liability.  It is well-established that "[m]ere participation in the preparation of the prospectus will not trigger § 12(a)(2) liability."  *Royal Ahold*, 351 F. Supp. 2d at 406, *see also Mun. Mortg.*, 876 F. Supp. 2d at 662 (dismissing Section 12 claims against underwriters where the complaint failed to allege "any connection between the Underwriters and [the named plaintiff's] purchases"); *Constellation*, 738 F. Supp. 2d at 632 n.16 (finding allegations that underwriters participated in the "preparation and/or dissemination" of the offering materials are insufficient to state a claim under Section 12(a)(2)).  "In order to state a claim under § 12(a)(2), the complaint must allege by whom the plaintiffs were solicited and from whom they purchased shares; these assertions must be supported by specific factual allegations demonstrating a direct relationship between the defendant and the plaintiff-purchaser."  *Royal Ahold*, 351 F. Supp. 2d at 406 (quoting *Pinter*, 486 U.S. at 651).  Because OKCERS has not done so, it has failed to state a Section 12(a)(2) claim against any of the Securities Act Defendants.

### F.      OKCERS Fails To Plead A Violation Of Item 503

OKCERS also alleges that the Registration Statement failed to comply with Item 503 of Regulation S-K, 17 C.F.R. § 229.503(c) ("Item 503"), because it did not disclose the adverse conclusions OKCERS drew from the former employees' statements. CC ¶ 468.  Item 503 requires that "a discussion of the most significant factors that make the offering speculative or risky" appear under the caption "Risk Factors," and that such "[d]iscussions must be concise and organized logically." 17 C.F.R. § 229.105.[25]  "[T]o withstand dismissal at the pleading stage, a complaint alleging omissions of Item 503 risks needs to allege sufficient facts to infer that a registrant knew, as of the time of an offering, that (1) a risk factor existed; (2) the risk factor could adversely effect [sic] the registrant's present or future business expectations; and (3) the offering documents failed to disclose the risk factor."  *Under Armour*, 342 F. Supp. 3d at 678 (quoting *Silverstrand Invs. v. AMAG Pharm., Inc*., 707 F.3d 95, 103 (1st Cir. 2013)); *see also Primo*, 966 F. Supp. 2d at 561 (internal citations omitted) (dismissing an Item 503 claim that failed to state a claim under Section 10(b) of the Exchange Act "because the sufficiency of Item 503(c) disclosures generally tracks the materiality standard under Section 10(b)").

For all the reasons above, OKCERS has failed to allege facts showing that the adverse factors were even occurring as of the date of the Offering.  Moreover, the Offering Materials disclosed all of the risks allegedly omitted.  *See* Ex. 1 at 16 ("We invest substantial resources in developing and implementing data-driven marketing strategies that focus on identifying the right potential student at the right time… If our execution of this strategy proves to be inefficient or unsuccessful in generating a sufficient quantity of qualified prospective students, or if the costs

---

[25] Item 105 replaced and updated Item 503 with minimal changes on August 26, 2020.  *See* Final Rule, Modernization of Regulation S-K Items 101, 103, and 105 (Aug. 26, 2020), available at https://www.sec.gov/rules/final/2020/33-10825.pdf.

associated with the execution of this strategy increase, our revenue could be adversely affected."); *id.* at 19 ("If the competitive programs or courses we ultimately enable fail to reach scale or cannot be scaled at a reasonable cost, or if we need to incur contingent costs in connection with offering competitive programs or courses, our ability to grow our business and achieve profitability would be impaired."); *id.* at 20 ("If new offerings do not scale efficiently and in the time frames we expect, our reputation and our revenue will suffer."); *id.* at 25 ("We face competition from established and emerging companies, which could divert university clients or students to our competitors, result in pricing pressure and significantly reduce or revenue.").

### G. Plaintiffs Fail To Plead Control Person Liability Under Section 15(a)

Section 15 of the Securities Act imposes joint and several liability on persons in control of entities that violate Sections 11 or 12(a)(2). *See* 15 U.S.C. § 77o; *Cozzarelli*, 549 F.3d at 630. Because Plaintiffs fail to state a claim under Sections 11 and 12(a)(2), they necessarily fail to state a claim under Section 15. *See, e.g.*, *Yates*, 744 F.3d at 881.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Complaint in its entirety, with prejudice.

Dated: October 27, 2020

Respectfully submitted,

**LATHAM & WATKINS LLP**

/s/ J. Christian Word
J. Christian Word (Bar No.: 26400)
Sarah A. Tomkowiak (admitted *pro hac vice*)
555 Eleventh Street, NW
Suite 1000
Washington DC 20004
Telephone: (202) 637-2200
Fax: (202) 637-2201
christian.word@lw.com
sarah.tomkowiak@lw.com

Amanda Betsch (admitted *pro hac vice*)
12670 High Bluff Drive
San Diego, CA 92130
Telephone: (858) 523-5400
Fax: (858) 523-5450
amanda.betsch@lw.com

*Attorneys for Defendants 2U, Inc.,
Christopher J. Paucek, Catherine A.
Graham, Harsha Mokkarala, Paul A.
Maeder, Robert M. Stavis, Gregory K.
Peters, Timothy M. Haley, Valerie B.
Jarrett, Earl Lewis, Coretha M. Rushing,
Sallie L. Krawcheck, John M. Larson,
Edward S. Macias, and Mark J. Chernis*

**PAUL HASTINGS LLP**

/s/ Barry G. Sher
Barry G. Sher (admitted *pro hac vice)*
Anthony Antonelli (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000
Fax: (212) 319-4090
barrysher@paulhastings.com
anthonyantonelli@paulhastings.com

Behnam Dayanim (Bar No.: 22442)
2050 M Street NW
Washington, DC 20036
Telephone: (202) 551-1737
Fax: (202) 551-0237
bdayanim@paulhastings.com

*Attorneys for Defendants Goldman Sachs
& Co. LLC, Credit Suisse Securities (USA)
LLC, Citigroup Global Markets Inc.,
Compass Point Research & Trading, LLC,
KeyBanc Capital Markets Inc., and
Macquarie Capital (USA) Inc.*