UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | |
|---|---|
| IN RE 2U, INC. SECURITIES CLASS ACTION | Consolidated Case Nos. TDC-19-3455 and TDC-20-10006 |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

Page(s)

I.  PRELIMINARY STATEMENT ........................................................ 1

II.  STATEMENT OF FACTS ............................................................. 2

    A.  2U's Graduate Segment Propped Up Its Growth ............................... 2

    B.  Defendants Touted 2U's Unstoppable Growth Despite Knowing It Was
        Unsustainable ........................................................... 3

    C.  The Truth Emerges Gradually ............................................. 6

III.  EXCHANGE ACT CLAIMS .......................................................... 7

    A.  THE COMPLAINT PLEADS MATERIAL MISREPRESENTATIONS AND
        OMISSIONS ............................................................... 8

        1.  Statements of past or current facts about 2U's business model, student
            enrollment, marketing efficiencies, and competition ................. 9

        2.  Statements Involving Specific Projections ........................... 17

        3.  Risk Factors Disclosures ........................................... 21

    B.  PLAINTIFFS PLEAD VIOLATIONS OF ITEMS 503 AND 303 ..................... 23

    C.  THE COMPLAINT ADEQUATELY PLEADS SCIENTER ............................. 24

        1.  The Individual Defendants Had Access to and Closely Monitored 2U's
            Enrollment Numbers ................................................. 25

        2.  Defendants' Own Statements Support a Strong Inference of Scienter ..... 32

        3.  Student Enrollment Was Critical To 2U's Core Operations ............. 34

        4.  Paucek's Suspicious Stock Sales During The Class Period Support A
            Strong Inference Of Scienter ....................................... 35

        5.  Graham's Resignation Supports a Strong Inference of Scienter ......... 38

        6.  2U's $300 Million Offering Supports an Inference of Scienter ......... 38

        7.  Corporate Scienter ................................................. 38

        8.  Defendants' Alternate Inference Is Not More Compelling Than the
            Complaint's Strong Inference of Scienter ........................... 39

      D.      THE COMPLAINT PLEADS CONTROL PERSON LIABILITY ..................... 40

IV.    SECURITIES ACT CLAIMS.......................................................................................... 40

      A.      The Securities Act Claims Are Not Time-Barred.................................................. 41

      B.      The Complaint Pleads Actionable Misstatements and Omissions........................ 44

      C.      Section 11 Standing Is Adequately Pleaded ........................................................ 46

      D.      OKCERS Can Maintain a Section 12(a)(2) Claim Against the Securities Act Defendants .............................................................................................................. 48

V.     THE COMPLAINT PLEADS CONTROL PERSON LIABILITY ................................. 50

VI.    CONCLUSION.............................................................................................................. 50

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abrams v. Baker Hughes Inc.*,
   292 F.3d 424 (5th Cir. 2002) ...................................................................35

*Arnlund v. Deloitte & Touche LLP*,
   199 F. Supp. 2d 461 (E.D. Va. 2002) .....................................................25

*Ash v. Powersecure Int'l, Inc.*,
   2015 WL 5444741 (E.D.N.C. Sept. 15, 2015)..........................................31

*Backe v. Novatel Wireless, Inc.*,
   642 F. Supp. 2d 1169 (S.D. Cal. 2009).....................................................13

*Black v. Martek Biosciences Corp.*,
   2006 WL 8435572 (D. Md. June 14, 2006)................................................21

*Briarwood Invs. Inc. v. Care Inv. Trust, Inc.*,
   2009 WL 536517 (S.D.N.Y. Mar. 4, 2009)...............................................50

*Brumbaugh v. Princeton Partners*,
   985 F.2d 157 (4th Cir. 1993) ...................................................................42

*Brumbaugh v. Wave Sys. Corp.*,
   416 F. Supp. 2d 239 (D. Mass. 2006) ...............................................13, 42

*Burt v. Maasberg*,
   2014 WL 1291834 (D. Md. Mar. 28, 2014)..................................................8

*Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*,
   2020 WL 6270482 (E.D. Va. Oct. 26, 2020)..............................................38

*Carlucci v. Han*,
   907 F. Supp. 2d 709 (E.D. Va. 2012) .................................................24, 28

*Cent. Laborers' Pension Fund v. SIRVA, Inc.*,
   2006 WL 2787520 (N.D. Ill. Sept. 22, 2006) ...........................................13

*City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc.*,
   2017 WL 11562247 (D. Md. July 6, 2017)..................................................15

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
   399 F.3d 651 (6th Cir. 2005) .............................................................15, 30

*Commercial Union Assurance Co. v. Milken*,
    17 F.3d 608 (2d Cir. 1994)................................................................................50

*Cozzarelli v. Inspire Pharmaceuticals Inc.*,
    549 F.3d 618 (4th Cir. 2008) ...........................................................................37

*Crowell v. Ionics, Inc.*,
    343 F. Supp. 2d 1 (D. Mass. 2004) .................................................................35

*Direct Benefits, LLC v. TAC Fin. Inc.*,
    2014 WL 671616 (D. Md. Feb. 20, 2014) ...................................................8, 21

*Direct Benefits, LLC v. TAC Fin., Inc.*,
    2020 WL 2769982 (D. Md. May 28, 2020) .....................................................18

*Dunn v. Borta*,
    369 F.3d 421 (4th Cir. 2004.) ....................................................................15, 46

*Epstein v, World Acceptance Corp.*,
    2015 WL 2365701 (D.S.C. May 18, 2015)..............................................8, 13, 39

*Epstein v. World Acceptance Corp.*,
    203 F. Supp. 3d 655 (D.S.C. 2016)....................................................16, 28, 38, 39

*Fed. Housing Fin. Agency v. UBS Ams., Inc.*,
    858 F. Supp. 2d 306 (S.D.N.Y. 2012), *aff'd*, 712 F.3d 136 (2d Cir. 2013) ...........................41

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010)..............................................................36

*Greenhouse v. MCG Capital Corp.*,
    392 F.3d 650 (4th Cir. 2004) ..........................................................................17

*Holman v. IMC Mortg. Co.*,
    2001 WL 21222 (D. Md. Jan. 9, 2001)............................................................50

*Huddleston v. Herman & MacLean*,
    640 F.2d 534 (5th Cir. 1981), *aff'd in part, rev'd in part on other grounds*,
    459 U.S. 375 (1983)...................................................................................20, 40

*In re Acuity Brands, Inc. Sec. Litig.*,
    2019 WL 10246166 (N.D. Ga. Aug. 12, 2019) ...............................................12

*In re Advance Auto Parts, Inc., Sec. Litig.*,
    2020 WL 599543 (D. Del. Feb. 7, 2020)..........................................................16

*In re Am. Bank Note Holographics, Inc. Sec. Litig.*,
    93 F. Supp. 2d 424 (S.D.N.Y. 2000)...........................................................48, 49

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
  851 F. Supp. 2d 746 (S.D.N.Y. 2012) .................................................................44

*In re BISYS Sec. Litig.*,
  397 F. Supp. 2d 430 (S.D.N.Y. 2005) .................................................................39

*In re Cabletron Sys. Inc.*,
  311 F.3d 11 (1st Cir. 2002) .................................................................................30

*In re Century Aluminum Co. Securities Litigation*,
  729 F.3d 1104 (9th Cir. 2013) ............................................................................47

*In re CNL Hotels & Resorts, Inc. Sec. Litig.*,
  2005 WL 1126561 (M.D. Fla. May 9, 2005) .......................................................50

*In re Constellation Energy Grp., Inc. Sec. Litig.*,
  738 F. Supp. 2d 614 (D. Md. 2010) ..............................................................48, 49

*In re Coventry Healthcare, Inc. Securities Litigation*,
  2011 WL 1230998 (D. Md. Mar. 30, 2011) .........................................................31

*In re DXC Technology Co. Sec. Litig.*,
  2020 WL 3456129 (E.D. Va. 2020) ....................................................................21

*In re Dynegy, Inc. Sec. Litig.*,
  226 F.R.D. 263 (S.D. Tex. 2005) ........................................................................48

*In re EVCI Colls. Holding Corp. Sec. Litig.*,
  469 F. Supp. 2d 88 (S.D.N.Y. 2006) ...................................................................13

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
  986 F. Supp. 2d 487 (S.D.N.Y. 2013) .................................................................22

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  352 F. Supp. 2d 429 (S.D.N.Y. 2005) .................................................................50

*In re Genworth Fin. Inc. Sec. Litig.*,
  103 F. Supp. 3d 759 (E.D. Va. 2015) ...............................................19, 21, 34, 40

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
  643 F. Supp. 2d 562 (S.D.N.Y. 2009) .................................................................48

*In re Hi-Crush Partners L.P. Sec. Litig.*,
  2013 WL 6233561 (S.D.N.Y. Dec. 2, 2013) .......................................................34

*In re Human Genome Scis. Inc. Sec. Litig.*,
  933 F. Supp. 2d 751 (D. Md. 2013) ......................................................................8

*In re Humphrey Hospitality Trust, Inc. Sec. Litig.*,
  219 F.Supp.2d 675 ..............................................................................................21

*In re Initial Pub. Offering Sec. Litig.*,
    214 F.R.D. 117 (S.D.N.Y. 2002) ........................................................46

*In re Jiffy Lube Sec. Litig.*,
    1990 U.S. Dist. LEXIS 20141 (D. Md. Oct. 31, 1990) ..........................41

*In re John Hopkins Univ. v. Hutton*,
    422 F.2d 1124 (4th Cir. 1970) ............................................................41

*In re Massey Energy Co. Sec. Litig.*,
    883 F. Supp. 2d 597 (S.D. W. Va. 2012) ..................................22, 30, 39

*In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig.*,
    876 F. Supp. 2d 616 (D. Md. 2012), *aff'd sub nom. Yates,* 744 F.3d 874 ...................... *passim*

*In re Oppenheimer Rochester Funds Grp. Sec. Litig.*,
    838 F. Supp. 2d 1148 (D. Colo. 2012) ..................................................49

*In re Oxford Health Plans, Inc.*,
    187 F.R.D. 133 (S.D.N.Y. 1999) ........................................................37

*In re Portal Software, Inc. Sec. Litig.*,
    2006 WL 2385250 (N.D. Cal. Aug. 17, 2006) ......................................50

*In re Regeneron Pharm., Inc. Sec. Litig.*,
    2005 WL 225288 (S.D.N.Y. Feb. 1, 2005)............................................21

*In re Res. Am. Sec. Litig.*,
    2000 WL 1053861 (E.D. Pa. July 26, 2000)..........................................38

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
    351 F. Supp. 2d 334 (D. Md. 2004) ..................................40, 41, 47, 48

*In re Sci.-Atlanta, Inc. Sec. Litig.*,
    239 F. Supp. 2d 1351 (N.D. Ga. 2002), *aff'd,* 374 F.3d 1015 (11th Cir. 2004) .....................15

*In re Scottish Re Grp. Sec. Litig.*,
    524 F. Supp. 2d 370 (S.D.N.Y. 2007)..............................................48, 49

*In re Seebeyond Techs. Corp. Sec. Litig.*,
    266 F. Supp. 2d 1150 (C.D. Cal. 2003) ................................................48

*In re Semgroup Energy Partners, L.P.*,
    729 F. Supp. 2d 1279 (N.D. Okla. 2010)..............................................49

*In re Sinclair Broadcast Group, Inc. Sec. Litig.*,
    2020 WL 571724 (D. Md. Feb. 4, 2020) ..................................16, 30, 31

*In re StockerYale Sec. Litig.*,
    453 F. Supp. 2d 345 (D.N.H. 2006)......................................................13

*In re Suprema Specialties, Inc. Sec. Litig.*,
    438 F.3d 256 (3d Cir. 2006)....................................................29, 48

*In re Twinlab Corp. Sec. Litig.*,
    103 F. Supp. 2d 193 (E.D.N.Y. 2000) ...........................................38, 49

*In re Under Armour Securities Litigation*,
    342 F.Supp.3d 658 (D. Md. 2018)..................................................42

*In re Wachovia Equity Sec. Litig.*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011)...............................................47

*In re Wash. Mut., Inc. Sec. Litig.*,
    259 F.R.D. 490 (W.D. Wash. 2009) ................................................49

*In re Westinghouse Sec. Litig.*,
    90 F.3d 696 (3d Cir. 1996).........................................................49

*In re Willis Towers Watson*
    *plc Proxy Litig.*, 937 F.3d 297 (4th Cir. 2019) ...............................41, 43

*In re WorldCom, Inc. Sec. Litig.*,
    294 F. Supp. 2d 392 (S.D.N.Y.2003)............................................47, 49

*Ind. Pub. Ret. Sys. v. SAIC, Inc.*,
    818 F.3d 85 (2d Cir. 2016).........................................................24

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009)........................................................34

*J&R Mktg., SEP v. GMC*,
    549 F.3d 384 (6th Cir. 2008) ......................................................24

*Jaroslawicz v. M&T Bank Corp.*,
    962 F.3d 701 (3d Cir. 2020)........................................................23

*Jones v. Canal Wood, LLC*,
    2019 WL 1370847 (E.D.N.C. Mar. 26, 2019) ......................................37

*KBC Asset Mgmt. NV v. 3D Sys. Corp.*,
    2016 WL 3981236 (D.S.C. July 25, 2016) ...........................15, 29, 34, 38

*Kensington Capital Mgmt. v. Oakley, Inc.*,
    1999 WL 816964 (C.D. Cal. Jan. 14, 1999) .....................................49, 50

*Kiken v. Lumber Liquidators Holdings, Inc.*,
    155 F. Supp. 3d 593 (E.D. Va. 2015) ...................................8, 15, 35, 38

*Lapin v. Goldman Sachs Grp., Inc.*,
    506 F. Supp. 2d 221 (S.D.N.Y. 2006)...............................................16

*Latham v. Matthews*,
    662 F. Supp. 2d 441 (D.S.C. 2009).........................................................................28

*Lefkoe v. Jos. A. Bank Clothiers*,
    2007 WL 6890353 (D. Md. Sept. 10, 2007) .......................................17, 18, 19, 36

*Lefkoe v. Jos. A. Bank Clothiers*,
    2008 WL 7275126 (D. Md. May 13, 2008).................................................. *passim*

*Lerner v. Northwest Biotherapeutics*,
    273 F. Supp. 3d 573 (D. Md. 2017).................................................................31, 32

*Lone Star Ladies Inv. Club v. Schlotzky's, Inc.*,
    238 F.3d 363 (5th Cir. 2001) ...........................................................................48

*Longman v. Food Lion, Inc.*,
    197 F.3d 675 (4th Cir. 1999) ...........................................................................15

*Lormand v. US Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009) ...........................................................................24

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
    513 F.3d 702 (7th Cir. 2008) ...........................................................................33

