**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND**

|  |  |
|---|---|
| IN RE 2U, INC. SECURITIES CLASS ACTION | Consolidated Case No. 8:19-cv-03455-TDC |

**<u>DEFENDANTS' REPLY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS</u>**

**TABLE OF CONTENTS**

I.      INTRODUCTION .............................................................................................................1

II.     EXCHANGE ACT CLAIMS .........................................................................................2

        A.      The Opposition Confirms That The Complaint Fails To Plead Scienter.................2

                1.      Plaintiffs Cannot Refute That The FEs Do Not Know Anything
                        About The EA Defendants' Scienter ............................................................2

                2.      Plaintiffs Label Mr. Paucek's Trading Suspicious But Fail To
                        Show Why.....................................................................................................6

                3.      Without More, Plaintiffs' Remaining Scattershot Theories Fail .................7

                4.      Plaintiffs Fail To Meaningfully Engage With The Non-Culpable
                        Inference ......................................................................................................8

        B.      The Opposition Does Not Identify An Actionable Misstatement...........................9

                1.      Plaintiffs Have Not Closed Any Of The Three Inlets Of The Safe
                        Harbor ..........................................................................................................9

                2.      Plaintiffs Cannot Explain How Investors Were Misled By Puffery ..........11

                3.      Plaintiffs Fail To Distinguish The Opinions From *Paradise Wire* ............13

                4.      Plaintiffs Fail To Tie The Alleged Omissions To Any Challenged
                        Statement....................................................................................................14

III.    SECURITIES ACT CLAIMS.......................................................................................16

        A.      OKCERS Ignores The Allegation That Triggers The Statute Of
                Limitations ............................................................................................................16

        B.      Only Two Of The Challenged Statements Remain In Dispute...............................17

        C.      OKCERS Does Not Meaningfully Respond To The SA Defendants'
                Falsity Argument ...................................................................................................18

        D.      OKCERS Does Not Dispute The SA Defendants' Section 11 Standing
                Argument ...............................................................................................................18

        E.      OKCERS Cannot Maintain A Section 12(a)(2) Claim ..........................................19

IV.     CONCLUSION..............................................................................................................20

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*In re Airgate PCS, Inc. Sec. Litig.*,
  389 F. Supp. 2d 1360 (N.D. Ga. 2005) ...................................................................................19

*Baker v. Seaworld Entm't, Inc*.,
  2016 U.S. Dist. LEXIS 72409 (S.D. Cal. Mar. 31, 2016) .......................................................19

*Carlucci v. Han*,
  907 F. Supp. 2d 709 (E.D. Va. 2012) ........................................................................................4

*Citiline Holdings, Inc. v. iStar Financial Inc.*,
  701 F. Supp. 2d 506 (S.D.N.Y. 2010)......................................................................................20

*Colbert v. Rio Tinto PLC*,
  824 F. App'x 5 (2d Cir. 2020) ..................................................................................................15

*Cozzarelli v. Inspire Pharms. Inc.*,
  549 F.3d 618 (4th Cir. 2008) .....................................................................................................7

*Credit Suisse First Boston Corp. v. ARM Fin. Grp., Inc.*,
  No. 99-cv-12046 WHP, 2001 WL 300733 (S.D.N.Y. Mar. 28, 2001)....................................19

*Cunha v. Hansen Nat. Corp.*,
  2010 WL 11469534 (C.D. Cal. July 12, 2010).........................................................................11

*Direct Benefits, LLC v. TAC Fin., Inc.*,
  2020 WL 2769982 (D. Md. May 28, 2020)................................................................................9

*Dunn v. Borta*,
  369 F.3d 421 (4th Cir. 2004) ...................................................................................................12

*In re DXC Tech. Co. Sec. Litig.*,
  2020 WL 3456129 (E.D. Va. June 2, 2020) .................................................................4, 10, 11

*In re E.Spire Commc'ns, Inc. Sec. Litig.*,
  127 F. Supp. 2d 734 (D. Md. 2001) ...........................................................................................7

*Kenny v. Bank of Am., N.A.*,
  2011 WL 13234444 (E.D. Va. Dec. 22, 2011) .........................................................................20

*Knurr v. Orbital ATK Inc.*,
  272 F. Supp. 3d 784 (E.D. Va. 2017) .........................................................................................7

*Lefkoe v. Jos. A. Bank Clothiers*,
  2007 WL 6890353 (D. Md. May 13, 2008) .......................................................................1, 9

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
  910 F. Supp. 2d 561 (S.D.N.Y 2012) ......................................................................................5

*Maguire Fin., LP v. PowerSecure Int'l, Inc.*,
  876 F.3d 541 (4th Cir. 2017) ..............................................................................................7, 8

*Mass. Mut. Life Ins. Co. v. Residential Funding Co.*,
  843 F. Supp. 2d 191 (D. Mass. 2012) ...................................................................................20

*Matrix Capital Mgmt. Fund, LP v. Bearing Point, Inc.*,
  576 F.3d 172 (4th Cir. 2009) ..................................................................................................7

*In re Mun. Mortg. & Equity LLC, Sec. & Derivative Litig.*,
  876 F. Supp. 2d 616 (D. Md. 2012) ......................................................................................19

*In re Nimble Storage, Inc. Sec. Litig.*,
  252 F. Supp. 3d 848 (N.D. Cal. 2017) ..................................................................................12

*OmniCare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015) ..............................................................................................................13

*Ottmann v. Hanger Orthopedic Grp., Inc.*,
  353 F.3d 338 (4th Cir. 2003) ..................................................................................................7

*Paradise Wire & Cable D.B. Pension Plan v. Weil*,
  918 F.3d 312 (4th Cir. 2019) ................................................................................................10

*In re Prudential Fin., Inc. Sec. Litig.*,
  2020 WL 7706860 (D.N.J. Dec. 29, 2020) ...........................................................................12

*Raab v. Gen. Physics Corp.*,
  4 F.3d 286 (4th Cir. 1993) ....................................................................................................12

*In re Royal Ahold N.V. Sec. & ERISA Litig.*,
  351 F. Supp. 2d 334 (D. Md. 2004) ......................................................................................19

*Singer v. Reali*,
  883 F.3d 425 (4th Cir. 2018) ................................................................................................10

*Stenlund v. Marriott Int'l, Inc.*,
  172 F. Supp. 3d 874 (D. Md. 2016) ......................................................................................17

