# EXHIBIT A

2021 WL 667085
Only the Westlaw citation is currently available.
United States Court of Appeals, Fourth Circuit.

IN RE: TRIANGLE
CAPITAL CORPORATION
SECURITIES LITIGATION
LifeWise Family Financial
Security, Inc., Plaintiff – Appellant,
and
Gary W. Holden, individually and
on behalf of all others similarly
situated; Yun Cheng; Chi Wai Leung;
Steven Lynn Koeppel; Susan Marie
Koeppel; Geraldine Checkman; Henry
Werdenberg; Elias Dagher, Plaintiffs,
v.
Triangle Capital Corporation; E. Ashton
Poole; Steven C. Lilly; Garland S.
Tucker, III, Defendants - Appellees.

No. 19-2162
|
Argued: December 9, 2020
|
Decided: February 22, 2021

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. Louise W. Flanagan, District Judge. (5:18-cv-00010-FL)

**Attorneys and Law Firms**

ARGUED: Patrick Donovan, WOLF HALDENSTEIN ADLER FREEMAN & HERZ, LLP, New York, New York, for Appellant. Ashley Charles Parrish, KING & SPALDING, LLP, Washington, D.C., for Appellees. ON BRIEF: Daniel K. Bryson, WHITFIELD, BRYSON & MASON, LLP, Raleigh, North Carolina, for Appellant. Joshua N. Mitchell, Washington, D.C., Michael R. Smith, B. Warren Pope Bethany M. Rezek, KING & SPALDING LLP, Atlanta, Georgia, for Appellees.

Before AGEE, WYNN and QUATTLEBAUM, Circuit Judges.

**Opinion**

Affirmed by published opinion. Judge Agee wrote the opinion, in which Judge Wynn and Judge Quattlebaum joined.

AGEE, Circuit Judge:

 **\*1**  LifeWise Family Financial Security, Inc. ("LifeWise") is the lead plaintiff in this securities fraud class action suit against Triangle Capital Corporation ("Triangle") and three of its controlling shareholders—E. Ashton Poole, Steven C. Lilly, and Garland S. Tucker (collectively, "Defendants"). In November 2017, several of Triangle's investments made in 2014 and 2015 faltered, causing Triangle's shares to decrease by twenty-one percent. LifeWise, a shareholder in Triangle, alleges that Defendants knew or should have known of the risks of those investments but defrauded them by failing to disclose such alleged risks. After the district court dismissed LifeWise's Amended Complaint without prejudice, LifeWise moved for leave to file its Proposed Second Amended Complaint ("PSAC"). The district court denied leave to do so as futile under Federal Rule of Civil Procedure 12(b)(6), finding that the PSAC failed to adequately allege scienter. For the reasons that follow, we affirm.

I.

We accept as true the facts alleged in LifeWise's PSAC and its exhibits. *See Matrix Cap. Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 182 (4th Cir. 2009). In addition, we accept Defendants' invitation to review their SEC Forms 10-K and 10-Q, news reports, press releases, and earnings calls transcripts that they submitted to the district court, given that LifeWise has not objected to their use. *See Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (assuming document met the standard for consideration as part of a Rule 12(b)(6) motion when opposing party did not object to them being part of the record before the district court).

A.

Triangle is a business development company ("BDC") providing "customized financing to lower middle market companies located primarily in the United States." J.A. 141.

Poole, Lilly, Tucker, and Brent P.W. Burgess (who is not a defendant) were all "C-level" executives in Triangle between 2014 and 2017.[1] Poole, Lilly, and Tucker also held positions on Triangle's Board of Directors.

The "lower middle market" that Triangle served referred to companies with annual revenues between $10 million and $250 million. Unlike traditional lenders, Triangle offered companies in this market "mezzanine financing," that is "a hybrid of debt and equity financing that provide[d] the lender with the ability to convert to an ownership or equity interest in the borrowing company in the event of default, after senior lenders [were] paid." J.A. 147. Mezzanine financing was inherently riskier for the lender because it received only a second- or lower-priority security interest in the borrower's assets, but its higher interest rates produced higher yields than traditional senior loans. In its 2014 Form 10-K, Triangle disclosed that the companies it invested in[2] "would be rated below investment grade if they were rated," which are commonly referred to as " 'high yield' or 'junk.' " 2014 Form 10-K at 3, *Holden v. Triangle Cap. Corp.*, No. 5:18-cv-00010-FL (E.D.N.C. filed May 25, 2018), ECF 78-11 [hereinafter "2014 Form 10-K"]. The lower middle market was "highly competitive," and many of those competitors were "substantially larger" with "considerably greater ... resources" than Triangle. *Id.* at 16. Triangle made identical disclosures in its 2015 Form 10-K. *See* 2015 Form 10-K at 3, 16, *Holden*, No. 5:18-cv-00010-FL (E.D.N.C. filed May 25, 2018), ECF 78-23 [hereinafter "2015 Form 10-K"].

