UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | |
|---|---|
| IN RE 2U, INC.<br>SECURITIES CLASS ACTION | Civil Action Nos. TDC-19-3455<br>TDC-20-1006 |

## MEMORANDUM OPINION

Plaintiffs Fiyyaz Pirani and the Oklahoma City Employees Retirement System ("OKCERS") have filed this consolidated civil class action against Defendant 2U, Inc. ("2U") and several of its officers, directors, and underwriters, in which they allege violations of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a-qq (2018) ("the Exchange Act"), and the Securities Act of 1933, 15 U.S.C. § 77a-aa ("the Securities Act"). Pending before the Court is Defendants' Motion to Dismiss, which is fully briefed. Having reviewed the submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, Defendants' Motion will be GRANTED IN PART and DENIED IN PART.

## BACKGROUND

### I.     History of 2U

Established in 2008, 2U provides online education programs to students and has common stock that trades on the NASDAQ stock exchange under the symbol "TWOU." Am. Compl. ¶ 50, ECF No. 92. From 2017 through 2019, Defendant Christopher J. Paucek, a co-founder of 2U, served as 2U's Chief Executive Officer ("CEO") and was a member of its Board of Directors. Defendant Catherine A. Graham served as 2U's Chief Financial Officer ("CFO") throughout 2018 and until her resignation on August 22, 2019. Defendant Harsha Mokkarala served as 2U's Chief

Marketing Officer from January 2016 to April 2018 and became its Chief Revenue Officer in April 2018.

Throughout its existence, a major portion of 2U's business has been its Graduate Division, or "Domestic Graduate Programs" ("DGP"), which partners with colleges and universities to offer online education programs that culminate in the institution conferring a graduate degree on the student. During the events at issue in this case, 2U marketed the programs to potential students and shepherded them through the application process, while the universities retained full control of the admissions process and decided which students to admit. 2U conceived of its process for finding potential customers and converting them to actual enrollments as a sales or marketing "funnel" in which the very beginning of the process—the wide top of the funnel—progressed down to the end of the process—the narrow bottom of the funnel—at which point a student was actually paying tuition for a graduate program. *Id.* ¶¶ 15, 69, 75. The top of the funnel consisted of 2U's digital advertising, which reached a large audience. 2U described the top of the funnel as a data-driven marketing system through which it targeted an audience of potential customers who were likely to seek out graduate programs, rather than just a random sample of the population. When individuals clicked on an advertisement or were otherwise identified by 2U as a "leads," or good candidates for further recruiting efforts, they were considered to be in the middle of the funnel. *Id.* ¶ 108. There, a salesperson, called an "admissions counselor," would contact the potential customers, pitch specific programs, and assist them with completing the application, in what executives called a "high-touch" model. *Id.* ¶ 15. Further down the funnel were the customers who completed and submitted applications to graduate programs. At the bottom of the funnel were customers who were admitted and then, finally, enrolled in the programs. The goal was to generate sufficient leads at the top of the funnel and convert those leads into applications started,

applications submitted, and ultimately enrolled students paying tuition.  Under 2U's agreements with universities, 2U bore the costs of employing this marketing strategy, finding potential customers, converting them to enrolled students, and providing the digital infrastructure for the online classes; in exchange, it received the lion's share of the revenue, aiming for 60 percent of the total tuition and fees paid by a student.

When 2U was founded in 2008, it provided one program at one university.  It then rapidly expanded to increase the number of its graduate programs and partner universities.  In 2017 alone, it added 10 new graduate programs, for a total of 37 graduate programs by the end of that year. 2U finished 2017 with over 1,800 full-time employees and total revenue of $286.8 million, but it had total expenses of $316.9 million, with marketing and sales costs accounting for $150.9 million of that amount.

Though 2U also offered courses as part of a "Short Course Segment," *id.* ¶ 56, its Graduate Division provided the vast majority of 2U's revenue, accounting for 84.6 percent of revenue in 2018 and 80 percent of revenue in the first half of 2019.  Out of 2U's 24 graduate program partners, a handful provided a disproportionate amount of revenue within the Graduate Division.  For example, during 2017, programs at the University of Southern California ("U.S.C.") provided 27 percent of 2U's revenue, those at Simmons College provided 17 percent, and those at the University of North Carolina provided 10 percent.  2U identified graduate programs by the type of degree they provided, such as a Master of Business Administration ("MBA") or Master of Social Work, and described each degree category as a "multi-program vertical" or "MPV."  *Id.* ¶ 80. Because much of 2U's revenue came from the Graduate Division and that revenue was received only when a student had enrolled in a program and had paid tuition or fees, enrollments in graduate

programs were a primary driver of overall revenue.   2U closely monitored enrollments and reported aggregate data on enrollment to investors.

As 2U grew, it added more programs from different universities to its MPVs.  Programs within an MPV could have widely different tuition costs.  2U argued that this price differentiation within an MPV increased marketing efficiency because prospective customers who sought out a particular type of degree could be pitched on different programs within the same MPV and may prefer one program or its cost over another.

2U's central narrative to investors was that, although its business was not yet profitable, it had expanded rapidly and would continue to do so, with sustained annual revenue growth exceeding 30 percent, until it reached a "steady state" of over 190 programs with hundreds of students enrolling each year, garnering $3 billion in annual revenue, at which point it would become profitable.  *Id.* ¶ 10.  Economies of scale played a key role in potential profitability:  as 2U grew larger, it would collect more data from prospective and actual customers across the funnel, which would make its advertising more efficient and less expensive and would help it to develop MPVs that ensured that a larger portion of students at the top of the funnel ultimately enrolled in a program at the bottom.  Because its projected growth rate significantly exceeded that of other online education programs, 2U was highly rated by investment analysts.

As part of its effort to monitor the Graduate Division, 2U worked to forecast its growth, including in enrollments, based on "seasonality and demand from quarterly reports of past numbers of enrollments and degrees received by students, lead generations and historical sales," as well as based on data from the sales funnel, including the number of applications completed and students who had paid deposits.  *Id.* ¶¶ 88-89.  These enrollment forecasts were conducted six months in advance and were provided to Mokkarala, who then reported the data to Paucek.  Graham also

received enrollment forecasts from the finance team.  According to a former 2U employee, referenced by Plaintiffs as FE-2, who led a team responsible for forecasting, "enrollment projections began to slowly stall in 2017, and the problem worsened in 2018 and 2019."  *Id.* ¶ 89. FE-2 has alleged that Mokkarala "often wanted to see forecast numbers earlier than they were due" and became "stressed about enrollment numbers" in 2017, *id.*, and that Paucek was "unhappy with the dropping numbers," *id.* ¶ 357.  She has also alleged that "2U was not spending enough money to make sales in 2017 through 2019."  *Id.* ¶ 88.

## II.   2018 Events

According to FE-2, by February 2018, 2U's sales goals had become unreachable.  Also in February 2018, according to allegations from an employee in the office of the CEO, referenced as FE-1, "concern about low enrollment" became "a topic and remain[ed] one," and Paucek himself "mention[ed] concern about enrollment not too far into 2018."  *Id.* ¶ 86.  FE-1 has also alleged that Paucek and Mokkarala were "working closely . . . to figure out how to enroll more students."  *Id.* Another former employee, FE-8, has alleged that while admissions counselors typically received reports containing projections for individual programs, 2U abruptly stopped sending them those reports in late 2017 or early 2018.  *Id.* ¶ 350.

Also in February 2018, Paucek publicly announced that 2U projected its annual revenue to grow by 30 percent or more per year for the "foreseeable future" until it reached 193 graduate programs and annual revenue of $3 billion.  *Id.* ¶ 10.  Paucek also announced that in addition to 14 new graduate programs to be started in 2018, it would launch 16 more graduate programs in 2019.  Then, on February 27, 2018, Paucek and Graham certified 2U's Securities and Exchange Commission ("SEC") Form 10-K annual report for the year ending December 31, 2017 ("the 2017 Form 10-K").  In the 2017 Form 10-K, 2U stated that its "core strategy is to launch graduate

5

programs and short courses with new and existing university clients and to increase student enrollments across our portfolio," and that adding more graduate programs and increasing student enrollments was part of its growth strategy.  2017 Form 10-K at 4, 7, Mot. Dismiss. Ex. 1, ECF No. 144-4.  The next day, at a technology investment conference, Graham stated that managing student acquisition costs was "one of the tricks [of the] business," that "what will kill the business is if you don't get very, very good and very data-driven at projecting how many students you're going to get off of specific marketing channels," and that 2U had "gotten very, very good" at forecasting.  Am. Compl. ¶ 227.

On May 3, 2018, 2U announced its financial results for the first quarter of 2018.  In the accompanying press release, Paucek stated that "the annual number of launched graduate programs has increased substantially over the past few years and shows no signs of slowing down. Our pipeline also continues to be strong, giving us confidence in our revenue expectations in that core segment in future years."  *Id.* ¶ 235.  2U's stock price hit a high of $98.58 per share on May 14, 2018.  A few weeks later, on May 25, 2018, 2U conducted a public offering of stock shares "in the aggregate principal amount of $300 million."  *Id.* ¶ 455.  As part of the offering, 2U provided a registration statement, a prospectus, and other materials, which incorporated 2U's 2017 Form 10-K by reference.  The 2017 Form 10-K stated in part that 2U had "improved [its] data-driven digital marketing capabilities . . .  to generate increased student enrollments in a cost effective manner."  *Id.* ¶ 459.  At a technology conference on June 5, 2018, Mokkarala touted 2U's MPV strategy as a "great way for us to grow the pie overall both for individual programs as well as the network" because it allowed 2U to find more students for each program with greater efficiency.  *Id.* ¶ 248.

By July 2018, however, 2U had begun to encounter more problems.  One former employee, identified by Plaintiffs as FE-3, alleged that by the time she left the company that month, it was

clear that 2U was "desperate" for students.  *Id.* ¶ 90.  Meanwhile, a 2U Senior Digital Media Specialist at the time whose work focused on reducing the cost of advertising, referred to by Plaintiffs as FE-4, alleged that marketing staff was "stretched thin" by new programs and that "her team could never get costs down because the price of ads continued to increase as the audience pool continued to lessen."  *Id.* ¶¶ 95-96.  Meanwhile, another former employee alleged that by that time, her program's quotas were unrealistic, and another alleged that by the summer of 2018, enrollment targets had become impossible to meet.

On August 2, 2018, 2U released its financial results for the second quarter of 2018.  With those results, 2U raised its 2018 full-year revenue projections to between $410 and $412 million.  On the accompanying earnings call that day, Paucek stated that 2U was confident that it was in a "reacceleration of the grad business" based on "enrollments and pipeline" and because it now had "high visibility into how we believe the 2018 cohort will scale."  *Id.* ¶ 256.  Paucek stated that the pipeline of graduate programs was "stronger than it's ever been," *id.* ¶ 258, and referenced 2U's newly increased steady-state target of 250 graduate programs with 80,000 to 85,000 degrees conferred per year.  As to competition from other companies, he described competitors as "fellow travelers" who helped challenge the notion that online education was inferior to in-person learning.  *See id.* ¶ 162.

On August 8, 2018, at an investor conference, Graham, noting that 2U was focused on the marketing costs to acquire enrolled students relative to the revenue generated from such students, asserted that 2U was "not seeing changes in marketing efficiency . . . we're still able to acquire students at the same kinds of prices."  *Id.* ¶ 271.  Graham also suggested that even if only 1 or 1.5 percent of prospective students might enroll in a specific program, 2U experienced "marketing efficiency" from its MPVs because others would "go to a second or third program if you have that

7

to offer them." *Id.* ¶ 81.  Then, on August 14, 2018, Paucek announced that 2U was increasing its target steady-state revenue from $3 billion to $4 billion per year.  That day, Paucek also reiterated, "We're not having a marketing efficiency challenge." *Id.* ¶ 277.

On November 5, 2018, 2U released its 2018 third quarter financial results.  During the earnings call to discuss the results with investors, Paucek stated that 2U was "now confident enough in the overall portfolio and the strength of the pipeline to put a timeline on it," believed that it could "keep consolidated revenue growth above 30% for at least the next 5 years," and expected "to hit $1 billion in revenue in a little over 3 years." *Id.* ¶ 173.  During the same session, Graham noted that 2U would experience lower profit margins in 2019, but that this outcome was the result of a conscious decision to invest more in growth.

By late 2018, however, 2U personnel perceived further enrollment challenges.  One former employee has alleged that by the time she left the company at the end of 2018, "it was clear [2U] was facing enrollment challenges in 2019," and that she had low expectations for the coming "cohort," or starting class of students within a program.  *Id.* ¶ 103.  Another former employee, referred to by Plaintiffs as FE-7, regularly met with Paucek and has alleged that, although 2U was trying different marketing tools to address enrollment challenges, including search engine optimization for specific Google searches, "it was obvious before 2019 that her team would not be able to meet" that year's enrollment goals.  *Id.* ¶ 110.

### III.   2019 Events

As alleged by several former 2U employees who left the company in 2019, the Graduate Division faced additional problems before or during 2019.  According to one former employee, competition from other online education companies increased in 2018 and, by 2019, there was more competition from top-tier universities and more affordable alternatives to 2U's programs,

which caused 2U's advertising costs to increase.  Four different former employees have alleged that programs within 2U's own MPVs competed with one another, including that Rice University's MBA program lost potential students to 2U's MBA programs at other universities, and FE-8 has alleged that a $115,000 U.S.C. program competed with other 2U programs that cost only $70,000. FE-7 has similarly alleged that "2U had oversaturated the market for MBAs and was competing with its own programs at different universities."  *Id.* ¶ 106.  Former employees also alleged problems with sales and marketing, including that 2U's programs were hard to sell, and that, given the low rate at which leads were converted into enrollments, 2U's marketing was not generating enough leads.

On February 25, 2019, 2U released its fourth quarter and full-year financial results for 2018.  2U also projected its revenue to increase from $412 million in 2018 to approximately $550 million in 2019.  During the earnings call regarding the results, Paucek stated that "[m]ature programs continue to enroll new students" and newer ones were "scaling well." *Id.* ¶ 300.  Graham added that "[w]hat we're seeing now across all our program cohorts" made 2U "very comfortable that to drive growth, increasing our investments in both new program launches and current program marketing are wise strategic decisions."  *Id.* ¶ 302.  Graham also explained that lower margins were not a sign of  "continual degradation" but were instead "a matter of choice" by 2U in order to make investments in growth.  *Id.* ¶ 304.