*Mallen v. Alphatec Holdings, Inc.*,
    861 F. Supp. 2d 1111 (S.D. Cal. 2012), *aff'd sub nom. Fresno Cty. Emps.'*
    *Ret. Ass'n v. Alphatec Holdings, Inc.*, 607 F. App'x 694 (9th Cir. 2015) .............49

*Marsh Group v. Prime Retail, Inc.*,
    46 F. App'x 140 (4th Cir. 2002) ...........................................................................17

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)...........................................................................................8, 39

*Me. State Ret. Sys. v. CountryWide Fin. Corp.*,
    2011 WL 4389689 (C.D. Cal. May 5, 2011) .........................................................47

*Merck & Co. v. Reynolds*,
    559 U.S. 633 (2010).........................................................................................41

*Meyer v. Jinkosolar Holdings Co.*
    761 F. 3d 245 (2d Cir. 2014)..........................................................................20, 23

*Nieman v. Duke Energy Corp.*,
    2013 WL 4004274 (W.D.N.C. July 26, 2013)..................................................48, 49

*Northumberland Cty. Ret. Sys. v. Kenworthy*,
    2013 WL 5230000 (W.D. Okla. Sept. 16, 2013) .............................................47, 48

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
  380 F.3d 1226 (9th Cir. 2004) ............................................................29

*Ollila v. Babcock & Wilson Enters., Inc.*,
  2018 WL 792069 (W.D.N.C. Feb. 8, 2018) ................................................... *passim*

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015).............................................................16

*Oneida Sav. Bank v. Uni-Ter Underwriting Mgmt. Corp.*,
  2014 WL 4678046 (N.D.N.Y. Sept. 18, 2014).......................................38

*Ottmann v. Hanger Orthopedic Grp., Inc.*,
  353 F.3d 338 (4th Cir. 2003) ............................................................12

*Pa. Pub. Sch. Employees' Ret. Sys. v. Bank of Am. Corp.*,
  874 F. Supp. 2d 341 (S.D.N.Y. 2012)......................................................39

*Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*,
  918 F.3d 312 (4th Cir. 2019) ............................................................20

*Pension Tr. Fund for Operating Engineers v. Mortg. Asset Securitization
  Transactions, Inc.*,
  730 F.3d 263 (3d Cir. 2013)...........................................................41

*Pipefitters Local No. 636 Defined Benefit Plan v. Tekelec*,
  2013 WL 1192004 (E.D.N.C. Mar. 22, 2013) .......................................31

*Proter v. Medifast, Inc.*,
  2013 WL 1316034 (D. Md. Mar. 28, 2013)......................................31, 32

*Rabkin v. Lion Biotechnologies, Inc.*,
  2018 WL 905862 (N.D. Cal. Feb. 15, 2018) .........................................22

*Republican Party of N.C. v. Martin*,
  980 F.2d 943 (4th Cir. 1992) ............................................................8

*Ret. Sys. of Gov't of V.I. v. Blanford*,
  794 F.3d 297 (2d Cir. 2015)........................................................30, 36

*Ret. Sys. v. EnergySolutions, Inc.*,
  814 F. Supp. 2d 395 (S.D.N.Y. 2011).............................................23, 24

*Ret. Sys. v. MBIA, Inc.*,
  637 F.3d 169 (2d Cir. 2011)............................................................44

*Ret. Sys. v. Sonoco Prods. Co.*,
  827 F. Supp. 2d 559 (D.S.C. 2011)......................................................20

*Rougier v. Applied Optoelectronics, Inc.*,
  2019 WL 6111516 (S.D. Tex. Mar. 27, 2019)........................................................12

*S. Ferry LP, No. 2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) ..........................................................................34

*S. Ferry LP No. 2 v. Killinger*,
  687 F. Supp. 2d 1248 (W.D. Wash. 2009).........................................................39

*Scritchfield v. Paolo*,
  274 F. Supp. 2d 163 (D.R.I. 2003)...................................................................16

*SEC v. Conaway*,
  698 F. Supp. 2d 771 (E.D. Mich. 2010)............................................................24

*SEC v. Pirate Investor LLC*,
  580 F.3d 233 (4th Cir. 2009) ..........................................................................28

*Silverstrand Invs. v. AMAG Pharm., Inc.*,
  707 F.3d 95 (1st Cir. 2013)........................................................................23, 24

*Singer v. Reali*,
  883 F.3d 425 (4th Cir. 2018) .........................................................12, 20, 23, 33

*Stratte-McClure v. Morgan Stanley*,
  776 F.3d 94 (2d Cir. 2015)..............................................................................24

*Teachers' Ret. Sys. of La. v. Hunter*,
  477 F.3d 162 (4th Cir. 2007) .....................................................................29, 31

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007).......................................................................................24

*Transenterix Inv'r Grp. v. Transenterix, Inc.*,
  272 F.Supp.3d 740 (E.D.N.C. 2017).................................................................47

*Turka v. S.C. Pub. Serv. Auth.*,
  2020 WL 901965 (D.S.C. Feb. 25, 2020)...........................................................22

*Umstead v. Durham Hosiery Mills, Inc.*,
  578 F. Supp. 342 (M.D.N.C. 1984) .................................................................41

*Va. Bankshares, Inc. v. Sandberg*,
  501 U.S. 1083 (1991).....................................................................................15

*Van Dongen v. CNinsure, Inc.*,
  951 F. Supp. 2d 457 (S.D.N.Y. 2013)...............................................................38

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
  2015 WL 3755218 (E.D. Pa. June 16, 2015) ....................................................31

*Wilson v. Saintine Expl. & Drilling Corp.*,
   872 F.2d 1124 (2d Cir. 1989)...................................................................................49

*Yates v. Municipal Mortgage & Equity, LLC*,
   744 F.3d 874 (4th Cir. 2014) ............................................................................ *passim*

*Zak v. Chelsea Therapeutics Int'l, Ltd.*,
   780 F.3d 597 (4th Cir. 2015) ..........................................................................33, 37

**Statutes**

15 U.S.C. § 77..............................................................................................40, 41, 50

15 U.S.C. §78j(b)............................................................................................7, 24, 40

15 U.S.C. §78t(b)..................................................................................................40

15 U.S.C. § 78u-5(c)(1)(A)(i) ...............................................................................19

**Rules**

Fed. R. Civ. P. 9(b) ............................................................................................8, 40

Fed R. Civ. P. 12 .....................................................................................8, 40, 48, 49

Rule 12(b)(6)........................................................................................................8

**Other Authorities**

17 C.F.R. § 240.10b5 ................................................................................7, 23, 24, 36

17 CFR § 230.159A ..............................................................................................49

## I.    PRELIMINARY STATEMENT

2U is an education technology company that partners with universities to provide online degree programs.  Consolidated Class Action Complaint ("Compl.") ¶55.  Unlike its competitors, Defendants presented 2U to investors as a spectacular success story, with year-after-year consolidated revenue growth above 30%.  Compl. ¶283.  Throughout the Class Period, Defendants underscored that 2U is "inherently [] a long-term story" that is "uncommon" because it "keeps growing north of 30% off of a base of over $400 million in revenue."   Compl. ¶¶182, 283.  Defendants insisted that their growth was "predicable," with 2U poised to "hit $1 billion in revenue in a little over 3 years [in late 2021 or early 2022]"–which "used to be a long-range goal" but "now it's right in front of us. We can see it."  Compl. ¶¶283, 293.  Defendants Paucek and Graham emphasized that 2U's steady growth was all but assured—it had a proven model, a healthy pipeline of new customers and strong student enrollments, a huge addressable market, and no serious competition.  Compl. ¶¶11, 40.

Significantly, analysts relied on Defendants' narrative and explicitly linked their valuation of 2U to its growth story and supposedly successful execution plan.  Compl. ¶13.  For example, analysts at Credit Suisse commented that given "the [C]ompany's highly recurring and disruptive business model with **long-term visibility into 2020+, we raise our TP to $100**."  *Id*.  Similarly, Barrington Research wrote that "[a]t current levels, 2U's stock is trading at 10.2x our estimate of 2018 revenue, compared to an average of 6.2x for its Ed Tech peers and 6.3x for its vertical focused SaaS [software-as-a-service] peer group. **We view this premium as warranted given that 2U's projected growth rate is much higher at 40%/32% in 2018/2019**."  Compl. ¶14.

In truth, however, 2U's student acquisition efforts were not scaling to meet the growing need for students in the Company's expanding portfolio of programs.  Compl. ¶84.  For example, according to several 2U former employees ("FEs"), Defendants were particularly concerned about

1

the low enrollments they were seeing internally. *Id.* ¶85. The accounts of these witnesses are corroborated by independent research based on several FOIA requests directed at some of 2U's largest university clients, which found that the majority of 2U's top programs were failing, with many others similarly underperforming—facts that Defendants repeatedly denied. *Id.* ¶147. Rather than come clean to investors and analysts, Defendants stopped disclosing revenue per cohort, an important metric that would have alerted the market to 2U's failing business model. When the truth finally emerged, the Company's stock became worthless. *Id.* ¶¶199, 212. While investors suffered, Defendant Paucek lined his pockets, profiting some $22.8 million when he sold his 2U stock at artificially inflated prices during the Class Period.

## II.     STATEMENT OF FACTS

### A.     2U's Graduate Segment Propped Up Its Growth

At the start of the Class Period, 2U had two reportable business segments, the graduate program segment and the short course segment. Compl. ¶55. During the Class Period, the graduate segment generated the lion's share of 2U's revenue, accounting for 84.6% of revenue in 2018 and 80% of revenue in the first six months of 2019. *Id.* ¶56. To be profitable, the graduate segment business model requires that partnerships with universities be long-lasting. *Id.* ¶58. Starting a program requires substantial investment on the part of 2U, on average $5 to $10 million per program, and university customers commit to initial terms of 10 to 15 years. *Id.* Universities then pay 2U a percentage of the tuition and fees students pay. *Id.* This revenue-sharing model gave 2U a perverse financial incentive to make its programs larger and more costly. *Id.* ¶59. 2U targeted a share of 60% of the money students paid. *Id.* This avaricious business model ultimately drove one of 2U's largest and most important programs—the USC Master of Social Work—into the ground, with the Century Foundation calling 2U a "wol[f] in sheep's clothing," interested only in reaping profits at the expense of students and schools. *Id.*

Naturally, given the importance of the graduate segment, 2U's growth plan focused on dramatically increasing the size of its domestic graduate business. *Id.* ¶¶67, 68. At the start of the Class Period, Defendants projected growth to $3 billion in steady state annual revenue. *Id.* ¶67. Then, when 2U faced skepticism of its business model in the second half of 2018, Defendants doubled down, raising the Company's projected growth to $4 billion. *Id.* ¶¶67-68.

### B.  Defendants Touted 2U's Unstoppable Growth Despite Knowing It Was Unsustainable

Throughout the Class Period, Defendants claimed that as 2U grew and collected more data from prospective students, it was targeting its advertising more efficiently and negotiating better rates as a bulk buyer. *Id.* ¶70. Then, once students were in the funnel (*e.g.*, completed applications, paid deposits, and registered), Defendants told investors that 2U's multi-program vertical strategy, where the Company had multiple programs in the same degree field, led to a higher percentage of enrolled students. *Id.* ¶¶70, 88. By converting a higher percentage of prospective students in the funnel to students in a 2U program, Defendants claimed they were creating an additional layer of efficiency. *Id.* But these and other representations were false. According to FE2, before 2017, the Company had experienced growth year after year, but enrollment projections began to slowly stall in 2017, and the problem worsened in 2018 and 2019. *Id.* ¶89. Beginning in 2018, the Company was no longer able to generate leads reliably using the methods it had used before, due to increased competition for students combined with a change in 2U's strategy, from partnering with well-known universities to adding programs from lesser-known universities that were harder to market. *Id.* ¶¶93-103.

Despite knowing that 2U's business model was not scaling as claimed, Defendants not only continued to tout its success, but they repeatedly raised guidance and accelerated their growth plans by announcing additional partnerships. *Id.* 135. As online learning grew more popular, and

2U faced competition from universities and other service providers, some observers began to openly question whether 2U could sustain its touted growth trajectory. *Id.* When faced with skepticism about competition, 2U's business model, or its ability to scale that model efficiently to recruit students for its growing portfolio of programs, Defendants repeatedly assured investors that their business model worked. *Id.*

This pattern began in early 2018 and continued in earnest throughout the Class Period. *Id.* ¶¶136-146. For example, on January 17, 2018, BMO Capital Markets ("BMO") published a mostly positive earnings preview report that praised 2U's "program launch 'cadence' of 58 new partner programs to be launched between 2018 and 2020," a "framework for the company to generate its '30% or better revenue growth' targets." *Id.* ¶136. BMO remarked, however, that "[t]here are some concerns regarding **whether the demand for these programs will (and has) outstripped the potential supply**. While we were unable to find data to support either position, we do envision some pricing pressure over time[.]" *Id.* Shortly after BMO published its report, Paucek and Graham hosted a conference call, highlighting the Company's 2017 revenue growth of 39% over the prior year, maintaining that the result "strongly validates" 2U's business model, and **raised guidance for 2018**, claiming expected revenue growth of 40% for 2018. *Id.* ¶¶137-139. In response to and relying on 2U's representations, analysts raised their target price for the stock "to reflect updated guidance." Barrington Research reiterated their OUTPERFORM investment rating, citing the Company's "**superior growth rate, revenue growth visibility/predictability and the size of its potential market**." *Id.* ¶141.

On July 19, 2018, investment manager Spruce Point released a direct challenge to 2U's success narrative. *Id.* ¶147 (report attached hereto as Exhibit ("Ex.") A). Spruce Point argued that **its proprietary research uncovered that a significant number of 2U's programs were, in reality,**

***underperforming*** the Company's steady state enrollment expectations, including "eight of the 14 programs launched between 2013 and 2015," and four of the top seven programs, which Spruce Point claimed had reached peak or declining enrollments. *Id.* Spruce Point also argued that declining tuition costs in rival programs were putting pressure on tuition in 2U programs, undercutting 2U's assumption that it would reach steady state revenues of $16 million per program. *Id.* ¶147. Spruce Point additionally found that competition for students was increasing, pressuring 2U's margins, as the cost to acquire students increased. *Id.* It also argued that 2U was becoming less transparent with investors, ***as in November 2017 it took the unusual step of altering its historical disclosure practices about cohort performance*** by deliberately ceasing to disclose revenue per cohort, a metric that would have alerted investors to 2U's underperforming programs. Ex. A. at 5, 16. The findings in the Spruce Report have since been confirmed by Plaintiffs' own investigation. The investigation uncovered that the decision to exclude information regarding year-over-year change in graduate program revenues came precisely when, according to former employees, Defendants were visibly concerned about enrollment as they were seeing internal enrollment projections decline. Compl. ¶151. Moreover, former employees working on student enrollment confirmed problems recruiting students at the very programs highlighted by Spruce Point, including USC's MSW and Rossier programs, and Simmons. *Id.*

Defendants forcefully denied the allegations by Spruce Point ("it's just not accurate"), and investors and analysts again believed 2U, having no knowledge of the internal trends and facts that Defendants were seeing at the time. *Id.* ¶¶152-171. Doubling down on 2U's assurances of unstoppable growth, Paucek insisted that the Company's spectacular performance, in fact, "is ***leading us to raise full year revenue guidance*** this quarter by over $2 million. At the midpoint of the new range, we ***expect year-over-year revenue growth of 43%***." *Id.* ¶155. Paucek cited

"enrollments and pipeline" as reasons that the Company was "confident in the reacceleration over the next few years." *Id.* ¶157. Paucek defended 2U's business model, claiming that "the MPV [vertical] strategy is clearly what drives our marketing efficiency. ***So today, we don't have a marketing efficiency issue***." *Id.* ¶160. Paucek also dismissed claims of outside competition, stating that "[t]hese other models are not impacting our new program pipeline. ***Quite the opposite***. We're taking over do-it-yourself programs, and ***we're winning contracts from competitors***. Do-it-yourself programs don't have the benefit of a world-class digital marketing shop or the leverage created by our multiple program verticals. When we take them over, they scale, often quickly." *Id.* ¶161.