*Teachers' Ret. Sys. of LA v. Hunter*,
  477 F.3d 162 (4th Cir. 2007) ..................................................................................................5

*TransEnterix Inv. Grp. v. Transenterix, Inc.*,
    272 F. Supp. 3d 740 (E.D.N.C. 2017)...................................................................19

*In re Under Armour Sec. Litig.*,
    342 F. Supp. 3d 658 (D. Md. 2018) ...............................................................16, 17

*Wochos v. Tesla, Inc.*,
    2021 WL 246210 (9th Cir. Jan. 26, 2021) ........................................................5, 10

*Yates v. Mun. Mortg. & Equity, LLC*,
    744 F.3d 874 (4th Cir. 2014) ........................................................................4, 6, 7

## STATUTES

15 U.S.C. § 77m.................................................................................................................16

15 U.S.C. § 78u-4(b)(2)(A)................................................................................................3

15 U.S.C. § 78u-5(e) ........................................................................................................10

## REGULATIONS

17 C.F.R. § 230.159A ......................................................................................................20

## I.   INTRODUCTION

The undisputed reality is that 2U increased student enrollments and revenues over the first six quarters of the class period, met or exceeded its public projections over that same period, and suffered a decline in enrollment only after it proactively disclosed to the public in May 2019 that it expected enrollments to decline in the next quarter and lowered its projections. These truths cannot be reconciled with Plaintiffs' story that 2U was secretly suffering from declining enrollment over the entire seventeen-month class period. So Plaintiffs simply ignore them. They instead repeat the vague anecdotes supposedly provided by anonymous former employees about unquantified and unspecific difficulties those individuals encountered at various times in meeting internal targets at their particular program. As the Exchange Act Defendants ("EA Defendants") thoroughly showed in their Motion, those allegations do not support a strong inference that anyone acted with fraudulent intent or even made a misstatement about 2U's business or prospects.

Plaintiffs' substantive response to the EA Defendants' motion to dismiss their securities fraud claims is, for the most part, nothing more than statements of undisputed legal standards followed by a string cite to decisions in which a court found that some other plaintiff had met that standard. Missing is the analysis necessary to show that *this* Complaint and *these* allegations are like the complaints in those decisions and thus sufficient to state a claim. For example, Plaintiffs argue that well-pled allegations that a defendant had access to information contradicting their public statements is indicative of scienter and cite six decisions in support. Their statement of the law is of course true and the EA Defendants do not dispute it. But each of the cited decisions involved unique facts that the courts evaluated to determine whether the plaintiff had pled a strong inference of scienter. Plaintiffs make no effort to show that their allegations are at all similar. Indeed, even a cursory examination of the cases show that they are not. *See, e.g.*, *Lefkoe v. Jos. A. Bank Clothiers*, 2007 WL 6890353, at *6 (D. Md. May 13, 2008) ("Defendants do not challenge

1

that they had access to reports which would have reflected the inventory build-up and resultant need for massive promotional activity."). For the reasons set forth in the Motion, Plaintiffs' Complaint fails to meet the exacting pleading standards imposed by the Private Securities Litigation Reform Act ("PSLRA") and applied by the courts of the Fourth Circuit.

OKCERS' response on the Securities Act claims effectively concedes that they are too late. Specifically, OKCERS does not dispute (or even mention for that matter) that the Complaint alleges that the May 7, 2019, disclosure revealed the "truth" thus triggering the one-year statute of limitations. This alone compels complete dismissal of OKCERS' claims. Furthermore, OKCERS' opposition does not rebut the Securities Act Defendants' ("SA Defendants") showing that the five challenged statements are not actionable and that the Complaint does not plead facts to show that any statement was false or misleading or that any SA Defendant is liable under Section 11 or 12.

## II.   EXCHANGE ACT CLAIMS

### A.   The Opposition Confirms That The Complaint Fails To Plead Scienter

**1.**   <u>Plaintiffs Cannot Refute That The FEs[1] Do Not Know Anything About Any EA Defendant's State Of Mind</u>

The parties agree that the PSLRA's heightened pleading standards and Fourth Circuit law require Plaintiffs to plead that each EA Defendant knew or was severely reckless in failing to know that each challenged statement was false or misleading when made. Mot. 12; Opp. 24. The dispute is over whether Plaintiffs have done so. Plaintiffs concede that their ability to plead recklessness rests almost exclusively on the FEs. Opp. 9 n.1. Plaintiffs also tacitly concede that the Complaint does not link specific FE allegations to any particular challenged statement or any particular EA Defendant. Mot. 13. Instead, Plaintiffs continue to make sweeping generalizations. *See, e.g.*,

---

[1] Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion. References to "Exs." are to the Exhibits filed in support of Defendants' Motion (ECF No. 144). References to "Reply Exs." are to the Exhibits filed concurrently herewith.

2

Opp. 28 ("These allegations demonstrate that the Individual Defendants were closely involved in 2U's growth prospects … contributing to a strong inference of scienter").  For this reason alone, Plaintiffs have not pled scienter as to "each act or omission."  15 U.S.C. § 78u-4(b)(2)(A).

Moreover, Plaintiffs' generalizations are based on embellished paraphrasing of (already-vague) FE statements.  *See* Appendix D (comparing characterizations of FE statements in the Opposition to the Complaint).  For example, Plaintiffs argue:  "Many former employees explained that Defendants Paucek, Graham, and Mokkarala had access to and closely monitored enrollment numbers. The numbers alerted the Individual EA Defendants to the declining enrollments no later than February 2018."  Opp. 25 (citing CC ¶ 356).  Paragraph 356, however, only describes statements by FE-1, who had no contact with Ms. Graham or Mr. Mokkarala and said merely that enrollment "became a topic" by "February 2018."  FE-1 said nothing about "numbers," much less that company-wide enrollments were "declining" by February 2018 (nor could she since 2U's enrollments increased in every quarter of 2018, *see* Mot. 8; Ex. 15).  In fact, Plaintiffs fail to identify *any* FE who alleges what 2U's internal enrollment numbers were, or by how much they were supposedly declining, *at any point* in the Class Period.  Thus, they have not identified any facts from which the Court could infer any EA Defendant recklessly disregarded enrollment trends.