**\*2** Triangle largely outsourced its investment decision-making processes. Specifically, a team of outside experts conducted the underwriting and due diligence processes, and then prepared a report for Triangle's "investment committee," on which Poole, Tucker, Lilly, Burgess, and five other individuals sat. The investment committee would consider the proposal and decide whether to proceed, request additional due diligence, or modify the proposed structure and/or terms of the investment. Generally, however, Triangle depended largely on Tucker, Poole, Lilly, and Burgess "for the final selection, structuring, closing and monitoring of [its] investments." 2014 Form 10-K at 16; 2015 Form 10-K at 16.

B.

1.

"By late 2013 and early 2014," mezzanine financing lenders in the lower middle market allegedly began to experience significantly increased competition from unitranche lenders. J.A. 149. In essence, unitranche lending "combin[ed] senior and subordinated debt into one package with a blended [interest] rate," which both lowered a borrower's costs and presented other ancillary strategic benefits that mezzanine lending did not. *Id.* Based on unitranche lending's rising popularity, LifeWise alleges that Triangle's financial advisors recommended that Triangle "begin moving away from mezzanine structures and into lower yielding but more secure second lien unitranche and senior structures." J.A. 153.

Defendants decided, however, to continue forward with an investment strategy focused primarily on mezzanine lending deals throughout 2014 and 2015, though they did incorporate some unitranche deals into their portfolio. After the first quarter of 2014, Tucker told investors on a conference call that he and the others at Triangle believed that "the lower middle market is poised to provide attractive investment opportunities during the balance of 2014." J.A. 156. Poole emphasized that Triangle was "focusing on quality over quantity in terms of [its] investment pace per quarter," and passing on "B deals" in favor of "focus[ing] on A deals." J.A. 157. This emphasis on "quality over quantity" was a common theme at each quarterly investors conference call throughout 2014. At the end of 2014, Tucker lauded Triangle's "robust" investment pipeline, the "strength of [its] balance sheet, and the opportunities we see across the lower middle market." J.A. 162–64.

That same message was repeated throughout 2015. Defendants emphasized that they were "not trying to grow the portfolio purely for growth" and were "confident in both the overall quality of our investment portfolio and the investment opportunities in the lower middle market" that year. J.A. 169, 173.

2.

In December 2015, Brown Gibbons Lang & Company, an investment bank and financial advisory firm, issued a report entitled "The State of Middle Market Financing in the U.S." J.A. 218–58 [hereinafter "the BG&L Report"]. That Report compiled survey results and commentary from a number of middle market BDCs about the trends they saw in the lending market that year. The report found that "[l]ender responses were mixed when speaking to the quality of

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.   2

deal opportunities" in the middle market, J.A. 224, but that "[t]he lower middle market (EBITDA[3] below $10 million) has experienced little disruption," J.A. 221. One respondent explained, "Most of the drop off in volume has been in the upper middle market. But in the lower end of the market, we are still finding plenty of opportunity." J.A. 221. However, Triangle's own Chief Investment Officer ("CIO"), Burgess, observed that there had been a "compression in the market, meaning terms, pricing, and structures are increasingly very similar across the EBITDA size spectrum, and the compression continues to become more striking." J.A. 233.

**\*3** The BG&L Report noted that other portions of the mezzanine lending market had "continued to contract as unitranche and second lien [lending] have taken share." J.A. 234. Some respondents said that the shift caused them to change the structure of their previously pure-mezzanine deals. Conversely, the Report noted that "[d]espite the growing popularity of the unitranche product," others in the market seeking financing "like[d] the patient capital that mezzanine offer[ed]," and so mezzanine lending "continue[d] to generate steady deal flow." J.A. 235. Indeed, some respondents reported that the mezzanine market remained "really vibrant," especially below the $10 million EBITDA threshold. *Id.* In fact, one mezzanine firm reported an "above-average" year in terms of investments, and saw 2015 as "one of its best years of mezzanine capital deployment in [its] history." *Id.* Another firm reported similar success.