However, when 2U released its financial results for the first quarter of 2019 on May 7, 2019, it disclosed that net, year-over-year losses for the first quarter of 2019 had increased from $6.7 million to $21.6 million and announced a reduction in projected revenue for the full year of 2019.  On the accompanying earnings call with investors, Paucek stated that three issues in the Graduate Division drove the revised forecast:  (1) increased admissions selectivity by partner

universities; (2) mid-funnel pressure "on the rate at which prospective students are submitting their applications";  and (3) "slowness" in the 2019 cohort, largely due to a delayed initial launch date in one program.  *Id.* ¶ 310.  Paucek acknowledged that 2U now expected a lower growth rate of 25 percent for 2019 but stated that this reduction was "only a comment for 2019" and "not a recalibration for the future." *Id.* ¶ 327.  Paucek also reiterated that 2U's "guidance of 30%" growth remained its expectation "for the foreseeable future" and that 2U remained "very bullish" about its "long-term prospects." *Id.* ¶ 329.

Despite Paucek's positive prognosis on May 7, 2U's public outlook changed radically on July 30, 2019.  On that date, 2U raised its projected net loss for 2019 to over $70 million, a 300 percent year-over-year increase.  During the accompanying earnings call with investors, Paucek stated that 2U's revised projections meant "a step down in revenue" for the business.  *Id.* ¶ 396.  As to the Graduate Division, Paucek acknowledged that "[c]ompetition for students has increased" and that 2U was now expecting "smaller average steady-state programs" and lower rates of prospective students choosing to enroll.  *Id.* ¶ 397.  Paucek declared that 2U's historic growth narrative had been a "mistake" that required a new "level set" with investors.  *Id.* ¶ 398.  The next day, 2U's stock price dropped by over 65 percent to $12.80 per share as analysts downgraded their expectations, stating that this was "a major story change" and "clearly a breaking of the Company's model."  *Id.* ¶¶ 400-02.  The new share price represented an 87 percent decline from its high of $98.58 in May 2018, and one analyst went so far as to declare 2U "uninvestable." *Id.* ¶ 401.  Less than a month later, on August 22, 2019, Graham resigned.

The Court will provide additional facts as relevant in its discussion below.

### IV.    Procedural History

In August 2019, Plaintiffs Aaron Harper and Anne M. Chinn filed separate class action complaints in the United States District Court for the Southern District of New York, alleging federal securities law violations by 2U and related individuals.  After these cases were transferred to the District of Maryland, this Court consolidated them and appointed Fiyyaz Pirani as the Lead Plaintiff.  On July 20, 2020, Plaintiffs filed a consolidated Amended Complaint, captioned as the "Consolidated Class Action Complaint."  ECF No. 92.  In Count I of the Amended Complaint, Plaintiffs assert a claim under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 (2021), against 2U, Paucek, Graham, and Mokkarala (collectively, "the Exchange Act Defendants").  In Count II, Plaintiffs assert a claim under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against Paucek, Graham, and Mokkarala (collectively, "the Executive Defendants").  In Counts III and IV, respectively, OKCERS asserts claims under Sections 11 and 12(a)(2) of the Securities Act, 15 U.S.C. §§ 77k, 77l, against 2U, Paucek, Graham, members of 2U's Board of Directors at the time of the Offering, and the underwriters for the Offering (collectively, "the Securities Act Defendants").  In Count V, OKCERS brings a claim under Section 15 of the Securities Act, 15 U.S.C. § 77o, against Paucek, Graham, and individual members of the Board of Directors.  The members of the Board of Directors named as Defendants in the Securities Act claims are:  Paul A. Maeder, Mark J. Chernis, Timothy M. Haley, John M. Larson, Robert M. Stavis, Sallie L. Krawcheck, Earl Lewis, Edward S. Macias, Gregory K. Peters, Coretha M. Rushing, and Valerie B. Jarrett (collectively, "the Director Defendants").  The underwriters named as Defendants in the Securities Act claims are: Goldman Sachs & Co. LLC, Credit Suisse Securities (USA) LLC, Citigroup Global Markets, Inc., Compass Point Research & Trading, LLC, KeyBanc Capital Markets Inc., and Macquarie Capital

11

(USA) Inc. (collectively, "the Underwriter Defendants").  All claims stem from statements made by Defendants between February 26, 2018 and July 19, 2019 ("the Class Period").

## DISCUSSION

In their Motion to Dismiss, Defendants argue that the Amended Complaint fails to state a claim under the Exchange Act because the alleged material false statements or omissions were not false, not material, or were non-actionable statements, and Plaintiffs failed to plead particularized facts establishing a strong inference of scienter.  Defendants argue that the Amended Complaint fails to state a claim under the Securities Act because (1) the Securities Act claims are time-barred; (2) Plaintiffs lack standing for the Section 11 claim; (3) none of the Securities Act Defendants was a "person who offers or sells a security" as required for liability on the Section 12(a)(2) claim; (4) the identified statements or omissions  were neither false statements nor omissions of material fact; and (5) Plaintiffs have not alleged a plausible claim that Defendants violated Item 105 of Regulation S-K, 17 C.F.R. § 229.105.  Plaintiffs oppose the Motion.

## I.      Legal Standard

To defeat a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*   Legal conclusions or conclusory statements do not suffice.  *Id.*  The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Ordinarily on a Rule 12(b)(6) motion, the Court considers only the allegations in the complaint and documents integral to the complaint that are of unquestioned authenticity. Fed. R. Civ. P. 12(d). Courts are permitted to consider documents attached to a motion to dismiss "when the document is integral to and explicitly relied on in the complaint, and when the plaintiffs do not challenge the document's authenticity." *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606–07 (4th Cir. 2015) (quoting *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004)). Here, Defendants have submitted with their Motion the documents containing the alleged actionable statements, as well as other SEC filings and transcripts from earnings calls from the Class Period. Where these documents are integral to the complaint and Plaintiffs have not objected to their consideration, the Court will consider the attached exhibits as well.

## II.     Exchange Act

In their Amended Complaint, Plaintiffs have identified more than 50 allegedly material false statements or omissions that the Exchange Act Defendants made during the Class Period. In addressing the Motion, the Court will first discuss the controlling legal standards for claims under Sections 10(b) and 20(a) of the Exchange Act and then assess whether Plaintiffs have adequately stated a plausible claim for relief.

### A.     Statutory Standards

Section 10(b) of the Exchange Act makes it "unlawful for any person, directly or indirectly" to use "in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). One such SEC rule is Rule 10b-5,

which states, as relevant here, that it is unlawful for "any person" "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5.

Section 20(a), meanwhile, establishes liability for each "person who, directly or indirectly, controls any person liable" under the Exchange Act and its applicable regulations.  15 U.S.C. § 78t(a).  Because Plaintiffs' Section 20(a) claim is premised on their Section 10(b) claim, and Defendants do not argue that it fails for reasons beyond the Section 10(b) claim, the Court will review the Exchange Act claims collectively under the standards applicable to Section 10(b) claims.  *See Cozzarelli v. Inspire Pharms. Inc.*, 549 F.3d 618, 628 (4th Cir. 2008) (finding that where plaintiffs' claims under Sections 20(a) of the Exchange Act were "derivative of" their Section 10(b) and Rule 10b-5 claims, dismissal of the latter claims meant that dismissal of the Section 20(a) claims was proper).

An Exchange Act claim under Section 10(b) and Rule 10b-5 requires:  (1) that the defendant made a false or misleading statement or omission of material fact; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase of a sale or security; (4) reliance on the misrepresentation or omission; (5) economic loss; and (6) loss causation.  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011); *Singer v. Reali*, 883 F.3d 425, 438 (4th Cir. 2018). Because Defendants argue only that Plaintiffs' claims do not satisfy the first two elements—a material false or misleading statement or omission and scienter—the Court will address only these elements.

14

### 1.      Heightened Pleading Standard

Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 (1995) (codified as amended in various sections of title 15 of the United States Code) ("PSLRA"), subject claims under Section 10(b) to heightened pleading standards.  Rule 9(b) requires that, when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  The PSLRA requires that in a private securities fraud action, for each allegation of a false or misleading statement or an omission of a material fact, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading," and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(1)(B), (b)(2)(A).

### 2.      False Statement or Omission of Material Fact

To prevail under Section 10(b), a plaintiff must show that the defendant made a statement or omission that "was *misleading* as to a *material* fact." *Matrixx Initiatives, Inc.*, 563 U.S. at 37-38 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 238 (1988)).  For an omitted fact to be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 318 (4th Cir. 2019) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).  "[V]ague statements" consisting of "commonplace commercial puffery," are not material. *Rabb v. Gen. Physics Corp.*, 4 F.3d 286, 289-90 & n.1 (4th Cir. 1993); *Howard v. Haddad*, 962 F.2d 328, 331 & n.11 (4th Cir. 1992) ("[P]uffery . . . lacks the materiality essential to securities fraud allegations.").

15

A statement of opinion may be actionable not only if the opinion proves to be incorrect, but also if the speaker does not actually hold the stated belief, or if supporting facts contained in the opinion were untrue.  *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 185-86 (2015); *Raab*, 4 F.3d at 290.  An opinion statement could also be actionable based on a material omission if such a statement could be understood to "convey facts about how the speaker has formed the opinion" or the "speaker's basis for holding that view."  *Omnicare, Inc.*, 575 U.S. at 189.  Thus, if an opinion statement omits material facts about the speaker's "inquiry into or knowledge concerning a statement of opinion, and those facts conflict with what a reasonable investor would take from the statement itself," the omission would be material.  *Id.* The fact that a speaker knew of, but did not disclose, "some fact cutting the other way" does not necessarily render the opinion statement materially misleading; rather whether an omission of a fact from an opinion is materially misleading "depends on context," including "surrounding text, including hedges, disclaimers, and apparently conflicting information."  *Id.* at 190-91; *Paradise Wire*, 918 F.3d at 322.   "[An] investor must identify particular (and material) facts going to the basis for the [defendant]'s opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context."  *Omnicare, Inc.*, 575 U.S. at 194.  Although courts traditionally drew a distinction between statements of current opinions and future opinions, including finding that a projection of future performance is "generally not actionable under the federal securities laws" if it is not worded as a guarantee, *Raab* 4 F.3d 289-90, *Omnicare*'s standard for assessing omissions of material fact arising from opinion statements has been applied to opinions on future events.  *See Paradise Wire*, 918 F.3d at 321-22 (considering under *Omnicare* whether statements of projections of future financial performance were actionable based on omissions of material fact).

16

### 3. Scienter

The scienter element requires that a "plaintiff must prove that the defendant acted with 'a mental state embracing intent to deceive, manipulate, or defraud.'" *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874, 884 (4th Cir. 2014) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007)). "At the pleading stage," allegations of "intentional or severely reckless conduct" suffice. *Id.* "In the § 10(b) context, a reckless act is one that is 'so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Id.* (quoting *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 181 (4th Cir. 2009)).

Under the PSLRA's heightened pleading standards, a complaint alleging securities fraud must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). Thus, "[t]o allege fraud against an individual defendant, the plaintiff must allege facts supporting a strong inference of scienter as to that person," and to allege fraud against a corporation, "the plaintiff must allege facts that support a strong inference of scienter with respect to at least one authorized agent of the corporation." *Yates,* 744 F.3d at 885 (quoting *Matrix Capital*, 576 F.3d at 182). Inferences of scienter are to be given the "weight warranted by context and common sense" and must be weighed against the opposing inferences "drawn from the facts in their entirety." *Id.* (citations omitted). An inference of scienter is "strong" only where the inference is "at least as compelling as any opposing inference" of an innocent state of mind. *Id.* Where an inference of innocent or merely negligent action is more compelling than an inference of intentional or reckless conduct, a motion to dismiss will prevail. *Id.* Although an inference of scienter must be "strong in light of" alternative

explanations, it need not be "irrefutable" or based on "smoking-gun" evidence. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

Under this standard, the fact that a defendant knowingly made an inaccurate statement—even a materially misleading one—is not, by itself, sufficient to support an inference of scienter. *Maguire Fin., LP v. PowerSecure Int'l, Inc.*, 876 F.3d 541, 548 (4th Cir. 2017) (declining to "stack inference on upon inference" and find scienter where the plaintiff "allege[d] facts that permit[ted] an inference that" the defendant "knew his statement was false, and then" sought for the court to "infer from that inference that [he] acted with scienter"). However, where a plaintiff identifies "numerous allegedly misleading statements and omissions that were not caused by the use of imprecise language or the execution of a legitimate business decision," such allegations may support a strong inference of scienter. *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 610 (4th Cir. 2015). *Compare id.* (finding scienter adequately pleaded where the plaintiff alleged that "defendants either knowingly or recklessly misled investors by failing to disclose critical information received from the FDA during the new drug application process, while releasing less damaging information that they knew was incomplete") *with Maguire Fin., LP*, 876 F.3d at 549 (declining to infer scienter from "an executive's use of a single *possibly ambiguous* word on a live analyst call that purportedly mischaracterized an agreement" relating to only "4.1% of the company's annual revenue").

Finally, when a complaint relies on "facts provided by confidential sources, it must describe the sources with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged or in the alternative provide some other evidence to support their allegations." *Yates*, 744 F.3d at 885 (quoting *Teachers' Ret. System of La. v. Hunter*, 447 F.3d 162, 174 (4th Cir. 2007)).

### 4.      PSLRA Safe Harbor

The PSLRA specifically provides a "safe harbor" for certain "forward-looking statements" which include:   "a statement containing a projection of revenues, income, [or] earnings"; "a statement of the plans and objectives of management for future operations"; "a statement of future economic performance"; and "any statement of the assumptions underlying or relating to" a statement covered by the other categories of forward-looking statements.  15 U.S.C. § 78u-5(i)(1).

The safe harbor protection applies to preclude liability for a forward-looking statement that (1) is "identified as a forward-looking statement" and "is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement"; (2) is "immaterial"; or (3) if "the plaintiff fails to prove that the forward-looking statement . . . was made with actual knowledge" by the speaker that it "was false or misleading," or in the case of a statement by a business entity, fails to prove that it was "made by or with the approval of an executive officer of that entity" and that the officer had "actual knowledge" that the statement was "false or misleading."  *Id.* § 78u-5(c).  Thus, pursuant to this third category, for a forward-looking statement covered by one of the safe harbors, there must be actual knowledge, not mere recklessness, as to whether a statement was false or misleading.  *Slayton v. Am. Express Co.*, 604 F.3d 758, 773 (2d Cir. 2010); *Inst. Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 274 (3d Cir. 2009) (collecting cases); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 705 (7th Cir. 2008).