Defendants again touted accelerated growth, projecting that 2U would hit $1 billion in revenues in a little over three years, with consolidated growth expectations at 33% for 2019 and in the 30s for at least the next 5 years. *Id.* ¶¶172-75. Defendants emphasized that 2U's growth was predictable and clear, claiming regarding the Company's long marketing cycle, "[t]he positive of that, ***it is predictable, and it gives me really high confidence*** to say that in a little over 3 years, we hit $1 billion in revenue." *Id.* ¶185; *see similarly id.* ¶194 ("we remain confident in our ability to continue delivering 30%-plus top line growth, get to $1 billion in revenue within 3 years and leverage a business model that we've proven can deliver profitability as programs mature").

### C.     The Truth Emerges Gradually

On May 7, 2019, 2U surprised the market when it reported disappointing first quarter 2019 financial results and lowered its financial guidance. *Id.* ¶197. Specifically, Defendants revealed that 2U was likely to achieve $13 million less in revenues than previously represented. *Id.* During an earnings call that same day, Graham disclosed that guidance was lowered because 2U was seeing "some decline in expected graduate program enrollments beginning in the second quarter and continuing through the rest of the year." *Id.* ¶198. On this news, the price of 2U stock dropped

over 25 percent.  *Id.* ¶199.  Still, 2U's stock price remained artificially inflated even after these disclosures.  Rather than admit that the Company's lackluster financial results and lowered guidance were caused by a fundamental problem with its business model, Defendants framed the disappointing results as the result of a confluence of *one-time factors*: partners getting more selective; lower application submission rates; and a change in launch date for one of 2U's largest programs.  *Id.* ¶¶200-01.  Defendants continued to reassure the market that 2U's model worked. *Id.* ¶204.  Analysts were duped again, observing that "despite these challenges, *the [Company], importantly, noted that this is NOT weakness in marketing efficiency at the top of the funnel*" and that "[m]anagement remains confident that marketing efficiency and the quality of candidates is not changing."  *Id.* ¶207.

Then, just two months later, on July 30, 2019, 2U shocked the market by revealing that its growth plans were failing and needed to be abandoned as costs ballooned, and that it was significantly reducing its 2019 guidance.  *Id.* ¶208.  In particular, 2U projected that net loss for 2019 had increased by over $70 million.  *Id.*  Defendants finally admitted that the marketing funnel did not work, saying "[c]ompetition for students has increased," and that 2U now expected "smaller average steady-state program[s]," with "our guidance presum[ing] lower conversion rates on a go-forward basis."  *Id.* ¶¶210-11.  Analysts referred to this sudden disclosure as a "*[m]ajor story change*," observing that this "*unexpected*" announcement "is *clearly a breaking of the [Company]'s model*…."  *Id.* ¶¶213-14.  BMO downgraded 2U as a result of management's disclosure that they would "'reset the velocity' for growth," which was likely to result in "*a massive sell-off*."  *Id.* ¶¶213-14.  On this news, 2U's stock fell *65 percent*.  *Id.* ¶212.

## III.    EXCHANGE ACT CLAIMS

To state a claim for securities fraud under § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, a plaintiff must allege: "(1) a material misrepresentation or omission by

the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011).

"A motion to dismiss under Rule 12(b)(6) … does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). "'[N]either Rule 9(b) nor the PSLRA requires plaintiff[s] to set forth facts which, because of the lack of discovery, are in the exclusive possession of the Defendants.'" *Direct Benefits, LLC v. TAC Fin. Inc.*, 2014 WL 671616, at *8 (D. Md. Feb. 20, 2014) (quoting *Keeney v. Larkin*, 306 F. Supp. 2d 522, 528 (D. Md. 2003)). "In the final analysis, a motion to dismiss for failure to state a claim should not be granted unless it appears to a certainty that the plaintiff would be entitled to no relief under any set of facts which could be provided in support of the claims." *In re Human Genome Scis. Inc. Sec. Litig.*, 933 F. Supp. 2d 751, 757 (D. Md. 2013).

## A.   THE COMPLAINT PLEADS MATERIAL MISREPRESENTATIONS AND OMISSIONS

The PSLRA requires plaintiffs to "'specify each statement alleged to have been misleading'" and "'the reason or reasons why the statement is misleading.'" *Burt v. Maasberg*, 2014 WL 1291834, at *13 (D. Md. Mar. 28, 2014) (quoting 15 U.S.C. § 78u-4(b)(1)). When a plaintiff alleges "'*sufficient* facts to support a *reasonable belief* in the allegation that the defendant's statement was misleading, the court should deny the Rule 12(b)(6) motion as to this "misrepresentation" element.'" *Epstein v, World Acceptance Corp.*, 2015 WL 2365701, at *5 (D.S.C. May 18, 2015) (quoting *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 174 (4th Cir. 2007)) (emphases in original). "As a general rule, the trier of fact decides whether a public statement is misleading." *Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 601

(E.D. Va. 2015).

Throughout the Class Period, Defendants made numerous false and misleading statements. The statements fall under the following three categories: (1) statements of past or current facts about 2U's business model, student enrollment, marketing efficiencies, and competition; (2) statements involving specific projections; and (3) risk factors disclosures.

### 1.    Statements of past or current facts about 2U's business model, student enrollment, marketing efficiencies, and competition

Several of the alleged misstatements and omissions are statements of current fact that conveyed a misleading and incomplete picture of 2U's performance.[1]  For example, Defendants repeatedly claimed that 2U efficiently managed its student acquisition costs through the MPV, assuaging the market's concerns that a greater scale of graduate degree programs did not, in fact, pressure costs, and insisted that the Company did not have a marketing efficiency issue: "But regardless, the MPV strategy is clearly what drives our marketing efficiency.  So today, we don't have a market efficiency issue."  Compl. ¶260.  Defendants insisted that "as we get to a greater scale, we are able to be more effective there, not less."  *Id.*  Paucek touted the benefit of 2U's model versus the competitors and 2U's unique ability to capture students, claiming that "our model works" – "the graduate segment is the organic growth engine powering 2U.  FCE [Full Course Equivalents] growth is beginning to reaccelerate.  New student enrollments are strong across the portfolio."  *Id.* ¶262.  Graham amplified those statements, representing that "We're signing new programs in the same range as we've been signing before and we're not seeing any changes in

---

[1] For each representation that is allegedly false and misleading, Plaintiffs identify the maker of the statement, the date of the statement, and the reasons why the statement is false and misleading. Compl. ¶¶66-109.  Plaintiffs also explain through the accounts of former 2U employees how Defendants were aware of undisclosed facts rendering their public representations false and misleading when made.  *See*, *e.g.*, Compl. ¶¶106-111, 346-49, 356-57.

marketing efficiency.  So in other words, we're still able to acquire students at the same kinds of prices that we were able to acquire students previously…we're not seeing pressure in marketing and efficiency."  *Id.*  ¶271.   Defendants likewise insisted that, far from losing students to competitors, 2U was in fact "winning contracts from competitors."  *Id.* ¶161.

Amplifying Graham's representations, Paucek rejected suspicions of marketing inefficiencies at 2U, remarking that "one of the sort of false notions out there is that there is a marketing efficiency challenge.  There is not.  We're not having a market efficiency challenge." *Id.* ¶277.  Accordingly, Paucek said, there is "proof" that "the core model is generating results. And the reality is many of our older programs not only have room to run from a market efficiency standpoint, but we're continuing to build more and more offerings into those programs to drive growth."  *Id*.  Continuing the growth-in-students mantra throughout the Class Period, Paucek insisted that "our data shows we're driving significant growth in the quantity of prospective students and started applications," "we aren't seeing declines in front-end marketing efficiency," and "the rate of admitted students that choose to enroll or yield has remained steady year-over-year."  *Id.* ¶¶310, 314.

These and other similar representations were materially false and misleading when made because 2U's marketing funnel was not scaling to meet the needs of its growing portfolio.  In fact, 2U's vertical strategy led to cheaper programs cannibalizing enrollments from more expensive programs, and outside competition was adversely affecting the Company's ability to enroll students.  As recounted by several former employees, beginning in 2017 and continuing throughout the Class Period, Defendants saw 2U's projected enrollment numbers decline across the board. For example, FE-1, who worked directly with Paucek, explained that a few months into 2018, concerns about low enrollment become a topic inside 2U, and remained one.  Compl. ¶86.  FE-1

recalled that Paucek was working closely with the Chief Marketing Officer, Defendant Mokkarala, on the issue of low enrollments. *Id.*  Likewise, FE-2, who was responsible for forecasting the Company's growth and demand based on enrollment numbers, recalled that enrollment projections began to stall in 2017 and worsened in 2018 and 2019. *Id.* ¶89.  Similarly, FE-3, one of only four of 2U's social media strategists, explained that when she left the company in July 2018, 2U was desperately in need of students. *Id.* ¶90.

2U's former employees reported specific problems recruiting students at ***six of 2U's top twenty graduate programs***: USC Master of Social Work (#1), USC Rossier Online (#3), Simmons MSW (#6), University of Dayton MBA (#12), Harvard Business Analytics (#17), and the Washington University Legal Studies program (#19). Compl. ¶133.  USC programs accounted for 27% of 2U's revenue in 2017, 21% in 2018, and 15% in 2019.  *Id*. ¶132.  Simmons programs accounted for 17% of 2U's revenues in 2017, 13% in 2018, and 8% in 2019.  *Id.*  Those two schools alone contributed 44%, 34%, and 23% of revenue in 2017, 2018, and 2019, respectively.  *Id.*  The former employees explained that 2U was effectively undermining its biggest programs with cheaper offerings in the same verticals (*see*, *e.g.*, Compl. ¶¶114, 120).  Moreover, admissions counselors were unable to keep up with 2U's growth from additional graduate programs and 2U's unrealistic quotas that were not based on any prior metrics (*see*, *e.g.*, *id*. ¶¶121-22).  The breadth of these problems is corroborated by the analysis conducted by Spruce Point, whose own investigation showed that ***8 of 2U's 14 programs launched between 2013 and 2015 were, in fact, underperforming, and that 4 of 2U's top 7 programs had peaked and were experiencing declining student enrollments***.  *See supra* at 4-5.  2U vociferously denied these allegations.  *Id.*

Problems in these large programs alone would have been material to investors and should have been promptly disclosed.  But the Complaint alleges that 2U was encountering similar

problems in **additional** programs.  *Id*. ¶134.  Indeed, former employees describe similar problems in other programs, including Syracuse's MBA program (*id*. ¶106), American University (*id*. ¶113), USC's Master of Education in School Counseling (*id*. ¶116), Rice's MBA program (*id*. ¶¶118, 124-25, 127), Master of Legal Studies and Master of Dispute Resolution at Pepperdine University (*id*. ¶119), and the Master of Science in Education at the University of Dayton (*id*. ¶120); *see also id*. ¶130 (according to FE-9, other programs faced similar problems).  2U was also losing students to increased competition from other program providers who were offering better terms and capturing advertising space, increasing 2U's marketing costs.  *See*, *e.g.*, *id*. ¶¶94, 99-100, 104-11.

Once Defendants chose to tout 2U's business model, student enrollment, and marketing efficiencies, they were subject to a duty to disclose a mix of information that was not misleading. *Singer v. Reali*, 883 F.3d 425, 440 (4th Cir. 2018) ("by choosing to inform the market that it was training surgeons on how to obtain reimbursements for the System[,]…the Company was obliged to further disclose its fraudulent reimbursement scheme, i.e., its instructions to surgeons to unlawfully code the System under Category I.  Otherwise, the Officers' statements about the Company's training efforts were utterly misleading."); *Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 352 (4th Cir. 2003) (defendants' positive statements about the integration of two businesses created a duty to disclose that the combined company was experiencing a loss of referral business); *In re Acuity Brands, Inc. Sec. Litig.*, 2019 WL 10246166, at *16–17 (N.D. Ga. Aug. 12, 2019) (finding actionable statements that "failed to disclose, or deliberately understated, the impact increased competition was having on Acuity's business"); *Rougier v. Applied Optoelectronics, Inc.*, 2019 WL 6111516, at *9 (S.D. Tex. Mar. 27, 2019) (finding actionable statements touting a better ability to meet demand than competitors and touting market share, while professing no concern about losing business to competitors, when the company was experiencing issues that

threatened its market position); *Backe v. Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1181 (S.D. Cal. 2009) (statements touting "strong demand" were false and misleading); *In re EVCI Colls. Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 101–02 (S.D.N.Y. 2006) (finding actionable "EVCI's statements about enrollment increases and growth strategies"); *Cent. Laborers' Pension Fund v. SIRVA, Inc.*, 2006 WL 2787520, at *13–14 (N.D. Ill. Sept. 22, 2006) (finding actionable statements about investing in marketing and about a supposedly efficient business model). Accordingly, Defendants' statements are actionable.

Defendants make no convincing arguments why their statements are not actionable. Instead, they argue generally that "for the most part," their statements were literally true. (Mot. at 33.) Leaving aside the fact that, to the contrary, many of the statements were literally *false*, statements that are literally true are not immune from liability under the federal securities laws because "[s]ome statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors." *Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 249 n.10 (D. Mass. 2006); *In re StockerYale Sec. Litig.*, 453 F. Supp. 2d 345, 350 (D.N.H. 2006) ("the fact that a statement is literally accurate does not preclude liability under federal securities laws"); *Epstein,* 2015 WL 2365701, at *5 (same).