Plaintiffs admit that the FEs are low-level employees who did not report directly to any EA Defendant (Mot. 14-16; App. C) but argue that the FEs had "personal knowledge of the facts they recounted," which "should not be discounted solely because of their job titles."  Opp. 29-30.[2]  This misses the point.  The EA Defendants do not dispute that the FEs would know what they claim to know or that low-level employees *could* know information that supports scienter.  The critical

---

[2] Only FE-1, FE-2, and FE-16 are alleged or alluded to have had contact with an EA Defendant. Mot. 14-15.  The EA Defendants carefully parsed these allegations and demonstrated that they were insufficient to support scienter.  *Id.*  Plaintiffs do not respond at all.

problem with these FEs is that they "do not expressly assert that the … defendants intentionally or recklessly" made a false or misleading statement. *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 887 (4th Cir. 2014). At best, the FEs' allegations are "vague and conclusory" as to any EA Defendant's state of mind and thus insufficient to plead scienter. *Id.* (confidential sources who attended meetings with defendants did not support a strong inference of scienter); *In re DXC Tech. Co. Sec. Litig.*, 2020 WL 3456129, at *11 (E.D. Va. June 2, 2020) (statements that "simply characterize the disclosed workforce reductions and the impact they had on particular people or segments" did not "make plausible" that defendants "knew their statements were false or misleading").

Lacking any response to the EA Defendants' showing that no FE was in a position to possess complete information about 2U's enrollments, revenue, or business strategy at a *company-wide level*, but only had first-hand knowledge of their respective programs (Mot. 13-18), Plaintiffs argue that the FEs "***collectively*** show[] the severity and pervasiveness of 2U's problems." Opp. 30. This is nothing more than an allegation that the EA Defendants "must have known" of a bigger issue, which courts routinely reject. *See, e.g.*, *Yates*, 744 F.3d at 890 (rejecting plaintiffs' argument that defendants must have acted with requisite scienter because of their position and issues at the company).[3] As Defendants showed, allegations that FEs (no matter how many) believed that their individual goals were impossible to achieve do not establish that any EA Defendant "shared that gloomy view" at any particular program, much less with respect to 2U's overall portfolio. *See*

---

[3] Plaintiffs also spend four pages reiterating the FEs' formulaic allegations that the EA Defendants, as senior executives, "[h]ad access to and closely monitored" enrollment numbers and were "hands-on executives." Opp. 25-29. Because Plaintiffs still fail to identify how any of the information accessible to or monitored by the EA Defendants actually exposed them to adverse information, such generic allegations do not permit a strong inference of scienter, as their own case law confirms. *Carlucci v. Han*, 907 F. Supp. 2d 709, 731 (E.D. Va. 2012) (cited in Opp. 28).

*Wochos v. Tesla, Inc.*, 2021 WL 246210, at *9 (9th Cir. Jan. 26, 2021) (rejecting allegations that two employees told the CEO that Tesla's production goals were impossible where plaintiffs failed to plead that the CEO shared those views or "*knew*" Tesla's goal "was *impossible* to achieve").

Indeed, the inference that Plaintiffs attempt to draw from the FEs (*i.e.*, that enrollment was declining) "is simply wrong"—2U reported six straight quarters of increasing enrollments during those periods. *See Teachers' Ret. Sys. of LA v. Hunter*, 477 F.3d 162, 177 (4th Cir. 2007) (rejecting confidential witness recollection inconsistent with known facts). Plaintiffs argue those company-wide enrollment numbers "hid the truth that the majority of 2U's top programs were in fact underperforming as early as 2017," Opp. 26, primarily relying on a November 2018 Spruce Point report, which purportedly found that "***at least four of 2U's top seven programs were experiencing significant enrollment declines as early as 2017***." *Id.* But Spruce Point made no such finding. Spruce Point, a short seller who stands to make money if 2U's stock price declines, merely speculated that "four of 2U's top seven programs . . . enrollment trends *may be experiencing flat or declining enrollment trends*." Opp. Ex. A at 15 (emphasis added). Such speculation cannot support a strong inference of scienter. *See In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 910 F. Supp. 2d 561, 577-78 (S.D.N.Y. 2012) (speculation from a short seller insufficient to plead scienter) ("[S]hort sellers operate by speculating that the price of a security will decrease … they have an obvious motive to exaggerate the infirmities of the securities in which they speculate"). Moreover, Spruce Point was wrong. Not only did 2U's overall enrollments increase in 2018, but the four programs in question each remained in 2U's top seven programs by "new student enrollments" for 2018—and shifted spots only slightly (both up and down) from 2017. *Compare* Reply Ex. 24 (4Q'17 Earnings Results Presentation) at 4 *and* Reply Ex. 25 (4Q'18 Earnings Results Presentation) at 7. And while Plaintiffs contend that Spruce Point "corroborates" the FEs, Opp.

5

26, only three FEs even mention one of these programs, and none of them say enrollments were declining. *See* CC ¶¶ 122-23 (FE-13, Placement Specialist, Simmons Social Work) (program enrollment targets were "impossible to achieve"); *id.* ¶ 118 (FE-10, Admissions Counselor, Rice MBA) (Rice was "losing students to" UNC's MBA program); *id.* ¶ 116 (FE-9, Sales Manager, USC Education) (as the market got "more saturated," students were "shopping around").

### 2.   Plaintiffs Label Mr. Paucek's Trading Suspicious But Fail To Show Why

Plaintiffs agree that stock sales only contribute to an inference of scienter if suspicious in timing or amount. Opp. 35. As the EA Defendants showed, Mr. Paucek's sales were neither: the sales were prescheduled pursuant to a 10b5-1 plan;[4] his trading activity was consistent with his prior trading history; and he increased his net holdings in 2U during the Class Period, acquiring 579,000 shares while only selling 300,290. Mot. 19; *Yates*, 744 F.3d at 890-91.[5] Because all other factors undermine an inference of scienter, Plaintiffs focus exclusively on the fact that the proceeds Mr. Paucek received from his stock sales during the Class Period are greater than the proceeds he received during a similar length of time before the Class Period. Opp. 35. As the EA Defendants explained, and Plaintiffs do not attempt to refute, this ignores that the increase in gross proceeds was not a function of selling more shares (in fact, he sold *fewer* shares than in the prior period), but rather was a function of 2U's increased stock price. Mot. 19-20. Moreover, Mr. Paucek's $22.8 million in proceeds are not "staggering" (Opp. 35) when placed in context. Mr. Paucek

---

[4] Plaintiffs are wrong that a 10b5-1 trading plan is a "premature affirmative defense." Opp. 35. It is a factor that courts are instructed to consider at the pleading stage. *Yates*, 744 F.3d at 890-91. Plaintiffs' argument that Mr. Paucek adopted the plans on March 15, 2018 and June 15, 2018 when he knew of contradictory facts (Opp. 36 n.11) fails for the same reasons they cannot plead scienter.