3.

Just before announcing the results for 2015's final quarter, on February 3, 2016, Triangle issued a press release announcing that Poole was replacing Tucker as Triangle's CEO, but that Tucker would remain Chairman of Triangle's Board. Tucker also received a $2.5 million bonus as part of the restructuring of positions. Triangle subsequently reported a "strong finish" in 2015's final quarter, noting that it continued to "excel[ ] in originating high-quality new investments in the lower middle market." J.A. 176, 180.

The following months brought several more changes to Triangle. In June 2016, four months after Poole took over as Triangle's CEO, the company announced a new operational plan referred to as "TCAP 2.0." J.A. 184. This plan called for Triangle to begin shifting its focus "away from riskier, high-yield investments" and instead placing "greater emphasis on unitranche financing." *Id.* Then in July 2016, Triangle

closed an underwritten public offering of its common stock, netting approximately $120 million in proceeds, to be used "to infuse further investments." *Id.* And in October 2016, Burgess resigned from both his position as Triangle's CIO and as a director.

Defendants' message to investors was less optimistic over the course of 2017 than in prior years. In February 2017, when Triangle announced the results for 2016's final quarter, Poole told investors on a call that "Triangle was moving in a 'positive' direction, as opposed to its direction in previous periods, and implied that Triangle had weathered the storm that had gripped the entire BDC industry in 2015." J.A. 189. Just five days after that call, Triangle raised another $132 million in equity through a stock offering. And not long after that, Triangle "announced that it had amended its senior credit facility and increased the facility by $135 million or 45%." *Id.*

Triangle then saw its investment portfolio begin to falter. In a May 2017 call with investors to discuss the first quarter's results, Lilly commented on Triangle's business activity during 2014 and 2015: "[I]f you look at that period ... I think you would reasonably conclude that there was a period where Triangle was [chasing] yield more than it should have." J.A. 191 (second alteration in original). In August 2017, Triangle announced that the amount of full-non-accrual assets in its portfolio increased to 5.4 percent of its total portfolio at cost. In a subsequent call with investors, Lilly again reflected on Triangle's business strategy in 2014 and 2015:

> [F]rankly, a couple of years ago, in kind of '14 and '15, there was a motive, if you will, to—internally try to maintain what at that time was [the] highest base per share dividend in the sector. And that's not a long term strategy, that is prudent for investors as one of comfortably over earnings for a long, sustained period of time and achieving that lower volatility.

J.A. 196.

Then in November 2017, Triangle announced that its third quarter saw seven additional investments go on full non-accrual status. During a subsequent call with investors, Poole explained how the investment decisions made from 2013 to 2015 contributed to this result:

> **\*4** During the period from early 2013 through the end of 2015, as large amounts of capital poured into the direct lending space, investment structures and pricing in lower middle market and broader middle market changed rapidly. Perhaps most notably by unitranche depth becoming the

security of choice by financial sponsors.... Our investment professionals were aware of these changes [in 2014 and 2015] and recommended to our former CEO [Tucker] to begin moving away from mezzanine structures and into lower yielding but more secure second lien unitranche and senior structures.... Unfortunately the strategic decision was made not to move off balance sheet in a meaningful way and TCAP continued to lead with a yield focused mezzanine strategy. In the process of doing so we added incremental exposure to a number of riskier credits, many of which are now underperforming[.]

J.A. 197–98 (emphases omitted) (alterations in original). Poole called this the "wrong" decision in hindsight:

[T]he adherence to a majority focused mezzanine investment strategy when during a period of massive change in the market, other investment strategies were available which provided a better risk-reward equation was the wrong strategic call. We are continuing to act decisively and aggressively with the goal of moving through our underperforming investments as quickly as possible, but at this point we acknowledge that as a firm we are being held back primarily by our 2014 and 2015 investment vintages.

J.A. 198. Shortly thereafter, Triangle's stock price decreased by $2.57 per share, a twenty-one percent decline, amounting to a $262 million market capitalization loss since the beginning of 2014.

C.

After LifeWise filed its initial suit against Defendants, the district court consolidated LifeWise's case with two others and named LifeWise the lead plaintiff. Accordingly, LifeWise filed an Amended Complaint on behalf of the newly formed proposed class members, defined to include those who owned Triangle shares between May 7, 2014 and November 1, 2017, excluding Defendants, Triangle's officers and directors, and their immediate family members. The Amended Complaint asserted two claims: (1) a violation of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), as implemented by Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5(b), by Triangle; and (2) a violation of section 20(a) of the Securities Exchange Act by Tucker, Poole, and Lilly, 15 U.S.C. § 78t(a).