Notably, where a statement contains discrete sub-statements about present facts and separate, discrete forward-looking sub-statements, only those forward-looking sub-statements receive the PSLRA's safe harbor protection.  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 246 (2d Cir. 2016); *Makor Issues & Rights, Ltd.*, 513 F.3d at 705 ("[A] mixed present/future statement is

not entitled to the safe harbor with respect to the part of the statement that refers to the present."); *Harris v. Ivax Corp.*, 182 F.3d 799, 805-07 (11th Cir. 1999) (stating that a "non-forward-looking statement" contained within a mixed present/future statement "falls outside the safe harbor"); *In re Constellation Energy Grp., Inc. Sec. Litig.*, 738 F. Supp. 2d 614, 626 (D. Md. 2010).

### B.      August 2, 2018 Statements

Plaintiffs allege that, on an August 2, 2018 earnings call to discuss 2U's 2018 second-quarter financial results, Paucek made material false or misleading statements or omissions in light of the facts that as of late 2017 and early 2018, 2U's data projecting enrollment six months ahead reflected lower enrollment growth, such that by early 2018, there were concerns about low enrollment and efforts to determine how to enroll more students, and that by July 2018, the company was "desperate for students to enroll in its programs." Am. Compl. ¶ 90.

In his August 2, 2018 statements, Paucek represented that 2U was in the midst of a "reacceleration of the grad business" and stated:

> Let's talk about why we're confident in the reacceleration over the next few years: enrollments and pipeline.  First, enrollments. Most of the DGPs launched in 2018 have had their first class starts, and we're deep into the application cycle for all fall starts. So now we—we now have high visibility into how we believe the 2018 cohort will scale. . . . So what about the other 34 programs?  We believe most of them are still years away from reaching steady-state enrollments.  These things take time.  The first program in a vertical typically takes 5 to 6 years to achieve our projected steady-state enrollments.   Subsequent programs typically take 4 to 5 years. So we're still expecting enrollment growth in some of our oldest programs.

*Id.* ¶ 256.  Paucek further stated, "Our pipeline is simply stronger than it's ever been. . . . Next year, we expect at least 14 of our programs will be MPV.  Now you'll remember, these programs ramp enrollments faster than programs in new verticals."  *Id.* ¶ 258.  Paucek also asserted that "2U has a track record of scaling enrollments that's better than anyone in the space," that "Our model

works. The graduate segment is the organic growth engine powering 2U," and that "New student enrollments are strong across the portfolio.  Pipeline is excellent."  *Id.* ¶¶ 258, 262.

### 1.     Material Omission

Plaintiffs have sufficiently alleged that these statements were misleading in that Paucek engaged in a material omission of fact by failing to acknowledge the declining enrollment projections.  These statements followed February 2018 statements by 2U informing investors that its rapid growth would continue at a rate of 30 percent annually for the "foreseeable future," such that it would grow from 37 active programs and $300 million in annual revenue to a steady state of 250 programs and $3 billion in yearly revenue.  *Id.* ¶ 10.  In support of his August 2, 2018 statements of continued confidence in this reacceleration of 2U's growth, Paucek specifically referenced enrollments as a basis for that confidence and stated that 2U had current data—namely, for programs started in 2018 and for programs starting in the fall of 2018.   By stating that 2U presently had "high visibility" into how "the 2018 cohort will scale," Paucek was conveying a message that 2U already had data that would support the conclusion that the reacceleration would continue.  *Id.* ¶ 256.  At the same time, Paucek's statement that 2U was "still expecting enrollment growth in some of [its] oldest programs," without altering its prior projected steady-state enrollment goals, conveyed that demand remained sufficiently strong across the preexisting 34 graduate programs to sustain the reacceleration.  *Id.*

Under these circumstances, a reasonable investor would infer that, based on 2U's current data, projected enrollment remained strong and the company's new programs would experience adequate demand for enrollment to keep 2U on track to meet its stated goal of 250 programs and $3 billion in yearly revenue.  For example, Paucek's claims that the "model works," "[n]ew student enrollments are strong across the portfolio," and the pipeline was "stronger than its ever been,"

21

combined with his statements that upcoming MPVs would "ramp enrollments faster than" other programs, *id.* ¶¶ 258, 262, conveyed a message that enrollment would be sufficient to meet 2U's growth targets.  As if to confirm that message, Paucek announced an increased goal of $4 billion in annual revenue on August 14, 2018.

As a result, the omission of any reference to the negative enrollment projections was material because it would have "significantly altered the total mix of information" available to a reasonable investor.  *Paradise Wire*, 918 F.3d at 318.  Disclosure of an omitted fact is required "when necessary to make statements made, in light of the circumstances under which they are made, not misleading."  *Matrixx Initiatives, Inc.*, 563 U.S. at 44 (quoting Rule 10b-5).  An opinion stating a belief  may form the basis of a material omission if the speaker omits facts about the speaker's "knowledge concerning a statement of opinion" that "conflict with what the investor would take from the statement itself," because a reasonable investor could understand the statement to convey facts about "the speaker's basis for holding" the opinion.  *Omnicare, Inc.*, 575 U.S. at 188-89; *see Singer*, 883 F.3d at 440 (stating that once a company chose to "inform the market that it was" conducting certain business activities, its statements would be "utterly misleading" unless it disclosed further information related to problems in those activities).  Here, if the declining enrollment projections had been disclosed, an investor would have understood that Paucek's expressed, continuing confidence in the broad reacceleration was misplaced and that 2U's plans for massive growth both in terms of number of programs and total revenue were in jeopardy.  *See Matrixx Initiatives, Inc.*, 563 U.S. at 47 (finding omissions material where the company told investors that revenues would rise significantly but "had information indicating a significant risk to its leading revenue-generating product" and failed to disclose that information); *Ottmann v. Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 352 (4th Cir. 2003) (finding an omission

material where the defendant "made positive comments" regarding revenue from patient referrals after two medical businesses merged but failed to disclose that the total percentage of referrals had declined); *Zak*, 780 F.3d at 609-10 (treating as material undisclosed information that a company's drug application to the FDA had received an adverse FDA staff recommendation).  Moreover, the enrollment projections were not merely "some fact cutting the other way," the omission of which would not be material because investors understand that "not every fact known" to a speaker "supports its opinion."  *Omnicare*, 575 F.3d at 190.  Declining enrollment projections augured doom for 2U's growth plan and produced enduring concern for top executives, not merely for a lone junior employee.  *Cf. id.* (stating that the failure to disclose one junior attorney's concern about a practice's legality, where six senior attorneys had approved the practice as legal, would not be material).

Contrary to Defendants' argument, Paucek's statements were not corporate puffery for the very reason they were misleading:  Paucek did not merely use vague, positive language about 2U's future but instead specifically conveyed that the previously described reacceleration was continuing and supported that assertion with a specific factual basis—enrollment information.  *See Dunn v. Borta*, 369 F.3d 421, 431 (4th Cir. 2004) (finding that misrepresentations were not puffery where they were "not simply sales pitches but rather can be proven true or false"); *Raab*, 4 F.3d 286, 290 (finding to be not material a "loose prediction" of growth that was not "supported by specific statements of fact"); *see also In re Cable & Wireless, PLC*, 321 F. Supp. 2d 749, 766–67 (E.D. Va. 2004) (collecting cases and summarizing immaterial puffery as "loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available").

Lastly, also contrary to Defendants' claim, Paucek's August 2, 2018 statements are distinguishable from the projections of future performance at issue in *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312 (4th Cir. 2019). In that case, investors argued that a company's proxy statement was "materially misleading" because it contained a chart with projections of future financial performance and portrayed the company as a "financially growing enterprise" but failed to disclose select negative financial data. *Paradise Wire*, 918 F.3d at 321, 323. The proxy statement, however, contained numerous "tailored and specific warnings," including that the business "has incurred operating losses and may not achieve profitability," that the company had over $62 million in losses in over three years, and that its "future operating losses and the timing of the profitability are highly uncertain, and it may never achieve or sustain profitability." *Id.* at 322-23. Accordingly, based on *Omnicare's* instruction to consider whether opinion statements omit material facts in the context of additional statements such as disclaimers and warnings, the Fourth Circuit rejected the investors' argument, concluding that it was "difficult to imagine more clear warning language" that prevented the proxy statement from being "materially false or misleading." *Id.* at 322-23.

In contrast, Paucek's predictions were given with absolute confidence and no tailored or specific warnings. The most relevant warning would have been the precise one that he omitted: that despite his stated confidence in enrollments, the Company's internal projections showed them declining. Though Defendants reference general warnings about potential future risks in other statements, such as the 2017 Form 10-K issued on February 27, 2018, not only were those warnings given six months before in an entirely different communication, but none stated or even implied that the Company's internal data projected that its lifeblood—graduate enrollments—would decline, or that it had already encountered present business challenges that might further erode its

24

growth or revenue.  In fact, the only warning provided during the August 2, 2018 call reinforced Paucek's misleading statements by stating that "forward-looking statements" made on the call "are based on information currently available," communicating that Paucek's claims accounted for the "information currently available," when, in fact, he was omitting key parts of that information. FQ2 2018 Earnings Call Tr. at 4, Mot. Dismiss Ex. 5, ECF No. 144-8.  Where Paucek had knowledge of the declining enrollment projections, his omission rendered materially misleading his August 2, 2018 statements because he provided no warnings or other information that would have corrected a reasonable person's reading of those statements.  *See Singer*, 883 F.3d at 440, 442 (holding that, where "undisclosed facts on the ground would substantially affect a reasonable investor's calculations," defendants' omission of such information was material despite "generic warning[s] of a risk" (quoting *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014))); *cf. Frankfurt-Trust Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 230 (S.D.N.Y. 2018) (finding that opinion statements about future results did not contain materially misleading omissions in part because they were accompanied by "frank warnings" about the specific business segments at issue).

### 2.    Scienter

Plaintiffs also have alleged adequately that Paucek omitted the declining enrollment projections with scienter.  Plaintiffs identified two former employees, FE-1 and FE-2, who had specific knowledge that Paucek and Mokkarala were aware of the declining enrollment projections and had concerns about them.  FE-2, as a 2U manager and senior manager until early 2019, led a team "responsible for detecting trends and forecasting 2U's growth" based on seasonality, past demand from quarterly reports on enrollment and degrees awarded, lead generation data, and "sales funnel" data consisting of the number of students who completed applications, made

deposits, and registered for courses.  Am. Compl. ¶ 88.  FE-2 stated that enrollment had grown each year before 2017 but "enrollment projections began to slowly stall in 2017, and the problem worsened in 2018 and 2019."  *Id.* ¶ 89.  According to FE-2, 2U typically conducted enrollment projections six months in advance, and once a forecast was complete, she provided the results to her supervisor, who gave them to Mokkarala, who then reported the numbers to Paucek.  *Id.* ¶ 89. Mokkarala "often wanted to see forecast numbers" earlier than they were due," and "was stressed about enrollment numbers throughout."  *Id.*  FE-2 has reported that Paucek was "unhappy with the dropping numbers."  *Id.* ¶ 357.

FE-1, meanwhile, worked in the Office of the CEO until the spring of 2019, where she "worked directly with Defendant Paucek to prepare him for meetings, organize the information submitted . . . for each board meeting," and "handle his personal projects."  *Id.* 356.  From this vantage point, FE-1 was aware that by early 2018, "concern about low enrollment" became "a topic and remain[ed] one," and that Paucek himself "mention[ed] concern about enrollment not too far into 2018."  *Id.* ¶¶ 86, 356.  FE-1 has further stated that Paucek and Mokkarala were "working closely . . . to figure out how to enroll more students."  *Id.* ¶ 86.

Where FE-1 worked directly with Paucek in his office and FE-2 managed the generation of enrollment projections that were reviewed by Paucek and Mokkarala, they meet the requirement that confidential sources be described with "sufficient particularity to support the probability that the person . . . would possess the information alleged."  *Yates*, 744 F.3d at 885.  Their allegations are sufficient to meet the requirement of a "strong inference of scienter."  *Tellabs, Inc.*, 551 U.S. at 326 (noting that "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically").  These two former employees' allegations reinforce one another: both recall that enrollment became a concern in early 2018, and FE-2's indirect knowledge about

26

Mokkarala's stress aligns with FE-1's first-hand knowledge that Mokkarala and Paucek were concerned.  Taken together, they show that Paucek knew by early 2018 that enrollment projections were declining and that this decline remained a persistent concern up to and well after his August 2, 2018 statement.  In turn, the fact that Graduate Division enrollment provided the key revenue stream for the most important part of the business supports not only the allegations that Paucek was concerned about enrollment, but also a strong inference that Paucek knew that omitting the declining enrollment projections from his statement was misleading.  *See Yates*, 744 F.3d at 890 (stating that allegations of a particular segment's importance to the whole business are "relevant to the court's holistic analysis of scienter").

Building on these two employees' statements, Plaintiffs' other allegations, even if not individually sufficient to establish scienter, collectively bolster a strong inference of scienter. First, FE-3, a former employee who interacted with Paucek on several occasions and was "sure" that he received enrollment information regularly, has stated that by July 2018, 2U was "desperate" for students to enroll in its programs.  Am. Compl. ¶¶ 90.  Second, FE-8, a former executive admissions counselor at 2U, alleged that admissions staff had historically been given reports containing projections of the performance of specific programs, but they "suddenly stopped" receiving these reports in late 2017 or early 2018.  *Id.* ¶ 350.  These allegations align with the timeline of declining enrollment projections reported by FE-1 and FE-2 and support the assertions that low enrollment had become a concern for executives.  Third, as reflected in Paucek's remark, "Don't let the skeptic win," at the beginning of his August 2, 2018 statement, *id.* ¶ 154, Paucek was aware of a July 19, 2018 short-seller's investment report, known as the Spruce Point Report, that argued that many of 2U's programs were not meeting enrollment expectations, with four of its top seven programs at "peak or declining enrollments."  *Id.* ¶ 147.  Regardless of the accuracy

of the Spruce Point Report's characterization of enrollment projections, the fact that Paucek was aware of it and saw the need to discourage investors from considering it supports the conclusion that by August 2, 2018, Paucek both understood the enduring importance of enrollment to investors and must have reviewed 2U's own internal enrollment projections in order to address that report. These allegations further reinforce the strong conclusion that Paucek had actual knowledge that his material omission would mislead investors. *See Yates,* 744 F.3d at 885 (stating that allegations are afforded "the inferential weight warranted by context and common sense").