Defendants cherry-pick a few examples to argue that the statements are "facially true," but even those statements are misleading when they are properly considered in the context of Defendants' allegedly unparalleled growth story. (Mot. at 34-36.) For example, Defendants represented that what is "driving our program in the graduate program segment" was the fact that we "began the acceleration of our new DGP launch cadence." This statement would have misled a reasonable investor by painting a picture of smooth growth. That image, however, was unsupported by the facts on the ground at 2U, including the fact that the Company was already

13

encountering material problems scaling its marketing funnel to serve these additional programs, thus impeding growth.   Those facts were concealed from investors.   Likewise, Defendants' representation that "our data shows we're driving significant growth in the quantity of prospective students and started applications" was false because 2U's student acquisition model was not scaling as expected.   Far from driving such "significant growth," the Company was unable to capture prospective students.   To make accurate disclosures, Defendants should have revealed the obstacles to student acquisition that 2U was facing at the time, such as the fact that competitors and 2U's own vertical strategy were cannibalizing 2U's growth.   Defendants likewise take issue with the representation that 2U had no weaknesses with market efficiency at the top of the funnel, which Defendants now claim means "long before a person has even begun an application."   (Mot. at 36.)   But the qualifying language Defendants attempt to inject does not appear anywhere in the Complaint (Compl. ¶310).   When read in context and in the light most favorable to Plaintiffs, Defendants' representations imply that 2U's market efficiency at the top of the funnel was one factor "driving significant growth in the quantity of prospective students and started applications."

Defendants also pluck some language out of context from a few challenged statements, arguing that statements like 2U's pipeline "continues to be strong," that 2U's "model works" and that "new student enrollments are strong across the portfolio" are inactionable corporate puffery. (Mot. at 28-29.)   But there is nothing "too indefinite" or "so vague" about Defendants' repeated misrepresentations that, contrary to the markets' concerns, 2U did not have a market efficiency challenge, that their "data shows" significant growth in the quantity of prospective students and started applications, and that such "proof" demonstrates that 2U's business model worked as the Company was "still able to acquire students at the same kinds of prices" as in the past.   The determination of whether statements are "puffery" requires considering those statements in

14

context.  *See City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 672-73 (6th Cir. 2005) ("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation.").

The use of some "soft" or "puffing" language does not render an otherwise false or misleading statement immaterial.  *See Longman v. Food Lion, Inc.*, 197 F.3d 675, 683 (4th Cir. 1999) (statements of "opinion or puffery" may be actionable "in particular contexts when it is both factual and material"); *In re Sci.-Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351, 1360 (N.D. Ga. 2002) ("A statement can be dismissed as puffery as a matter of law only if it is immaterial because it is so exaggerated or so vague that a reasonable investor would not rely on it in considering the 'total mix' of facts available"), *aff'd,* 374 F.3d 1015 (11th Cir. 2004).  The statements are not nonactionable optimism, but rather are "specific factual allegations … [that] can be proven true or false." *Dunn v. Borta*, 369 F.3d 421, 431 (4th Cir. 2004.)  *See*, *e.g.*, *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1093-94 (1991) (statements that price was "high" and proposal "fair" to shareholders were actionable); *City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc.*, 2017 WL 11562247, at *4 (D. Md. July 6, 2017)  (representation that renewed contract would be a "big, beautiful package" was actionable because, "taken together and in context," it "created a false belief in the minds of the market" that the contract "would allow at least the status quo to continue"); *Ollila v. Babcock & Wilson Enters., Inc.*, 2018 WL 792069, at *4 (W.D.N.C. Feb. 8, 2018) (representation of "strong backlog" actionable where the complaint alleged that defendants were aware of undisclosed problems and delays); *see similarly KBC Asset Mgmt. NV v. 3D Sys. Corp.*, 2016 WL 3981236, at *5 (D.S.C. July 25, 2016); *Kiken,* 155 F. Supp.

3d at 603-04 ("product quality" and "high quality standards" statements were actionable).[2]

Defendants also argue that "many" (although they only list four statements) of the statements are "non-actionable" opinion because they are prefaced with "we think," "we believe" or "we feel." (Mot. at 29-32.) But the Complaint sufficiently alleges that these "opinions" could not have been sincerely held given Defendants' contemporaneous knowledge of problems undercutting those statements (as explained *supra* at 10-11 and *infra* at 25-29). *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 176 (2015); *see similarly Ollila*, 2018 WL 792069, at *6 (statements of opinion actionable "[a]s plaintiff alleges that they were not sincerely held"). The opinions are actionable because Defendants omitted "particular (and material) facts going to the basis for the[ir] opinion," and omitted "material facts about the [defendants'] inquiry into or knowledge concerning" the opinions. *Omnicare*, 575 U.S. at 194; *see also Epstein v. World Acceptance Corp.*, 203 F. Supp. 3d 655, 667-68 (D.S.C. 2016). Here, Defendants' statements were "reasonably understood to rest on a factual basis that justifie[d] them as accurate, the absence of which render[ed] them misleading." *Ollila*, 2018 WL 792069 at *5 (quoting *Va. Bankshares*, 501 U.S. at 1093).[3]

---

[2] *See also In re Advance Auto Parts, Inc., Sec. Litig.*, 2020 WL 599543, at *4–5 (D. Del. Feb. 7, 2020) (finding statements touting "sales growth," "margin[s]," and expectations of "sales and customer momentum to continue" were actionable because Defendants failed to disclose adverse facts); *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 240 (S.D.N.Y. 2006) (statements material where defendant "attempted to distinguish itself from other institutions"); *Scritchfield v. Paolo*, 274 F. Supp. 2d 163, 175-76 (D.R.I. 2003) (stressing that "a company's statements that it is 'premier,' 'dominant,' or 'leading' must not be assessed in a vacuum (*i.e.*, by plucking the statements out of their context to determine whether the words, taken *per se*, are sufficiently 'vague' so as to constitute puffery").

[3] The statements of opinion in *In re Sinclair Broadcast Group, Inc. Sec. Litig.*, 2020 WL 571724, at *8-9 (D. Md. Feb. 4, 2020), were not actionable because "[a] reasonable investor would have understood that, notwithstanding Sinclair's own position, the final arbiter of FCC compliance is the FCC, not Sinclair," and "[a]ccording to [Plaintiff]'s own version of the facts[,]…negative feedback from the FCC came only after the alleged misstatements were made."

Defendants argue that Plaintiffs failed to quantify or provide particularized facts about the severity or scope of the alleged problems (Mot. at 31), challenging their materiality.  But that is plain wrong.  As described above, the Complaint alleges that by the beginning of the Class Period (*i.e.*, by February 26, 2018), it was clear that Defendants' assumptions were wrong, and 2U's student recruitment infrastructure ***couldn't keep pace with the 37 existing programs***, let alone the additional programs in the pipeline.  Compl. ¶71.  It was also clear that the market for online education was becoming increasingly crowded and the model that 2U developed in the early days of online learning no longer worked.  *Id.*  The Company could not continue to grow at the staggering 30% rate it had promised investors.  *Id.* ¶85.  Enrollment projections began to fall in 2017 and worsened thereafter.  *Id.* ¶89.  FE-2 recounted that as early as February 2018, it was clear that the Company's sales goals could not be reached.  *Id*. ¶128.  And, according to the Spruce Report, ***eight of the 14 programs launched between 2013 and 2015 were underperforming and four of the top seven programs were seeing significant enrollment declines***.  *See supra* at 4-5, 11.  These problems would have been material to a reasonable investor deciding to invest in 2U.[4]  Indeed, when the truth finally emerged, 2U's stock lost ***over 87%*** of its value.  *See Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 660-61 (4th Cir. 2004) ("majority rule" is that a stock price drop in response to a corrective disclosure is "*some* evidence" of materiality) (emphasis in original).

### 2.      Statements Involving Specific Projections

Defendants contend that their projections are immaterial as a matter of law, but courts routinely find specific statements concerning forecasts of growth, as here, to be actionable.  *See*, *e.g.*, *Lefkoe v. Jos. A. Bank Clothiers*, 2007 WL 6890353, at *5 (D. Md. Sept. 10, 2007) (finding

---

[4] The materiality standard is "objective" and the "issue generally presents a question of fact." *Marsh Group v. Prime Retail, Inc.*, 46 F. App'x 140, 144-45 (4th Cir. 2002).

actionable statements that the company "expects earnings per share for the fiscal year ending January 28, 2006 (fiscal year 2005) to at least meet the consensus analyst estimate of $2.20 per share, representing at least a 28% increase when compared with earnings per share from prior year" (*Lefkoe* complaint ¶109); *Direct Benefits, LLC v. TAC Fin., Inc.*, 2020 WL 2769982, at *11, 17 (D. Md. May 28, 2020) (statement that "[w]e . . . expect to triple revenues in 2011 to approximately $3M in revenues" survived summary judgment).

Here, Defendants did not "merely" make "expressions of optimism or vague generalizations." *Lefkoe*, 2007 WL 6890353, at *5. To the contrary, Defendants made "specific statements concerning forecasts of growth in [revenues]." *Id.* A few examples are listed below:

- With our now most recent quarter and with our guide for next year, we feel very comfortable that we believe that the core business is super strong and continues to grow. So it's reasonable to expect that more than 30% revenue growth, we've already told you 32% and 34% for next year. (Compl. 277.)

- Strong year- over- year growth combined with our stepped- up program launch targets for 2019, 2020 and 2021, have put 2U on the path to $1.0 billion in revenue, which we expect to hit in a little over three years. (*Id.* ¶281.)

- Look, it isn't common that a company keeps growing north of 30% off of a base of over $400 million in revenue. We said in the past that we expect to keep revenue growth above 30% for the "foreseeable future". We're now confident enough in the overall portfolio and the strength of the pipeline to put a timeline on it. We think we can keep consolidated revenue growth above 30% for at least the next 5 years. Based on these current growth expectations, 2U expects to hit $1 billion in revenue in a little over 3 years. (*Id.* ¶283.)

- The positive of that, it is predictable, and it gives me really high confidence to say that in a little over 3 years, we hit $1 billion in revenue. (*Id.* ¶293.)

Additionally, the language shows that these projections were presented by Defendants with a high degree of confidence, a fact that alone demonstrates their materiality. Indeed, analysts

closely tracked, believed, and relied on 2U's growth statements in setting the target price of the Company's shares.  *See supra* at 1, 4-5, 7.[5]

Defendants also argue that their projections are protected by the PSLRA's "safe harbor" provision.  (Mot. at 22-25.)  Not so.  The safe harbor applies only if the "forward-looking statement … is accompanied by *meaningful* cautionary statements ...."   15 U.S.C.  § 78u-5(c)(1)(A)(i). (emphasis added).  As a threshold matter, "the adequacy of cautionary language is a question of fact, and, typically, is not a question to be resolved on a motion to dismiss."  *Lefkoe*, 2007 WL 6890353, at *5 n.10; *see Ollila*, 2018 WL 792069, at *5; *In re Genworth Fin. Inc. Sec. Litig.*, 103 F. Supp. 3d 759, 790 (E.D. Va. 2015).  If, however, the Court does consider the issue at this stage, Defendants' cautionary language was not "meaningful."  First, Defendants' cautionary language was consistently boilerplate, without substantive updates, throughout the Class Period.  Drawing from the entire Class Period, Defendants identify hollow statements such as "[o]ur financial performance depends heavily on our ability to acquire qualified potential students for our offerings, and our ability to do so *may* be affected by circumstances beyond our control"; "*If* our execution of this strategy proves to be inefficient or unsuccessful…our revenue *could* be adversely affected"; "any changes to admissions standards…*could* affect student enrollment"; "we face competition…which *could* divert university clients."  (emphases added.)   Moreover, the cautionary language identified by Defendants warned of risks that had *already materialized* and,

---

[5] Defendants' projections and the context in which they arose are far different from those presented in Defendants' cases (Mot. at 23).  Here, many projections were embedded with existing facts (*see*, *e.g.*, Compl. ¶¶235, 256, 258, 269, 277, 281, 289, to list a few), the projections were not vague but specific and made repeatedly, many of them were worded as guarantees, and analysts repeatedly relied on the projections in setting the price of 2U's securities.  The information 2U concealed, which rendered Defendants' misrepresentations false and misleading, was not otherwise in the public domain.  And, far from alerting the market of the factors impeding its growth, Defendants repeatedly slapped down the market's concerns.

in turn, such statements are not immunized. *Singer*, 883 F.3d at 442-43 (finding that risk warnings were too general to immunize misleading statements where defendants warned, as here, that the company "*may* be subject to or otherwise affected by federal and state healthcare laws, including fraud and abuse and health information privacy and security laws, and *could* face substantial penalties *if* we are unable to fully comply with such laws") (emphases added); *Meyer v. Jinkosolar Holdings Co.* 761 F. 3d 245, 251 (2d Cir. 2014) (cited with approval in *Singer*) ("A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability. . . . One cannot … disclose … a business's peculiar risk of fire, the installation of a comprehensive sprinkler system to reduce fire danger, and omit the fact that the system has been found to be inoperable, without misleading investors"); *Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir. 1981) (similar), *aff'd in part, rev'd in part on other grounds,* 459 U.S. 375 (1983).[6]

Here, for example, 2U's ability to acquire students *had already been affected* by outside competitors and by 2U's own vertical programs, and the Company *was already suffering* from marketing inefficiencies that impeded its ability to generate growth. When the truth about Defendants' inability to generate meaningful growth became known to the market at the end of the Class Period, investors were unprepared, and 2U's stock price went into a tailspin. Thus, Defendants' boilerplate cautionary language did not warn investors of the true risks at hand and, consequently, was meaningless. Moreover, some of the statements that Defendants claim are "forward-looking" include present or historical facts that take them outside the safe harbor. *See*

---

[6] *See also Ollila*, 2018 WL 792069 at *5; *City of Ann Arbor Emps.' Ret. Sys. v. Sonoco Prods. Co.*, 827 F. Supp. 2d 559, 576 (D.S.C. 2011). *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312 (4th Cir. 2019), is easily distinguishable. There, the risk warnings were "extensive, specific, and tailored," and "significantly," the "case d[id] not involve" a "situation" where "factual information in disclosure documents [was] known to be false." *Id.* at 319-20.

*supra* n. 5.  *See Genworth*, 103 F. Supp. 3d at 789 ("[A] 'mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present.'"); *In re Regeneron Pharm., Inc. Sec. Litig.*, 2005 WL 225288, at *13 (S.D.N.Y. Feb. 1, 2005) (same).