[5] Plaintiffs claim not to know where to find this stock information. Opp. 37. It is set forth in 2U's Proxy Statement, and incorporated into its 2019 Form 10-K (Ex. 3) that Plaintiffs rely upon in the Complaint. CC ¶¶ 306-338. As such, it can be considered by this Court. Mot. 4 n.2.

retained 1.359 million shares of stock and vested options, meaning, he lost a significant amount of money when 2U's stock price declined.  *See* 2U, Inc., Proxy Statement at 48-49 (Apr. 30, 2019).[6]

### 3.       Without More, Plaintiffs' Remaining Scattershot Theories Fail

Although the Court's review of Plaintiffs' allegations must be holistic, Plaintiffs are not permitted to simply "stack inference upon inference." *Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 548-49 (4th Cir. 2017).  In the absence of any particularized facts showing that the EA Defendants knew or recklessly disregarded that any challenged statement was false when made, Plaintiffs' sundry other allegations (the largely obsolete "core operations" theory (Opp. 34) and Ms. Graham's resignation (*id.* at 38)) are insufficient to plead scienter standing alone.  *See, e.g.*, *Yates*, 744 F.3d at 890 (scienter cannot be established simply because a program or contract represents a "core business" absent detailed allegations establishing actual exposure to the accounting problems); *In re E.Spire Commc'ns, Inc. Sec. Litig.*, 127 F. Supp. 2d 734, 749 n.12 (D. Md. 2001) (the "mere fact" that defendants resigned is "hardly proof of fraudulent intent").

Plaintiffs also contend that because the EA Defendants "repeatedly insisted" that 2U "was scaling enrollment and that its business plan led to marketing efficiencies," the EA Defendants either knew or were reckless in not knowing that the Company was unable to scale enrollment. Opp. 33.  This logic is not only circular, it is also missing the factual predicate that 2U was, in fact, unable to scale enrollment.  *See* Mot. 16-18; *Knurr v. Orbital ATK Inc.*, 272 F. Supp. 3d 784 (E.D. Va. 2017) (defendants' frequent public statements about the Lake City Contract's contributions to sales and warnings about rising costs did not contribute to a strong inference of scienter because

---

[6] Plaintiffs also assert that 2U's May 2018 Offering supports an inference of scienter and cite only out-of-circuit cases. Opp. 38.  This is because the Fourth Circuit has long held that such generic "motive" is not informative of scienter.  *See*, *e.g.*, *Matrix Cap. Mgmt. Fund, LP v. Bearing Point, Inc.*, 576 F.3d 172, 185 (4th Cir. 2009); *Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 627 (4th Cir. 2008); *Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 352 (4th Cir. 2003).

plaintiffs failed to plead that defendants were privy to, but concealed, cost overruns).[7]

### 4.     Plaintiffs Fail To Meaningfully Engage With The Non-Culpable Inference

The non-culpable (and more compelling) inference to be drawn from the observable facts is that 2U experienced six consecutive quarters of growing revenue and enrollments, proactively disclosed program-specific challenges at USC and UNC, and promptly adjusted (and then re-adjusted) expectations as soon as it appeared the future would not play out as well as anticipated. Mot. 20-22; *Maguire*, 876 F.3d at 548 (cautioning that "securities fraud should not be predicated solely on an overly optimistic view of a future"). Plaintiffs do not grapple with these truths and instead retort that this Court should infer that the EA Defendants hid the truth because they did not want to disappoint investors. Opp. 39. That inference is unreasonable in light of the undeniable fact that 2U proactively disclosed the "truth" in May 2019 before it suffered any declines in enrollment. CC ¶ 386. Plaintiffs also posit, based on Spruce Point's report, that "[i]f Defendants had nothing to hide, why did they stop reporting in November 2017 the Platform Revenue Retention Rate metric that would have alerted investors that most of 2U's top programs were underperforming?" Opp. 40. 2U explained why it stopped reporting that metric in 2017: it "currently provides little to no value in evaluating our business and is not expected to provide value in the future." 2U, Inc. Form 10-Q at 21 (Sep. 30, 2017). But more to the point, neither Plaintiffs (nor Spruce Point) have alleged (nor can allege) what this outdated metric would have

---

[7] Plaintiffs agree that to plead corporate scienter, they must plead that an authorized agent of 2U acted with scienter. Opp. 38. For the reasons set forth herein, Plaintiffs have failed to show that Mr. Paucek, Ms. Graham, or Mr. Mokkarala acted with scienter. Plaintiffs suggest that they have pled corporate scienter through Gabriel Bustamante, 2U's Executive Vice President of Global Sales and Admissions (*id.*), but the FE allegations regarding Mr. Bustamante fail to plead his scienter for the same fundamental reason that they fail as to the Individual Defendants: they do not establish that Mr. Bustamante had knowledge of any information contradicting any of 2U's public statements. *See* CC ¶¶ 352-55, 377.

purportedly revealed, much less that it would show underperformance at 2U's top programs.

### B.       The Opposition Does Not Identify An Actionable Misstatement

#### 1.       Plaintiffs Have Not Closed Any Of The Three Inlets Of The Safe Harbor

As the EA Defendants showed, dozens of the challenged statements are forward-looking statements and immunized by all three inlets of the PSLRA's safe harbor.  Mot. 22-28; App. A (identifying language of futurity in each Projection).  Plaintiffs make four arguments in response.

*First*, Plaintiffs weakly dispute that each of these Projections is forward-looking by asserting that "some of the [Projections] include present or historical facts that take them outside the safe harbor."  Opp. 20.  However, Plaintiffs do not identify which Projections they are referring to or what "present or historical facts" are embedded in them (much less that those "facts" are alleged to be false).  Each Projection squarely falls within the definition of forward-looking.