Defendants successfully moved to dismiss the Amended Complaint. The district court found that the Amended Complaint asserted four types of false statements and omissions, but that LifeWise failed to adequately allege that any were actually false or misleading. The court dismissed the Amended Complaint without prejudice, and gave LifeWise twenty-one days to seek leave to file a second amended complaint. LifeWise thereafter sought leave to file the PSAC at issue here, supplementing its two claims for relief with additional factual allegations.

But LifeWise's second bite at the apple fared no better. Upon review of the PSAC's factual allegations set forth above, the district court found that LifeWise sufficiently alleged that "[D]efendants knew of the industry opinions about the effect of unitranche investing and increased lenders on mezzanine financing," and the court assumed "that the industry opinions cited by [LifeWise] would be material to investors." J.A. 414–15. It concluded, however, that LifeWise failed to allege scienter, a necessary element of both of its section 10(b) and 20(a) claims. In "[w]eighing the competing inferences," the court explained that LifeWise's fraud allegations were "not cogent and compelling [as] compared to the alternative explanation—that [D]efendants were aware that the [BDC] market was changing, but they continued to believe that high-quality investment opportunities remained in the marketplace." J.A. 419–20. It therefore denied leave to amend as futile and dismissed LifeWise's claims with prejudice.

**\*5** LifeWise's timely appeal followed, and we have jurisdiction pursuant to 28 U.S.C. § 1291.

II.

Federal Rule of Civil Procedure 15(a)(2) instructs courts to "freely give" parties leave to file amended pleadings. To that end, we have said that district courts should "liberally allow amendment," *Galustian v. Peter*, 591 F.3d 724, 729 (4th Cir. 2010), and deny such leave only in cases of "prejudice, bad faith, or futility," *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 510 (4th Cir. 1986) (footnote omitted). Traditionally, we held that a proposed amendment was "futile" if it was "clearly insufficient or frivolous on its face." *Id.* But in recent years, we have made clear that district courts are free to deny leave to amend as futile if the complaint fails to withstand Rule 12(b)(6) scrutiny. *See, e.g.*, *Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011). While we typically review a district court's decision to deny leave to amend for abuse of discretion, *see, e.g.*, *Laber v. Harvey*, 438 F.3d 404, 428 (4th Cir. 2006) (en banc), if the decision is based on futility

grounds for failure to state a claim under Rule 12(b)(6), we will perform a de novo review, *United States ex rel. Ahumada v. NISH*, 756 F.3d 268, 274 (4th Cir. 2014). Given that we find ourselves in the latter situation, we proceed with a de novo review.

III.

A.

Section 10(b) of the Securities Exchange Act implicitly provides investors with a private right of action against a seller of securities who "use[s] or employ[s] ... any manipulative or deceptive device" in that sale. 15 U.S.C. § 78j(b); *see Matrix*, 576 F.3d at 181. The phrase "manipulative or deceptive device" includes situations in which a seller "make[s] any untrue statement of a material fact or ... omit[s] ... a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). And any person who "controls" the company engaged in securities fraud "shall also be liable jointly and severally with" it for the fraud, "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). There are six essential elements to any section 10(b) and Rule 10b-5 claim, *see Matrix*, 576 F.3d at 181, but we focus on only one of them here: scienter.[4]

**\*6** Section 10(b) liability will lie only if a deceptive tactic is employed with scienter—that is, "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 319, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007) (citation omitted). We have held that scienter encompasses "severe recklessness," defined as "an act so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 343 (4th Cir. 2003); *see also Teachers' Ret. Sys. v. Hunter*, 477 F.3d 162, 184 (4th Cir. 2007).

The Private Securities Litigation Reform Act of 1995 ("PSLRA") imposes a heightened pleading standard for scienter, requiring plaintiffs to "state with particularity facts giving rise to a *strong inference*" of scienter. 15 U.S.C. § 78u-4(b)(2) (emphasis added). A scienter inference is "strong" if, when "weighed against the opposing inferences that may be drawn from the facts in their entirety," it "is at least as compelling as any opposing innocent inference." *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 885 (4th Cir. 2014). In analyzing the strength of the scienter inference, we review the facts "holistically" and afford them "the inferential weight warranted by context and common sense." *Id.* (quoting *Matrix*, 576 F.3d at 183).