Defendants argue that despite these specific allegations, the inference of scienter does not meet the requirement that it be "at least as compelling as [the] opposing inference of an innocent state of mind." *Id.* (citations omitted). The better inference from the allegations, they assert, is that "broader operational challenges and competitive headwinds did not exist until the second quarter" of 2019, and Defendants informed the market "as soon as [they] became aware." Mot. Dismiss at 21, ECF No. 144-1. In support of this inference, Defendants assert that 2U was "able to set and meet financial expectations" for most of the Class Period, *id.* at 20, note that "enrollment increased every quarter of 2018 and the first quarter of 2019," and argue that Plaintiffs have not alleged what Paucek or Mokkarala "knew about the achievability" of any forecasts. *Id.* at 27. The Court disagrees. First, on the issue of scienter, it does not matter whether Defendants specifically knew that the enrollment projections would come true in the future or that they would fail to meet future enrollment goals. What matters is that Paucek knew of material information that would have significantly altered the total mix of information available to investors—specifically, that internal data projected declining enrollment—and that Paucek knew that his omission on August 2, 2018 would mislead investors.

Second, the fact that total enrollment, as well as revenue, increased during much of the Class Period does not diminish the culpable inference. A driver who knows that the car soon will run out of fuel can nevertheless drive forward several more miles at the same speed with the remaining fuel; an observer interested in knowing how far that car will travel cares as much or more about how much fuel remains as whether the car presently continues to move. The material omission was information that suggested that enrollment soon would plateau or decline despite its present rise. These declining projection enrollments signaled that present increases in enrollment, and the type of growth contemplated by the reacceleration, were unsustainable. Where FE-1 had direct knowledge of the fact that Paucek was concerned about enrollment projections, the allegations support an inference that he recognized their importance to the sustainability of 2U's growth, even as total enrollment increased, and therefore knew that omitting the declining projections would mislead investors.

Third, Defendants' proffered inference is not more compelling in light of the remaining allegations. The assertion that challenges to 2U's business "did not exist until the second quarter" of 2019, Mot. Dismiss at 21, is not compatible with Plaintiffs' allegations from former employees that 2U was "not spending enough on marketing to make sales in 2017 and 2018," Am. Compl. ¶ 109, that by February 2018, 2U's sales goals were "unreachable," *id.* ¶ 128, that 2U was "desperate" for students by July 2018, *id.* ¶ 90, and that it was clear before 2019 that salespeople were not receiving enough marketing leads to hit 2019 enrollment goals. Plaintiffs' less precisely dated allegations—that advertising costs had increased, that 2U programs faced increased competition for students from external competitors, and internally from cheaper programs also operated by 2U—detail problems that likely contributed to the marketing challenges explicitly identified as issues in 2018 and thus can be inferred to have emerged no later than that year.

Although the allegations relating to increased competition and costs come in part from former employees who did not necessarily have direct interactions with the Executive Defendants, and Plaintiffs have not alleged that the Executive Defendants were specifically informed of these market forces or their effect, they provide relevant context for the core allegations relating to scienter on Paucek's August 2, 2018 statements—the direct evidence that before that date Paucek was aware of the declining enrollment projections and was concerned about them to the point of meeting with Mokkarala to discuss them.  In light of such allegations, Defendants' proposed inference—that 2U's outlook remained so positive in 2018 that the Executive Defendants did not know that omitting the known projected enrollment declines would mislead investors—is not more compelling than the culpable inference of scienter.  In such an environment, the stronger inference is that Paucek's own specific concern about declining enrollment projections and meetings with Mokkarala to address the topic reflected an understanding that market forces were impacting 2U's ability to meet its aggressive growth targets, such that he knew that omitting the declining projections as part of his August 2, 2018 reaffirmation of those targets would mislead investors.

Finally, none of the PSLRA's safe harbors for forward-looking statements shield Defendants from liability.  Although Plaintiffs' challenge to the August 2, 2018 statements relates to at least one statement arguably asserting a present fact—that "we now have high visibility into how we believe the 2018 cohort will scale"—Plaintiffs acknowledge that some of the statements they challenge as misleading are forward-looking statements:  "we're confident in the reacceleration *over the next few years*" and "we're still *expecting* enrollment *growth*."  *Id.* ¶ 256 (emphasis added).  Because the PSLRA's three safe harbor provisions apply to "any forward-looking statement, whether written or oral," 15 U.S.C. § 78u-5(c)(1), the Court will assess each.  First, the statements were not accompanied by any "meaningful cautionary statements."  *Id.* § 78u-

30

5(c)(1)(A)(i).  As discussed above, the only provided warnings referenced risks in broad terms as potential future dangers; none would have put investors on alert that 2U's internal data were already projecting declining enrollment that could signify that increased competition, inadequate demand, rising marketing costs, and shifts toward cheaper programs were already affecting, or would soon adversely impact, 2U.  *See supra* part II.B.1.  Second, as discussed above, the omitted fact was material.  *See id.*; 15 U.S.C. § 78u-5(c)(1)(A)(ii).  Third and finally, the Court has found that the allegations support a strong inference that Paucek had actual knowledge that his August 2, 2018 statement was misleading when he made it.  15 U.S.C. § 78u-5(c)(1)(B)(i).  Because the August 2, 2018 statements do not meet the requirements for the PSLRA's safe harbor, the Court finds that Plaintiffs have stated a plausible claim for relief.

### C.        February 25, 2019 Statements

Plaintiffs allege that there were additional false statements or omissions of material fact in a February 25, 2019 earnings call to discuss 2U's 2018 fourth-quarter financial results because 2U's declining enrollment projections made it "clear by the beginning of 2019 that 2U would not meet its projected enrollment targets for 2019."  Am. Compl. ¶ 303.  During the call, Paucek stated:

> I'm telling you, our business is resilient, it's diversified, and it's growing.  Fourth quarter was rock solid . . . .  Mature programs continue to enroll new students.  Newer programs are scaling well, and the 2018 cohort continues to be excellent. In fact, 7 programs [of the top 20 by enrollment] were launched in the past 2 years. Let that land for a second, 7. So much for the theory that all of the new ones will be small and suboptimal.

*Id.* ¶ 300.  After Paucek's opening remarks, Graham gave her own prepared remarks, in which she identified higher profit margins in 2U's "most mature program cohort" and stated that:

> This demonstrates that there are almost certainly additional students that we could enroll and service in these programs while staying within our target financial parameters.  As such, this higher margin was a significant part of our decision to

expand marketing spend and take somewhat lower margins for 2019 to attract additional students and drive additional revenue.

***

What we're seeing now across all our program cohorts strongly validates the typical program economic life cycle we've consistently discussed with you and makes us very comfortable that to drive growth, increasing our investments in both new program launches and current program marketing are wise strategic decisions.

FQ4 2018 Earnings Call Tr. at 8, Mot. Dismiss Ex. 7, ECF No. 144-10; Am. Compl. ¶ 302.  During the later question-and-answer session, a participant stated, "[W]e appreciate the efforts not to leave any enrollment on the table if they can power more growth and with the kind of increased spending in 2019" and asked, "But directionally, how should we think about EBITDA [Earnings Before Interest, Taxes, Depreciation, and Amortization] margin expansion maybe going forward?"  FQ4 2018 Earnings Call Tr. at 19.  Graham answered:

> [Y]ou shouldn't think of this as being a continual degradation of margins on a year-over-year and continuing basis.  This is kind of getting us back onto the right glide path from where such a number of our programs should be.  And I can't tell you, at this point, whether 2020 will sort of flatten out in margin or step up a little.  But over time, I would say that our intention is to return to the kind of patterns that we had been seeing, which is you will see slow and—slow but perhaps steady increases in margin over time as we move towards steady state. You should keep in mind that for us, margins are, in many ways, a matter of choice as to how much investment we're making in growth, and I just want you guys to remember that, that this is very much within our control based on how quickly we decide to grow and what opportunities there are in front of us.

Am. Compl. ¶ 304.  Graham also explained on the call that "[t]his year's spend increase is not an exercise in spending more to grow the same or less."  FQ4 2018 Earnings Call Tr. at 8.

### 1.     Material Omission

Plaintiffs have sufficiently alleged that Graham's statements were misleading in that she omitted a material fact by failing to disclose the declining enrollment projections.  On August 14, 2018, Paucek had raised 2U's target growth to $4 billion in annual revenue, with 250 domestic

32

graduate programs.  In light of these targets, and Paucek's opening statement effectively stating that 2U remained on track to meet those goals, Graham's statement that "[w]hat we're seeing now across all our program cohorts strongly validates the typical program economic life cycle we've consistently discussed with you" and "makes us very comfortable that to drive growth, increasing our investments in both new program launches and current program marketing are wise strategic decisions" was misleading because it conveyed the message that 2U's current, internal data did not show signs that 2U's business model—which depended on continuing, significant growth in the number of new programs and enrolled students—was off track in any way.  Am. Compl. ¶ 302. Particularly in the context of Graham's earlier statement in her prepared remarks that higher profit margins in mature programs showed that there were "almost certainly additional students that we could enroll," this statement fairly conveyed the message that current data showed that mature and recently added programs would continue to experience the same enrollment demand as in the past and would be sufficient to meet the previously stated targets.  FQ4 2018 Earnings Call Tr. at 8.

Also misleading were Graham's later statements that, despite recent cost increases, investors "shouldn't think of this as a being a continual degradation of margins on a year-over-year and continuing basis" because "margins are, in many ways, a matter of choice as to how much investment we're making in growth," and "this is very much within our control based on how quickly we decide to grow and what opportunities there are in front of us."  *Id.* at 19-20. Particularly in light of Graham's earlier statement that "[t]his year's spend increase is not an exercise in spending more to grow the same or less," *id.* at 8, a reasonable investor would understand these statements to mean that 2U had the ability to choose the extent of its profitability, that 2U was not facing any adverse pressures on enrollment that could require it to spend more in order to maintain its historical enrollment rates, and that 2U would continue to have high demand

for its ever-growing number of graduate programs, such that its steady-state target of 250 programs and $4 billion annual revenue remained realistic.

As a result, Graham's omission of any reference to the declining enrollment projections was material because it would have "significantly altered the total mix of information" available to a reasonable investor. *Paradise Wire*, 918 F.3d at 318. If the declining projections had been disclosed, a reasonable investor would have understood that Graham's stated confidence in the business model and its growth strategy was not only misplaced, but that the core plan that increases in the number of programs and enrollments would fuel future revenue of $4 billion was imperiled. In light of the declining projections, an investor also would have understood that Graham's portrayal of increased marketing costs and decreased margins as a discretionary investment choice to be inaccurate, and that, instead, additional spending likely would be needed to achieve the target enrollment rates, causing diminished margins into the future.

To the extent that some of Graham's statements are fairly characterized as opinions does not render them not actionable. As discussed above, an opinion statement could be actionable based on a material omission if it is understood to "convey facts about how the speaker has formed the opinion" or the "speaker's basis for holding that view" and it omits material facts about the speaker's "inquiry into or knowledge concerning a statement of opinion." *Omnicare, Inc.*, 575 U.S. at 189. Where Graham's statements explicitly characterized the basis of her knowledge as including "[w]hat we're seeing," Am. Compl. ¶ 302, the failure to disclose the declining enrollment projections available to 2U made her statements "misleading to a reasonable person reading the statement fairly and in context." *Omnicare*, 575 U.S. at 194; *Matrixx Initiatives, Inc.*, 562 U.S. at 47 (finding omissions material where a company told investors that revenues would rise by 50 to 80 percent but failed to disclose "information indicating a significant risk to its leading

34

revenue-generating product"). Second, the enrollment projections were not merely "some minor fact cutting the other way," *Omnicare, Inc.*, 575 U.S. at 189, but significant information so important that it caused concern among company leadership, including Paucek and Mokkarala. Third, the opinion is not inactionable sales puffery because Graham identified a specific factual basis for her statements—the data 2U was "seeing now"—and identified this source in the context of other statements suggesting that the data showed yet-untapped enrollment demand and specific claims that margins and marketing costs were the result of deliberate choices under 2U's control. Am. Compl. ¶ 302.

Finally, though whether an omission of a fact from an opinion is materially misleading "depends on context" such as warnings and disclaimers, *Omnicare, Inc.*, 575 U.S. at 190, the cautionary warnings and risk disclosures that 2U and Graham provided before and on February 25, 2019 did not sufficiently mitigate the materially misleading impact of Graham's omission. To the extent that the warnings contained in 2U's 2017 and 2018 Forms 10-K filed separately and at different times could be considered, they were rote, general warnings that merely highlighted the obvious downsides of ineffective marketing, emerging competition, and the inability to find enough students, but they did not specifically warn of any actual data that cast doubt on 2U's business model and growth plans, let alone disclose that 2U itself was specifically projecting declining enrollment that contradicted Graham's overwhelmingly favorable analysis. *See Singer*, 883 F.3d at 442 (finding as material a defendant's omission of facts that would "substantially affect a reasonable investor's calculations" despite general warnings of risk).

On the earnings call itself, the one generic warning and Graham's subsequent, specific warning did nothing to correct the misperception and may well have amplified it. The generic warning—virtually identical to the one given on the August 2, 2018 call—warned, among other

things, that "forward-looking statements" were "based on information currently available to us" and that actual results could differ, yet Graham's analysis did not consider or disclose significant "information currently available," namely the declining enrollment projections. FQ4 2018 Earnings Call Tr. at 4. Although Graham specifically warned that 2019 margins and revenue could differ from 2018 because 2U had launched a number of "short courses" that could experience variation as 2U gained experience with that novel format, Graham further stated that "despite that cautionary note, we remain excited and energized by the opportunity we have in front of us, not only for 2019 but beyond." *Id.* at 9. This narrow, tailored warning about short-course performance and its impact on 2019 finances did not suffice to provide fair warning about the known, broader problem with anticipated graduate program enrollment and the external forces that might be eroding 2U's model. If anything, Graham's pivot to a very positive outlook for "2019 and beyond," *id.*, reinforced the message that there were no adverse data revealing an upcoming decline in enrollments.

### 2. Scienter

Plaintiffs also have alleged adequately that Graham omitted the declining enrollment projections with scienter. As discussed with respect to Paucek's August 2, 2018 statements, allegations from FE-1 and FE-2 establish that by early 2018, the declining projections were known to Paucek and Mokkarala and had caused concern. *See supra* part II.B.2. The question then is whether the allegations support a strong inference that Graham herself knew by February 25, 2019 that projected enrollments were declining and that omitting this information would mislead investors.

The Court finds Plaintiffs' allegations sufficient to support such an inference. First, as reflected in her statement that "there are almost certainly additional students that we could enroll,"

Graham was prepared to and did discuss enrollments with investors, and FE-16, Graham's executive assistant from September 2017 to April 2019, has stated that Graham worked closely with Paucek, including spending the two weeks before investor earnings calls preparing for those sessions in multi-hour meetings with enrollment data displayed in the meeting room.  Under these circumstances, it is virtually inconceivable that, by the February 25, 2019 call, Graham was unaware of the declining enrollment projections and Paucek's concerns about them.