Additionally, and contrary to Defendants' contention, because Defendants acted with actual knowledge, they cannot invoke safe harbor protection.  *See In re Genworth,* 103 F. Supp. 3d at 790 ("If the forward-looking statement is made with actual knowledge that it is false or misleading, the accompanying cautionary language can only be meaningful if it either states the belief of the speaker that it is false or misleading or, at the very least, clearly articulates the reasons why it is false or misleading"); *Direct Benefits,* 2014 WL 671616, at *8 (projections actionable where "Defendants' alleged omissions [about lost revenue from a primary source] intimate Defendants' actual knowledge of the false or misleading nature of the projection"); *Black v. Martek Biosciences Corp.*, 2006 WL 8435572, at *4-5 (D. Md. June 14, 2006) (finding growth projections actionable because the complaint alleged that Defendants knew contrary facts that made "their projections lack[] a reasonable basis").  Here, as explained *supra* at 10-11 and *infra* at 25-29, Defendants had knowledge of contrary facts that called into question the accuracy of their projections at the time they were made.[7]

### 3.   Risk Factors Disclosures

Defendants also made misleadingly incomplete risk disclosures.   Under the caption

---

[7] *In re DXC Technology Co. Sec. Litig.*, 2020 WL 3456129, at *7 (E.D. Va. 2020) is inapposite because the pleaded facts were "fundamentally inconsistent with any such inference" that Defendants "knew or thought they would be unable to reach" their revenue projections, and the complaint otherwise alleged only conclusory statements that "Defendants had no reasonable basis for their revenue projections."  Likewise, in *In re Humphrey Hospitality Trust, Inc. Sec. Litig.*, 219 F.Supp.2d 675, the allegations consisted largely of vague and conclusory statements about what reports "must have indicated" about the Company's financial health, and no efforts to quantify their impact on the company's health.  Here, in contrast, the Complaint quantifies the problems. *See supra* at 4-5, 11, 17, 26.

"ineffective marketing efforts," Defendants represented only that "*[i]f*" the Company's "execution of this [marketing] strategy proves to be inefficient or unsuccessful," 2U's revenue "*could* be adversely affected." Compl. ¶332. That representation is actionable because the Company was, at the time, aware of facts and trends that indicated the Company's marketing efforts did not keep pace with 2U's projected growth, and 2U was encountering low enrollment. 2U's presentation of a then-occurring problem as a potential and as-yet-unrealized risk is therefore materially false and misleading. *See*, *e.g.*, *Turka v. S.C. Pub. Serv. Auth.*, 2020 WL 901965, at *1, 6-7 (D.S.C. Feb. 25, 2020) (generic risk factors typically associated with nuclear plant construction and development that construction and engineering performance *may* contribute to financial risk on a nuclear build and that daily project oversight *would* be provided on-site at this build were actionable because the statements failed to mention that the project was, at that point, likely insurmountably behind its operation schedule); *In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 618-19 (S.D. W. Va. 2012) (risk factor statements that mines *could* be temporarily or permanently closed, or that the company's operations *could* be stopped based on the company's failure to comply with safety laws were actionable because the company had already failed to comply with the regulations); *Rabkin v. Lion Biotechnologies, Inc.*, 2018 WL 905862, at *9 (N.D. Cal. Feb. 15, 2018) (risk disclosures were misleading); *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) ("purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized").

Likewise, the risk disclosure regarding 2U's student acquisition efforts, *i.e.*, that "a shortage of advertising space…*could* have a material adverse effect on our business, results of operations and financial condition" (Compl. ¶334), was materially false and misleading when

made because the Company was, at the time, encountering competition for advertising space in the increasingly saturated online education market, which was impacting 2U's ability to drive enrollments at the time of the warning.  Similarly, the statement that "*[i]f* new offerings do not scale efficiently and in the time frames we expect, our reputation and our revenue will suffer" (*id.* ¶336) is actionable because 2U's inability to scale its student acquisition operation was negatively impacting the Company's student acquisition efforts at the time the statement was made.[8]

### B.    PLAINTIFFS PLEAD VIOLATIONS OF ITEMS 503 AND 303

"[C]ourts have generally found Item 503 [now Item 105] violations to track Rule 10b–5 violations ...[and] analyze the sufficiency of Item 503 disclosures with the familiar materiality standard." *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 426, 427 (S.D.N.Y. 2011).  As explained above, the Complaint alleges facts showing that the adverse factors were occurring at the time of the Offering, and the Offering materials failed to disclose the risks 2U was facing at that time.  The generic and hypothetical risk disclosures that "***If*** our execution of this strategy proves to be inefficient…or ***if*** the costs…increase, our revenue ***could*** be adversely affected," that "***if*** new offerings do not scale efficiently, "or competition "***could*** divert university clients" (Mot. at 49-50) are insufficient as a matter of law.  *See Singer,* 883 F.3d at 442-43; *Jinkosolar,* 2014 WL 3747181 at 251.  Accordingly, the Complaint sufficiently pleads an Item 503 violation.  *See*, *e.g.*, *Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 710-17 (3d Cir. 2020) (vacating district court's dismissal of Item 503 violations because the risk disclosures left out facts that would have been material to investors); *Silverstrand Invs. v. AMAG Pharm., Inc.*, 707 F.3d 95, 104-06 (1st Cir. 2013) (finding district court incorrectly dismissed Item 503 allegations due to

---

[8] The above purported disclosure regarding marketing efforts was repeated in 2U's forms 1Q2018 10-Q, 2Q2018 10-Q, 3Q2018 10-Q, 1Q2019 10-Q, and in the 2018 10-K, and the statements were materially false and misleading for substantially the same reasons.  Compl. ¶338.

omitted risks); *City of Roseville,* 814 F. Supp. 2d at 427 (finding Item 503 sufficiently pled because jury could find the risks were materially misstated or defendants omitted material facts).  The existential risks to 2U's business model and survival were plainly material to investors.

Moreover, "Item 303's affirmative duty to disclose in [public filings] can serve as the basis for a securities fraud claim under Section 10(b)." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015).  Thus, courts have held that defendants whose omissions violate Item 303 are liable under Rule 10b-5 and other federal securities laws.  *See*, *e.g.*, *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 94 (2d Cir. 2016) (finding § 10(b) liability); *Silverstrand,* 707 F.3d at 102 (finding § 11 liability); *J&R Mktg., SEP v. GMC,* 549 F.3d 384, 392 (6th Cir. 2008) (same); *SEC v. Conaway*, 698 F. Supp. 2d 771, 837 (E.D. Mich. 2010) (finding Item 303's purposes consistent with § 10(b)'s).  Defendants' omissions of severely declining enrollment numbers and the fundamental shifts in competition were actionable failures to disclose under Item 303.

## C.     THE COMPLAINT ADEQUATELY PLEADS SCIENTER

"The Fourth Circuit has held that a plaintiff may allege the required state of mind, or scienter, for securities fraud liability by pleading intentional misconduct or recklessness." *Carlucci v. Han*, 907 F. Supp. 2d 709, 728 (E.D. Va. 2012).  "Scienter exists if the defendant knew the statement was misleading or knew of the existence of facts which, if disclosed, would have shown it to be misleading.'" *Id.*  A showing of scienter does not require evidence of motive.  *Lefkoe v. Jos. A. Bank Clothiers*, 2008 WL 7275126, at *8 (D. Md. May 13, 2008).  Moreover, scienter allegations "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'"  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323-24 (2007).  Rather, the Complaint need only create an inference of scienter that is as compelling as any nonculpable explanation, with any "'tie [going to] the plaintiff.'"  *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009).  "When making the assessment whether scienter has been

adequately pleaded, it is prudent to keep in mind that the PSLRA does not require a plaintiff to prove his case in his complaint" and "a plaintiff generally must frame the facts [of the case] without the benefit of discovery." *Arnlund v. Deloitte & Touche LLP*, 199 F. Supp. 2d 461, 475 (E.D. Va. 2002). Here, the Complaint's allegations establish a strong inference of scienter.

### 1. The Individual Defendants Had Access to and Closely Monitored 2U's Enrollment Numbers

Many former employees explained that Defendants Paucek, Graham, and Mokkarala had access to and closely monitored enrollment numbers. The numbers alerted the Individual Defendants to the declining enrollments no later than February 2018. Compl. ¶356. According to FE-1, who worked directly with Paucek to prepare him for meetings, organize the information that was submitted to the board for each board meeting and handle his personal projects, there was an ongoing conversation about low enrollment that began by February 2018. *Id.* FE-1 observed that while enrollment was not a concern when she first started at 2U, by February 2018 low enrollment became a topic of discussion for Paucek and other senior executives at 2U—and remained a concern. *Id.* More specifically, FE-1 explained that not too far into 2018, she first started hearing Defendant Paucek mention concerns about enrollment and noted that Paucek was trying to figure out what to do to address the problems. *Id.* ¶357. She explained that Paucek was working closely with then-Chief Marketing Officer, Defendant Mokkarala, on the issue of low enrollments. *Id.* FE-2 corroborated FE-1, recounting that Paucek was unhappy with the "dropping numbers." *Id.* FE-2 also explained that Defendant Mokkarala became stressed about enrollment numbers after enrollment projections began to slowly stall in 2017, in contrast to the year-after-year growth the Company had previously experienced. *Id.* ¶358. As a result, he often wanted to see forecast numbers earlier than when they were due. *Id.*

Defendants argue that 2U reported increased enrollments in its graduate program segment

for the fourth quarter of 2017, the four quarters of 2018, and the first quarter of 2019 (Mot. at 7-8, 17). But these overall numbers hid the truth that the majority of 2U's top programs were in fact underperforming as early as 2017, impeding the Company's growth. Corroborating the former employees' allegations of enrollment problems facing 2U in late 2017 and continuing thereafter, Spruce Point found that *at least four of 2U's top seven programs were experiencing significant enrollment declines as early as 2017*. Ex. A at 4, 14-15. For example, with respect to UNC's MBA program, Spruce Point reported the following "steady declines" in year-over-year enrollment: '17/'16 July *+54% v.* '18/'17 July *-5%*; '17/'16 October *+41% v.* '18/'17 October *-1%*; '17/'15 January *+4% v.* '18/'17 January *-8%*; '17/'16 April *+18% v.* '18/'17 April *-12%*. Report at 14. As for the MPA program at UNC, Spruce Point uncovered that "*no students have been enrolled since September 2017*. This program just passed its 5th anniversary and has never enrolled more than 88 new students in a year. This is a far cry from the '300 to 500' new student enrollments that 2U describes as a typical steady state graduate program." *Id.* Spruce Point specifically named the top four underperforming programs as: (a) Simmons College Nursing; (b) Simmons College Social Work; (c) UNC's Master of Business Administration; and (d) USC Rossier Online / Education. Compl. ¶149.

Spruce Point argued that to cover up these problems, *2U's executives had deliberately made 2U less transparent*, writing that "a continuation of some of its historical disclosure practices about cohort performance would lead investors to our conclusions" and "*would have alerted investors to the existence of at least eight underperforming programs*." *Id.* According to Spruce Point, 2U stopped disclosing a metric called "Platform Revenue Retention Rate" beginning with its Form 10-Q for the third quarter of 2017, which was filed on November 7, 2017. *Id.* ¶150. This maneuver coincides with FE-8's recollection about the transmittal of such information internally

26

at 2U.   According to FE-8, the 2U executives received reports on program status, including projections of the ups and downs of each programs.  *Id.* ¶350.  FE-8 noted that these reports had also previously been provided to other 2U employees but, suspiciously, around late 2017 or early 2018 the Company suddenly stopped providing the reports to the admissions staff.  *Id.*

Moreover, multiple former employees corroborate that the Individual Defendants closely monitored enrollment numbers.  *Id.* ¶349.  For example, according to FE-16, over a two-week period before earnings days, the investor relations team, which consisted of the CEO, the CFO, and the general counsel, met for hours to discuss enrollment figures, which were displayed by the finance department on a white board in the board room.  *Id.*  Likewise, FE-14 recalled that Paucek stayed abreast of the upcoming enrollment outlook, and that he always expressed that he was aware of the state of the business through emails, company meetings, and one-off meetings.  *Id.* ¶348. Similarly, FE-13 explained that once a quarter, Paucek participated in Company calls over Zoom where leadership discussed enrollment numbers for each program.  *Id.*

Paucek, Graham, and Mokkarala also had access to enrollment information and status through Gabriel Bustamante, 2U's Executive Vice President of Global Sales and Admissions.  *Id.* ¶351.  According to FE-17, Bustamante had regular access to this information.  *Id.* ¶352.  FE-17 explained that enrollment numbers were shared with her supervisor and general manager weekly, who in turn met with Bustamante weekly to report and discuss the enrollment numbers.  *Id.*  That Bustamante was aware of enrollment numbers is corroborated by FE-16, who further explained that Bustamante tracked enrollment and provided three years of future projections for the Company, and FE-14, who noted that the admissions department kept close track of enrollment and that Bustamante discussed enrollment projections for the entire admissions department.  *Id.* ¶353.  FE-15 also explained that Bustamante kept careful tabs on prospective students over the

course of the sales cycle and met with the directors of admissions and finance weekly to review and discuss enrollment forecasts and to forecast for the upcoming quarter. *Id.* ¶354. According to FE-9, the Company held annual meetings where Bustamante discussed student enrollment. *Id.* Another former employee, FE-16, explained that Bustamante provided the Company's enrollment numbers and projections to the finance team, who in turn presented them to Graham. *Id.* ¶355. FE-1 also noted that Paucek and Mokkarala met with Bustamante and the leadership team frequently. *Id.*

These allegations demonstrate that the Individual Defendants were closely involved in 2U's growth prospects and closely—and frequently—analyzed issues impacting growth, like overall student enrollment rates and marketing efficiencies, contributing to a strong inference of scienter. *See SEC v. Pirate Investor LLC*, 580 F.3d 233, 243 (4th Cir. 2009) (defendants "knew facts or had access to information suggesting that their public statements were materially inaccurate," thus presenting "[o]ne of the classic fact patterns giving rise to a strong inference of scienter"); *Latham v. Matthews*, 662 F. Supp. 2d 441, 467 (D.S.C. 2009) (strong inference of scienter where defendants were personally or intimately involved in the sales, marketing and production activities that the plaintiffs alleged were false and misleading); *Epstein,* 203 F. Supp. 3d at 671 (factors indicating scienter include "Defendants' close monitoring of the Company's day-to-day business and corporate practices"); *Carlucci,* 907 F. Supp. 2d at 729 (defendants "knew facts or had access to information suggesting [their] public statements were not accurate," thus supporting a strong inference of scienter); *Ollila*, 2018 WL 792069, at *3 (scienter sufficiently pled by allegations that defendants "had access to information" about undisclosed problems at the company); *Lefkoe*, 2008 WL 7275126, at *8 ("securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of

facts or access to information contradicting their public statements").

Former employees also describe the Individual Defendants as hands-on executives.  FE-16, who was an executive assistant to Graham and to other 2U senior executives, observed that both Paucek and Graham were heavily involved in the day-to-day operations at 2U.  Compl. ¶¶346-47.  Likewise, FE-3 described Paucek as a highly engaged executive.  *Id.* ¶347.  "Defendants' intimate involvement in the day-to-day operations of the Company … bolsters Plaintiff's claims of scienter and boosts the inference of 'actual' exposure to the problems [the company] was experiencing."  *KBC*, 2016 WL 3981236, at *9; *see also Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1234 (9th Cir. 2004) ("executives' detail-oriented management style" supported scienter); *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 278 (3d Cir. 2006) (same).