*Second*, Plaintiffs do not deny that projections "not worded as guarantees" are immaterial as a matter of law in the Fourth Circuit, but assert in a footnote that "many" of the Projections "were worded as guarantees."  Opp. 19 n.5.  Again, Plaintiffs fail to identify any Projection that was a guarantee.  Plaintiffs' primary argument is that the Projections were material because they were "*specific* statements concerning forecasts."  *Id.* at 18 (emphasis added).  But specific projections are just as immaterial as general ones, unless worded as guarantees—and no Projection was.  Mot. 23.  The cases upon which Plaintiffs rely to advocate for this new standard are inconsistent with Fourth Circuit law (*Lefkoe*, 2007 WL 6890353, at *5), or do not consider the safe harbor (*Direct Benefits, LLC v. TAC Fin., Inc.*, 2020 WL 2769982, at *11 n.10 (D. Md. May 28, 2020)).  And Plaintiffs cite no authority for their argument that projections made "with a high degree of confidence" are material *per se*.  Opp. 18.

*Third*, Plaintiffs contend that the robust and detailed cautionary language identified by the EA Defendants, Mot. 24-25; App. B (setting forth cautionary language), does not trigger the

second inlet because (1) the adequacy of cautionary language cannot be decided at the pleading stage; or (2) if it can, the cautionary language was not "meaningful." Opp. 19. Plaintiffs are wrong on both. On the former, the Fourth Circuit has affirmed the dismissal of a complaint after concluding that a defendant's cautionary language was specific and not general. *See, e.g.*, *Paradise Wire & Cable D.B. Pension Plan v. Weil,* 918 F.3d 312, 319-21 (4th 2019) (evaluating warnings under bespeaks caution doctrine); *see also DXC*, 2020 WL 3456129, at *8. This inquiry is expressly contemplated by the PSLRA. 15 U.S.C. § 78u-5(e). As for the latter, Plaintiffs' argument that this language was "consistently boilerplate" is itself "boilerplate," and devoid of any analysis explaining why the EA Defendants' explicit and specific warnings about the factors that could cause 2U's results to differ materially from the Projections were not "meaningful" under the PSLRA and Fourth Circuit law. Opp. 19; Mot. 24-25. Plaintiffs do not cite a single decision in which any court found cautionary language like 2U's to be inadequate. Plaintiffs also contend that the cautionary language was not meaningful because 2U "warned of risks that had already materialized." Opp. 19-20 (emphasis omitted). Incorrect. As shown above and in the Motion, Plaintiffs have not pled any facts to show that any of these risks had materialized to the point of adversely impacting 2U's enrollment or results, much less when each materialized.[8] Nor can they—2U's enrollments and revenues increased throughout the Class Period. Mot. 7-8.[9]

*Finally*, Plaintiffs argue that the third inlet is closed because "Defendants had knowledge of contrary facts that called into question the accuracy of their projections at the time they were

---

[8] Plaintiffs do not dispute that the risk disclosures themselves are forward-looking. *Wochos v. Tesla, Inc.*, 2021 WL 246210, at *7-8 (9th Cir. Jan. 26, 2021); Mot. 23.

[9] Plaintiffs rely on *Singer v. Reali*, 883 F.3d 425 (4th Cir. 2018), but that case did not deal with cautionary language for purposes of the safe harbor or even forward-looking statements. It analyzed whether a general warning about the risks of penalties for failure to comply with the law was sufficient to satisfy a duty to disclose an illegal government reimbursement scheme. *Id.* at 422; Opp. 19-20.

made." Opp. 21.  But Plaintiffs do not plead any facts about the *EA Defendants*' knowledge; the most that Plaintiffs allege is what FEs knew (*see supra* Section II.A.1).  And despite Plaintiffs' attempt to lower the bar for themselves, the standard is not "knowledge of contrary facts that called into question" the Projections (Opp. 21), but rather "actual knowledge that the forward-looking statements were *false when made*."  *DXC*, 2020 WL 3456129, at *5 (emphasis added).  Plaintiffs do not plead when any EA Defendant learned of a contrary fact (Mot. 26-27) so they cannot demonstrate any EA Defendant's actual knowledge that a Projection was false when made.

### 2. Plaintiffs Cannot Explain How Investors Were Misled By Puffery

The EA Defendants showed that the majority of the challenged statements are vague statements of corporate optimism, or "puffery," that courts routinely dismiss.  Mot. 28-29. Plaintiffs respond that puffery must be considered in context.  Opp. 14-15.  The EA Defendants agree that context matters, but Plaintiffs merely cite this general principle of law without showing that it applies.  Plaintiffs do not provide any context to suggest that any specific statement that appears to be pure puffery actually misled investors.  Plaintiffs quote snippets from three statements, but these do nothing to advance Plaintiffs' "context matters" theory.

First, Plaintiffs argue that Ms. Graham's August 8, 2018 statement ("we're still able to acquire students at the same kinds of prices [as in the past]") is not puffery; but the EA Defendants do not contend that this statement is puffery. *Id.* at 14; App. A (Statement 22).  Second, Plaintiffs argue that Mr. Paucek's August 14, 2018 statement that "We feel like the proof is in the pudding," is not "too indefinite" or "so vague."  Opp. 14 (quoting only the word "proof").  But this statement is quintessential puffery, for obvious reasons. *Cunha v. Hansen Nat. Corp.*, 2010 WL 11469534, at *16 (C.D. Cal. July 12, 2010) ("I think the proof is in the pudding" was puffery).  Far from a factual representation that "2U's business model works," as Plaintiffs suggest (Opp. 14 (quoting

11

only "model works")), this expression is commonly used to say that the best way to find out if something is good is to test it yourself—just as the best test of a pudding is to eat it.[10]

Finally, Plaintiffs contend that Mr. Paucek's statement on May 7, 2019 that "Our data shows we're driving significant growth in the quantity of prospective students and started applications," is not puffery. Opp. 14. But this statement lacks any specificity whatsoever. Mr. Paucek did not quantify the "growth" in prospective students or applications, explain how that may affect future enrollments (or revenue), or include any other details that communicated meaningful information about 2U's business.[11] Unlike in Plaintiffs' cases, this vague statement cannot "be proven true or false." *Id*. at 15 (citing *Dunn v. Borta*, 369 F.3d 421, 431 (4th Cir. 2004)); *see, e.g.*, *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289 (4th Cir. 1993) (statements regarding strong growth continuing into the future were puffery); *In re Prudential Fin., Inc. Sec. Litig.*, 2020 WL 7706860, at *14 (D.N.J. Dec. 29, 2020) (statements describing balance sheet as "strong" and  reserves as "rock-solid" were "inactionable puffery"). Nor do Plaintiffs explain how this innocuous puffery is misleading in "context." Opp. 14-15. Mr. Paucek's statement was made on the same day that 2U announced that it expected its second quarter and fiscal year results to be lower than projected because of an expected decline in enrollments, due to increased selectivity and a decrease in the number of students submitting applications. Ex. 9 at 6. Investors were hardly misled that 2U's growth strategy was risk free.