B.

1.

We first analyze whether the facts alleged in the PSAC give rise to an inference of scienter. At a general level, LifeWise states that it is not looking to hold Defendants liable simply because they made bad investments. Instead, LifeWise argues that Defendants knew in 2014 and 2015 that the mezzanine lending market was contracting, and that the mezzanine deals that remained were of inferior quality than what was available before the rise of unitranche lending. They assert that this knowledge, coupled with the "false" representations about the quality of those deals and the state of the mezzanine market, give rise to a strong inference of scienter.

To support that inference, LifeWise points to the following factual allegations: (1) the advice from Triangle's internal investment advisors at some unspecified time between 2013 and 2015 that Poole, Lilly, Tucker, and Burgess should adopt a unitranche-first investment strategy; (2) Poole and Lilly's 2017 statements to investors regarding their choice in 2014 and 2015 to continue with a mezzanine-first investment approach; (3) the BG&L Report's purported conclusion in December 2015 that the mezzanine market was rapidly shrinking; (4) Tucker's stepping down from his position as CEO in 2016 and receiving a bonus, coupled with Poole's subsequent elevation to the position and implementation of TCAP 2.0; and (5) Triangle's efforts to raise capital through 2016 and 2017. As explained below, to the extent that we can make any inference of scienter from these allegations, it is exceptionally weak.

To begin with, LifeWise relies heavily on its allegation that Triangle's C-level executives, who both served on and largely controlled the investment committee's decisions, were advised that the mezzanine lending market was contracting, and that Triangle should focus on unitranche lending. As

*Tellabs* demands, we accept this allegation as true. 551 U.S. at 322, 127 S.Ct. 2499. But, two factors diminish the strength of any scienter inference that could be drawn. First, "omissions and ambiguities count against inferring scienter, for plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.' " *Id.* at 326, 127 S.Ct. 2499 (quoting 15 U.S.C. § 78u-4(b)(2)). Here, LifeWise never specifies when this advice was given, how firm in their conviction these investment advisors were in recommending that Triangle should avoid mezzanine deals moving forward, or what a mix of mezzanine and unitranche investments should look like. Neither do any of the statements from Triangle's C-level executives in 2017 shed any further light on those issues. Second, as LifeWise concedes, it has not alleged that Defendants had some particular motive to defraud investors. While the absence of a motive allegation "is not fatal," we do not ignore its absence, for it often "weigh[s] heavily" in a scienter analysis. *Id.* at 325, 127 S.Ct. 2499; *see also Ottmann, 353 F.3d at 345* (noting that the lack of facts showing "a motive and opportunity to commit fraud ... may be relevant to the scienter inquiry"). These ambiguities, and the lack of a motive to defraud, thus diminish the strength of any scienter inference that can be drawn from the allegation.

**\*7** Next, LifeWise suggests that we should infer from the advice that some of Defendants' investment advisors gave that they had contemporaneous knowledge that the mezzanine lending market was in fact devoid of quality deals. Pointing to Lilly's May 2017 and Poole's November 2017 statements to investors, LifeWise argues that those statements equate to admissions that Defendants knew in 2014 and 2015 that they were investing in low-quality deals. But LifeWise cannot connect the backwards-looking statements of Lilly and Poole to actual contemporaneous knowledge that the 2014-2015 mezzanine market had no viable prospects. LifeWise's argument is purely speculative.

In May 2017, Lilly observed that in looking back on 2014 and 2015, one "would reasonably conclude that there was a period where Triangle was [chasing] yield more than it should have." J.A. 191 (alteration in original). But this statement does not allow us to reasonably infer, much less strongly infer, that at the time Defendants made those investments they knew or recklessly disregarded the risk that pursuing yield necessarily required a sacrifice in the quality of their investments. *See Cozzarelli v. Inspire Pharms. Inc., 549 F.3d 618, 627 (4th Cir. 2008)* (rejecting the plaintiff's theory that because it was "almost impossible" to achieve a study's desired result, the

defendant's decision to pursue it showed a fraudulent intent, given that it was "improbable that [the defendant] would stake its existence on a drug and clinical trial that the company thought was doomed to failure"); *see also Maguire Fin., LP v. PowerSecure Int'l, Inc., 876 F.3d 541, 547 (4th Cir. 2017)* ("[A]n inference that [the defendant] *may* have known [its] statement was false does not alone satisfy the scienter requirement." (emphasis added)).[5]