Second, FE-16 alleged that Gabriel Bustamante, 2U's Executive Vice President of Global Sales and Admissions, "tracked enrollment and provided three years of future projections," Am. Compl. ¶ 353, and gave them to the finance team, which in turn presented the projections to Graham.  FE-14, a 2U admissions counselor from February 2018 to September 2019, also alleged that Bustamante "discussed enrollment projections for the entire admissions department."  *Id*. Where FE-16 served as Graham's executive assistant throughout the class period and FE-14 was an admissions counselor privy to Bustamante's interactions with the department, they meet the requirement that confidential sources be described with "sufficient particularity to support the probability that the person . . . would possess the information alleged."  *Yates*, 744 F.3d at 885. The two allegations buttress one another:  FE-16 possessed first-hand knowledge of Graham's interaction with Paucek and Bustamante, as well as the enrollment projections Bustamante ultimately provided to Graham, while FE-14 corroborates the allegation that Bustamante had access to enrollment projections.  Considered alongside FE-16's assertions about Graham's close working relationship with Paucek and their extensive preparation for earnings calls which included access to the enrollment data, and the assertions that Paucek and Mokkarala had become concerned about declining enrollment projections in early 2018, the allegations support the conclusion that Graham learned of the declining enrollment projections before the February 25, 2019 statements.

In turn, given the importance of graduate program enrollment to 2U's revenue, these allegations support a strong inference of scienter in that Graham had actual knowledge that omitting the declining enrollment projections from her statements would mislead investors. *See Tellabs, Inc.*, 551 U.S. at 326.

The alternative, non-culpable inference does not meet the requirement that it be "at least as compelling as [the] opposing inference of an innocent state of mind." *Yates,* 744 F.3d at 885. 2U's investment narrative was premised on steady, significant growth to establish 250 programs and billions of dollars in annual revenue. This result was feasible only if 2U could continue to enroll adequate numbers of students in its existing and forthcoming programs. Declining enrollment projections strongly suggested that it would not be able to enroll sufficient students in the near future, such that the target growth rate was unsustainable and its business model, including the ability to generate significant revenue at low cost, was deeply flawed. The alternative inference—that Graham did not know by February 2019 that omitting declining enrollment projections would mislead investors—is uncompelling because it requires believing that 2U's CFO did not comprehend the importance of enrollment to the business despite frequently discussing enrollment with investors, receiving enrollment projections from her team, and working closely with a CEO concerned by declining projections, including to prepare their statements for earnings calls with investors.

Lastly, none of the PSLRA's safe harbors for forward-looking statements shield Defendants from liability. Graham's February 25, 2019 statement that "[w]hat we're *seeing now* . . . *validates* the typical economic life cycle *we've consistently discussed* with you" is a present statement about current and historical facts. Am. Compl. ¶ 302 (emphasis added). Likewise, Graham's statement that margins were "a matter of choice" is arguably a present statement not

covered by the PSLRA.  Nevertheless, the portion of Graham's statement asserting that "what we're seeing now" "makes us very comfortable that to drive growth, increasing our investments . . . are wise strategic decisions" is arguably a forward-looking statement in that it indirectly references future economic performance.  *See, e.g.*, *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d at 246.

Even assuming that all of these could be characterized forward-looking statements, the PSLRA does not bar a claim based on them.  *See* 15 U.S.C. § 78u-5(c)(1).   First, the statements were not accompanied by any "meaningful cautionary statements." *Id.* § 78u-5(c)(1)(A)(i).  As discussed above, the warnings provided around Graham's statements were neither meaningful nor cautionary as to the existence of current data projecting enrollment declines or already presenting challenges to the business model.  *See supra* part II.C.1.  Second, also as discussed above, the omitted fact was material.  *See id.*  Third, although the statement that "[w]hat we're seeing now across all our program cohorts strongly validates the typical program economic life cycle we've consistently discussed with you" is severable and therefore not subject to the "actual knowledge" requirement, the Court has found that the allegations support the conclusion that Graham had actual knowledge that her entire statement, including the forward-looking aspects of it, was misleading in light of the omission of a material fact.  Because Plaintiffs have adequately alleged that Graham made a material omission of fact as part of her February 25, 2019 statements with actual knowledge that it rendered the statements misleading, and the statements do not meet the requirements for the PSLRA's safe harbor, these statements provide an additional basis for the Court to deny the Motion as to the Exchange Act claims.

### D.    May 7, 2019 Statements

Plaintiffs also allege that, on a May 7, 2019 earnings call with investors, Paucek made false statements or omissions of material fact, again based on his failure to disclose 2U's internal

projections of declining enrollment that they allege made it clear by that date that 2U could not achieve its stated enrollment goals.  As discussed above, the allegations support the finding that Paucek was aware of and concerned about the declining enrollment projections since early 2018. *See supra* part II.B.2.

On February 25, 2019, Graham raised 2U's expected revenue from $411.8 million in fiscal year 2018 to between $546.6 and $550.8 million in fiscal year 2019.  Am. Compl. ¶ 32.  But then, on May 7, 2019, 2U filed its SEC Form 10-Q quarterly report on the first quarter of 2019 and, in an accompanying press release, announced "a reduction in projected revenue for full year 2019." *Id.* ¶¶ 307-08.   2U disclosed that net, year-over-year losses for the first quarter of 2019 had increased from $6.7 million to $21.6 million.  *Id.* ¶ 35.  On an earnings call later that day, Paucek explained the changes in the Graduate Division and 2U's decision to reduce its revenue forecast for 2019:

> This is driven by a few challenges in the grad segment, some that are in our control and some that aren't.  We've seen enough data and think it's important to get ahead of it, so we've made a decision to call it now and change our forecast. We expect that business to grow mid-20% for the full year.

> As I take you through the specifics, you'll see there are plenty of structural positives to report.  Let's turn to 3 factors at play in our new 2019 expectations for the grad business. Number one, our partners are getting more selective, which impacts admit rate; number two, we're seeing some pressure mid-funnel on the rate at which prospective students are submitting their applications for review; and number three, we're seeing some slowness in the 2019 cohort, most importantly, one of our largest projected programs for the 2019 cohort had its launch date slip to later in the year for reasons beyond the control of the school and 2U.

> Before I get into specifics on each of these, I want to make one thing clear. We do not believe the challenges we're seeing are attributable to weakness in our marketing efficiency at the top of the funnel. We've said that before and are reiterating it again today. Our data shows we're driving significant growth in the quantity of prospective students and started applications. We're doing so at an average cost that has remained consistent with historicals. It's actually down in many spots. Across the portfolio, applicant quality remains steady.

40

FQ1 2019 Earnings Call Tr. at 4-5, Mot. Dismiss Ex. 9, ECF No. 144-12; *see also* Am. Compl. ¶

310.  Turning to the first factor, Paucek stated that "[h]istorically, admit rate has been a noisy

number with lots of ups and downs, so it's inherently tricky to forecast" but the key cause of lower

admission rates was university partners becoming more selective as programs scaled.  FQ1 2019

Earnings Call Tr. at 5.  On the second factor, Paucek said:

> [W]e're seeing some changes in the rate of application submission even though we
> continue to generate strong prospect numbers at the top of the funnel.  Now this is
> a complicated part of the business with many program-specific variables and a lot
> of process.  One example of an issue we're seeing, more people are moving through
> our funnel without speaking to a counselor.  We're addressing these in a variety of
> ways, which involves lots of blocking and tackling, but I can assure you, we're all
> over it.

*Id.*  Paucek later added:

> [On] the submit rates or the mid-funnel stuff . . . it's really quite a long list of
> individual program-related details and then a couple that go across the system.  But
> we're not overstating on that one when we say it's really—it's a lot of different
> things that are often program-specific.  So I would say there's a reason we focused
> more on selectivity.  That's a big component of it.  And that more than anything is
> what caused us to sort of call it and effectively reset this segment.

*Id.* at 11.  On the third factor, Paucek explained that the University of California at Davis MBA

program had been delayed, but that was "nothing concerning for the long-term size and health of

that program."  *Id.* at 5.  Paucek then summarized the implications of these three factors:

> So what does this all mean for the grad segment moving forward? As I mentioned
> earlier, we aren't seeing declines in front-end marketing efficiency.  We're
> generating more prospects and application starts than ever and doing so at a quality
> level and average cost that has been consistent over time. And the rate of admitted
> students that choose to enroll or yield has remained steady year-over-year.
> However, increased selectivity does put some pressure on total average spend per
> student. Now despite that, on average, our programs are generally more profitable
> than we anticipated.

*Id.*; *see also* Am. Compl. ¶ 314.  Paucek concluded his discussion of the Graduate Division by asserting that enrollments in the top 15 programs were projected to be higher in 2019 than in 2017, and that "[W]e continue to see programs across the portfolio scale toward our target ranges for new student enrollments. We still firmly believe in our runway of 250 DGPs.  Pipeline for those programs is strong."  Am. Compl. ¶ 316.

During the call's question-and-answer session, a participant asked, "If you look at the notional model of the business, all right, based on where we are today, are you still comfortable with a model that says that maturity programs are doing the 300 to 500 [student enrollments] per year?"  FQ1 2019 Earnings Call Tr. at 14.  Paucek answered:

> Yes . . . It's clear that like on some level, some of the programs that got really big, probably in our best interest overall to hit our 300 to 500 and not drive every program to its maximum size.  And it's clear that the top ones have come down. Now at the same time, if you exclude the top 5, it's also clear that the next 10 are really going great. So you end up with this sort of clarity that the average, we like. We feel very good about the 250 [target total graduate programs] still. We don't feel like we have any reason to not believe that that's well within our opportunity set.  We feel strong about the ranges.  But it's clear that the big ones did come down. So once again, felt like we should call it.

Am. Compl. ¶ 321.  Later on the call, an attendee stated:

> [I]t sounds like the new enrollment trends are softening. . . . You previously gave some multiyear growth targets.  I'm assuming those are now off the table.  But just curious if you can help us understand how much you're expecting them to reset lower.

FQ1 2019 Earnings Call Tr. at 15.  Paucek replied:

> [W]e've kind of reset the number at 25%. . . . [W]e do feel like we've reset them solidly. You can obviously see the cadence. And with that cadence, you can have your own estimates as to what you believe will happen. But at this point, giving outyear guidance on a segment basis, we believe, is not the right call. Now to be clear, we do feel like we did reset this in a way that we feel very solid about.

Am. Compl. ¶ 326.  When asked whether this reset to a 25% growth rate applied only to 2019, Paucek answered, "Yes. That is only a comment for 2019.  It is not a recalibration for the future. And to be clear, our launch cadence is a factor in what we think will happen in the outyears."  *Id.*

When another attendee clarified whether the business would be "a 30%-plus grower here for the foreseeable future," Paucek answered, "Yes.  I mean we did give consolidated guidance of 30%. So we still feel like that's where we are. . . . [W]e feel very bullish about the long-term prospects for the company on both sides, grad and Alternative Credential."  *Id.* ¶ 329.

### 1.    Material Omission

Plaintiffs have sufficiently alleged that Paucek's May 7, 2019 statements—in particular, his statements that as to the long-term goal of 250 programs with an annual enrollment range of 300 to 500 students each, "[w]e don't feel like we have any reason to not believe that that's well within our opportunity set" and "[w]e feel strong about the ranges," *id.* ¶ 321—was misleading in that Paucek omitted a material fact by failing to disclose 2U's declining enrollment projections. From this response, a reasonable investor would have understood that despite the somewhat sudden downward adjustment in projected revenue for 2019, 2U possessed no information that cast significant doubt on its business model or its steady-state goal of 250 graduate programs with 300 to 500 annual enrollments each.  This understanding would have been informed by the context in which these statements were made, specifically, Paucek's other statements during the earnings call  which conveyed the message that 2U's reduced revenue forecast for 2019 was largely the result of one-time factors that would not continue into subsequent years, and that the fundamentals of 2U's business model remained sound.  First, in acknowledging issues with "the rate of application submission" in the middle of the sales funnel as relevant to the reduced revenue forecast, Paucek focused on a specific issue—more applicants failing to speak with a counselor—

and assured that it would be resolved quickly, and he emphasized that the decreased rate of application submission was "really . . . a lot of different things that are often program-specific" and not issues "that go across the system." FQ1 2019 Earnings Call Tr. at 11. Paucek also cited the discrete issue of a delayed start for the U.C. Davis MBA program as a factor underlying the changed forecast. Second, though Paucek identified increasing selectivity by universities as a factor, he noted that nevertheless, on average, "our programs are generally more profitable than we anticipated." Am. Compl. ¶ 314. Third, Paucek clarified that the reduced revenue forecast applied only to 2019 and was "not a recalibration for the future." *Id.* ¶ 327. Indeed, he confirmed that 2U still anticipated growth of over 30 percent "for the foreseeable future" and that the company felt "very bullish" about the long-term prospects for the graduate program. *Id.* ¶¶ 327, 329. From these statements, a reasonable investor would have inferred that 2U remained on course for its long-term goals, that any setbacks in 2U's graduate segment were based on a narrow set of program-specific issues and limited to only 2019, and that there were no ongoing, systemic problems with the business model.

As a result, Paucek's omission of any reference to 2U's declining enrollment projections was material because it would have "significantly altered the total mix of information" available to a reasonable investor. *Paradise Wire*, 918 F.3d at 318. If the negative projections had been disclosed, a reasonable investor would have understood that 2U, in fact, had possessed information since early 2018 reflecting that its long-term growth and enrollment goals were either not possible or would require significantly higher spending per student. They also would have led such an investor to recognize that 2U's reduced 2019 revenue forecast, increased 2018 marketing spending, and tighter margins likely signaled fundamental business weaknesses rather than

isolated aberrations, such that 2U's steady-state goals and 30 percent-plus annual growth likely were unachievable.

The fact that Paucek's statement was framed as an opinion does not render it inactionable. First, where Paucek specifically stated that "we don't feel like we have any reason to not believe" in 2U's long-term goals, he was effectively telling investors that his opinion was based on consideration of information available to 2U, such as internal data, and was thus "convey[ing] facts about how the speaker has formed the opinion." *Omnicare, Inc.*, 575 U.S. at 189. Plaintiffs have identified specific facts—the declining enrollment projections—available to 2U that in fact provided a reason not to believe in the goals, the omission of which made the opinion statement at issue "misleading to a reasonable person reading fairly" in context. *See id.* at 194; *Paradise Wire*, 918 F.3d at 312. Second, the projections were not merely "some fact cutting the other way," *Omnicare, Inc.*, 575 U.S. at 189, but vital information that had concerned Paucek for over a year, directly contradicted Paucek's claim, and undermined 2U's growth plans. Third, where Paucek provided specific factual statements and analysis as the basis for his opinion, including the current enrollment of the top 15 programs and three factors that uniquely affected the 2019 fiscal year, his opinion does not constitute inactionable puffery. *See, e.g.*, *Raab*, 4 F.3d at 289 (identifying puffery as "vague statements predicting growth").