Defendants argue that the former employees' allegations are not grounded in their personal knowledge (Mot. at 14-15), and that many of the employees did not report directly to the executive defendants.  But direct reporting is not required, and Plaintiffs allege each former employee's job description and responsibilities within the Company, demonstrating the employees' personal knowledge of the facts they recounted.  *See Lefkoe*, 2008 WL 7275126, at *7 (crediting confidential witnesses' allegations where the complaint provided "job descriptions that suggest that the sources would have personal knowledge of the facts alleged and, in many cases, provides multiple sources to corroborate facts"); *Hunter*, 477 F.3d at 174 (confidential witness allegations must "support the probability that a person in the position occupied by the source would possess the information alleged or in the alternative provide other evidence to support their allegations") (internal quotations omitted).

Defendants also attempt to impugn the credibility of Plaintiffs' seventeen former

employees by deriding them as "low-level," "not executives," who "were only employed by 2U for a portion of the Class Period."  (Mot. at 13-14.)  These arguments lack merit.  The "level" of an employee in the corporate hierarchy is not dispositive of her or his reliability as a witness.  *See*, *e.g.*, *Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*, 794 F.3d 297, 301, 307-08 (2d Cir. 2015) (crediting allegations from low-level employees); *In re Sinclair,* 2020 WL 571724, at *16 (crediting various low-level witnesses such as a news anchor and assistant news director); *In re Massey Energy,* 883 F. Supp. 2d at 606 (crediting various low-level witnesses, including a belt buster).  Here, the former employees relayed important information about the true facts on the ground at 2U, which should not be discounted solely because of their job titles.  Similarly, there is no requirement that a confidential source be employed at a company during the entire class period.  The former employees who were not employed at 2U during the entire duration of the Class Period clearly had first-hand knowledge of facts during the various portions of the Class Period when they were working at the Company.   The corroborative nature of the information supplied by these witnesses of severe problems affecting 2U's growth, which were occurring throughout the Class Period, further bolsters their reliability.  *See*, *e.g.*, *Lefkoe*, 2008 WL 7275126, at *7   (crediting allegations derived from confidential sources where the complaint "provide[d] multiple sources to corroborate facts"); *In re Cabletron Sys. Inc.*, 311 F.3d 11, 29-30 (1st Cir. 2002) (same).

Defendants also contend that these former employees had a "myopic" view of a particular aspect of 2U's business (Mot. at 14), but that is simply incorrect.  As explained above, the problems were systemic and affected many of 2U's largest graduate programs.  Moreover, the information the seventeen witnesses provided ***collectively*** shows the severity and pervasiveness of 2U's problems.

The cases on which Defendants rely are inapposite.  *Yates v. Municipal Mortgage & Equity,*

*LLC*, 744 F.3d 874 (4th Cir. 2014), involved efforts by defendants to comply with a "difficult," "complex," and "challenging new accounting standard." *Id.* at 887.  Moreover, the Court did not hold that only a high-level employee or executive can serve as a confidential witness or that such witness must have reported directly to or have direct contact with an individual defendant, because statements by confidential witnesses are reliable as long as they were in a position to "possess the information alleged …." *Id.* at 885.[9]  *Ash v. Powersecure Int'l, Inc.*, 2015 WL 5444741, at *12-13 (E.D.N.C. Sept. 15, 2015), involved the uncorroborated account of one sole witness whose testimony did not even remotely relate to the sole actionable misrepresentation, and the complaint did not allege any facts supporting an inference of scienter based on the core operations doctrine. *In re Coventry Healthcare, Inc. Securities Litigation*, 2011 WL 1230998, at *7 (D. Md. Mar. 30, 2011), involved no allegations that the individual defendants were told by the confidential witnesses about the issues or "*otherwise knew about these issues*." (Emphasis added.) *Pipefitters Local No. 636 Defined Benefit Plan v. Tekelec*, 2013 WL 1192004, at *11-12 (E.D.N.C. Mar. 22, 2013), involved "mere allegations of regular management meetings" and the complaint did not allege that the "scorecards reflected declining revenues."  In *Hunter*, 477 F.3d at 181-82, a confidential witness's assessment in valuing the business was contradicted by other facts alleged in the complaint, and other facts alleged by the plaintiffs were in line with the company's actual disclosures. *Lerner v. Northwest Biotherapeutics*, 273 F. Supp. 3d 573, 593-94 (D. Md. 2017), and *Proter v. Medifast, Inc.*, 2013 WL 1316034, at *11-12 (D. Md. Mar. 28, 2013), simply stand for the unremarkable proposition that someone's position of control in the company or general,

---

[9] Courts routinely credit allegations of confidential witnesses who are not alleged to have had direct contact with the individual defendants. *See, e.g.*, *In re Sinclair*, 2020 WL 571724, at *16-17; *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2015 WL 3755218, at *16 (E.D. Pa. June 16, 2015).

vague allegations of access to information, *without more*, are insufficient to satisfy scienter.  Far from pleading fraud, the allegations in *Lerner* involved mere disagreements with defendants' methodologies and the company accurately reported the results of its studies, and *Proter* involved "generic pleading[s]" that the fraudulent scheme "could not have been perpetrated without the knowledge and complicity of the personnel at the highest level of the Company, including each of the Individual Defendants."

### 2.   Defendants' Own Statements Support a Strong Inference of Scienter

During the Class Period, the Individual Defendants repeatedly assured the market that they were extremely good at "projecting how many students you're going to get," saying they "tested" and "test" 2U's forecasts and "we've gotten very, very good at that."  Compl. ¶359.  Defendants repeatedly and confidently assured investors of 2U's ability to scale enrollment growth for its ever-increasing portfolio of Graduate division programs.  *Id.* ¶362.  For example, Paucek assured investors on February 26, 2018 that the "acceleration of our new [Graduate division program] launch cadence," including "[t]en new programs launched in 2017" and an additional "13 to 14 new programs" in 2018 was "driving our progress."  *Id.*  Graham agreed, adding that "what [2U was] seeing … makes us very comfortable that increasing our investment in new programs to drive growth is a wise, strategic decision."  *Id.*  Then on May 3, 2018, Paucek insisted that "the annual number of launched graduate programs has increased substantially over the past few years and shows no signs of slowing down," and the "pipeline continues to be strong, giving us confidence in our revenue expectations in that core segment in future years."  *Id.* ¶363.  He claimed that the overall operating system "now is at scale."  *Id.*

On August 2, 2018, Paucek again represented that "2U has a track record of scaling enrollments that's better than anyone in the space," and "we are indeed scaling," as "[n]ew student enrollments are strong across the portfolio."  *Id.* ¶364.  Graham referred to any lower admittance

rates as simply "aberrations" that were not "systemic" and throughout the remainder of the Class Period insisted that any rumors about decreased revenue growth were "false notions" as "[w]e're not having a marketing efficiency challenge." *Id.* ¶366.  Even as late as February 25, 2019, Paucek proclaimed that "[m]ature programs continue to enroll new students.  Newer programs are scaling well, and the 2018 cohort continues to be excellent.  In fact, 7 programs on the list were launched in the past 2 years.  Let that land for a second, 7.  So much for the theory that all of the new ones will be small and suboptimal."  *Id.* ¶¶298, 300.  And months later, in May 2019, Paucek insisted that "[o]ur data shows we're driving significant growth in the quantity of prospective students and started applications."  *Id.* ¶¶307, 310.

By repeatedly insisting—often in response to analysts' concerns about these issues—that 2U was scaling enrollment and that its business plan led to marketing efficiencies, the Defendants either: (1) knew that the Company was unable to scale enrollment to keep up with outside competition and its increasing portfolio of programs; or (2) were reckless in not knowing or investigating that this was the case. Under either scenario, there is a strong inference that the Defendants made these statements with scienter.  *Singer*, 883 F.3d at 444 ("in any event, the fact that the System's new Category III code did not result in substantially greater losses to TranS1 would have put any otherwise-innocent Officer on notice that the fraudulent reimbursement scheme was afoot"); *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 610 (4th Cir. 2015) (strong inference of scienter where "the plaintiffs' allegations, when considered in the context of the entire complaint, [demonstrated] that the defendants either knowingly or recklessly misled investors by failing to disclose critical information … while releasing less damaging information that they knew was incomplete"); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 711 (7th Cir. 2008) (stating that it is "exceedingly unlikely" that top executives did not know facts

about a corporation's "most important products," particularly where they communicated with the market about those products); *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 270 (3d Cir. 2009) (defendant may be culpable "as long as what he knew made obvious the risk that his confident, unhedged [assertions] would mislead investors"); *KBC,* 2016 WL 3981236, at *9 (allegations that Defendants "repeatedly spoke on these issues at conferences, on conference calls, and in press releases" support scienter); *Genworth*, 103 F. Supp. 3d at 785 ("The fact that Defendants made repeated misrepresentations over the course of a year 'also suggests a substantial degree of scienter.'") (quoting *SEC v. Resnick*, 604 F. Supp. 2d 773, 782 (D. Md. 2009)).

### 3.    Student Enrollment Was Critical To 2U's Core Operations

Defendants' knowledge of the number of students 2U was actually enrolling in its Graduate division programs, and thus the overall health of those programs, can also be inferred because those facts were critical to 2U's operations and the success of the Company.  The Graduate Division was 2U's chief revenue generator and the most important driver of the Company's growth rate.  Compl. ¶374.  Thus, the Company's continued ability to enroll students was critical to 2U's financial success and further contributes to a strong inference of scienter.  See *In re Genworth,*103 F. Supp. 3d at 784-85 (misrepresentations concerning one of the company's "core sets of businesses" are "certainly relevant to the Court's holistic analysis" of scienter, and the fact that the Individual Defendants held senior executive positions "augments the other allegations of intimate involvement pleaded elsewhere in the Amended Complaint"); *KBC*, 2016 WL 3981236, at *9 ("In addition to the inferences drawn from Individual Defendants' positions, the allegedly misrepresented issues all related to core operations, which by nature can contribute to a strong inference of scienter"); *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) (similar); *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013) (core operations doctrine supported scienter where only 18% of the company's revenues were at issue).

### 4.   Paucek's Suspicious Stock Sales During The Class Period Support A Strong Inference Of Scienter

Although not required, the Complaint also alleges that Paucek was highly motivated to mislead investors about the continued growth of 2U in order to benefit from insider sales at artificially inflated stock prices.[10]   During the Class Period, Paucek realized substantial benefits from his personal disposal of 2U common stock while Defendants continued to conceal material facts from investors concerning the inability of 2U's student enrollment model to match the enrollment needs of the Company's rapidly growing portfolio of programs.   Throughout the Class Period, Paucek sold approximately 270,000 shares at prices ranging from $72.02 per share to $85.03 per share to realize proceeds of a staggering $22,835,947.  Compl. ¶369.  By comparison, over the period of time equal in length to the Class Period but immediately preceding it, Paucek realized only $11,316,471 in sales of 2U common stock.  *Id.*   Thus, Paucek realized a more than 50% increase in proceeds from Class Period sales over sales in the period immediately preceding it.  Accordingly, Paucek's behavior in entering into the Class Period stock sales further raises a strong inference of scienter.  *See Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 435 (5th Cir. 2002) (insider sales that are in "suspicious amounts or at suspicious times" are probative of scienter); *Kiken*, 155 F. Supp. 3d at 607 (finding inference of scienter when "[t]he named individual defendants also sold … their stock holdings … during the Class Period, when stock prices were at their highest value.").

Defendants assert that the foregoing sales were not suspicious because they were made pursuant to a 10b5 trading plan.  But this premature affirmative defense is highly fact-specific and

---

[10] That the Complaint does not allege that Graham and Mokkarala sold their shares does not negate their scienter (Mot. at 18), as these defendants could have "waited too long to sell, such that by the time it became apparent that full disclosure would be necessary, massive trades would expose them to potential criminal liability."  *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 15 (D. Mass. 2004).  In any event, allegations of motive are not required for scienter.  *Lefkoe*, 2008 WL 7275126 at *8.

inappropriate for resolution on a motion to dismiss.  *Lefkoe*, 2007 WL 6890353, at *6 n.11.  And

Defendants have not met their burden in establishing this fact-based affirmative defense, which is

not even supported from the face of the Complaint.   Defendants must prove that the plan was

entered into in good faith and before the insider became aware of material nonpublic information.

*See Selective Disclosure and Insider Trading*, SEC Release No. 34-43154, 73 SEC Docket 3 (Aug.

15, 2000); 17 C.F.R. § 240.10b5-1(c)(1)(i) & (ii). They must also prove that the plan (1) expressly

specifies the amount, price and date of sales; (2) provides a written formula or algorithm, or

computer program, for determining the amount, price and date of sales; or (3) prohibits the insider

from exercising any subsequent influence over how, when, or whether to effect purchases or sales;

provided, in addition, that any other person who did exercise such influence was not aware of the

material nonpublic information when doing so.  *See id.*; 17 C.F.R. § 240.10b5-1(c)(1)(i)(B)(1)-(3).

Indeed, 10b5 plans are frequently manipulated to enable an insider to profit from material non-

public information.  *Blanford*, 794 F.3d at 308; *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp.

2d 171, 200 (S.D.N.Y. 2010).

　　　Moreover, Paucek adopted his 10b5 plan during the Class Period, right in the midst of

Defendants' alleged fraud.  (Mot. at 18, Exhs. 10, 11, n. 1).  A plan adopted while a defendant is

aware of material non-public information offers no shelter from insider trading allegations or

inferences of scienter properly drawn therefrom.  *See* 17 C.F.R. § 240.10b5-1(c) (creating an

affirmative defense only when the defendant adopts the trading plan "[b]efore becoming aware of

the [material non-public] information"); *see also Yates v. Municipal Mortg. & Equity, LLC*, 744

F.3d 874, 891 (4th Cir. 2014); *Blanford*, 794 F.3d at 309 (citing *Yates*, 744 F.3d at 891).[11]

---

[11]   Here, unlike the allegations in *Yates*, 744 F.3d at 891, Paucek adopted the plans during the
Class Period (on March 15, 2018 and June 15, 2018, Defs.' Exhs 10 & 11), at a time when he knew
of facts on the ground that contradicted his and 2U's public representations.  And the Class Period

Defendants improperly inject unsupported "facts" extraneous to the complaint when they argue that Paucek's ownership supposedly *increased* during the Class Period (Mot. at 19) because he apparently "*acquired* 579,000 shares via the exercise of stock options."  It is unclear how Defendants arrived at this number, and the only two documents on which the Complaint relied to plead that Paucek *sold* approximately 270,000 shares during the Class Period (Compl. ¶369; Defs.' Exhs. 10 & 11) do not support Paucek's purported *acquisition* of 579,000 shares.  To the extent Defendants are relying on unspecified, extraneous documents to arrive at that number, such reliance is foreclosed.  *Zak,* 780 F.3d at 601 (SEC filings did not provide factual basis for district court's conclusion that no individual corporate officer sold stock during the class period); *see similarly Jones v. Canal Wood, LLC*, 2019 WL 1370847, at *5 (E.D.N.C. Mar. 26, 2019); *In re Mun. Mortg. & Equity, LLC, Sec. & Derivative Litig.*, 876 F. Supp. 2d 616, 653 n.7 (D. Md. 2012), *aff'd sub nom. Yates,* 744 F.3d 874. Moreover, whatever shares Paucek acquired by exercising his stock options hardly negate the strong inference of scienter, since those options were exercised at incredibly low prices—at a tiny fraction of the inflated market value at which Paucek *sold* his shares.  *See* Defs.' Exhs. 10 & 11 (showing Paucek exercising his options to acquire shares at a mere share price of $5.75, while disposing of his shares at highly inflated prices of over $82.7). *In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 140 (S.D.N.Y. 1999) (the court cannot evaluate the true value of exercised options without more information because defendants could have exercised them to buy shares at a very low price per share, making them valuable even if the stock plummeted).[12]

---

here is not even close to the "exceedingly long" 44-month period in *Yates*.