---

[10] Plaintiffs did not bold, italicize, or otherwise specifically challenge either Ms. Graham's "price" statement or Mr. Paucek's "proof" statement. *See, e.g.*, CC ¶¶ 277-78. This Court should reject their untimely attempt to challenge those statements now. *See In re Nimble Storage, Inc. Sec. Litig.*, 252 F. Supp. 3d 848, 853 n.7 (N.D. Cal. 2017) (rejecting plaintiff's attempt in opposition to base a securities fraud claim on a statement not bolded and italicized in plaintiff's complaint).

[11] Plaintiffs also do not allege any facts to show that the Company data referred to by Mr. Paucek did not support this statement.

### 3. Plaintiffs Fail To Distinguish The Opinions From *Paradise Wire*

Defendants showed that under *Omnicare* and the Fourth Circuit's *Paradise Wire* decision, nearly all of the challenged statements constitute non-actionable opinions.[12] Mot. 29-32. The Motion laid out in great detail how this case is exactly like *Paradise Wire*, where the Fourth Circuit explained that whether an omission makes an opinion misleading depends on context, and in light of 2U's express warnings of the specific risks it faced (like the defendant in *Paradise Wire*), a reasonable investor could not have been misled by Defendants' subjective opinions. *Id.* at 30-31. Plaintiffs make no attempt to distinguish *Paradise Wire* (they do not even mention it), which alone provides a basis to dismiss the claims based on the opinion statements.

As for *Omnicare*, Defendants showed that the Complaint does not plead facts demonstrating the objective or subjective falsity of any opinion. *Id.* at 31.[13] Plaintiffs barely attempt to refute these arguments. They assert that Defendants could not have "sincerely held" their opinions because they knew "of problems undercutting those statements." Opp. 16. But that is precisely what *Omnicare* says is not enough. *Omnicare, Inc. v. Laborers Distr. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 176 (2015) ("[A]n opinion statement … is not necessarily misleading … when [the speaker] knows, but fails to disclose, some fact cutting the other way."). Merely quoting the standard from *Omnicare*, Plaintiffs also assert that "Defendants omitted

---

[12] Plaintiffs observe that Defendants only discussed four opinion statements in their Motion. Opp. 16. True, page limits and human attention span prevented Defendants from separately addressing each of the 46 opinion statements identified in Appendix A. App. A (Statements 1-45, 53). In any event, Plaintiffs do not specifically address even one.

[13] It is unclear why Plaintiffs devote a page to arguing the materiality of certain factual allegations related to 2U's student recruitment, competition, enrollments, and performance of certain 2U programs. Opp. 17. Plaintiffs do not tie any of these allegations to a specific alleged misstatement. Plaintiffs suggest that Defendants have challenged "materiality," but Defendants' argument (Mot. 31) concerned the need for Plaintiffs to allege *particularized facts about the scope and severity of the alleged problems* to refute the objective and subjective truth under *Omnicare*, not materiality.

13

'particular (and material) facts going to the basis for the[ir] opinion[s]' and omitted 'material facts about the [defendants] inquiry into or knowledge concerning' the opinions." Opp. 16. Plaintiffs again fail to explain what those particularized and material omissions were (or why the rationale in *Paradise Wire* does not foreclose this argument). *Id.*

      **4.**      <u>Plaintiffs Fail To Tie The Alleged Omissions To Any Challenged Statement</u>

Defendants further showed that several of the challenged statements were facially true, and not rendered misleading by the omission of one or more of the supposed negative circumstances described in the Complaint. Mot. 32-36; App. A; CC ¶¶ 55-214. Plaintiffs counter that "many of the statements were literally false" (Opp. 13 (emphasis omitted)), but consistent with a clear pattern, do not identify *which* statements they think were literally false. The EA Defendants next examined specific representative statements, and explained why the allegedly omitted "facts" bore no connection to (let alone contradicted) the substance of the statements. Mot. 35-36. Plaintiffs' response is mostly a regurgitation of the alleged misstatements juxtaposed with FE statements,[14] a reference to the legal principle that a speaker must disclose material facts when necessary to make the statements made not misleading, and a string cite of decisions in which well-pled allegations were sufficient to show that a speaker failed to do so. Opp. 9-13. Missing is any analysis to show why any of the challenged statements are actually false or misleading. Instead, Plaintiffs simply assert that the EA Defendants "saw 2U's projected enrollment numbers decline across the board" and for that reason conclude that all of the challenged statements were inherently false or misleading. *Id.* at 10. This logic is faulty for two reasons. First, the notion that 2U's enrollment was declining is wholly unsubstantiated by the unreliable FE statements and inconsistent with 2U's

---

[14] Plaintiffs incorrectly reference Mr. Paucek's statement on August 2, 2018 that 2U was "winning contracts from competitors" as an alleged misstatement. CC ¶ 161. That statement also was not challenged in the Complaint, and so it cannot now be used to survive dismissal. *See supra* n.10.

actual enrollment numbers. *See* Mot. 8, 13-17. And second, Plaintiffs do not show how any particular statement is in conflict with what any FE supposedly told them. *Id.* at 33.

As to the specific statements the EA Defendants analyzed, Plaintiffs do not address Ms. Graham's innocuous August 8, 2018 statement. *Id.* at 35. Plaintiffs do persist in their allegation that Mr. Paucek's February 26, 2018 statement that "the acceleration of [2U's] new DGP launch cadence" was "driving [2U's] progress," was misleading because it "paint[ed] a picture of smooth growth" even though 2U "was already encountering material problems" that were "impeding growth." Opp. 13-14. Setting aside that Plaintiffs fail to allege these problems with any particularity, they have no response to the fact that the statement itself is explaining the progress 2U has achieved, and does not discuss 2U's future growth strategy, let alone imply growth would be smooth. Mot. 34; *see Colbert v. Rio Tinto PLC*, 824 F. App'x 5, 10 (2d Cir. 2020) (alleged omissions regarding the "valuation" of coal mines in Mozambique did not render misleading facially true statements that production at the mines continued to "ramp up" when the ramp up statements did "not purport to state anything regarding the valuation of the mines").