LifeWise's own "key" evidence—the BG&L Report—contradicts its argument. Issued in December 2015, at the tail end of LifeWise's pivotal timeline, the Report contains just as many optimistic statements about the state of the mezzanine lending market as it does those expressing concern with the potential changes in that market. Indeed, two mezzanine-lending firms boasted that 2015 was one of the most successful years they ever had. Several other industry professionals remarked that both the flow and quality of deals in the lower middle market generally remained steady. J.A. 224 ("We are seeing some nice businesses that are very financeable in today's market."); *id.* ("Quality is still good. The issue we have to contend with more is structure."); *cf.* J.A. 221 ("While the lower market has been affected, there is still a fairly resilient flow of transactions in the lower middle market."). In fact, the BG&L Report observed that most firms' portfolio credit quality was "strong ... across most sectors. Overall, trends in revenue and EBITDA growth are positive, however, there are signs that growth may be slowing. *Default risk remains low*." J.A. 238 (emphasis added). Without more, we cannot reasonably infer from Lilly's retrospective statement in May 2017 that in 2014 and 2015, the Defendants knew that the quantity of investments was incompatible with quality.

For similar reasons, we cannot reasonably draw that same inference from Poole's November 2017 conversation with investors. Of course, many bad investments will, in retrospect, look like the "wrong strategic call." J.A. 198. But nothing that Poole said plausibly suggests that Triangle or its C-level executives *knew* or recklessly disregarded the fact that each of their portfolio companies bore inherently more risk than the typical "high yield" or "*junk*" securities that constituted Triangle's investment portfolio. 2014 Form 10-K at 3 (emphasis added). In fact, Triangle regularly disclosed to its investors that "junk" was how their investments would be classified. *See id.*; 2015 Form 10-K at 3. The only reasonable inference we can draw is that Poole, and the Triangle Board, had buyer's remorse. *See* Tr. Q3 2017 Earnings Call at 5, *Holden*, No. 5:18-cv-00010-FL (E.D.N.C. May 25, 2018),

ECF 79-18 ("[Triangle's] difficult 2014 and 2015 investment managers relate directly to a missed strategic call on the market some years ago, where hindsight indicates clearly we should have moved in a specific direction at a specific time and we did not."). "The use of these statements amounts to little more than pleading fraud by hindsight." *In re Biogen Inc. Sec. Litig.*, 857 F.3d 34, 44 (1st Cir. 2017) (refusing to credit the defendants' alleged post-class period "evidentiary admissions" to an inference of scienter because they "do not provide particularized insight into the defendants' knowledge at the time of the alleged misstatements"). This is precisely what Congress intended for the PSLRA to eliminate. *E.g., In re Navarre Corp. Sec. Litig.*, 299 F.3d 735, 742 (8th Cir. 2002).

**\*8** In addition, LifeWise points to Tucker's departure in 2016 (along with his $2.5 million bonus) and Poole's subsequent changes to Triangle's investment strategy as evidence of fraudulent intent. But without allegations demonstrating Defendants' contemporaneous knowledge that their 2014 and 2015 investments lacked quality, we find it difficult to give this regime change any weight toward a scienter inference.

Finally, LifeWise asserts that Defendants' motivations to raise capital in 2016 and 2017, and their generalized motive throughout the class period to keep share prices and dividends high in order to attract more investors, are further evidence of their fraudulent intent. Once again, we "reject[ ] these types of generalized motives—which are shared by *all* companies—as insufficient to plead scienter under the PSLRA." *Ottmann*, 353 F.3d at 352; *see also Yates*, 744 F.3d at 891 ("We decline ... to infer fraud from financial motivations common to every company."); *Cozzarelli*, 549 F.3d at 627 ("[A] strong inference of fraud does not arise merely from seeking capital to support a risky venture.").

### 2.

Considering these allegations holistically and in their proper context, we hold that LifeWise has failed to allege a "strong" inference of scienter. As explained below, the much stronger inference is that Defendants had an honest debate about the merits of a subjective business judgment, and in hindsight, simply made the wrong choice with some investments.

This case is closely analogous to our decision in *Yates*. There, the plaintiffs claimed that the defendant fraudulently failed to disclose that the company implemented an incorrect interpretation of a new financial accounting standard. 744 F.3d at 881–83. We rejected that argument, reasoning that "[t]he more plausible inference is that there was an honest disagreement over the proper application of a challenging new accounting standard. That the ... defendants were ultimately wrong is not enough to support an inference of scienter." *Id.* at 887.