Finally, 2U's general warnings did not provide adequate information to render Paucek's May 7, 2019 omission immaterial. As discussed above, these broad cautionary statements discussing potential risks, such as competition, marketing, and business operations, did not address the specific issue of known declining enrollment projections. *See supra* part II.B.1. Even Paucek's specific discussions on May 7, 2019 about increasing selectivity by educational institutions and mid-funnel challenges, particularly when framed as not impacting years beyond 2019, did not

adequately warn of a broader, systemic threat to enrollment of which 2U was already aware.  *Cf.*
*Paradise Wire*, 918 F.3d at 323 (finding statements of future financial projections not material
where clear warnings "squarely addressed" the allegations asserted to be materially false and
misleading).  Plaintiffs have therefore sufficiently alleged a material omission from Paucek's May
7, 2019 statements.

### 2. Scienter

Plaintiffs have also alleged adequately that Paucek omitted the enrollment projections with
scienter—with knowledge that the omission would mislead investors—based on the same
allegations underlying the conclusion of a strong inference of scienter as to the August 2, 2018
statements.  *See supra* part II.B.2.  Where Paucek had been aware of and concerned about the
declining enrollment projections and also knew the importance of enrollment figures to 2U's
growth targets and overall business model, there is a strong inference that he understood that
omitting this information would mislead investors.  Statements from former employees identifying
relevant problems after August 2018 further bolster that inference.  For example, Plaintiffs allege
that FE-4, a former Manager of Digital Media Strategy at 2U, has stated that while she worked at
2U from July 2018 to July 2019, her team "could never get costs down because the price of ads
continued to increase as the audience pool continued to lessen" from July 2018 through July 2019.
Am. Compl. ¶¶ 95, 97.  Similarly, FE-7, a Sales Director at 2U from April 2018 to October 2019,
reported that her team converted only about two percent of sales leads generated by the "top of the
funnel" into enrollments, such that she knew before 2019 that "her team would not be able to meet
2019 enrollment goals" without receiving many more sales leads and was unsurprised when
enrollment for the first 2019 cohort was down.  *Id.* ¶¶ 106, 108, 110.  Although Plaintiffs do not
allege that these particular problems were directly reported to Paucek, by illustrating additional

evidence that 2U was not on track to meet its growth targets, they reinforce the conclusion that the declining enrollment projections known to have been received by Paucek were indicative of systemic problems such that he necessarily would have known that omitting them from the May 7, 2019 statements was materially misleading.

Furthermore, Paucek's other statements on May 7, 2019 solidify the strong inference of scienter.  Paucek identified numerous areas of apparent strength in precise detail, including prospective student quality, number of sales leads, cost of advertising, number of applications started, applicant quality, and the rate of enrollment by admitted applicants.  He similarly cabined 2U's lowered 2019 revenue projections to narrow causes, such as applicants not speaking to counselors, "individual program-related details" that affect the rate at which prospective students submit applications, and a late start for the U.C. Davis MBA program as part of his claim that 2U did not have "any reason to not believe" that its long-term targets could be achieved.  *Id.* ¶¶ 318, 321.  The fact that Paucek had such apparent command of these details of 2U's operations illustrates that it is implausible that he would have been unaware of the data showing that 2U's enrollment projections had stalled in 2017 and declined throughout 2018 and 2019, particularly after the extensive preparation sessions for earnings calls described by FE-16.   Under these circumstances, Paucek's explanations on May 7, 2019 could be read not as an innocent, overly optimistic analysis of 2U's declining revenue projections, but rather as a calculated effort to tiptoe around the truth—an artful sleight of hand apparently revealing all possible sources of information relating to 2U's outlook except the most damaging one.  Particularly when viewed alongside the previous misleading omissions on August 2, 2018 and February 25, 2019, the allegations relating to the May 7, 2019 statements are more than sufficient as to scienter.  *See Zak*, 780 F.3d at 610 (stating that "numerous allegedly misleading statements and omissions . . . that were not caused

by the use of imprecise language or the execution of a legitimate business decision" may support a strong inference of scienter).

For all of these reasons, the Court also concludes that the alternative, non-culpable inference does not meet the requirement that it be "at least as compelling as [the] opposing inference of an innocent state of mind." *Yates,* 744 F.3d at 885 (citations omitted). The non-culpable inference was not more compelling in August 2018, *see supra* part II.B.2, and it is even less so in May 2019, given the additional months of poor projections, the former employees' corroborating statements, and Paucek's careful discussion of everything but the enrollment projections.

Finally, although certain of Paucek's May 7, 2019 statements were forward-looking, such as the statement that "We don't feel like we have any reason to not believe that that's well within our opportunity set. We feel strong about the ranges," Am. Compl. ¶ 321, none of the PSLRA's safe harbors for forward-looking statements shield them from liability. 15 U.S.C. § 78-u5(c)(1)(A). As outlined above, the statements were not accompanied by any "meaningful cautionary statements," the omitted fact of the declining enrollment projections was material, and the allegations are sufficient to show that Paucek had actual knowledge that his statement was materially misleading. *See supra* part II.B.2. Plaintiffs have therefore sufficiently alleged Exchange Act violations based on the May 7, 2019 statements. Because the Court concludes that they have sufficiently alleged multiple actionable statements by the Exchange Act Defendants across 2018 and 2019 that contained omissions of material fact, the Court will deny the Motion as to the Section 10(b) claim. The Court will also deny the Motion as to the Section 20(a) against 2U because that claim rises and falls with the Section 10(b) claim. *See Cozzarelli*, 549 F.3d at 628.

## III.     Securities Act

In Counts III, IV, and V, Plaintiff OKCERS asserts claims under Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l(a)(2), 77o, based on allegedly "false and misleading statements and omissions of material fact" in a registration statement, prospectus, and prospectus supplement (collectively, "the Offering Materials") filed with the SEC in connection with 2U's May 23, 2018 stock offering ("the Offering").   Defendants argue that these claims are barred by the statute of limitations, that only persons who purchased stock at the Offering have standing for the Section 11 claim, that none of the Defendants are statutory sellers who face liability under Section 12(a)(2), that Plaintiffs failed to plead an actionable false statement or omission of material fact, and that Plaintiffs failed to plead a violation of Item 105 of Regulation S-K, 17 C.F.R. § 229.105 ("Item 105").

### A.     Legal Standards

Section 11 of the Securities Act provides that a "person acquiring [a] security" has a civil cause of action when a registration statement "contain[s] an untrue statement of a material fact or omit[s] to state a material fact required to be stated therein or necessary to make the statements therein not misleading."   15 U.S.C. § 77k(a).   As relevant here, Section 12(a)(2) of the Securities Act  provides that a "person purchasing [a] security" has a civil claim when a prospectus "includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements. . . not misleading."   15 U.S.C. § 77l(a)(2).   Unlike the Exchange Act, these provisions of the Securities Act do not require a plaintiff to prove scienter.   *Yates*, 744 F.3d at 894.

Section 15 of the Securities Act provides that a "controlling person," including a "person who, by or through stock ownership, agency, or otherwise, . . . controls any person liable" under Sections 11 or 12, is likewise liable to the same extent, "unless the controlling person had no

49

knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." 15 U.S.C. § 77o; *Cozzarelli*, 549 F.3d at 630 (stating that Section 15 "creates control-person liability only where Sections 11 or 12 have been violated").

Where the Securities Act claims allege a false statement or omission of material fact but do not allege fraud or require scienter, the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA's requirement that a plaintiff "state with particularity" facts relating to state of mind  do not apply.  *See* Fed. R. Civ. P. 9(b); 15 U.S.C. § 78u-4(b)(2); *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 351 F.Supp.2d 334, 402 (D. Md. 2004) ("*In re Royal Ahold*") (finding Rule 9(b) inapplicable to claims under Sections 11 and 12 of the Securities Act).

### B.    Statute of Limitations

The statute of limitations for actions under Sections 11 and 12(a)(2) of the Securities Act states, in relevant part:  "No action shall be maintained to enforce any liability created under section 77k or 77l(a)(2) of this title unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence."  15 U.S.C. § 77m.  Here, because Plaintiffs filed their original complaints on July 30, 2020, their Securities Act claims must have accrued no earlier than July 30, 2019.

Defendants initially argued that the part of 15 U.S.C. § 77m stating that accrual occurs when "discovery should have been made by the exercise of reasonable diligence" has been interpreted as a standard of "inquiry notice" under which a claim is "triggered by evidence of the possibility of a claim of misrepresentation and not by complete exposure of the alleged scam." Mot. Dismiss at 38 n.15 (citing *In re USEC Sec. Litig.*, 190 F. Supp. 2d 808, 819 (D. Md. 2002), *aff'd sub. nom. Cohen v. USEC, Inc.*, 70 F. App'x 679, 687-89 (4th Cir. 2003)).  In their reply

brief, however, Defendants do not further pursue such a standard.  To the extent that Defendants were seeking a standard under which a claim would accrue merely upon the receipt of information that would cause a potential plaintiff to initiate an inquiry into whether a claim could be pursued, such a standard cannot be reconciled with the plain language of § 77m, which necessarily provides that a claim would not accrue until after a potential plaintiff, even with some basis to inquire, had had some time period during which to engage in "the exercise of reasonable diligence" to identify a potential claim.  15 U.S.C. § 77m.  *Cf. Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 650-53 (2010) ("*Merck"*) (finding that a standard under which a claim accrues at "the point where the facts would lead a reasonably diligent plaintiff to investigate further" was incompatible with the text of the statute of limitations under Section 10(b) of the Exchange Act).  Notably, the United States Court of Appeals for the Fourth Circuit has never interpreted § 77m so narrowly.  *See Brumbaugh v. Princeton Partners*, 985 F.2d 157, 162 (4th Cir. 1993) (discussing the term "inquiry notice" in the context of the statute of limitations for a state common law fraud claim and applying its analysis to a claim under Section 10(b) of the Exchange Act).  Courts considering the issue as applied to § 77m have rejected or declined to apply this standard and have instead focused on standards that largely track the language of the statute, such as the "discovery standard" applied in *Merck* to Exchange Act claims under which a claim accrues when "the plaintiff did in fact discover," or "a reasonably diligent plaintiff would have discovered, the facts constituting the violation."  *See Pension Tr. Fund for Operating Engineers v. Mortg. Asset Sec. Transactions, Inc.*, 730 F.3d 263, 277-78 (3d Cir. 2013) ("*Operating Engineers*") (quoting *Merck*, 559 U.S. at 653) (concluding that "while a reasonably diligent plaintiff would have started an investigation based on these . . . storm warnings, the statute of limitations would not have begun to run until she discovered" or "would have discovered the untrue statements"); *In re Under Armour Sec. Litig.*,

342 F. Supp. 3d 658, 671-72 (D. Md. 2018); *In re Mun. Mortg. & Equity, LLC, Secs. and Derivative Litig.*, 876 F. Supp. 2d 616, 653-54 (D. Md. 2012) ("*In re Mun. Mortg. & Equity*"), *aff'd on other grounds sub. nom. Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874 (4th Cir. 2014). *But see In re USEC Sec. Litig.*, 190 F. Supp. 2d 808, 821 (D. Md. 2002) (finding Sections 11 and 12 claims time-barred in part because the plaintiffs were placed on "inquiry notice" of wrongdoing and, with a subsequent reasonable investigation, would have had sufficient facts to file suit more than one year before the actual filing of the complaint). The Court therefore rejects the inquiry notice standard referenced by Defendants and finds that under § 77m, a claim is timely if discovery of the untrue statement actually occurred or "should have been made by the exercise of reasonable diligence" no more than one year before Plaintiffs filed their claims. 15 U.S.C. § 77m. A fact is discovered when a "reasonably diligent plaintiff would have sufficient information about that fact to adequately plead it in a complaint . . . with sufficient detail and particularity to survive a 12(b)(6) motion to dismiss." *City of Pontiac Gen. Emp.'s Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011); *Operating Engineers*, 730 F.3d at 275.

Here, whether the Court's standard or the narrower inquiry standard is applied makes no difference because the earliest that Plaintiffs were on notice of a need to investigate whether it could advance a Securities Act claim was on July 30, 2019, when Paucek acknowledged that 2U now was expecting "smaller average steady-state program[s]" and prospective students converting to enrollment at lower rates, and that 2U's historic growth narrative had been a "mistake" that required a new "level set" with investors. Am. Compl. ¶¶ 43-44.

Defendants argue that 2U's May 7, 2019 statements provided notice sufficient to inform Plaintiffs that they may have Securities Act claims based on false or misleading statements or material omission. On that date, 2U issued a press release announcing "a reduction in projected

revenue for full year 2019." *Id.* ¶¶ 307-08.  Graham stated that the reduced revenue projection for 2019 was due to a "decline in expected graduate program enrollments beginning in the second quarter [of 2019] and continuing through" the year.  *Id.* ¶ 502.  As discussed above, however, during the accompanying earnings call, Paucek largely attributed the reduced 2019 guidance to a variety of short-term, program-specific factors, highlighted numerous other purported strengths in 2U's performance,  and emphasized that the reduced revenue projections applied only to 2019 and was "not a recalibration for the future," that 2U remained a "30%-plus grower" for the foreseeable future, and that 2U remained "very bullish" about the company's "long-term prospects."  *Id.* ¶¶ 327, 329; *see supra* part II.D.  Paucek also reassured investors that 2U's leadership did not "feel like we have any reason to not believe" that a total of 250 programs with target enrollment ranges of 300 to 500 per program were "well within [2U's] opportunity set."  Am. Compl. ¶ 321.  As a result, though the 2U stock price declined by $15.16 to $44.47 the next day, investment analysts remained confident in 2U's growth trajectory beyond 2019, with some stating that "[d]espite this news, we believe [2U's] long-term growth trajectory and its eventual path to profitability remain in sight."  *Id.* ¶ 207.