[12] Defendants' reliance on *Cozzarelli v. Inspire Pharmaceuticals Inc.*, 549 F.3d 618 (4th Cir. 2008) is misplaced, as the case made no mention of any details about the price of the options.

### 5.      Graham's Resignation Supports a Strong Inference of Scienter

The timing and circumstances of Graham's resignation, a key executive involved in 2U's financial projections based on its ability to scale enrollment, are highly suspicious.  That this resignation is temporally connected to the alleged corrective disclosure of the Company's failing growth plans and decreased financial projections further supports the inference of scienter.  *See*, *e.g.*, *Epstein*, 203 F. Supp. 3d at 671-72 (scienter supported by "the resignation of the Company's three most senior executive[s]"); *Cambridge Ret. Sys. v. Jeld-Wen Holding, Inc.*, 2020 WL 6270482, at *9 (E.D. Va. Oct. 26, 2020) (similar).

### 6.      2U's $300 Million Offering Supports an Inference of Scienter

On May 25, 2018, 2U completed a public offering raising $300 million.  Compl. ¶454-55. Defendants' false and misleading statements enabled 2U to raise these funds at artificially inflated prices.  *Oneida Sav. Bank v. Uni-Ter Underwriting Mgmt. Corp.*, 2014 WL 4678046, at *4-5 (N.D.N.Y. Sept. 18, 2014) (offering soon after alleged false statements shows motive); *see similarly Van Dongen v. CNinsure, Inc.*, 951 F. Supp. 2d 457, 474 (S.D.N.Y. 2013); *In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 206 (E.D.N.Y. 2000); *In re Res. Am. Sec. Litig.*, 2000 WL 1053861, at *6-7 (E.D. Pa. July 26, 2000).

### 7.      Corporate Scienter

2U's corporate scienter is established through Plaintiffs' showing the scienter of the Individual Defendants and Bustamante.  *See Kiken*, 155 F. Supp. 3d at 606 ("If the defendant is a corporation, the plaintiff must allege facts that support a strong inference of scienter with respect to at least one authorized agent of the corporation"); *KBC*, 2016 WL 3981236, at *11 ("'[C]orporate liability derives from the actions of its agents'" (quoting *Hunter*, 477 F.3d at 184)). Paucek, Graham, Mokkarala, and Bustamante acted with scienter and their state of mind is imputed

to the Company.[13]

### 8.    Defendants' Alternate Inference Is Not More Compelling Than the Complaint's Strong Inference of Scienter

The inference of scienter arising from the Complaint's cumulative allegations is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Matrixx*, 563 U.S. at 48.  Defendants understood that the market linked 2U's continued success to its unique ability to grow at unparalleled rates.  Defendants hid the truth from investors because they knew it would disappoint analysts and investors.  *See Massey Energy*, 883 F. Supp. 2d at 621 ("these allegations are sufficient to support Plaintiffs' inference that Defendants elected not to disclose more measurable safety metrics because they believed it would have an impact on the market"); *Epstein*, 2015 WL 2365701, at *7 (plaintiff pled "recklessness by claiming that Defendants had information about the true nature of its business conditions and performance but withheld making certain disclosures in order to control the timing and flow of the information").

The opposing inference proffered by Defendants that the "challenges and competitive headwinds did not exist until the second quarter [of 2019]" (Mot. at 21) should be rejected as implausible and directly contradicted by the Complaint's allegations, including the accounts of 2U's former employees.  *Epstein*, 203 F. Supp. 3d at 670 ("Any attempt by the moving party to assert its own version of events should be disregarded, as facts alleged in a plaintiff's complaint are all accepted as true at this stage in the case.").  If Defendants' illogical spin on the facts were true, then Defendants were extremely reckless when providing assertions of confidence in 2U's growth when they had insufficient knowledge to support such statements.  *See S. Ferry LP No. 2*

---

[13] Bustamante need not be a "maker" of the misrepresentations for his scienter to be imputed to 2U.  *Ollila*, 2018 WL 792069, at *2–3); *Pa. Pub. Sch. Employees' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 363 (S.D.N.Y. 2012); *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 443 (S.D.N.Y. 2005).

*v. Killinger*, 687 F. Supp. 2d 1248, 1260 (W.D. Wash. 2009) (when a defendant speaks and does not have actual knowledge about the subject at hand, "it would be at least actionably reckless to reassure the public about these matters at all").  If Defendants had nothing to hide, why did they stop reporting in November 2017 the Platform Revenue Retention Rate metric that would have alerted investors that most of 2U's top programs were underperforming?

Even a tie in the scienter analysis goes to the Plaintiff.  But the facts here heavily tilt the scale in Plaintiffs' favor.

### D.   THE COMPLAINT PLEADS CONTROL PERSON LIABILITY

The Individual Defendants do not dispute that they are "control persons" of the Company, contending only that Plaintiffs fail to allege a primary violation.  (Mot. at 37.)  Because the Complaint alleges primary violations of § 10(b), as demonstrated above, it similarly states a claim for control person liability under § 20(a).  *See Genworth*, 103 F. Supp. 3d at 790-91.

## IV.   SECURITIES ACT CLAIMS

§ 11 does not require pleading or proof that a defendant acted with intent to defraud or even knew that misrepresentations or omissions had been made; thus, liability is "virtually absolute, even for innocent misstatements."  *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983).  As a result, pleading a § 11 claim is not difficult: to establish a prima facie § 11 claim, the plaintiff need only plead a material misstatement or omission in a registration statement. *Id*.  Similarly, § 12(a)(2) holds any person liable who "offers or sells a security" by means of a materially false "prospectus or oral communication." *See* 15 U.S.C. § 77l.  Neither § 11 nor § 12(a)(2) requires that plaintiffs allege scienter.  *Id.* §§ 77k, 77l.

The heightened pleading requirements of Rule 9(b) do not apply to OKCERS's Securities Act claims. *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 403 (D. Md. 2004). Defendants do not challenge this basic principle particularly where, as here, the Securities Act

claims properly disclaim any allegations of fraud and are presented entirely separate from the Exchange Act claims, as if they were part of a separate complaint (*see*, *e.g.*, Compl. ¶¶430-544, 518, 528).  *See Royal Ahold*, 351 F. Supp. 2d at 403 ("It is hard to imagine what else plaintiffs could do, short of filing an entirely separate complaint").

Defendants' motion to dismiss Plaintiffs' Securities Act claims should be denied.

### A.      The Securities Act Claims Are Not Time-Barred

An action for liability under §§ 11 or 12(a)(2) must be "brought within one year after the *discovery* of the untrue statement or the omission, or after such *discovery* should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m (emphasis added).  The statute of limitations does not begin to run until the Plaintiffs or a reasonably diligent plaintiff would have discovered the facts supporting her claims.  *In re Willis Towers Watson plc Proxy Litig.*, 937 F.3d 297, 303 (4th Cir. 2019) (analyzing § 14(a) claims after *Merck*,[14] where the statutory language, as here, specifically referred to time limitations triggered from "discovery"); *see also In re Mun. Mortg. & Equity*,  876 F. Supp. 2d at 653; *Pension Tr. Fund for Operating Engineers v. Mortg. Asset Securitization Transactions, Inc.*, 730 F.3d 263, 274 (3d Cir. 2013) (discovery standard governs whether Securities Act claims are timely); *Fed. Housing Fin. Agency v. UBS Ams., Inc.*, 858 F. Supp. 2d 306, 319 (S.D.N.Y. 2012), *aff'd,* 712 F.3d 136 (2d Cir. 2013) (treating § 77m and § 1658(b) as equivalents).  "The question of when the misstatements should have been discovered is a question of fact that cannot be decided on a motion to dismiss."  *In re Jiffy Lube Sec. Litig.*, 1990 U.S. Dist. LEXIS 20141, at *11 (D. Md. Oct. 31, 1990) (citing *Mosesian v. Peat, Marwick, Mitchell & Co.*, 727 F.2d 873, 877 (9th Cir. 1984)); *Umstead v. Durham Hosiery Mills, Inc.*, 578 F. Supp. 342, 348 (M.D.N.C. 1984) (same); *see also In re John Hopkins Univ. v. Hutton*, 422 F.2d

---

[14] *Merck & Co. v. Reynolds*, 559 U.S. 633 (2010).

1124, 1130-31 (4th Cir. 1970) (summary judgment context).

Nevertheless, here, contrary to Defendants' contention, neither Plaintiffs nor another reasonably diligent plaintiff would have had sufficient information about the facts of the claims by May 7, 2019, to adequately plead them in a complaint filed by May 8, 2020.  On May 7, 2019, Defendant Graham announced only that 2U was reducing 2019 guidance after seeing "some decline in expected graduate program enrollments ***beginning in the second quarter [of 2019]*** and continuing through the rest of the year." Compl. ¶502.  Defendants attributed the sudden decline primarily to admission decisions made by universities, and Defendant Paucek insisted that 2U's growth story remained intact and that "we continue to see programs across the portfolio scale toward our target ranges for new student enrollments. We still firmly believe in our runway of 250 DGPs. Pipeline for those programs is strong." *Id.*  Because the announcement described ***trends commencing around mid-2019***, investors could not have discovered then that the actual causes of the enrollment decline were the undisclosed facts and trends present at the time of the Offering— ***around May 23, 2018***.  The still-concealed facts included increased competition for students and problems with 2U's student acquisition program as a result of 2U's crumbling business model. *Id.* ¶504.  Nor could investors have discovered in May 2019 that 2U's internal enrollment projections had been trending materially downward ***at the time of the Offering***. *Id.*  Indeed, it is hard to see how a reasonable plaintiff would even have had sufficient information of wrongdoing by May 2019 to warrant the start of an *inquiry*, let alone *discover* the wrongdoing by that time.[15]

---

[15] This factual scenario is completely different from the fact patterns presented in *In re Under Armour Securities Litigation*, 342 F.Supp.3d 658 (D. Md. 2018), and *Brumbaugh v. Princeton Partners*, 985 F.2d 157 (4th Cir. 1993).  Moreover, in *Brumbaugh*, the plaintiff "waited some eight years" to file the lawsuit despite prior warnings, prejudicing defendant, the claim was "originally meritless," the underlying facts were not disputed, and the risk factor disclosures were specific and targeted. *Id*. at 162.

It was not until July 30, 2019, that inquiry notice would even be triggered.  On that date, Defendants for the first time significantly reduced guidance and disclosed that 2U's growth plans—which had underpinned its stock valuation—were failing and needed to be abandoned as costs ballooned.  *Id.* ¶505.  Paucek disclosed that 2U was "moderating [its] outlook for the business in the short term" and "[e]xcluding the expected financial impact of Trilogy, this implies ***a step down in revenue expectations for the rest of the business***."  *Id.*  Paucek finally disclosed that the marketing funnel wasn't working, saying "competition for students has increased," that 2U now expected "smaller average steady-state program[s]" (meaning less profitable programs), and that "our guidance presumes lower conversion rates on a go-forward basis" (meaning higher marketing costs).  *Id.* ¶506.

In effect, Paucek disclosed that 2U had experienced the facts and trends that former employees reported seeing before and at the time of the Offering, including downward trending enrollment projections, increased competition for students, marketing efficiency problems, the multi-program vertical strategy failing to increase conversion rates, and unrealistic expectations for admissions counselors.  *Id.*  Paucek revealed that, due to these problems, 2U's business model needed to change.  *Id.* ¶507.  He described the Company's prior growth story as a "***mistake***" and stated that he needed to "***level set***" with the investment community.  *Id.*  On this news, the price of 2U stock declined ***65 percent*** in a single trading day, on extremely high volume of over 54 million shares traded.  *Id.* ¶508.  In light of these facts, Plaintiffs' claims are unquestionably timely.  *See*, *e.g.*, *Willis Towers*, 937 F.3d at 304 (knowing that CEO of company stood to benefit from the merger in general "wouldn't tell you" the basis of the suit, *i.e.*, that his "secret dealings with [company] created a conflict of interest that led [CEO] to renegotiate the merger on less favorable terms"); *Mun. Mortg.*, 876 F. Supp. 2d at 654 ("It is at least plausible that, after MuniMae disclosed

that it would have to consolidate 'substantially all' of the LIHTC Funds on January 31, 2007, a reasonably diligent plaintiff did not have sufficient information adequately to plead the Securities Act violations at that time.  The scope of the consolidation and restatement effort, the enormous cost it would entail, and its impact on CAD and the dividend were not disclosed until much later ….") (citation omitted); *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 174-75 (2d Cir. 2011) ("the reasonably diligent plaintiff has not 'discovered' one of the facts constituting a securities fraud violation until he can plead that fact with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss"); *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 765-66 (S.D.N.Y. 2012) (downgrade history of mortgage-backed securities did not convey facts sufficient to plead '33 Act claims).

### B.    The Complaint Pleads Actionable Misstatements and Omissions

The Complaint pleads five actionable statements that were false and misleading when made.  Defendants unpersuasively argue that the first two statements were "obviously inactionable puffery" as "soft expressions of optimism" (Mot. at 41).  But there is nothing vague about Defendants' specific representations that during the last decade, 2U had "refined [its] program selection algorithm and improved [its] data-driven digital marketing capabilities … to generate increased student enrollments in a cost effective matter," such that "since 2008, [it has] expanded [its] university client base from one to 24[,] … increased the number of 2U-powered graduate programs from one to 37, and enrolled over 33,000 graduate students," and that 2U was acquiring students "in a cost-effective manner."  As explained *supra* at 14-15, Defendants' representations must be examined in context.  A reasonable investor would have been misled by these particularized representations, which conveyed a picture not only of continued spectacular growth, but one that was being achieved cost-effectively.