As for Mr. Paucek's May 7, 2019 statement, Plaintiffs argue that "[o]ur data shows we're driving significant growth in the quantity of prospective students and started applications" was misleading because "the student acquisition model was not scaling as expected." Mot. 36. This argument is emblematic of the Complaint's defects. While disclosing the reasons why 2U was lowering its prediction for the next quarter, Mr. Paucek explained, "[w]e do not believe the challenges we're seeing are attributable to weakness in our marketing efficiency at the top of the funnel." CC ¶ 310. He did not mention the scaling of the student acquisition model at all and Plaintiffs do not (and cannot) explain how the amount of scaling relates to the "quantity of

15

prospective students and started applications."[15]

## III.   SECURITIES ACT CLAIMS

### A.   OKCERS Ignores The Allegation That Triggers The Statute Of Limitations

The parties agree that the Securities Act claims are time-barred unless they were "brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence."  15 U.S.C. § 77m; Mot. 38; Opp. 41.  As the SA Defendants showed, the one-year statute of limitations began to run on May 7, 2019, when OKCERS discovered or should have discovered the alleged misstatements by reading 2U's second quarter earnings release or listening to its second quarter earnings call.  Mot. 39.  This means that OKCERS' Securities Act claims, first asserted on July 30, 2020, are too late.

OKCERS' first argument is that the question of *when* an untrue statement or omission could have been discovered is a "question of fact that cannot be decided on a motion to dismiss." Opp. 41.  More recent decisions, including *Under Armour*—a case cited repeatedly throughout the Motion (Mot. 28-29, 37-41, 49), and which OKCERS does not try to distinguish—confirm that OKCERS is wrong.  *In re Under Armour Sec. Litig.*, 342 F. Supp. 3d 658, 573 (D. Md. 2018) (dismissing Section 11 claim on a Rule 12(b)(6) motion as too late under the discovery standard).

OKCERS next argues "it is hard to see how a reasonable plaintiff would even have had sufficient information of wrongdoing by May 2019 to warrant the state of an inquiry, let alone discover the wrongdoing by that time."  Opp. 42 (emphasis omitted).  That statement is completely at odds with OKCERS' Complaint.  As the SA Defendants showed, Paragraph 386 of the Complaint alleges that on *May 7, 2019*, 2U revealed the "relevant truth" allegedly concealed by

---

[15] Plaintiffs cite no in-circuit authority to dispute that a violation of Item 303 does not independently give rise to liability under Section 10(b) in the Fourth Circuit.  Mot. 36 n.14; Opp. 24.  Plaintiffs' Item 303 claims thus fail.  For the reasons shown in the Motion, Plaintiffs' Item 105 and Section 20(a) claims must also be dismissed.  Mot. 37, 49-50.

the SA Defendants' prior misstatements about 2U's growth plan and business model.  CC ¶ 386.

OKCERS completely ignores this allegation.  That additional information was disclosed in July is

irrelevant.  Opp. 43.  The limitations period begins to run as soon as there are "sufficient triggers

to allow" a plaintiff "to have investigated and reasonably have discovered" facts adequate to plead

a cause of action.  *Under Armour*, 342 F. Supp. 3d at 674.  OKCERS does not attempt to rebut this

point, much less identify any contradictory case law.  And, while OKCERS claims that it was not

until July 2019 that Mr. Paucek disclosed that 2U "had experienced the facts and trends that [the

FEs] reported seeing before and at the time of the Offering," OKCERS does not explain why it

could not have talked to the FEs in May 2019 and discovered this same information.  Opp. 43.

The basis of the Securities Act claims is that the Offering Materials misled investors into

believing that 2U would keep growing.  CC ¶ 131.  After six consecutive quarters of growth, 2U

announced, for the first time, on May 7, 2019 that it expected slower enrollment growth.  This

started the one-year period to file a claim.  OKCERS is too late.[16]

### B.    Only Two Of The Challenged Statements Remain In Dispute

The parties agree that OKCERS pleads five alleged misstatements in 2U's 2017 Form 10-

K, incorporated into the Offering Materials.  Mot. 41-43; Opp. 44.  By failing to respond to the SA

Defendants' arguments with respect to the third, fourth, and fifth arguments, only the first two are

at issue.  In response to the SA Defendants' argument that the third statement was an opinion,

OKCERS does not dispute that it cannot show that this opinion was subjectively false (*i.e.*, not

believed) because it has expressly disclaimed any allegations of fraud in connection with its

Securities Act claims.  Mot. 42.  Similarly, OKCERS does not dispute that the fourth and fifth

---

[16] Plaintiffs do not respond to the SA Defendants' argument that Rule 15(c) cannot revive the Securities Act claims.  "In failing to respond to this argument, … Plaintiff[s] concede[] the point." *Stenlund v. Marriott Int'l, Inc.*, 172 F. Supp. 3d 874, 887 (D. Md. 2016).

17

statements are forward-looking, not worded as guarantees, or that they affirmatively pled that these statements were not made with actual knowledge that they were false. *Id*. at 43. As a result, these statements are absolutely immunized under two of the inlets of the safe harbor.

As for the other two statements, the SA Defendants argued that they are inactionable puffery. *Id*. at 41-42. OKCERS argues that "a reasonable investor would have been misled" because these statements purportedly "conveyed a picture not only of *continued* spectacular growth, but one that was being achieved cost-effectively." Opp. 44 (emphasis added). But no reasonable investor would get that picture, because neither statement makes a representation about future growth or suggests that past successes will be repeated. And if it did, the statement would be forward-looking and immunized under the safe harbor. *See* Mot. 42-43.

### C.     OKCERS Does Not Meaningfully Respond To The Falsity Argument

In a more than three-page span of Defendants' Motion, the SA Defendants dissected the FE statements and demonstrated why each one failed to render the five challenged statements false or misleading. *Id.* at 41-43. OKCERS responds in a single page that just repeats the deficient allegations from the Complaint without any additional analysis. Opp. 44-45. OKCERS makes no effort to engage—much less refute—the SA Defendants' arguments that the FE allegations are inadequate. Most fundamentally, OKCERS cannot (and does not) reconcile its claims that 2U was missing projections and poised for failure when 2U undeniably exceeded its projections and grew its business for four consecutive quarters after the Offering. Mot. 43.