So too, here. As the BG&L Report underscores, professionals in Defendants' industry offered varying perspectives on the relative merits of mezzanine lending. Some felt that unitranche lending was a safer bet; but others prospered in the mezzanine market. The far more reasonable inference to draw from these facts is that Defendants were at a crossroads and had an honest, genuine debate about whether to continue with a mezzanine-focused investment strategy or transition to a unitranche-focused investment strategy. In the end, they chose a hybrid strategy in which some investments worked well but some did not. Nothing in that choice indicates fraudulent intent or recklessness.

Similarly, Poole's taking over Triangle in 2016 and changing the investment strategy is more reasonably read as an extension of that debate, rather than as an effort to cover up his (and others') fraud. Just like we held in *Yates*, that Defendants in hindsight chose the wrong strategy in 2014 and 2015, and then made the reflexive choice to move away from it in 2016, "is not enough to support an inference of scienter." *Id.* at 887.

Indeed, the *Yates* rationale applies with greater force here because Defendants debated the merits of several subjective business judgments. *See Cozzarelli*, 549 F.3d at 626–28 (finding no strong inference of scienter when a company did not disclose the endpoint of a drug study, because the stronger inference was that the company did so to gain a competitive advantage; "[i]t is beyond our purview to determine whether that decision was correct as a matter of business judgment"). Each day, executives must make difficult judgment calls based on their subjective interpretations of various market risk factors. But that does not allow investors like LifeWise to "use the benefit of 20-20 hindsight to turn management's business judgment into securities fraud." *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1419 (9th Cir. 1994) (citation omitted).

**\*9** These factors are what separate this case from *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597 (4th Cir. 2015). There, the plaintiffs alleged that the defendant, Chelsea Therapeutics, fraudulently failed to disclose all of the risks

inherent in submitting a new drug application to the Food and Drug Administration. *Id.* at 601–03. The facts alleged showed that Chelsea Therapeutics was aware of both the shortcomings in the only efficacy study supporting its new drug application and the FDA's statements to it that those shortcomings would likely lead to the application being denied. *Id.* at 609–10. We held that these facts gave rise to a strong inference of scienter, because Chelsea Therapeutics "fail[ed] to disclose critical information received from the FDA during the new drug application process, while releasing less damaging information that they knew was incomplete." *Id.* at 610. We emphasized that, unlike in other cases, the inference of scienter "involve[d] numerous allegedly misleading statements and omissions by the defendants that were not caused by ... the execution of a legitimate business decision." *Id.* But here, LifeWise rests its scienter inference on precisely what the *Zak* plaintiffs did not: statements and omissions of facts arising from the execution of legitimate, subjective business judgments that, only when viewed in hindsight, allegedly become misleading. *See also Maguire Fin.*, 876 F.3d at 546 ("The PSLRA was enacted by Congress '[a]s a check against abusive litigation by private parties,' lest every rosy corporate prognostication generate potential liability." (alteration in original) (citation omitted)); *ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 62 (1st Cir. 2008) ("[A] complaint 'may not simply contrast a defendant's past optimism with less favorable actual results' in support of a claim of securities fraud." (citation omitted)).

The breadth of Defendants' risk disclosures to investors further strengthens the competing inference of innocence. *See Matrix*, 576 F.3d at 187 (explaining that "[a] disclosure that meaningfully alerts investors to [a] risk ... may suggest that the individuals responsible for the disclosure did not knowingly (or perhaps not even recklessly) misstate" a fact to investors); *see also, e.g.*, *Ezra Charitable Tr. v. Tyco Int'l, Ltd.*, 466 F.3d 1, 8–9 (1st Cir. 2006) (quoting extensively from the defendant's Form 8-Ks and 10-Ks, and observing that such "attempts to provide investors with warnings of risks generally weaken the inference of scienter"); *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1249–50 (10th Cir. 2016) (observing the same).