Thus, as presented, the information disclosed on May 7, 2019 revealed only that 2U had encountered a few unexpected, short-term problems affecting enrollment in 2019 which did not impact 2U's long-term growth plans and thus was insufficient to put Plaintiffs on notice of possible untrue statements by 2U that would then necessitate a reasonable investigation.  These facts stand in stark contrast with those of *In re Under Armour Securities Litigation*, 342 F. Supp. 3d 658 (D. Md. 2018), relied upon by Defendants, in which the complaint was filed on August 4, 2017, but there was a steady drumbeat of negative information about the company released starting more than one year before that date, including a January 2016 report showing that the company's growth,

average sales price, and market share had declined; news in February and May 2016 of "suspicious departures of executives"; a June 2016 announcement of reduced revenue and operating income expectations; and a July 2016 announcement of further decreases in operating and net income as well as "a drop in sales growth below 20% for the first time in more than seven years" and a "forecast of the slowest quarterly growth in over six years." *Id.* at 673.  Applying § 77m, the court found that the Securities Act claims were time-barred because "[t]hese early disclosures, especially taken in their entirety, were sufficient triggers to allow [the plaintiffs] to have investigated . . . prior to August 4, 2016" the facts necessary to plead their claim.  *Id.*

Here, at the time of the May 7, 2019 statements, 2U had seen no recent, let alone suspicious, executive departures and had announced *increased* revenue expectations just months before in February 2019.  The reduced revenue expectations announced on May 7 were thus the first release of negative information that year, and 2U's CEO, Paucek, specifically reassured investors that there would be no impact on growth or prospects after 2019, a position largely accepted by analysts.  Under these circumstances, a reasonably prudent investor would not have inquired into whether 2U's historic and still-touted business model with a strong track record to date in fact was experiencing profound, sustained market challenges undermining its long-term marketing costs, student acquisition abilities, profit margins, and steady-state target goals.  *See In re Mun. Mortg. & Equity*, 876 F. Supp. 2d at 654 (finding plaintiffs' claims not time-barred and that earlier disclosures that the company would have to consolidate "substantially all" of its low income tax credit funds did not trigger the limitations period where the scope of the consolidation and restatement effort and "the enormous cost it would entail" were not revealed until almost a year later).  More acutely, such an investor did not have reason to inquire whether 2U was omitting internal enrollment projections that forecast the exact opposite of the company's message.

Based on the allegations in the Amended Complaint, as discussed above, Plaintiffs were likely first put on notice of a need to investigate a possible claim arising from false statements or material omissions as of 2U's disclosures on July 30, 2019. The next day, 2U's stock price dropped by over 65 percent to $12.80 per share as formerly bullish analysts downgraded their expectations, including by stating that this was "a major story change" and that "this is clearly a breaking of the Company's model." Am. Compl. ¶¶ 45-46. Graham then resigned on August 22, 2019. Where the July 30, 2019 disclosures of 2U's broad financial woes and fundamental flaws in its business model finally revealed sufficient information for Plaintiffs to initiate an inquiry into a Securities Act claim, and even then some additional time was likely needed to attain sufficient facts to assert a claim that would withstand a motion to dismiss, the Court will deny the Motion to the extent it seeks dismissal of Plaintiffs' Securities Act claims filed on July 30, 2020 as time-barred.

## C.    Section 11 Standing

Where OKCERS asserts its Securities Act class action claims "on behalf of all persons and entities that purchased or acquired 2U common stock pursuant or traceable to the Registration Statement," Am. Compl. ¶ 509, Defendants argue that "OKCERS' Section 11 claims brought on behalf of persons who did not purchase in the Offering should be dismissed for lack of standing." Mot. Dismiss at 47. Section 11 establishes liability where a registration statement contained a materially false or misleading statement or omission. 15 U.S.C. § 77k(a); *Yates*, 744 F.3d at 894. For such a claim, standing is limited to those who purchased shares that were the direct subject of the registration statement that contained the actionable statement or omission. *See In re Ariad Pharms., Inc. Sec. Litig.*, 842 F.3d 744, 755 (1st Cir. 2016); *Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 495 (5th Cir. 2005). Where "a company has issued shares under more than one registration statement, the plaintiff must prove that her shares were issued under the allegedly false or

misleading registration statement, rather than some other registration statement." *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1106 (9th Cir. 2013) ("*In re Century Aluminum*"); *see TransEnterix Inv. Grp. v. TransEnterix, Inc.*, 272 F. Supp. 3d 740, 761 (E.D.N.C. 2017).  Plaintiffs may meet this requirement by alleging that they purchased their shares directly in the relevant offering itself.  *In re Century Aluminum*, 729 F.3d at 1106; *cf. Yates*, 744 F.3d at 899-900 (assessing standing under Section 12(a)(2)).  Alternatively, plaintiffs may meet this requirement by alleging sufficient facts to show "that their shares, although purchased in the aftermarket, can be traced back to the" offering.  *In re Century Aluminum*, 729 F.3d at 1106 (holding that plaintiffs have standing to assert a Section 11 claim if they "purchased shares in the aftermarket" and "can trace their shares back to the relevant offering"); *cf. Yates*, 744 F.3d at 900 (finding that, for a Section 12(a)(2) claim, standing may be properly pleaded based on allegations the plaintiffs purchased the securities "pursuant and/or traceable to" the public offering when accompanied by "sufficient supporting facts" for that assertion).

Here, OKCERS alleges that it purchased shares at the May 23, 2018 Offering itself and thus has adequately pleaded standing for itself as the lead plaintiff on the Securities Act claims. *See In re Century Aluminum*, 729 F.3d at 1106; *Yates*, 744 F.3d at 899-900.  At this stage of the case, that is all that is necessary for the claim to proceed.  *See In re Royal Ahold*, 351 F. Supp. 2d at 401 ("In class action suits, in order to properly plead a § 11 claim, 'a named plaintiff must have purchased shares traceable to the challenged offering.'" (quoting *In re Glob. Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 207 (S.D.N.Y. 2003))).  Defendants have not cited, and the Court is not aware of, any case dismissing a Section 11 claim as to unnamed class members where the named plaintiff has adequately pleaded its own standing.  Issues relating to the class are more

appropriately addressed at the class certification stage.  The Court will deny the Motion as to Section 11 standing.

### D.    Section 12(a)(2) Statutory Seller Liability

Defendants further argue that the claims under Section 12(a)(2) against 2U, the Underwriter Defendants, and the Executive Defendants must be dismissed because they are not statutory sellers who may be held liable under that provision.  Section 12(a)(2) establishes liability against "[a]ny person who . . . offers or sells" a security "by means of a prospectus" that contains an untrue statement or omission of material fact.  15 U.S.C. § 77l(a)(2).  Under *Pinter v. Dahl*, 486 U.S. 622 (1988), statutory sellers who may be held liable pursuant Section 12(a)(2) include (1) offerors who sell the security to the plaintiff by transferring title for value, and (2) individuals such as brokers who successfully solicited the plaintiff's purchase and were "motivated at least in part by a desire to serve his own financial interests or those of the securities owner."  *Id.* at 644, 646-47; *see In re RAC Mortg. Inv. Corp. Sec. Litig.,* 765 F. Supp. 860, 865 (D. Md. 1991).

First, Plaintiffs' Section 12(a)(2) claims against 2U are viable because 2U is a "seller" under that statute pursuant to SEC Rule 159A, which provides, in relevant part, that:

> Definition of seller for purposes of section 12(a)(2) of the Act.  For purposes of section 12(a)(2) of the [Securities] Act only, in a primary offering of securities of the issuer, regardless of the underwriting method used to sell the issuer's securities, seller shall include the issuer of the securities sold to a person as part of the initial distribution of such securities, and the issuer shall be considered to offer or sell the securities to such person, if the securities are offered or sold to such person by means of any of the following communications:
>
> (1)    Any preliminary prospectus or prospectus of the issuer relating to the offering . . .

17 C.F.R. § 230.159A(a).  Here, the parties agree that 2U sold its shares through a "firm commitment offering," under which the Underwriter Defendants purchased all the shares offered

directly from the issuer, 2U, and then resold those shares to the public.  *See* Mot. Dismiss at 47; Opp'n at 48, ECF No. 155.  Thus, pursuant to the text of Rule 159A, an initial issuer of stock such as 2U is liable as a "seller" under Section 12(a)(2) for sales "in a primary offering" of its stock "regardless of the underwriting method used."  *Id.*  Notably, in adopting Rule 159A, the SEC stated that "[w]hen an issuer registers securities to be sold in a primary offering," that issuer "is selling its securities to the public, even if the issuer used "a firm commitment underwriting" that "involve[d] the sale first by the issuer to the underwriter and then the sale by the underwriter to the public."  Securities Offering Reform, 70 Fed. Reg. 44722-01, 44769, 2005 WL 1811282 (Aug. 3, 2005).  The SEC has also taken the view that "an issuer offering or selling its securities in a registered offering pursuant to a registration statement" could "be viewed as soliciting purchasers of the issuer's registered securities."  *Id.*  The phrase "primary offering" in Rule 159A thus includes the sale of securities through a firm commitment offering, as occurred here.

Defendants do not argue that Rule 159A does not apply to 2U as a textual matter.  Rather, Defendants contend that Rule 159A, adopted in 2005, conflicts with *Pinter*, and that the SEC "cannot overrule the Supreme Court."  Reply at 20, ECF No. 157 (quoting *Mass. Mut. Life Ins. Co. v. Res. Funding Co., LLC*, 843 F. Supp. 2d 191, 207 (D. Mass. 2012)).  However, the United States Court of Appeals for the Second Circuit, when confronted with the issue of Rule 159A's validity, upheld Rule 159A and concluded that it is a reasonable exercise of the SEC's authority as delegated by Congress to interpret ambiguities in a statute within the agency's jurisdiction.  *See Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 139-40 (2d Cir. 2017) ("*Nomura*").  In particular, the court rejected the argument that *Pinter* constitutes judicial precedent that "unambiguously forecloses" the SEC's interpretation, as *Pinter* noted that the statutory seller term includes "the owner who passed title . . . to the buyer for value,"

and that "the only element of the statutory seller provision *Pinter* found unambiguous" is that Congress did not intend for it to include "a person who urges the purchase but whose motivation is solely to benefit the buyer." *Nomura*, 873 F.3d at 140.  The Court agrees with the Second Circuit that *Pinter* does not hold that Section 12(a)(2) unambiguously bars liability to an issuer such as 2U.  Indeed, numerous other courts have found issuers who sold their securities through a firm commitment offering liable under Section 12(a)(2) based on Rule 159A.  *See Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1132 (S.D. Cal. 2012) (finding that Rule 159A rendered the issuer liable as seller under Section 12(a)(2) despite the use of a firm commitment offering), *aff'd on other grounds sub nom. Fresno Cnty. Emps. Ret. Ass'n v. Alphatec Holdings, Inc.*, 607 F. App'x 694, 695 (9th Cir. 2015); *Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d 506, 512 (S.D.N.Y. 2010) (same); *In re Oppenheimer Rochester Funds Grp. Sec. Litig.*, 838 F. Supp. 2d 1148, 1179 (D. Colo. 2012).  Defendants' lone supporting case, which predates *Nomura*, provides scant analysis to support its conclusion.  *See Mass. Mut. Life Ins. Co. v. Res. Funding Co., LLC*, 843 F. Supp. 2d 191, 208 (D. Mass. 2012).  Because Rule 159A establishes that issuers of stock who provide a prospectus or preliminary prospectus in a registration statement for an offering are sellers liable under Section 12(a)(2) even if they accomplish the sale through underwriters, Plaintiffs have alleged adequately a Section 12(a)(2) claim against 2U.  *See Alpha Cap. Anstalt v. Intellipharmaceutics Int'l, Inc.*, No. 19-cv-9270, 2020 WL 3318029, at *5 (S.D.N.Y. June 18, 2020) (denying a motion to dismiss a Section 12(a)(2) claim against an issuer that sold to the public via an underwriter because SEC Rule 159A provides that "an issuer is a statutory seller for the purposes of Section (a)(2) 'regardless of the underwriting method used to sell the issuers securities'" (citing 17 C.F.R. § 230.159A(a)).

As for the Underwriter Defendants, Defendants argue that Plaintiffs' allegations are deficient because they have not asserted that they actually purchased the stock from the Underwriter Defendants. In a firm commitment offering, underwriters may sell to a broker who then passes the title to plaintiffs. *In re Airgate PCS, Inc. Sec. Litig.*, 389 F. Supp. 2d 1360, 1367 (N.D. Ga. 2005) ("*In re Airgate*"). Although OKCERS alleges that it "purchased shares in the Offering," Am. Compl. ¶ 531, it does not allege that it purchased shares directly from the Underwriter Defendants, let alone from a specific one. Nor does OKCERS allege that the Underwriter Defendants solicited its purchase. While it is certainly possible that the Underwriter Defendants at the Offering sold shares directly to OKCERS or solicited its purchase, OKCERS's vague allegation is insufficient to state a plausible claim against the Underwriter Defendants. *See In re Airgate*, 389 F. Supp. 2d at 1367 (dismissing a Section 12(a)(2) claim where the plaintiffs failed to allege that the underwriter defendant sold stock directly to plaintiffs in a firm commitment offering); *Baker v. Seaworld Ent., Inc.*, No. 14-cv-2129, 2016 WL 2993481, at *18 (S.D. Cal. Mar. 31, 2016) (dismissing a Section 12(a)(2) claim where the plaintiffs did not allege that the underwriters were immediate sellers or solicited the plaintiffs). The Motion will therefore be granted as to the Section 12(a)(2) claims against the Underwriter Defendants.

Finally, Plaintiffs have failed to state a valid Section 12(a)(2) claim against Paucek, Graham, and the Director Defendants. Plaintiffs argue that these defendants are liable because they "participate[d] in the preparation of the Offering Materials" and signed the registration statement, which Plaintiffs argue was an "act of solicitation." Opp'n at 50. For solicitors other than the immediate seller, *Pinter* provides that "liability extends only to the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Pinter*, 486 U.S. at 647. Paradigmatic examples include

the "securities vendor's agent who solicited the purchase," or "the broker acting as an agent of one of the principals to the transaction." *Id.* at 644, 646.  Liability does not extend to those who were "merely a substantial factor in causing the sale." *Id.* at 654.  As an example of the improper use of a substantial factor test, the Court referenced *Lennerth v. Mendenhall*, 234 F. Supp. 59 (N.D. Ohio 1964), in which the court imposed liability on an "issuer's president, vice president, and another employee" based in part of the president's act of signing an agreement. *Pinter*, 486 U.S. at 649-50 n.25; *Lennerth*, 234 F. Supp. at 66.  Thus, liability based on solicitation requires that the "defendant must be directly involved in the actual solicitation." *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1215 (1st Cir. 1996).