In reality, however, by the time the Offering occurred in May 2018, 2U's internal

44

projections showed declining enrollment, and the Company's acquisition efforts were not scaling efficiently. For example, FE-2 explained that enrollment projections began to stall in 2017 and worsened in 2018, and it was evident by early February 2018 that 2U's projections were simply unreachable (Compl. ¶¶471-72, 498). FE-2's credibility is evident as she was directly responsible for detecting trends and forecasting 2U's growth. *Id.* ¶471. Other former employees corroborate FE-2. FE-6 observed that 2U's business model transformed in 2018, with the Company no longer focused on the quality of students or the caliber of its partner universities, resulting in 2U's cyber security, computer science, and computer engineering programs struggling to entice students (*id.* ¶¶477-79). Likewise, FE-9 explained that during her tenure at the Company (which commenced in August 2017), USC's Master of Education, for which she was responsible, became a "tough sell" (*id.* ¶¶489-90). Similarly, FE-8 observed that, during the time she served as admissions counselor for USC's Social Work program (the largest of 2U's top twenty graduate programs), 2U was undermining the program with cheaper offerings in the same vertical, and the same issues existed in the MBA vertical. (*id.* ¶¶487-88, 500).[16] FE-5 also recounted that beginning in 2018, competition increased dramatically. *Id.* ¶476. These allegations directly contradict Defendants' self-serving version of the facts, that "enrollment grew in every period [in 2017 and 2018] on a sequential basis." Further demolishing Defendants' argument are the independent findings of the Spruce Report, showing substantial enrollment declines in the majority of 2U's top programs during the relevant time period and numerous other underperforming programs. *See supra* at 4-5, 11, 17, 26. Spruce Point's analysis was based in part on FOIA requests to some of 2U's biggest university clients.

---

[16] This includes the time around the Offering, when FE-8 remained in that position. Compl. ¶487.

Defendants' third misstatement, that "We believe we compete favorably on the basis of [student acquisition and student retention]," is not puffery because it is a "specific factual allegation … [that] can be proven true or false." *Dunn,* 369 F.3d at 431. As explained, the Complaint alleges that, in reality, 2U was *losing* students to its competitors, to the point that it was unable to meet its projections. For this reason, even if viewed as a statement of opinion, it is actionable because the statement is alleged to be objectively false.

For the reasons described *supra* at 19-23, Defendants' fourth and fifth statements are actionable as misleadingly incomplete risk representations that are not immunized by the safe harbor.[17]

### C.    Section 11 Standing Is Adequately Pleaded

Named Plaintiff OKCERS brings § 11 claims on behalf of itself and a Class of similarly injured investors. Compl. ¶¶430, 509, 515-24. Importantly, Defendants do not argue that OKCERS lacks standing (Mot. at 46-47). Nor can they, because the Complaint alleges that "OKCERS purchased shares in the Offering," leaving no doubt as to OKCERS' standing. Compl. ¶522. Nothing more is required at the pleading stage, and Plaintiffs have no additional obligation to show how every other possible unnamed "proposed Class Members who did not purchase in the Offering can 'trace' their shares to the Registration Statement." (Mot. at 46-47.) *See Mun. Mortg.* 876 F. Supp. 2d at 657-58; *In re Initial Pub. Offering Sec. Litig.*, 214 F.R.D. 117, 122 (S.D.N.Y. 2002) (holding that "[i]n order to maintain a class action, ***Plaintiffs*** must first establish that ***they***

---

[17] Defendants argue in a footnote that 2U disclosed that it "expect[s] that the competitive landscape will expand as the market for online education offering at nonprofit institutions matures" (Mot. at 43 n.19), but this hopelessly general statement failed to warn the market that competition *was already* severely affecting 2U's ability to grow. Far from disclosing the existing problems, 2U was *downplaying* competition. And, as aforementioned, knowledge is not an element of Plaintiffs' Securities Act claims. For the reasons described above at 23-24, OKCERS also adequately pleads an Item 503 violation.

have a valid claim with respect to the shares that they purchased") (emphasis added); *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 422 (S.D.N.Y.2003) (denying a motion to dismiss § 11 claims in part because "[i]n filing the Complaint, [PSLRA] lead plaintiff fulfilled its obligation to assess the causes of action available to the class, to plead those claims in the consolidated amended complaint, and to identify as named plaintiffs any additional class representatives that were necessary to assert the claims").   The cases cited by Defendants demonstrate this common-sense approach.   *Transenterix Inv'r Grp. v. Transenterix, Inc.*, 272 F.Supp.3d 740, 760-61 (E.D.N.C. 2017) (finding that plaintiff did not have standing to assert § 11 claims on behalf of the class because the complaint did not plausibly allege that ***plaintiff's*** shares were issued as part of the relevant offering).

In any event, the Complaint alleges that OKCERS brings its § 11 claims "on behalf of all persons and entities that purchased or acquired 2U common stock *pursuant or traceable to* the Registration Statement." Compl. ¶509.  This allegation satisfies this Court's standing requirement. *Mun. Mortg.*, 876 F. Supp. 2d at 658-59 (allegation that Plaintiff purchased his shares "pursuant to, or traceable to, the SPO registration statement and prospectus" sufficient after *Twombly* and *Iqbal*); *Royal Ahold*, 351 F. Supp. 2d at 403-04 (allegation that "Lead Plaintiff … purchased … common stock … pursuant to the registration and prospectus" "sufficient to state a § 11 claim").[18]

---

[18] *Accord In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 373 (S.D.N.Y. 2011); *Me. State Ret. Sys. v. CountryWide Fin. Corp.*, 2011 WL 4389689, at *11 (C.D. Cal. May 5, 2011); *Northumberland Cty. Ret. Sys. v. Kenworthy*, 2013 WL 5230000, at *6 (W.D. Okla. Sept. 16, 2013).  The cases on which Defendants rely (Mot. at 46-47) are non-binding and contrary to this Court's holdings in *Municipal Mortgage* and *Royal Ahold*.  Moreover, in *In re Century Aluminum Co. Securities Litigation,* 729 F.3d 1104 (9th Cir. 2013), the court acknowledged that allegations that plaintiffs purchased directly in the offering would suffice, but there plaintiffs instead "concede[d] that they purchased in the aftermarket." *Id.* at 1106.  The same is true for *Transenterix Investor Group* 272 F. Supp. 3d  at 760-61.  Defendants' remaining cases concerning class certification (Mot. at n.24) have no bearing on the Court's inquiry at this stage of the proceedings and, in any event, courts routinely certify § 11 claims because tracing does not involve

### D.       OKCERS Can Maintain a Section 12(a)(2) Claim Against the Securities Act Defendants

As a preliminary matter, this Court has recognized that whether a defendant qualifies as a statutory seller under § 12(a)(2) can involve factual questions not properly decided on a motion to dismiss. *Royal Ahold*, 351 F. Supp. 2d at 402.[19]  In the event the Court opts to resolve the issue at this stage, the Complaint sufficiently alleges that the Securities Act Defendants are all statutory sellers. *First*, the Complaint alleges that OKCERS purchased their shares ***in the Offering***.  Compl. ¶531.  In a "firm commitment offering," as here (*see* Mot. at 47), where the underwriters purchased all the shares from the issuer to sell them to investors, the underwriters are statutory sellers. *Lone Star Ladies Inv. Club v. Schlotzky's, Inc.*, 238 F.3d 363, 370 (5th Cir. 2001) ("[I]n a firm commitment underwriting, the public purchases form the underwriter …"); *see similarly In re Am. Bank Note Holographics, Inc. Sec. Litig.*, 93 F. Supp. 2d 424, 439 (S.D.N.Y. 2000); *Northumberland*, 2013 WL 5230000, at *8; *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 400 (S.D.N.Y. 2007).[20]  These allegations suffice, but the Complaint alleges even more: that the

---

insurmountable obstacles and is a question of fact reserved for trial.  *See*, *e.g.*, *In re Dynegy, Inc. Sec. Litig.*, 226 F.R.D. 263, 274-75 (S.D. Tex. 2005) (rejecting Defendants' argument about the standing of absent class members as inappropriate) (*citing Lewis v. Casey*, 518 U.S. 343, 395 (1996) (Souter, J., joined by Ginsburg, J., and Breyer, J., concurring in part, dissenting in part, and concurring in judgment) ("[T]he propriety of awarding classwide relief … does not require a demonstration that some or all of the unnamed class could themselves satisfy standing requirements for named plaintiffs").  *Accord In re Seebeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1171-72 (C.D. Cal. 2003).

[19] *See similarly Nieman v. Duke Energy Corp.*, 2013 WL 4004274, at *7 (W.D.N.C. July 26, 2013); *In re Giant Interactive Grp., Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 574 (S.D.N.Y. 2009) ("Defendants' argument [that plaintiff lacked standing under § 12(a)(2)] is a premature attempt to limit the scope of the class at the pleading stage") (*citing Krane v. Capital One Servs., Inc.*, 314 F. Supp. 2d 589, 612 (E.D. Va. 2004) (denying attempt to limit scope of class as premature at the pleading stage)); *Suprema Specialties*, 438 F.3d at 274 n.7 ("The question here is … a factual one, to be resolved through discovery").

[20]  The plaintiffs in *Royal Ahold* (Mot. at 47-48) did not allege that they purchased the shares ***in the offering***. *Constellation* relied on *Royal Ahold* and, critically, did not involve a firm commitment underwriting.  Here, the Plaintiffs allege unequivocally that they purchased shares

Underwriter Defendants participated in the drafting and dissemination of the Offering Materials and collectively received discounts and commissions of approximately $14,524,503 in connection with pedaling 2U's shares.  Compl. ¶453.[21]

*Second*, the Company also qualifies as a statutory seller because the Complaint alleges that 2U conducted a public offering of its securities through the Underwriter Defendants, issuing shares in the aggregate principal amount of $300 million (Compl. ¶¶431, 447-455, 454), therefore alleging or "imply[ing] that [it] benefitted financially from the sale of those securities."  *In re Scottish Re*, 524 F. Supp. 2d at 400.  Defendants' argument that 2U is not a statutory seller also "is foreclosed as a matter of logic and by SEC Rule 159A, providing that issuers of securities are statutory sellers for purposes of § 12(a)(2).  *In re Oppenheimer Rochester Funds Grp. Sec. Litig.*, 838 F. Supp. 2d 1148, 1179 (D. Colo. 2012) (secondary offering context); *Nieman*, 2013 WL 4004274, at *7 (merger context); *Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1132 (S.D. Cal. 2012) (secondary offering context), *aff'd sub nom. Fresno Cty. Emps.' Ret. Ass'n v. Alphatec Holdings, Inc.,* 607 F. App'x 694 (9th Cir. 2015); *Kensington Capital Mgmt. v. Oakley, Inc.*, 1999 WL 816964, at *5 (C.D. Cal. Jan. 14, 1999) (an issuer may be considered a statutory seller even where securities are issued through underwriters).[22]

---

***in the offering*** (Compl. ¶531), and because it was a firm commitment offering, the only possible direct sellers to the Plaintiffs were the underwriters.

[21]  A plaintiff is not, at the pleading stage, "required to prove it purchased specific common units from specific underwriters."  *In re Semgroup Energy Partners, L.P.*, 729 F. Supp. 2d 1279, 1307 (N.D. Okla. 2010); *see also In re Constellation Energy Grp., Inc. Sec. Litig.*, 738 F. Supp. 2d 614, 632 (D. Md. 2010) ("plaintiffs need not allege exactly which plaintiff purchased which security from which defendant"); *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 423 (S.D.N.Y. 2003) (same).  *Accord In re Westinghouse Sec. Litig.*, 90 F.3d 696, 718 (3d Cir. 1996); *In re Wash. Mut., Inc. Sec. Litig.*, 259 F.R.D. 490 (W.D. Wash. 2009); *In re Twinlab Corp. Sec. Litig.*, 103 F. Supp. 2d 193, 204 (E.D.N.Y.2000); *In re Am. Bank Note*, 93 F. Supp. 2d at 438.

[22] The term "seller" applies not only to the seller who is in privity with the investor-plaintiff, but also with other persons, not in privity, who "solicited the sales in question for financial gain." *Wilson v. Saintine Expl. & Drilling Corp.*, 872 F.2d 1124, 1126 (2d Cir. 1989).  *Accord*

*Third*, Paucek, Graham, and the Director Defendants did not merely participate in the preparation of the Offering Materials (Mot. at 48).  Each also ***signed*** the Registration Statement (Compl. ¶455), therefore engaging in the act of "solicitation."  Accordingly, they are statutory sellers.  *Briarwood Invs. Inc. v. Care Inv. Trust, Inc.*, 2009 WL 536517, at *4 (S.D.N.Y. Mar. 4, 2009); *In re Portal Software, Inc. Sec. Litig.*, 2006 WL 2385250, at *4 (N.D. Cal. Aug. 17, 2006); *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 454 (S.D.N.Y. 2005); *In re CNL Hotels & Resorts, Inc. Sec. Litig.*, 2005 WL 1126561, at *11 (M.D. Fla. May 9, 2005); *Kensington*, 1999 WL 816964, at *5.

## V.   THE COMPLAINT PLEADS CONTROL PERSON LIABILITY

Because the Complaint adequately pleads violations of §§ 11 and 12(a)(2), the Court should deny Defendants' motion to dismiss the § 15 claim.  *Mun. Mortg.,* 876 F. Supp. 2d at 663.

## VI.   CONCLUSION

For all of the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety.[23]

Dated:  December 18, 2020

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman (admitted *pro hac vice*)
Emma Gilmore (admitted *pro hac vice*)
Villi A. Shteyn (admitted *pro hac vice*)
600 3rd Avenue, 20th Floor
New York, NY  10016
Tel:  212-661-1100

---

*Commercial Union Assurance Co. v. Milken*, 17 F.3d 608, 616 (2d Cir. 1994) ("Privity between the buyer and seller is no longer required in a § 12(2) action").

[23] In the event that the Court grants any part of Defendants' motion to dismiss, Plaintiffs respectfully request leave to amend, which here should be freely granted.  *Holman v. IMC Mortg. Co.*, 2001 WL 21222, at *6 (D. Md. Jan. 9, 2001) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 242 (4th Cir. 1999)).

Fax: 917-463-1044
Email: jalieberman@pomlaw.com
        egilmore@pomlaw.com
        vshteyn@pomlaw.com

*Counsel for Lead Plaintiff Fiyyaz Pirani and*
*Lead Counsel for the Class*

**GOLDMAN & MINTON, P.C.**
Thomas J. Minton – No. 03370
3600 Clipper Mill Rd., Suite 201
Baltimore, MD 21211
Tel: (410) 783-7575
Fax: (410) 783-1711
Email: tminton@charmcitylegal.com

*Counsel for Lead Plaintiff Fiyyaz Pirani*

**LABATON SUCHAROW LLP**
James W. Johnson (admitted *pro hac vice*)
Serena P. Hallowell (admitted *pro hac vice*)
Lara A. Goldstone (admitted *pro hac vice*)
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Fax: (212) 818-0477
jjohnson@labaton.com
shallowell@labaton.com
lgoldstone@labaton.com

*Counsel for Additional Named Plaintiff*
*Oklahoma City Employee Retirement System*
*and Additional Counsel for Lead Plaintiff*
*Fiyyaz Pirani and for the Class*