### D.     OKCERS Does Not Dispute The Section 11 Standing Argument

The parties agree that persons who cannot "trace" their shares to the Registration Statement do not have standing. *Id.* at 46-47; Opp. 47. OKCERS argues that it does not have to plead how persons who purchased in the secondary market (unlike OKCERS) can "trace" their shares to the Registration Statement, but also does not dispute that it is impossible to do. *See id.* at 46-47; *see*

18

*TransEnterix Inv. Grp. v. Transenterix, Inc.*, 272 F. Supp. 3d 740, 761 (E.D.N.C. 2017).  Thus, the Section 11 claims on behalf of persons who did not purchase their shares in the Offering should be dismissed for lack of standing.

### E.        OKCERS Cannot Maintain A Section 12(a)(2) Claim

The parties agree that only statutory sellers can be liable under Section 12(a)(2).  OKCERS argues that whether a defendant qualifies as a statutory seller "can" involve factual questions not appropriate for a motion to dismiss, but does not show that any such factual questions are present here.  Opp. 48 (citing dicta from *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F. Supp. 2d 334, 401 (D. Md. 2004)).  The Complaint contains no facts demonstrating that any SA Defendant is a statutory seller and OKCERS' arguments are easily refuted.  Mot. 47-48.

*First*, OKCERS' alleged purchase "in" a firm commitment offering does not establish any Underwriter Defendant is a statutory seller.  *See, e.g.*, *Baker v. Seaworld Entm't, Inc*., 2016 U.S. Dist. LEXIS 72409, at *56 (S.D. Cal. Mar. 31, 2016).  "[E]ven in a firm commitment underwriting, it is possible that the underwriters sold to a broker who may have actually passed the title to Plaintiffs." *Id.*[17] And boilerplate allegations that the Underwriter Defendants prepared and disseminated Offering Materials and received discounts/commissions are insufficient as a matter of law to demonstrate direct and active solicitation of OKCERS' purchase.  *See* Mot. 48.

---

[17] *See In re Airgate PCS, Inc. Sec. Litig.*, 389 F. Supp. 2d 1360, 1367 (N.D. Ga. 2005) (same)*; Credit Suisse First Boston Corp. v. ARM Fin. Grp., Inc.*, 2001 WL 300733, at *10 (S.D.N.Y. Mar. 28, 2001) (same); *see also In re Mun. Mortg. & Equity LLC, Sec. & Derivative Litig.*, 876 F. Supp. 2d 616, 662 (D. Md. 2012) (rejecting argument that "Underwriter Defendants were 'sellers' . . . because the SPO was a 'firm commitment offering'").  OKCERS' assertion that it need not prove it purchased "specific common units from specific underwriters" misses the point—it lacks standing because it fails to allege any of the Underwriter Defendants directly sold OKCERS a single share of 2U stock, or directly solicited its purchase.  Mot. 48.

19

*Second*, OKCERS is wrong that 2U is a statutory seller.  It does not matter that 2U "benefited financially" from the Offering, because it indisputably did not directly solicit OKCERS' purchase.  *Id.*  SEC Rule 159A does not alter that outcome because it cannot overrule the Supreme Court.  *See Mass. Mut. Life Ins. Co. v. Residential Funding Co.*, 843 F. Supp. 2d 191, 207 (D. Mass. 2012) (noting that only two courts had applied Rule 159A since it became effective in 2005 and that the Supreme Court in *Pinter v. Dahl* required a plaintiff to show that an issuer actively solicited plaintiffs' purchase).

*Third*, relying exclusively on decisions from outside of the Fourth Circuit and ignoring *Royal Ahold*, *Constellation*, and *Pinter*, OKCERS argues the individual defendants are statutory sellers because they *signed* the Registration Statement.  *See* Opp. 50; Mot. 48.  There is an apparent split of authority among and in some district courts, but, as one court observed, "[e]very Court of Appeals to have considered the issue, however, has held that *an individual's* signing a registration statement does not itself suffice as solicitation under Section 12(a)(2)."  *Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d 506, 512 (S.D.N.Y. 2010) (emphasis added).[18]

## IV.   CONCLUSION

For all of these reasons, Defendants request that the Complaint be dismissed in its entirety with prejudice.  Moreover, Plaintiffs' request to amend, made in a footnote on the last page of its Opposition (Opp. 50 n.23), should be denied.  *See* Fed. R. Civ. P. 7(b)(1)(B); *Kenny v. Bank of Am., N.A.*, 2011 WL 13234444, at *2 (E.D. Va. Dec. 22, 2011) (denying request for leave to amend where plaintiff "fail[ed] to state with particularity the grounds therefor").

---

[18] Plaintiffs make little to no effort to rehabilitate their Item 503 claim.  Opp. 46 n.17 ("For the reasons described above at 23-24, OKCERS also adequately pleads an Item 503 violation.").  And the parties agree that Plaintiffs' failure to state a claim under Sections 11 and 12(a)(2) requires dismissal of the Section 15 claim.  Mot. 50; Opp. 50.

20

Dated: February 9, 2021

Respectfully submitted,

**LATHAM & WATKINS LLP**

/s/ J. Christian Word
J. Christian Word (Bar No.: 26400)
Sarah A. Tomkowiak (admitted *pro hac vice*)
555 Eleventh Street, NW
Suite 1000
Washington DC 20004
Telephone: (202) 637-2200
Fax: (202) 637-2201
christian.word@lw.com
sarah.tomkowiak@lw.com

**PAUL HASTINGS LLP**

/s/ Barry G. Sher
Barry G. Sher (admitted *pro hac vice)*
Anthony Antonelli (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000
Fax: (212) 319-4090
barrysher@paulhastings.com
anthonyantonelli@paulhastings.com

Behnam Dayanim (Bar No.: 22442)
2050 M Street NW
Washington, DC 20036
Telephone: (202) 551-1737
Fax: (202) 551-0237
bdayanim@paulhastings.com

*Attorneys for Defendants 2U, Inc., Christopher J. Paucek, Catherine A. Graham, Harsha Mokkarala, Paul A. Maeder, Robert M. Stavis, Gregory K. Peters, Timothy M. Haley, Valerie B. Jarrett, Earl Lewis, Coretha M. Rushing, Sallie L. Krawcheck, John M. Larson, Edward S. Macias, and Mark J. Chernis*

*Attorneys for Defendants Goldman Sachs & Co. LLC, Credit Suisse Securities (USA) LLC, Citigroup Global Markets Inc., Compass Point Research & Trading, LLC, KeyBanc Capital Markets Inc., and Macquarie Capital (USA) Inc.*

21