First, as noted previously, Defendants told their investors that they invested in "*junk*" rated companies. 2014 Form 10-K at 3 (emphasis added). These companies often "ha[d] limited financial resources to meet future capital needs," creating the risk that they "may be unable to meet their obligations" to Triangle. *Id.* at 25. Compounding things, there was often

little publicly available information about these companies, so if Triangle could not obtain "all material information" about them, it "may not make a fully informed investment decision." *Id.* at 25. Triangle's investments were by design "highly speculative" and presented "a higher amount of risk than alternative investment options and a higher risk of volatility or loss of principal." *Id.* at 31. That is why Triangle's investors could reap high returns because the underlying investments were high risk—and they knew that before investing. Thus, Defendants warned that investing in Triangle "may not be suitable for someone with [a] lower risk tolerance." *Id.* at 31.

Second, Defendants warned about the "highly competitive" nature of the market they operated in: "[i]f we are forced to match our competitors' pricing, terms and structure, we may not be able to achieve acceptable returns on our investments or may bear substantial risk of capital loss." *Id.* at 16. And if competition increased further, Defendants could be forced "to accept less attractive investment terms." *Id.*[6]

These risk disclosures help contextualize Defendants' statements throughout 2014 and 2015. While Defendants shared with investors their optimism with the quality of investment opportunities Defendants saw in those years, this did not mean that they were guaranteed to prove fruitful. That is precisely what Defendants disclosed. Without particular facts showing that Defendants knew, at the time they made these investments, that they all lacked quality, or that they inherently bore more risk than the other "junk" investments from years prior, LifeWise cannot show that its proffered inference of scienter is as strong as the inference of innocence.[7] "[S]tacking inference upon inference," as LifeWise attempts to do, cannot be enough to give rise to a cogent inference of scienter, as it flies in the face of "the [PSLRA]'s mandate that the strong inference of scienter be supported by facts, not other inferences." *Maguire Fin.*, 876 F.3d at 548.

 **\*10**  Accordingly, we hold that LifeWise has not satisfied the PSLRA's heightened burden for pleading scienter. This failure is fatal to both its securities fraud claim against Triangle, and its director liability claims against Poole, Lilly, and Tucker. *See Teachers' Ret. Sys.*, 477 F.3d at 188.

IV.

For these reasons, we affirm the district court's dismissal of LifeWise's claims with prejudice.

*AFFIRMED*

**All Citations**

--- F.3d ----, 2021 WL 667085

Footnotes

1   For purposes of this opinion, "C-level" executive refers to the common executive-level managerial positions of chief executive officer ("CEO"), chief financial officer ("CFO"), chief information officer ("CIO"), and chief operating officer ("COO").

2   Triangle called the companies it provided financing to "investments."

3   "Earnings Before Interest, Taxes, Depreciation, and Amortization."

4   Specifically, those six elements are: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrix*, 576 F.3d at 181 (emphasis and citation omitted). It is unclear whether the district court found, or assumed, that one of Defendants' representations was both false and material. Regardless, in our de novo review, we will assume without deciding that LifeWise has adequately alleged that Defendants made a material misrepresentation, but it is by no means clear that we should. Many of the statements that form the basis of LifeWise's securities fraud claims here appear to be mere statements of opinion or forward-looking statements, neither of which generally can support a section 10(b) and Rule 10b-5 claim. But we need not delve into these issues further, because the insufficiency of LifeWise's scienter allegations is fatal to its claims. *See In re PEC Sols., Inc. Sec. Litig.*, 418 F.3d 379, 388 n.6 (4th Cir. 2005) (declining to decide whether the plaintiff alleged any material misrepresentations because "the complaint's failure to meet the PSLRA's heightened-scienter pleading requirement kills the whole claim").

5   We note that Defendants expressed openness to unitranche lending in 2014, and eventually incorporated some unitranche financing into Triangle's investment portfolio during the years at issue. While the PSAC alleges that Defendants remained focused on mezzanine lending, it is silent as to the precise balance that Defendants struck between the two. The PSAC's failure to recognize or address that fact is not helpful to its scienter argument.

6   All of the risk disclosures discussed in the preceding two paragraphs are also contained in Triangle's 2015 Form 10-K. *See* 2015 Form 10-K at 3, 16, 25, 31.

7   LifeWise urges us to hold that Item 303 of Regulation S-K, 17 C.F.R. § 229.303(a)(3)(iii), required Defendants to disclose more about the impact of unitranche lending on the mezzanine lending market in 2014 and 2015, and that Defendants' failure to do so was fraudulent. The circuits are split as to whether a violation of SK-303 itself provides a basis for liability, but we need not enter that foray here. Even if Defendants were required to disclose that market trend, LifeWise has offered no facts that would allow us to infer that Defendants acted fraudulently in failing to do so.

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.