Under these principles, circuit courts have consistently held that mere participation in preparing offering materials, such as by signing the registration statement, is insufficient to constitute "solicitation." *See, e.g.*, *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 871 (5th Cir. 2003) (holding that "signing the registration statement" did not suffice for solicitation); *Shaw*, 82 F.3d at 1216 (holding that "neither involvement in preparation of a registration statement or prospectus nor participation in 'activities' relating to the sale of securities, standing alone," is sufficient to establish liability based on solicitation); *Citiline Holdings, Inc.*, 701 F. Supp. 2d at 512 (collecting circuit cases and finding allegations that defendants signed the registration statement insufficient); *see also In re Constellation Energy*, 738 F. Supp. 2d at 632-33 & n.16 (finding insufficient the allegation that individual defendants prepared the offering materials); *In re Royal Ahold*, 351 F. Supp. 2d at 406 (same).  Where Plaintiffs have alleged only that Paucek, Graham, and the Director Defendants participated in preparing the Offering Materials or signed the registration statement, these allegations are insufficient to support a claim against them under Section 12(a)(2).

For the reasons stated above, the Court will deny the Motion as to the Section 12(a)(2) claim against 2U but grant it as to the Section 12(a)(2) claims against the Underwriter Defendants, Paucek, Graham, and the Director Defendants.

### E.     False Statements or Omissions of Material Fact

Defendants also assert that Plaintiffs have not stated a plausible Securities Act claim because none of Plaintiffs' five alleged false statements or omissions in the Offering Materials are actionable in that they do not involve omissions of material fact.  On May 25, 2018, 2U conducted the Offering and included among the Offering Materials 2U's 2017 Form 10-K.  The "Overview" section of the 2017 Form 10-K stated:

> Over the past decade, we have developed new and innovative tools within our platform to enhance the effectiveness of instructional methods and improve student outcomes and the student experience.  During that time, we have also refined our program selection algorithm and improved our data-driven digital marketing capabilities across our ecosystem of offerings to generate increased student enrollments in a cost effective manner. As a result, demand for our comprehensive platform of integrated technology and services has increased significantly. Since 2008, we have expanded our university client base from one to 24 across our entire portfolio of offerings, increased the number of 2U-powered graduate programs from one to 37, and enrolled over 33,000 graduate students.  Our core strategy is to launch graduate programs and short courses with new and existing university clients and to increase student enrollments across our portfolio.

2017 Form 10-K at 4.

Plaintiffs identified as actionable the following five statements in the 2U's 2017 Form 10-K.

> 1.     Over the past decade, we have developed new and innovative tools within our platform to enhance the effectiveness of instructional methods and improve student outcomes and the student experience.  During that time, we have also refined our program selection algorithm and improved our data-driven digital marketing capabilities across our ecosystem of offerings to generate increased student enrollments in a cost effective manner.  Am. Compl. ¶¶ 459-60.

2.     Leveraging data analytics and machine learning techniques, we develop targeted, offering-specific digital marketing campaigns that can reach and engage interested and qualified prospective students in a cost-effective manner. *Id.* ¶¶ 461-62.

3.     We expect that the competitive landscape will expand as the market for online education offerings at nonprofit institutions matures. We believe the principal competitive factors in our market include the following:  . . . expertise in marketing, student acquisition and student retention. . . . We believe we compete favorably on the basis of these factors.  Our ability to remain competitive will depend, to a great extent, upon our ability to consistently deliver our high-quality platform, meet university client needs for content development, acquire, support and retain students and deliver desired student, faculty and university outcomes. *Id.* ¶¶ 463-64.

4.     We have grown rapidly and expect to continue to invest in our growth for the foreseeable future.  If we fail to manage this growth effectively, the success of our business model will be compromised. . . .

     If we fail to manage this expansion of our business efficiently, our costs and expenses may increase more than we plan and we may not successfully expand our university client base, enhance our platform, develop new offerings with new and existing university clients, attract a sufficient number of qualified students in a cost-effective manner, satisfy the requirements of our existing university clients, respond to competitive challenges or otherwise execute our business plan. *Id.* ¶¶ 465-66.

5.     We face competition from established and emerging companies, which could divert university clients or students to our competitors, result in pricing pressure and significantly reduce our revenue. *Id.* ¶ 467.

As acknowledged by the parties, the materiality standards that apply to Exchange Act claims apply equally to Securities Act claims.  *See Omnicare, Inc.*, 575 U.S. at 185 n.2, 189 n.7 (referencing precedent related to the Exchange Act in analyzing materiality under the Securities Act).  An omitted fact is material if there is a substantial likelihood that its disclosure "would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Paradise Wire*, 918 F.3d at 318.

The first two statements are actionable in that they omit material facts. As to the first, that "we have also refined our program selection algorithm and improved our data-driven digital marketing capabilities . . . to generate increased student enrollments in a cost effective manner" this statement was materially misleading because, as described above, the company's internal projections were forecasting worsening enrollment no later than early 2018. Am. Compl. ¶ 460. Notably, this statement was made after, in February 2018, Paucek had projected 30 percent annual revenue growth "for the foreseeable future" and an eventual steady-state annual revenue of $3 billion from 193 graduate programs, *id.* ¶ 10, and after, on May 3, 2018, he stated that the "annual number of launched graduate programs has increased substantially over the past few years and shows no signs of slowing down." *Id.* ¶ 363. In this context, the first statement conveyed that 2U's business model was working, including its strategy of consistently increasing enrollment at low cost to 2U. The fact that the statement was made in the Overview section just before an additional reference to 2U's historic growth to 37 programs and more than 33,000 graduate students reinforced the message that the model was cost-effective and that growth was sustainable.

The omission of the negative enrollment projections was material because it would have "significantly altered the total mix of information" available to a reasonable investor. *Paradise Wire*, 918 F.3d at 318. The declining enrollment projections meant that 2U likely would not be able to continue increasing total enrollments while maintaining the historic acquisition cost per student—either enrollments would decline, or acquisition costs would increase, or both. If the worsening enrollment projections had been disclosed, a reasonable investor would have understood that even if 2U historically had been able acquire students in a cost-effective manner, it may not be able to do so in the near future. Given that 2U's business model and long-term goals hinged on increasing revenue by continuing to rapidly expand programs and enrollment, a

reasonable investor aware of the declining enrollment projections would be aware that the business model may soon falter, such that the current stock price was unwarranted.

For similar reasons, the second statement, that 2U "develop[s] targeted, offering-specific digital marketing campaigns that can reach and engage interested and qualified prospective students in a cost-effective manner," could also be deemed materially misleading.  Am. Compl. ¶ 461-62.  Again, had investors been aware of the declining enrollment projections, they would have had a basis to be concerned that 2U's marketing campaigns were not actually able to generate student enrollments in a cost-effective manner so as to meet 2U's growth targets.  Moreover, Plaintiffs have provided factual allegations from former 2U employees that by the date of the Offering in May 2018, in addition to the declining enrollment projections, 2U's sales goals had become "unreachable," *id.* ¶ 128, and that 2U was not "spending enough on marketing to make sales from 2017 and 2018," *id.* ¶ 109; *see id.* ¶ 88.  Viewed in the light most favorable to Plaintiffs, these assertions bolster the conclusion that the second statement was misleading, particularly absent the disclosure that 2U had declining enrollment projections.

These two statements were not puffery:   2U specifically identified its program-selection process and marketing capabilities as reasons for its model's efficacy and pointed to its rapid growth to 37 programs and 33,000 enrolled graduate students as evidence of this efficacy.  Whether its model was cost-effective could be tested and, in fact, was directly challenged by the very information that the statement omitted—worsening internal enrollment projections.  *See Dunn*, 369 F.3d at 431 (finding that misrepresentations were not puffery where they could "be proven true or false").   The Court therefore finds that the first two statements involved misleading omission of material fact actionable under the Securities Act.

The other three statements, however, are not actionable.  As to the third statement—that 2U "believe[d] the principal competitive factors in our market" included "expertise in marketing, student acquisition and student retention," and that "We believe we compete favorably on the basis of these factors," Am. Compl. ¶ 463—there has been no showing that the belief about the main competitive factors was false, and the general opinion that 2U competes "favorably" constitutes puffery and is too vague to be material.  *See Raab*, 4 F.3d at 289 ("Soft, puffing statements . . . generally lack materiality because the market price of a share is not inflated by vague statements.").

The fourth and fifth statements primarily consist of forward-looking warnings and statements of opinion that are not demonstrably false.  In the fourth statement, the claim that "[w]e have grown rapidly and expect to continue to invest in our growth for the foreseeable future" is not identifiably false, and the disclaimers, such as "[i]f we fail to manage this growth effectively, the success of our business model will be compromised," is not likely to be false.  Am. Compl. ¶ 465.  Likewise, Plaintiffs have not provided allegations sufficient to show that the fifth statement's warning that "[w]e face competition from established and emerging companies, which could divert university clients or students to our competitors, result in pricing pressure and significantly reduce our revenue" is false.  *Id.* ¶ 467.  Further, where Plaintiffs have not alleged facts sufficient to infer that there were identifiable problems with competition as of May 2018, omitting information about that issue was not misleading.

Finally, where most parts of the fourth and fifth statements are forward-looking, they are not actionable because the PSLRA's safe harbor provisions preclude claims based on such statements absent actual knowledge that they were false or misleading, and Plaintiffs do not allege these statements were made with such knowledge.  *See* 15 U.S.C. § 78u-5(c).  Even if they had, unlike some of the forward-looking statements referenced in relation to the Exchange Act claims,

these statements about growth and competition are so general in nature that they do not suggest a definable source of information relied upon in asserting them which would support a claim of a material omission.  The Motion will be granted as to the third, fourth, and fifth statements.

> **F.      Item 105**

Defendants further argue that Plaintiffs have failed to state a plausible claim of a violation of the Securities Act based on Item 105.  Item 105 requires "a discussion of the material factors that make an investment in the registrant or offering speculative or risky" and further requires that a registrant "[c]oncisely explain how each risk affects the registrant or the securities being offered."  17 C.F.R. § 229.105.  Item 105 replaced a similar requirement previously contained in Item 503 of Regulation S-K, 17 C.F.R. § 229.503 ("Item 503").  *See Jaroslawicz v. M&T Bank Corporation*, 962 F.3d 701, 705 (3d Cir. 2020).  Item 105 does not provide an independent cause of action.  *Id.* at 711 n.10.  Rather, failure to comply with Item 105 may render a misstatement or omission of a material risk factor actionable under preexisting causes of action, including Sections 11 and 12(a)(2) of the Securities Action.  *See Silverstrand Invs. v. AMAG Pharms., Inc.*, 707 F.3d 95, 102 (1st Cir. 2013) (discussing Item 503 as grounds for a Section 11 claim); *City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183-84 (2d Cir. 2014) ("*UBS AG*") (discussing an alleged Item 503 violation in the context of Section 11 and 12(a)(2) claims).

Plaintiffs allege that the following risk factors had to be disclosed in the 2017 Form 10-K that was incorporated by reference in the Offering Materials:

> (1) [T]he Company had been seeing enrollment forecasts decline since 2017, a trend that was worsening in 2018; (2) the Company was failing to adapt to an increasingly saturated market for online degree programs; (3) the Company was failing to successfully scale its marketing operations to keep pace with its growth in programs; (4) 2U was failing to achieve projected marketing efficiencies at the front end of the funnel as costs for online marketing rose; and (5) the Company was failing to execute at the mid-point in the funnel, as the understaffed admissions

department was unable to keep up with unrealistic quotas, and as 2U's multi-program vertical strategy resulted in the Company's own programs competing for the same students.

Am. Compl. ¶ 468.

The standard for materiality is the same as that applied to an alleged violation of Rule 10b-5. *City of Roseville Emp.'s Ret. Sys. v. Energysolutions, Inc.*, 814 F. Supp. 2d 396, 426 (S.D.N.Y. 2011).   Accordingly, where the Court has found the failure to disclose the declining enrollment projections to be material pursuant to Rule 10b-5, it finds that Plaintiffs have stated an Item 105 claim based on that risk factor.   However, the Court does not find a plausible claim based on the other asserted risk factors.   Item 105 focuses on specific, current facts or events that have negative future implications.   *See, e.g.*, *UBS AG*, 752 F.3d 173, 184 (finding "multiple legal proceedings" currently underway that could expose defendant to significant damages and penalties constituted a factor under Item 503); *Jaroslawicz*, 962 F.3d at 715 (finding that ongoing noncompliance with federal regulations, including those relating to anti-money laundering programs, was a risk factor under Item 105); *Silverstrand Invs.*, 707 F.3d at 106 (finding that serious side-effects, including death and anaphylaxis, of a company's drug product that had not yet been approved by the FDA constituted a risk factor under Item 503).   Plaintiffs' other alleged risk factors, which consist of general, sweeping claims of failure such as that 2U was "failing to adapt" and "failing to successfully scale," Am. Compl. ¶ 468, are so imprecise and non-measurable, and cannot reasonably be established to be objectively true or untrue, that they do not form a proper basis for an Item 105 claim.   Even if they could qualify as risk factors, while Plaintiffs have alleged certain adverse facts about 2U's performance and outlook as of May 2018 beyond the declining enrollment projections, they have not alleged sufficient facts to show that these broad statements relating to performance on discrete business processes were specifically true as of that date such

68

that they had to be listed as risk factors under Item 105. The Motion will therefore be granted as to all risk factors other than the declining enrollment projections.

### G.    Section 15 Control Person Liability

Setting aside exceptions not applicable here, Section 15 of the Securities Act renders liable every person who "controls any person" found liable under Sections 11 or 12. 15 U.S.C. § 77o. As a result, where Section 11 or 12 liability has been adequately pleaded against a company, Section 15 claims against the individuals who controlled the company typically are also adequately pleaded. *See, e.g., Cozzarelli*, 549 F.3d at 630 ("[S]ection [15] creates control-person liability only where Sections 11 or 12 have been violated."); *Cohen*, 70 F. App'x at 685 (noting that Section 15 "provid[es] for joint civil liability of all persons controlling a company liable for violations Section 11 or 12"). Because Plaintiffs have adequately pleaded claims against 2U under Sections 11 and 12(a)(2), Plaintiffs have also adequately pleaded a Section 15 claim against Paucek, Graham, and the Director Defendants. The Court therefore will deny the Motion as to the Section 15 claim.

In summary, the Court will deny the Motion as to the Sections 11 and 15 claims because Plaintiffs timely filed suit, have standing, and have sufficiently alleged an actionable omission of a material fact within the Offering Materials. As for the Section 12(a)(2) claims, the Court will deny the Motion as to 2U but grant it as to all other Securities Act Defendants.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion to Dismiss will be GRANTED IN PART and DENIED IN PART, as specified in the accompanying Order.

Date:  August 5, 2021



THEODORE D. CHUANG
United States District Judge