**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| IN RE 2U, INC. SECURITIES CLASS ACTION | Consolidated Case No. 8:19-cv-03455-TDC |

**DECLARATION OF JEREMY A. LIEBERMAN IN SUPPORT OF
(I) PLAINTIFFS' MOTION FOR FINAL APPROVAL OF CLASS ACTION
SETTLEMENT AND APPROVAL OF PLAN OF ALLOCATION OF THE NET
PROCEEDS OF THE SETTLEMENT AND (II) LEAD COUNSEL'S
MOTION FOR AN AWARD OF ATTORNEYS' FEES, PAYMENT
OF LITIGATION EXPENSES, AND REIMBURSEMENT TO PLAINTIFFS**

I, JEREMY A. LIEBERMAN, declare as follows pursuant to 28 U.S.C. §1746:

1.      I am a member of the Bar of the State of New York, and am admitted *pro hac vice* to appear before this Court in this action.  I am the managing partner of the law firm of Pomerantz LLP ("Pomerantz"), Counsel for Court-appointed Lead Plaintiff Fiyyaz Pirani ("Lead Plaintiff") and Lead Counsel for the proposed class.[1]  I have been actively involved in all aspects of the prosecution and resolution of the Action, am familiar with its proceedings, and have personal knowledge of the matters set forth herein based upon my supervision and participation in all material aspects of the Action.

2.      Pursuant to Rule 23 of the Federal Rules of Civil Procedure, I submit this declaration in support of Plaintiffs' Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation of the Net Proceeds of the Settlement.  I also submit this declaration in support of Lead Counsel's Motion for an Award of Attorneys' Fees, Payment of Litigation Expenses, and Reimbursement to Plaintiffs.  Both motions have the full support of Lead Plaintiff and Additional Named Plaintiff Oklahoma City Employee Retirement System ("OCERS," and together with Pirani, "Plaintiffs").  *See* Declaration of Fiyyaz Pirani, dated October 28, 2022,

---

[1] All capitalized terms used herein that are not otherwise defined have the meanings provided in the Stipulation and Agreement of Settlement, dated as of May 31, 2022 (ECF No. 224-3) (the "Stipulation"), which was entered into by and among Plaintiffs and the Settlement Class and 2U, Inc. ("2U"), Christopher J. Paucek, Catherine A. Graham, Harsha Mokkarala, Paul A. Maeder, Robert M. Stavis, Gregory K. Peters, Timothy M. Haley, Valerie B. Jarrett, Earl Lewis, Coretha M. Rushing, Sallie L. Krawcheck, John M. Larson, Edward S. Macias, and Mark J. Chernis (with 2U, the "2U Defendants"), and Goldman Sachs & Co. LLC, Credit Suisse Securities (USA) LLC, Citigroup Global Markets Inc., Compass Point Research & Trading, LLC, KeyBanc Capital Markets Inc., and Macquarie Capital (USA) Inc. (collectively, the "Defendants," and with Plaintiffs, the "Parties").

attached hereto as Exhibit 1, and Declaration of Paul Bronson on Behalf of OCERS, dated October 27, 2022, attached hereto as Exhibit 2.[2]

## I.    PRELIMINARY STATEMENT

3.    The proposed Settlement now before the Court provides for the resolution of all claims in the Action, and related claims, in exchange for a cash payment of $37,000,000.  As detailed herein, Plaintiffs and Lead Counsel respectfully submit that the Settlement represents a very favorable result for the Settlement Class in light of the significant risks of continuing to litigate the Action.

4.    This case has been vigorously litigated from its commencement in August 2019 through the execution on April 21, 2022 of a memorandum of understanding to settle the Action. The Settlement was achieved only after Lead Counsel, *inter alia,* as detailed herein: (i) conducted a thorough and wide-ranging investigation concerning the allegedly fraudulent misrepresentations made by Defendants, which included a review and analysis of publicly available information, interviews with numerous witnesses who were former 2U employees that were familiar with the Company's student enrollment operations and other potentially relevant information, and consultation with experts on market efficiency, loss causation, and damages; (ii) prepared and filed a detailed Consolidated Class Action Complaint (ECF No. 92); (iii) researched and drafted an opposition (ECF No. 155) to Defendants' comprehensive motion to dismiss the Complaint (ECF No. 144), which the Court granted in part and denied in part; (iv) moved for class certification (ECF No. 210); (v) engaged in fact discovery efforts, which led to the analysis of approximately

---

[2] Citations to "Exhibit" or "Ex. __" herein refer to exhibits to this Declaration.  For clarity, citations to exhibits attached to such exhibits will be referenced as "Ex. __-__."  The first numerical reference is to the designation of the entire exhibit attached hereto and the second alphabetical reference is to the exhibit designation within the exhibit itself.

285,000 pages of documents produced by Defendants and third parties; and (vi) engaged in extensive mediation efforts overseen by Gregory Lindstrom, which included the preparation of mediation briefs, a full-day mediation session, and extensive subsequent negotiations.

5.    Plaintiffs and Lead Counsel believe that the Settlement is in the best interests of the Settlement Class.  Due to their efforts, Plaintiffs and Lead Counsel are well-informed about the strengths and weaknesses of the claims and defenses in the Action.  As discussed in detail below, the Settlement was achieved in the face of vigorous opposition by Defendants who would have, had the Settlement not been reached, continued to raise numerous challenging defenses.  For example, Defendants would have continued to raise serious arguments concerning scienter and the falsity of the alleged misstatements.  Additionally, Defendants would likely argue that damages are not significant.   Issues relating to damages would likely have come down to an inherently unpredictable and hotly disputed "battle of the experts," with Defendants' experts opining, among other things, that Plaintiffs' damages model overstated damages and did not account for other factors that may have caused the price of 2U stock to decline.  In the absence of a settlement, there was a very real risk that the class could have recovered nothing or an amount significantly less than the negotiated Settlement.

6.    Further, the Settlement forecloses the risk of attempting to collect a judgment against an insolvent defendant.  As discussed further in Section VII.A below, 2U's financial condition is far weaker than it was during the Class Period or at the inception of this Action.  The amount of cash and cash equivalents on 2U's balance sheet, as well as its stock price, has declined starkly, raising serious doubt as to whether 2U could satisfy a judgment for the full amount of damages in this case.  Further, applicable insurance coverage could be depleted by continued prosecution of this Action.

7. With respect to the proposed Plan of Allocation for the Settlement proceeds, as discussed below, the proposed plan was developed with the assistance of Plaintiffs' damages expert, and provides for the distribution of the Net Settlement Fund to Settlement Class Members who submit Claim Forms that are approved for payment on a *pro rata* basis based on their losses attributable to the alleged securities law violations.

8. With respect to Lead Counsel's application for fees and expenses, as discussed in Lead Counsel's Memorandum of Law in Support of Motion for an Award of Attorneys' Fees, Payment of Litigation Expenses, and Reimbursement to Plaintiffs ("Fee Brief"), the requested fee of 33.4% of the Settlement Amount, plus accrued interest, would be fair both to the Settlement Class and to Plaintiffs' Counsel, and warrants the Court's approval. This fee request is within the range of fee percentages regularly awarded in this type of contingent litigation and, under the facts of this case, is justified in light of the substantial benefits that Lead Counsel, together with other Plaintiffs' Counsel, have conferred on the Settlement Class, the risks they undertook, the quality of their representation, the nature and extent of the legal services, and the fact that Plaintiffs' Counsel pursued the case at their financial risk. Lead Counsel also seeks reimbursement of $198,380.16 in litigation expenses incurred in prosecuting this Action. In addition, Lead Counsel requests, pursuant to the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. §78u-4(a)(4), reimbursement of $30,000 on behalf of Lead Plaintiff Fiyyaz Pirani and $5,121.65 on behalf of Additional Named Plaintiff OCERS in connection with their representation of the Settlement Class.

## II. FACTUAL BACKGROUND

### A. Summary of Claims

9. As set forth in the Complaint, 2U is an education technology company that partners with universities to provide online degree programs. Consolidated Class Action Complaint (ECF

No. 92) (the "Complaint" or "Compl.")  ¶55.  2U's common stock trades on the NASDAQ exchange under the symbol "TWOU."  *Id.* ¶ 50.  The Action arises out of Defendants' allegedly false and misleading statements concerning the Company's ability to sustain its growth trajectory as it enrolled more students and offered expanded course offerings.  *Id.* ¶¶10-15.  The Complaint alleges that Defendants underscored that 2U is "inherently [] a long-term story" that is "uncommon" because it "keeps growing north of 30% off of a base of over $400 million in revenue."  *Id.* ¶¶182, 283.  Defendants insisted that their growth was "predicable," with 2U poised to "hit $1 billion in revenue in a little over 3 years [in late 2021 or early 2022]"–which Defendant Paucek claimed in November 2018 "used to be a long-range goal" but "now it's right in front of us. We can see it."  *Id.* ¶¶283, 293.  Defendants Paucek and Graham emphasized that 2U's steady growth was all but assured—it had a proven model, a healthy pipeline of new customers and strong student enrollments, a huge addressable market, and no serious competition.  *Id.* ¶¶11, 40.

10.    In truth, however, 2U's student acquisition efforts were not scaling to meet the growing need for students in the Company's expanding portfolio of programs.  *Id.* ¶84.  For example, according to several 2U former employees ("FEs"), Defendants were particularly concerned about the low enrollments they were seeing internally.  *Id.* ¶85.  The accounts of these witnesses are corroborated by independent research based on several FOIA requests directed at some of 2U's largest university clients, which found that the majority of 2U's top programs were failing, with many others similarly underperforming—facts that Defendants repeatedly denied.  *Id.* ¶147.  Rather than come clean to investors and analysts, Defendants stopped disclosing revenue per cohort, an important metric that would have alerted the market to 2U's failing business model.  When the truth finally emerged, the Company's stock sharply declined.  *Id.* ¶¶199, 212.

11.    The Complaint asserts claims against 2U and three of its executives, Christopher Paucek ("Paucek"), Catherine Graham ("Graham"), and Harsha Mokkarala ("Mokkarala") for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b), 78t(a), and Rule 10b-5 promulgated thereunder by the U.S. Securities and Exchange Commission (the "SEC"), 17 C.F.R. §240.10b-5.  The Complaint also asserts Claims against Paucek, Graham, certain 2U directors and six of the Company's underwriters who participated in the Company's secondary offering completed on May 25, 2018, Goldman Sachs & Co. LLC, Credit Suisse Securities (USA) LLC, Citigroup Global Markets, Inc., Compass Point Research & Trading, LLC, KeyBanc Capital Markets Inc, and Macquarie Capital (USA) Inc. for violations of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act"), and rules promulgated thereunder.

## III.    PROCEDURAL HISTORY

### A.    Commencement of the Action and Appointment of Lead Plaintiff and Lead Counsel

12.    On August 7, 2019, this Action commenced with the filing of a class action complaint by investor Aaron Harper, represented by Glancy Prongay & Murray LLP, in the United States District Court for the Southern District of New York.  ECF No. 1.  The case was entitled *Harper v. 2U, Inc.*, Civil No. 1:19-cv-07390-RA, and was assigned to United States District Judge Ronnie Abrams.  On August 9, 2019, Anne Chinn, the plaintiff in *Chinn v. 2U, Inc.*, No. 1:19-cv-07479-RA ("the *Chinn* Action"), filed a separate class action in the Southern District of New York also alleging federal securities law violations by the Defendants, which was also assigned to Judge Abrams.  *Chinn* Action, ECF No. 1.

13.    Pursuant to Section 21D(a)(3) of the Exchange Act, 15 U.S.C. §78u-4(a)(3)(B), as amended by the PSLRA, on October 24, 2017, nine members of the purported class moved for the

appointment as lead plaintiff: (i) Fiyyaz Pirani (ECF No. 39); (ii) National Elevator Industry Pension Fund (ECF No. 31); (iii) Anders-Christian Moeller (ECF No. 17); (iv) DeKalb County Employees Retirement Plan (ECF No. 24); (v) Erik Fjellborg (ECF No. 11); (vi) Edward Hackman and Herbert Saunders (ECF No. 35); (vii) Aaron Harper (ECF No. 13); (viii) Employees Retirement System of the Puerto Rico Electric Power Authority (ECF No. 27); and (ix) Public School Teachers' Pension & Retirement Fund of Chicago ("Chicago Teachers") (ECF No. 21).

14.    Following the filing of the nine lead plaintiff motions, all competing movants beside Chicago Teachers and Pirani withdrew their motions. *See* ECF Nos. 44, 49, 50, 51, 52, 53, 54.

15.    On October 16, 2019, Defendants filed a motion to transfer this action to the United States District Court for the District of Maryland pursuant to 28 U.S.C. § 1404(a).  On November 25, 2019, proposed lead plaintiffs Chicago Teachers and Pirani both filed notices of non-opposition to Defendants' motion to transfer.  ECF Nos. 62–63.  On November 26, 2019, Judge Abrams of the Southern District of New York granted Defendants' unopposed motion to transfer.  ECF No. 65.

16.    On April 9, 2020, Judge Abrams issued an order in the *Chinn* Action, instructing the parties to file a joint letter stating whether they consent to transferring the *Chinn* Action to the United States District Court for the District of Maryland, where it would be consolidated with *Harper v. 2U, Inc., et al.*, 8:19-cv-03455-TDC. *Chinn* Action, ECF No. 18.  The parties in the *Chinn* Action either consented to or took no position on the transfer.  *Chinn* Action, ECF Nos. 19, 21.  On April 23, 2020 Judge Abrams transferred the *Chinn* Action to the District of Maryland. *Chinn* Action, ECF No. 22.  The *Chinn* Action was then assigned Case No. 8:20-cv-01006-TDC in the District of Maryland.

7

17.    On June 1, 2020, Judge Theodore D. Chuang of the District of Maryland (1) ordered that the cases be consolidated under the caption *In Re 2U, Inc. Securities Class Action*, with both case numbers, but with all filings docketed in Case No. TDC-19-3455 only; (2) appointed Pirani as Lead Plaintiff; and (3) appointed Pomerantz LLP as Lead Counsel.  ECF No. 86.

### B.    The Consolidated Class Action Complaint

18.    On July 30, 2020, Plaintiffs filed the Complaint, asserting claims under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder, and claims under Sections 11, 12(a)(2), and 15 of the Securities Act.  ECF No. 92.  The Complaint added OCERS, which had standing to assert claims under Section 11 of the Securities Act (*see* ECF 166 at 56) as an additional plaintiff.  ECF No. 92.

19.    The Complaint was the result of a significant effort by Plaintiffs' Counsel that included, among other things, the review and analysis of: (i) documents filed publicly by the Company with the SEC; (ii) press releases, news articles, and other public statements issued by or concerning the Company and the Defendants; (iii) research reports issued by financial analysts concerning the Company; and (iv) other publicly available information and data concerning the Company and the Individual Defendants.  Plaintiffs' Counsel identified approximately 441 former 2U employees and other persons believed to have relevant knowledge, contacted 267, and interviewed 82 of them.  Lead Counsel included seventeen of these individuals in the Complaint as confidential witnesses.

20.    In general, the Complaint alleges that Defendants violated the federal securities laws by issuing materially false financial statements, making materially false or misleading statements, or omitting material information concerning the Company's growth prospects as it scaled its business through adding additional students and program offerings, including that the Company's pipeline of incoming students was strong.

21.     As alleged in the Complaint, on July 19, 2018, investment manager Spruce Point released a direct challenge to 2U's success narrative. *Id.* ¶147.  Spruce Point argued that its proprietary research uncovered that a significant number of 2U's programs were, in reality, underperforming the Company's steady state enrollment expectations, including "eight of the 14 programs launched between 2013 and 2015," and four of the top seven programs, which Spruce Point claimed had reached peak or declining enrollments. *Id*.  Spruce Point also argued that declining tuition costs in rival programs were putting pressure on tuition in 2U programs, undercutting 2U's assumption that it would reach steady state revenues of $16 million per program. *Id.*  Spruce Point additionally found that competition for students was increasing, pressuring 2U's margins, as the cost to acquire students increased.  *Id.*  It also argued that 2U was becoming less transparent with investors, as in November 2017 it took the unusual step of altering its historical disclosure practices about cohort performance by deliberately ceasing to disclose revenue per cohort, a metric that would have alerted investors to 2U's underperforming programs. The findings in the Spruce Report were then confirmed by Plaintiffs' own investigation, which uncovered that the decision to exclude information regarding year-over-year change in graduate program revenues came precisely when, according to former employees, Defendants were visibly concerned about enrollment as they were seeing internal enrollment projections decline. *Id*. ¶151. Moreover, former employees working on student enrollment confirmed problems recruiting students at the very programs highlighted by Spruce Point, including USC's MSW and Rossier programs, and Simmons. *Id*.

22.     As alleged in the Complaint, the truth about the Company's growth prospects was first revealed on May 7, 2019 when 2U reported disappointing first quarter 2019 financial results and lowered the Company's financial guidance, including that the Company was likely to achieve

$13 million less in revenues than previously represented. *Id.* ¶384. The full truth was then revealed on July 30, 2019, when 2U admitted that the Company's growth plans were failing and needed to be abandoned as costs ballooned, and that the Company was significantly reducing its 2019 guidance. *Id.* ¶395. In particular, 2U's projected net loss for 2019 had increased by over ***$70 million***. In addition, these projected losses for the year, represented a ***300 percent*** year-over-year increase. *Id.* In all, when the truth was allegedly revealed, 2U's stock price had fallen ***over 87%*** from the class period high. *Id.*

### C. Defendants' Motion to Dismiss the Complaint

23. On September 29, 2020, Defendants filed with the Court their notice to seek leave to file motions to dismiss. ECF No. 138. On October 7, 2020, the Court granted Defendants leave to file a motion to dismiss by October 27, 2020. ECF No. 143.

24. On October 27, 2020, Defendants moved to dismiss the Complaint. ECF No. 144. Defendants' fifty-page memorandum of law (ECF No. 144-1) (the "MTD") cited dozens of cases and raised numerous legal issues aimed at undermining Plaintiffs' claims and allegations. Defendants also filed twenty-three exhibits in support of their motion to dismiss. ECF Nos. 144-4 through 144-26. With regard to the Exchange Act claims, Defendants argued that the Complaint should be dismissed because Plaintiffs failed to plead scienter, and the alleged misstatements were immaterial corporate puffery or opinion, or were protected by the PSLRA safe harbor for forward-looking statements. Defendants further argued, with respect to the Securities Act claims, that the Complaint should be dismissed because Plaintiffs lacked standing and their claims were time-barred.

25. Regarding scienter, Defendants argued that, among other things, the Complaint did not sufficiently allege scienter through allegations by former employees ("FEs") because "Plaintiffs d[id] not link specific FE allegations to any particular challenged statement or any

particular Defendant." MTD at 13. Further, Defendants challenged the FEs' descriptions, arguing that none were in a position to have information relevant to Plaintiffs' claims, as all but one were low-level sales employees who did not report to any of the individual defendants. *Id.* at 14. Defendants also argued that the information alleged by the FEs was too vague and lacked the necessary detail or specificity to support Plaintiffs' allegations of a Company-wide issue. *Id.* at 16-17. Defendants then argued that Defendant Paucek's stock sales were not suspicious because he sold merely some of his stock and the sales were made pursuant to a pre-determined 10b5-1 plan. *Id.* at 18-19.

26.    Regarding the immateriality of the alleged misstatements and omissions, Defendants argued that the misstatements, in varying degrees, were either inactionable corporate puffery or opinion, or they were forward looking and protected by the PSLRA safe harbor. For instance, Defendants argued that because many of the alleged misstatements related to the Company's growth projections, they were forward-looking and entitled to protection under the safe harbor. *Id.* at 22-23. In doing so, Defendants first argued the projections were immaterial as the Company expressly stated that they were not guarantees. *Id.* at 23. Defendants next cited to a litany of risk disclosures contained in the Company's SEC filings, which they claimed warned of the specific risks alleged to be concealed. *Id.* at 25. Finally, Defendants argued that the Complaint contained no allegations sufficient to show that any of the Defendants had actual knowledge of the purported falsity when the statements were made. *Id.* at 26-27. Defendants next argued that "[a]lmost all" of the alleged misstatements were inactionable because they were either opinions or vague and subjective statements of corporate optimism that were too indefinite to be demonstrably false. *Id.* at 28. Defendants additionally argued that none of the statements were actually false and would not have misled a reasonable investor. *Id.* at 32-36.

27.     As to the Securities Act claims, Defendants first argued that they were time-barred because Plaintiffs ostensibly failed to assert their claims within one year of discovering the untrue statements or omissions. *Id.* at 38-40.  Defendants also argued OCERS lacked standing to bring their Section 11 claims on behalf of a class that included purchasers whose purchases could not be traced back to the secondary offering at issue in this Action. *Id.* at 46-47.

28.     On December 18, 2020, Plaintiffs filed their opposition to Defendants' motion to dismiss. ECF No. 155.  As to Defendants' scienter arguments, Plaintiffs countered that Defendants had access to and were aware of 2U's declining enrollment numbers based on the allegations of former employees, particularly FE-1, who worked with Defendant Paucek and helped him prepare for meetings where low enrollment was discussed. *Id*. at 25-26.  Similarly, other employees throughout the Company reported that Defendants closely monitored enrollment numbers throughout the Class Period. *Id.* at 26-28.  Plaintiffs next argued that scienter was supported by Defendants' own statements, which indicated that they closely monitored enrollment numbers, as well as the fact that student enrollment was critical to the Company's core operations. *Id.* at 32-34.  In addition, Plaintiffs argued that Defendants' stock sales during the Class Period as well as Graham's resignation were both suspicious given their timing at key points in the Class Period. *Id.* at 35-37.

29.     With respect to the falsity and materiality of the alleged misstatements, Plaintiffs argued that that Defendants failed to disclose that 2U's marketing funnel was not scaling to meet the needs of its growing portfolio, 2U's vertical strategy led to cheaper programs cannibalizing enrollments from more expensive programs, and outside competition was adversely affecting the Company's ability to enroll students. *Id.* at 10.  Plaintiffs further argued that the FEs reported specific problems with six of 2U's top 20 graduate programs, information which would have been

12

material to investors in light of Defendants' positive assurances to the contrary. *Id.* at 11-12. Plaintiffs further countered Defendants' puffery and opinion arguments, showing that, in context, the statements were demonstrably false statements of fact. *Id.* at 15-16.

30.     With regard to the Securities Act claims, Plaintiffs countered Defendants' argument that the claims were time barred, arguing that a reasonable investor would not have discovered the falsity of Defendants' statements until July 30, 2019, at the earliest. *Id.* at 41-43. Plaintiffs also rebutted Defendants' standing argument, noting that OCERS only sought to represent a class of purchasers who could trace their stock back to the secondary offering. *Id.* at 46-47.

31.     On February 9, 2021, Defendants filed a reply brief in further support of their motion, responding to Plaintiffs' arguments. ECF No. 157.

### D.     The Court's Order on Defendants' Motion to Dismiss the Complaint

32.     On August 5, 2021 the Court issued a Memorandum Opinion (ECF No. 166) and Order (ECF No. 167) granting in part and denying in part Defendants' motion. The Court granted Defendants' motion to dismiss with respect to Plaintiffs' claims brought under Section 12(a)(2) of the Securities Act against all Defendants except for 2U. ECF No. 166 at 62.

33.     In addressing Defendants' false and misleading statements, the Court found that Plaintiffs sufficiently alleged that many of Defendants' statements were misleading because Defendants made material omissions of fact by failing to acknowledge declining enrollment projections. *Id.* at 21. For example, in discussing Defendants' liability concerning alleged misrepresentations made in August 2018, some of which specifically referenced enrollments as a basis for Defendants' confidence in rapid growth, the Court found that Defendant Paucek was "conveying a message that 2U already had data that would support the conclusion that the reacceleration would continue." *Id.* "At the same time, Paucek's statement that 2U was 'still expecting enrollment growth in some of [its] oldest programs,' without altering its prior projected

13

steady-state enrollment goals, conveyed that demand remained sufficiently strong across the preexisting 34 graduate programs to sustain the reacceleration." *Id.*  The Court reasoned that "if the declining enrollment projections had been disclosed, an investor would have understood that Paucek's expressed, continuing confidence in the broad reacceleration was misplaced and that 2U's plans for massive growth both in terms of number of programs and total revenue were in jeopardy." *Id.* at 22.  However, the Court dismissed an alleged false and misleading statement about 2U's "principal competitive factors" and ability to "compete favorably" because "there has been no showing that the belief about the main competitive factors was false, and the general opinion that 2U competes 'favorably' constitutes puffery and is too vague to be material.  *Id.* at 66.  The Court dismissed two other alleged false and misleading statements, finding that they were "forward-looking warnings and statements of opinion that are not demonstrably false," were "general in nature," and were not alleged to be made with "actual knowledge that they were false or misleading."  *Id.* at 66-67.

34.   In addressing scienter, the Court found that Plaintiffs sufficiently alleged that Defendants "omitted the declining enrollment projections with scienter," crediting FE-1 and FE-2, "who had specific knowledge that Paucek and Mokkarala were aware of the declining enrollment projections and had concerns about them." *Id.* at 25.  Moreover, the Court found that "the fact that Graduate Division enrollment provided the key revenue stream for the most important part of the business supports not only the allegations that Paucek was concerned about enrollment, but also a strong inference that Paucek knew that omitting the declining enrollment projections from his statement was misleading." *Id.* at 27.  The Court observed that statements from several additional confidential witnesses, such as FE-3 and FE-8, "align with the timeline of

14

declining enrollment projections reported by FE-1 and FE-2 and support the assertions that low enrollment had become a concern for executives." *Id.*

35.     On September 10, 2021, the Court held a Case Management Conference, during which Defendants sought leave to file a motion for reconsideration based on the purported recantation of one of Plaintiffs' FEs.  The Court rejected that request. ECF No. 200.

36.     On September 16, 2021, Defendants filed their Answers to the Complaint, denying the Complaint's substantive allegations.  ECF Nos. 189 and 190.

### E.     Plaintiffs' Motion for Class Certification

37.     On December 3, 2021, Plaintiffs filed a motion for class certification, and appointment of Pirani and OCERS as Class Representatives and Pomerantz as Class Counsel.  ECF No. 210.  In the motion, Plaintiffs set forth how the proposed class readily satisfies Rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements.  Further, Plaintiffs showed that the class satisfied Rule 23(b)(3)'s additional requirement that common questions of law or fact predominate over individual questions and that a class action is the superior method to adjudicate this dispute.  More specifically, Plaintiffs established predominance, in part, by satisfying the requirements for the presumption of class-wide reliance established in *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988) and reaffirmed in *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014).  In particular, Plaintiffs showed that 2U stock traded in a semi-strong efficient market during the class period.  In support of that finding, Plaintiffs submitted a 37-page expert report from economic expert Matthew D. Cain, PhD ("Cain").  ECF No. 210-4.  Dr. Cain also offered the opinion that damages could be calculated using a common class-wide methodology.  *Id*.

38.     The Parties agreed to settle the Action before any further briefing occurred, but after extensive discovery.

## IV.    DISCOVERY

39.    Following the lifting of the PSLRA stay after the Court's decision on the motion to dismiss, discovery moved forward without delay. Pursuant to the Court's Scheduling Order dated September 20, 2021, the Parties were not required to exchange initial disclosures. ECF No. 193. Thereafter, the Court entered the Modified Scheduling Order (ECF No. 195), setting deadlines for the completion of discovery, class certification, expert discovery, and dispositive motion practice. The case was eventually assigned to Magistrate Judge Timothy J. Sullivan for all discovery and related scheduling matters on February 1, 2022.   ECF No. 218.

40.    Plaintiffs served their first set of document requests on October 13, 2021, whereby Defendants served their responses and objections on November 12, 2021. Defendants served their first set of document requests on December 15, 2021, whereby Plaintiffs served their responses and objections on January 14, 2021. Plaintiffs served their second set of document requests on January 26, 2022.

41.    The Parties also exchanged interrogatories. On October 13, 2021, Plaintiffs served their first set of interrogatories, whereby Defendants served their responses and objections on November 12, 2021. Defendants served their first set of interrogatories on September 30, 2021, whereby Plaintiffs served their responses and objections on November 1, 2021.

42.    Defendants began producing documents in response to Plaintiffs' requests on December 14, 2021 (231 pages of documents). Furthermore, Defendants made their second document production on January 14, 2022 (5 pages of documents), their third document production on January 21, 2022 (127,702 pages of documents), their fourth document production on January 24, 2022 (6 pages of documents), their fifth document production on February 7, 2022 (8,124 pages of documents), their sixth document production on February 16, 2022 (10,130 pages of

16

documents), their seventh document production on February 24, 2022 (1,510 pages of documents), and their eight document production on March 15, 2022 (21 pages of documents).

43.     Additionally, on May 5, 2022, Defendants produced confirmatory discovery, consisting of approximately 129,709 pages.

44.     On January 31, 2021, Plaintiffs filed a Notice of Intent to File Motion to Compel against Defendants.  ECF No. 215.  In light of the Parties' agreement to stay the case pending mediation, Plaintiffs ultimately did not file a motion to compel.

45.     In all, Defendants' productions comprised over 50,000 documents that totaled approximately 275,000 pages.  The Parties were continuing to conduct discovery when they agreed to settle the Action.

46.     On January 18, 2022, Defendants noticed the deposition of Lead Plaintiff for February 15, 2022, and the deposition of Additional Named Plaintiff for February 17, 2022 pursuant to Fed. R. Civ. P. 30(b)(6).  Though Plaintiffs' Counsel extensively prepared for these depositions, they did not take place in light of the Parties' agreement to stay the case pending mediation.

47.     Plaintiffs also engaged in discovery with third parties who were 2U's partners in some of its graduate programs.  For example, on November 18, 2022, Plaintiffs issued document subpoenas on the following twelve third parties: Harvard University; American University; University of Dayton; Pepperdine University; Fordham University; Emerson College; Syracuse University; Southern Methodist University; Rice University; Georgetown University; University of California, Berkeley; and University of Southern California.  Similarly, on November 24, 2021, Plaintiffs issued document subpoenas on the following eleven third parties: Yale University; Washington University; Vanderbilt University; University of North Carolina at Chapel Hill; Tufts

University; Simmons University; New York University; Northwestern University; George Washington University; University of Denver; and Baylor University. Plaintiffs' Counsel engaged in dozens of meet and confer sessions with these subpoena recipients, and exchanged numerous proposals concerning their production of documents. In total, third parties (including certain of the FEs) produced approximately 2,400 documents, totaling over 9,000 pages.

## V.   SETTLEMENT NEGOTIATIONS

48.   In February 2022, the Parties engaged Phillips ADR Enterprises, P.C. to retain Greg Lindstrom, a well-respected and highly experienced mediator (the "Mediator"), to assist them in exploring a potential negotiated resolution of the claims in the Action.

49.   On February 17, 2022, the Parties informed the Court that they scheduled a mediation session for April 5, 2022, and jointly moved the Court to stay the Action pending mediation, including all proceedings, hearings, discovery, pending motions, and deadlines, until April 19, 2022. ECF No. 219. That same day, on February 17, 2022, the Court granted the Parties' joint motion to stay the Action until April 19, 2022. ECF No. 220.

50.   On April 5, 2022, the Parties participated in a full-day mediation session before Mediator Lindstrom in an attempt to reach a settlement. In advance of the mediation, the Parties exchanged mediation statements, which addressed issues of both liability and damages and discussed the Parties' respective views of the claims and alleged damages. While the mediation that day was ultimately unsuccessful, the Parties continued to engage in settlement negotiations thereafter.

51.   As a result of continued discussions, the Mediator ultimately provided the Parties with a Mediator's proposal to settle the Action. Plaintiffs and Defendants each accepted the Mediator's proposal and reached an agreement in principle to settle the Action on April 21, 2022, two days after the temporary stay expired. On April 28, 2022, the Parties executed a memorandum

18

of understanding, agreeing to settle the Action for $37 million subject to the execution of a formal, final settlement agreement.  On April 29, 2022, the Parties informed the Court of the agreement in principle, and further requested that the Court extend the stay until June 2, 2022, at which time Plaintiffs anticipated filing a Motion for Preliminary Approval of the Settlement. ECF No. 222. That same day, on April 29, 2022, the Court granted the Parties' request to extend the stay and denied without prejudice Plaintiffs' Motion for Class Certification. ECF No. 223.

52.     Thereafter, the Parties negotiated the terms of the Stipulation, which was executed on May 31, 2022 and filed with the Court on June 2, 2022.  ECF No. 224-3.

53.     As provided for in the Stipulation, in exchange for payment of the Settlement Amount, the Action will be dismissed with prejudice and Plaintiffs and the Settlement Class will forever release all Released Plaintiffs' Claims against the Defendants' Releasees.  Released Plaintiffs' Claims are all claims that were brought or that could have been brought in the Action or in any forum arising out of the allegations and the purchase of 2U Securities during the Class Period.  *See* Stipulation at ¶1(ll), ¶5.  Also, upon the Effective Date of the Settlement, Defendants will forever release all Released Defendants' Claims against the Plaintiffs' Releasees.  Released Defendants' Claims are all claims related to the institution, prosecution, or settlement of the claims. *See* Stipulation at ¶1(kk), ¶7.

54.     On June 2, 2022, Plaintiffs moved for preliminary approval of the Settlement.  ECF No. 224.  On June 23, 2022, the Court entered the Preliminary Approval Order, authorizing that notice of the Settlement be sent to Settlement Class Members and scheduling the Settlement Hearing for December 9, 2022 to consider whether to grant final approval to the Settlement, approve the proposed Plan of Allocation, and award attorneys' fees and expenses.  ECF No. 229.

## VI.   PLAINTIFFS' COMPLIANCE WITH PRELIMINARY APPROVAL ORDER AND REACTION OF THE SETTLEMENT CLASS TO DATE

55.   Pursuant to the Preliminary Approval Order, the Court appointed Epiq Class Action & Claims Solutions, Inc. ("Epiq") as the Claims Administrator and instructed Epiq to disseminate copies of the Notice of (I) Proposed Settlement; (II) Motion for an Award of Attorneys' Fees and Litigation Expenses; and (III) Settlement Fairness Hearing and the Proof of Claim Form (collectively the "Notice Packet") by mail and to publish the Summary Notice of (i) Proposed Settlement;  (ii) Motion for an Award of Attorneys' Fees and Litigation Expenses; and (iii) Settlement Fairness Hearing.

56.   The Notice, attached as Exhibit A to the Declaration of Bradford Amann ("Mailing Decl." or "Mailing Declaration") (Exhibit 3 hereto), provides potential Class Members with information about the terms of the Settlement and contains, among other things: (i) a description of the Action and the Settlement; (ii) the terms of the proposed Plan of Allocation; (iii) an explanation of Class Members' right to participate in the Settlement; (iv) an explanation of Class Members' rights to object to the Settlement, the Plan of Allocation, and/or the fee and expense motion, or exclude themselves from the Settlement Class; and (v) the manner for submitting a Claim Form in order to be eligible for a payment from the net proceeds of the Settlement.  The Notice also informs Class Members of Lead Counsel's intention to apply for an award of attorneys' fees in an amount not to exceed 33.4% of the Settlement Amount, plus accrued interest, and for payment of litigation expenses in an amount not to exceed $425,000, plus accrued interest.  Ex. 3-A at 2, 14.

57.   As detailed in the Mailing Declaration, Epiq mailed Notice Packets to potential Class Members, as well as banks, brokerage firms, and other third-party nominees whose clients may be Class Members.  Ex. 3 at ¶¶ 3-13.  In total, as of October 24, 2022, Epiq has mailed 45,753

20

Notice Packets to potential nominees and Class Members by first-class mail, postage prepaid. *Id.* at ¶ 12. To disseminate the Notice, Epiq obtained the names and addresses of potential Class Members from a data filed provided by Defendants' Counsel, and from banks, brokers and other nominees. *Id.* at ¶¶ 4, 9.

58. On July 1, 2022, Epiq also caused the Summary Notice to be published in *Investor's Business Daily* and to be transmitted over the internet using *PR Newswire*. *Id.* at ¶ 14 and Exhibit C thereto.

59. Epiq also maintains and posts information regarding the Settlement on a dedicated website established for the Settlement, www.2usecuritiesclassaction.com, to provide Class Members with information concerning the Settlement, as well as downloadable copies of the Notice Packet and the Stipulation. *Id*. at ¶ 17.

60. Pursuant to the terms of the Preliminary Approval Order, the deadline for Settlement Class Members to submit objections to the Settlement, the Plan of Allocation, and/or the fee and expense motion is November 10, 2022, and the deadline for Settlement Class Members to request exclusion from the Settlement Class is November 18, 2022. To date, no objections to the Settlement, the Plan of Allocation, or the Fee and Expense Application have been received, and two requests for exclusion have been received. *Id*. at ¶¶ 18, 20. Should any objections or additional requests for exclusion be received, Plaintiffs will address them in their reply papers, which are due to be filed with the Court on November 25, 2022. Plaintiffs' reply papers will also update the Court regarding the estimated claims rate and Recognized Losses for claims filed by Settlement Class members.

## VII.   RISKS FACED BY PLAINTIFFS IN THE ACTION

61. The Settlement eliminates the significant risk that the Settlement Class would recover nothing due to 2U's diminished financial condition. 2U's balance sheet reflects a massive

reduction in cash and cash equivalents on hand, as well as hundreds of millions of dollars of net losses, and the Company's stock price is a fraction of its Class Period highs.  These facts raise serious doubt as to whether 2U could satisfy a judgment for the full amount of damages in this case.  Further, as detailed above, the core allegations in this case were that Defendants made materially false and misleading statements during the Class Period regarding the Company's enrollment pipeline and growth prospects.  While Plaintiffs believe that the claims asserted against Defendants are meritorious, they recognize that the Action presented a number of significant risks to establishing the falsity and materiality of the alleged misstatements and that Defendants acted with scienter.  Plaintiffs faced considerable risks and obstacles to achieving a greater recovery, were the case to continue.  Plaintiffs and Lead Counsel carefully considered these challenges during the months leading up to the Settlement and during the settlement discussions with Defendants.  In addition, even if Plaintiffs were able to overcome the risks to establishing liability, they faced very serious risks in proving damages and loss causation.

### A.      Risks Related to 2U's Financial Condition

62.      In addition to the numerous litigation risks discussed below, 2U's financial condition has weakened significantly in recent years, raising serious doubts that it could satisfy a trial verdict for the full extent of damages in this Action.  2U's cash position as well as its stock price have fallen drastically since the Class Period.  As of the end of 2018, during the Class Period, 2U reported $450 million of cash and cash equivalents on hand.[3]  As of March 31, 2022 and June

---

[3] 2U, Inc., Annual Report for year ending December 31, 2018 (Form 10-K), filed Feb. 26, 2019, at 38 (available at https://www.sec.gov/Archives/edgar/data/1459417/000110465919010491/a19-30045_410k.htm).

30, 2022, 2U reported $217 million and $220.8 million, respectively, of cash and cash equivalents.[4] The Company has reported massive net losses in 2019, 2020, and 2021, and that trend has continued this year, with the Company incurring over $188 million in net losses for just the first six months of 2022.[5]  In addition to the precipitous stock price declines during the Class Period—at the end of which 2U's stock price was $12.80 per share, down from a Class Period high of $98 per share—the stock has continued to tumble, closing at $6.15 per share on October 27, 2022, yielding a market capitalization of only $477 million.  This represents a massive decline from the Company's $2.9 *billion* market capitalization as of the end of 2018.  Moreover, applicable insurance coverage would be depleted by defense costs if Plaintiffs continued to prosecute this Action, as well as by the three related derivative actions.[6]

---

[4] 2U, Inc., Quarterly Report for period ending March 30, 2022 (Form 10-Q), filed May 10, 2022, at                4                (available                at https://www.sec.gov/ix?doc=/Archives/edgar/data/1459417/000145941722000018/twou-20220331.htm); 2U, Inc., Quarterly Report for period ending June 30, 2022 (Form 10-Q), filed July         28,        2022,        at        4        (available        at https://www.sec.gov/ix?doc=/Archives/edgar/data/1459417/000145941722000021/twou-20220630.htm).

[5] 2U, Inc., Annual Report for year ending December 31, 2021 (Form 10-K), filed March 1, 2021, at                17                (available                at https://www.sec.gov/ix?doc=/Archives/edgar/data/1459417/000145941722000004/twou-20211231.htm) ("We incurred net losses of $194.8 million, $216.5 million and $235.2 million during the years ended December 31, 2021, 2020 and 2019, respectively."); 2U, Inc., Quarterly Report for period ending June 30, 2022 (Form 10-Q), filed July 28, 2022, at 5 (available at https://www.sec.gov/ix?doc=/Archives/edgar/data/1459417/000145941722000021/twou-20220630.htm) (net loss for six months ending June 30, 2022).

[6] The derivative actions are: *Lucey v. Paucek*, No. 20-cv-02424-GLR (D. Md.); *Theis v. Paucek*, No. 20-cv-3360-PAC (S.D.N.Y.); and *Shumacher v. Paucek*, No. 2020-1019-LWW (Del. Ch.).

B.      **Risks Concerning Liability**

1.      **Risks Concerning Scienter**

63.     If the case were to continue, Defendants would strenuously maintain that they did not act with scienter, which is generally the most difficult element of a securities fraud claim for a plaintiff to prove.  In this case, Defendants had numerous scienter arguments that posed very significant hurdles to proving that they acted with an intent to commit securities fraud or with severe recklessness.  As an initial matter, Defendants would argue that Plaintiffs' scienter allegations were based only on circumstantial evidence.

64.     Defendants would likely take the position that the evidence will show, at summary judgment and trial, that they genuinely believed that 2U would be able to grow in line with their projections and that the pipeline of incoming students was strong enough to support that growth. In particular, Defendants were likely to argue that:

(a)     Plaintiffs cannot point to any evidence supporting a motive on the part of any one of the Defendants to commit fraud.

(b)     2U's internal data supported its public projections of continued enrollment growth and was consistent with its public revenue guidance until shortly before 2U proactively alerted the market in mid-2019 when it began to see a material divergence.

(c)     2U was optimistic that any enrollment declines were due to short-term issues in certain of its largest programs.

(d)     Plaintiffs' only evidence of enrollment issues were isolated incidents of individual programs increasing and decreasing in enrollments throughout the Class Period, which were beyond 2U's control.

(e)     Neither of the two FEs that the Court relied upon heavily at the pleading stage (FE-1 and FE-2) will provide support for Plaintiffs' claims at summary judgment or trial.  Notably, Defendants will likely argue that FE-1 later recanted her allegations, stating she had no knowledge of the Company's enrollment issues nor of Paucek's or Mokkarala's discussions of enrollment number.

24

65.     For all these reasons, there was a very significant risk that the Court on summary judgment, or a jury after trial, could have concluded that Defendants did not act with scienter.

### 2.     Risks in Proving Materially False Misstatements

66.     Defendants would also have argued at summary judgment that the alleged false and misleading statements concerning the Company's enrollment pipeline and growth projections were not materially false and misleading.

67.     In addition to the arguments above regarding scienter, which also pertain to whether the alleged misstatements were actually false, Defendants likely would argue that the evidence will show that Defendants disclosed enrollment issues as soon as they became aware of them.  For instance, Defendants would argue that Defendants only became aware of a sustained, wide-spread decline in enrollment projections at the end of July 2019, which they promptly disclosed on the Company's Q2 earnings call on July 30, 2019.  In addition, Defendants would very likely reassert at summary judgment and trial that the statements sustained by the Court were forward-looking, and thus protected by the PSLRA safe harbor, or inactionable as puffery or opinion statements. Moreover, Defendants would point to significant risk disclosures where 2U cautioned investors that its business model was dependent on factors beyond 2U's control, such as university admissions decisions and increased competition in the online higher education market.

68.     For these reasons, Plaintiffs faced a substantial risk that the Court or a jury could have concluded that the alleged misstatements were not materially false or misleading.

### C.     Risks Related to Loss Causation and Damages

69.     Even assuming that Plaintiffs overcame the above risks and successfully established liability, Defendants had very substantial arguments that there were no recoverable damages or that damages were minimal.

70.     Plaintiffs' consulting damages expert has estimated maximum aggregate damages of approximately $1.54 billion, which, depending on the model applied, may have been as low as $926 million, not accounting for the disaggregation of inactionable price movement.

71.     Defendants, on the other hand, would of course argue that damages are much less than Plaintiffs' estimate.  In particular, Defendants would likely contend that when accounting for profits made as a result of Class Period sales, maximum available damages would be closer to $1.1 billion.  Further reducing damages, Defendants would likely argue that the truth was fully revealed to the market on May 7, 2019, thereby precluding Plaintiffs from recovering damages based on 2U's July 30, 2019 stock decline, as 2U disclosed on May 7, 2019 that it anticipated declining enrollments for Q2 2019 and that, as a result, 2U expected to achieve less revenue in 2019 than previously projected. As of that disclosure, Defendants would likely contend, investors were aware of the alleged falsity of 2U's prior statements about its business model and trends, and no one who purchased 2U stock after that date could have been misled or damaged. There was a significant risk that Plaintiffs would not be able to prove that the July 30, 2019 statement revealed anything that was supposedly known to 2U, but left unknown to investors after May 7, 2019. If Plaintiffs are unable to claim damages associated with 2U's July 30, 2019 stock drop, and the Class Period ended on May 7, 2019, Plaintiffs' damages could drop to as low as $314 million.

72.     In addition, Defendants would likely argue, through their own expert testimony, that Plaintiffs' damages expert significantly underestimated the impact of non-fraud related information released on the alleged corrective disclosure dates.  In particular, Defendants would likely argue that a sizeable portion of the price drops in May and July 2019 was due to confounding factors, as on both allegedly corrective disclosure dates, 2U disclosed negative information that was unrelated to the alleged wrongdoing.  For example, on May 7, 2019, 2U attributed its reduced

guidance to three factors: (1) increased admissions selectivity by 2U's university partners; (2) some pressure mid-funnel on the rate at which prospective students were submitting their applications for review; and (3) the delayed launch of the UC Davis MBA program in the 2019 cohort. The first and third factors are unrelated to the alleged fraud and thus Plaintiffs must present a reliable method to remove the portion of the May 8, 2019 stock price decline attributable to this information. Likewise, on July 30, 2019, 2U attributed its further reduced guidance to three factors: (1) increased competition in the graduate segment; (2) executional issues in 2U's short course business; and (3) recent guidance issued by the Department of Education regarding California residents' ability to receive federal student aid for out-of-state distance education programs.

73.    Of course, even a reduced damages estimate assumes that liability could be established with respect to all elements of the claims, which, as explained above, was far from certain.  Indeed, in order to recover any damages at trial, Plaintiffs would have to prevail at many stages in the litigation—namely, a motion for summary judgment, class certification, and at trial and, even if Plaintiffs prevailed at those stages, in the appeals that would likely follow.  At each of these stages, there would be significant risks attendant to the continued prosecution of the Action, and no guarantee that further litigation would have resulted in a higher recovery, or any recovery at all.

## VIII.   THE PLAN OF ALLOCATION

74.    Pursuant to the Preliminary Approval Order, and as set forth in the Notice, all Settlement Class Members who wish to participate in the distribution of the Net Settlement Fund must submit a valid Claim Form, including all required information, that is postmarked no later than October 29, 2022.  As provided in the Notice, after deduction of Court-awarded attorneys' fees and expenses, Notice and Administration Costs, and Taxes and Tax Expenses, the balance of

27

the Settlement Fund (the "Net Settlement Fund") will be distributed according to the plan of allocation approved by the Court (the "Plan of Allocation").

75.     The proposed Plan of Allocation, which is set forth in full in the Notice (Ex. 3–A at 8-12), was designed to achieve an equitable and rational distribution of the Net Settlement Fund, but it is not a damages analysis that would be submitted at trial.  Lead Counsel developed the Plan of Allocation in close consultation with Plaintiffs' damages expert and believes that the plan provides a fair and reasonable method for equitably distributing the Net Settlement Fund among Authorized Claimants.

76.     In developing the Plan of Allocation, Plaintiffs' consulting damages expert calculated the estimated amount of artificial inflation in the prices of 2U Securities that allegedly was proximately caused by Defendants' false and misleading statements and omissions.  In calculating the estimated artificial inflation allegedly caused by those misrepresentations and omissions, Plaintiffs' expert considered price changes in 2U Securities in reaction to public disclosures that allegedly corrected the respective alleged misrepresentations and omissions.

77.     Under the Plan of Allocation, a "Recognized Loss Amount" will be calculated for each purchase of 2U Securities during the Class Period consistent with the measure of damages under the Exchange Act.  Purchases of 2U Securities pursuant or traceable to the Registration Statement, which are subject to the Securities Act, will be eligible for a 25% enhancement given that scienter need not be proven in connection with Securities Act claims.

78.     The Claims Administrator, Epiq, under Lead Counsel's direction, will determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund based upon each Authorized Claimant's total Recognized Claim compared to the aggregate Recognized Claims of all Authorized Claimants.  Calculation of Recognized Claims will depend upon several factors,

including when the Authorized Claimant purchased 2U Securities during the Class Period, whether the Authorized Claimant purchased 2U Securities pursuant to the Registration Statement, and whether the securities were sold and, if so, when.

79.     Once the Claims Administrator has processed all submitted claims, notified claimants of deficiencies or ineligibility, processed responses, and made claim determinations, the Claims Administrator will distribute the Net Settlement Fund.  After an initial distribution of the Net Settlement Fund, if there is any balance remaining in the Net Settlement Fund after six (6) months from the date of initial distribution, Lead Counsel will, if cost effective, re-distribute the balance among Authorized Claimants who have cashed their checks.  These re-distributions will be repeated until the balance in the Net Settlement Fund is no longer feasible to distribute.  Any balance that still remains in the Net Settlement Fund after re-distribution(s), which is not cost effective to reallocate, after payment of any outstanding Notice and Administration Costs or Taxes and Tax Expenses, will be contributed to a 501(c)(3) non-profit organization(s) unaffiliated with the Parties or their counsel, and approved by the Court.

80.     To date, there have been no objections to the Plan of Allocation.  Ex. 3, ¶ 20.

81.     In sum, the proposed Plan of Allocation, developed in consultation with Plaintiffs' consulting damages expert, was designed to fairly and rationally allocate the Net Settlement Fund among Authorized Claimants.  Accordingly, Lead Counsel respectfully submits that the proposed Plan of Allocation is fair, reasonable, and adequate and should be approved.

## IX.     LEAD COUNSEL'S APPLICATION FOR ATTORNEYS' FEES AND EXPENSES IS REASONABLE

### A.     Consideration of Relevant Factors Justifies an Award of a 33.4% Fee

82.     Consistent with the Notice to the Settlement Class, Lead Counsel, on behalf of itself and Plaintiffs' Counsel, seeks a fee award of 33.4% of the Settlement Amount, plus accrued

interest.  Any attorneys' fees awarded by the Court will be allocated among Plaintiffs' Counsel by Lead Counsel.  Lead Counsel also requests payment of expenses in connection with the prosecution of the Action from the Settlement Fund in the amount of $198,380.16, in addition to an award of $30,000 to Lead Plaintiff Fiyyaz Pirani and $5,121.65 to Additional Named Plaintiff to reimburse them for the time they dedicated to the Action, consistent with the PSLRA.  Lead Counsel submits that, for the reasons discussed below and in the accompanying Fee Brief, such awards would be reasonable and appropriate under the circumstances before the Court.

### 1.    Plaintiffs Support the Fee and Expense Application

83.    Plaintiffs Fiyyaz Pirani and OCERS have evaluated and fully support the fee and expense application.  Ex. 1 at ¶¶ 7-8; Ex. 2 at ¶ 5.  In coming to this conclusion, Plaintiffs—who are sophisticated investors that were involved throughout the prosecution of the Action and negotiation of the Settlement—considered, among other things, the recovery obtained for the Settlement Class as well as Plaintiffs' Counsel's substantial efforts to prosecute the claims on behalf of the class.  Plaintiffs took their roles as representative plaintiffs seriously in order to ensure an able and vigorous prosecution of the claims.  Ex. 1; Ex. 2.

### 2.    The Time and Labor of Plaintiffs' Counsel

84.    The many tasks undertaken by Plaintiffs' Counsel in this case are detailed above. The investigation, prosecution, and settlement of the claims asserted in the Action required extensive efforts on the part of Plaintiffs' Counsel, given the complexity of the legal and factual issues raised by the claims and the vigorous defense mounted by Defendants.  The Action was prosecuted for more than three years.  Among other efforts, Plaintiffs' Counsel conducted a comprehensive investigation into the claims; researched and prepared a detailed Complaint; briefed a thorough opposition to Defendants' motion to dismiss; moved for class certification;

conducted discovery; and engaged in a hard-fought settlement process with experienced defense counsel.

85.   At all times throughout the pendency of the Action, Lead Counsel's efforts were driven and focused on advancing the litigation to bring about the most successful outcome for the class, whether through settlement or trial.

86.   Attached hereto are declarations in support of the request for an award of attorneys' fees and reimbursement of litigation expenses. *See* Declaration on Behalf of Pomerantz (Ex. 4), Declaration on Behalf of Labaton Sucharow LLP (Ex. 5), and Declaration on Behalf of Goldman & Minton P.C. (Ex. 6).

87.   Included with these declarations are schedules that summarize the time spent prosecuting this Action by each firm, as well as each firm's litigation expenses by category (the "Fee and Expense Schedules").  The attached declarations and the Fee and Expense Schedules report the amount of time spent by attorneys and professional support staff of each firm and the "lodestar" calculations, *i.e.*, their hours multiplied by their current hourly rates.  As explained in each declaration, they were prepared from daily time records regularly prepared and maintained by the respective firms, which are available at the request of the Court.

88.   The hourly rates of Plaintiffs' Counsel here range from $625 to $1,300 for partners, $615 to $725 for of counsels/senior counsels, and $385 to $665 for associates. *See* Exs. 4-A, 5-A, and 6.  It is respectfully submitted that the hourly rates for attorneys and professional support staff included in these schedules are reasonable and customary within the commercial litigation bar. Exhibit 7, attached hereto, is a table of hourly rates for defense firms compiled by Labaton Sucharow from fee applications submitted by such firms nationwide in bankruptcy proceedings in

31

2021.  The analysis shows that across all types of attorneys, Plaintiffs' Counsel's rates are consistent with, or lower than, the firms surveyed.

89.     Plaintiffs' Counsel have collectively expended 12,395.67 hours prosecuting and settling the Action.  *See* Exs. 4-A, 5-A, and 6.  The resulting collective lodestar is $6,863,624.30.  *Id*.  The requested fee of 33.4% of the Settlement Amount results in a modest "multiplier" of 1.8 of the lodestar, meaning that counsel is seeking 180% of the value of their time.

### 3.      The Complexity and Duration of the Litigation

90.     This Action presented substantial challenges from the outset of the case, which were skillfully navigated by Plaintiffs' Counsel.  The specific risks Plaintiffs faced in proving Defendants' liability and damages are detailed above in Sections VII.B and C.  These case-specific risks are in addition to the more typical risks accompanying securities class action litigation, such as the fact that this Action is governed by stringent PSLRA requirements and case law interpreting the federal securities laws, and was undertaken on a contingent basis.

### 4.      The Skill and Efficiency of Lead Counsel

91.     Lead Counsel Pomerantz is a highly experienced and skilled securities litigation law firm.  The expertise and experience of its attorneys are described in Exhibit 4-D annexed hereto.  Since the passage of the PSLRA, Pomerantz has been approved by courts to serve as lead counsel in numerous securities class actions throughout the United States.

92.     For example, Pomerantz served as lead counsel in: *In re Petrobras Sec. Litig.*, No. 14-cv-9662 (S.D.N.Y. 2018) ($3 billion recovery); *Kaplan v. S.A.C. Capital Advisors, L.P.*, No. 12-cv-9350 (S.D.N.Y. 2017) ($135 million settlement); *Pirnik v. Fiat Chrysler Automobiles N.V. et al.*, No. 1:15-cv-07199-JMF (S.D.N.Y) ($110 million settlement); and *In re Comverse Technology, Inc. Sec. Litig.*, No. 06-CV-1825 (E.D.N.Y.) ($225 million settlement).  *See* Ex. 4-D.

**5.      The Risk of Nonpayment**

93.      From the outset, Lead Counsel understood that it was embarking on a complex, expensive, and lengthy litigation with no guarantee of ever being compensated for the substantial investment of time and money the case would require.  In undertaking that responsibility, Lead Counsel was obligated to ensure that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and to cover the considerable costs that a case such as this requires.  With an average time of several years for these cases to conclude (and this case has been no different), the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.  Plaintiffs' Counsel received no compensation during the course of the Action but have incurred 12,395.67 hours of time for a total lodestar of $6,863,624.30 and have incurred $198,380.16 in expenses in prosecuting the Action for the benefit of the Settlement Class.

94.      Lead Counsel also bore the risk that no recovery would be achieved.  Even with the most vigorous and competent of efforts, success in contingent-fee litigation, such as this, is never assured.

95.      Lead Counsel knows from experience that the commencement of a class action does not guarantee a settlement.  To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to convince sophisticated defendants to engage in serious settlement negotiations at meaningful levels.

96.      Lead Counsel is aware of many hard-fought lawsuits where, because of the discovery of facts unknown when the case was commenced, or changes in the law during the pendency of the case, or a decision of a judge or jury following a trial on the merits, excellent professional efforts by skilled attorneys produced no fee for counsel.

97.     Federal Circuit court cases include countless opinions affirming dismissals with prejudice in securities cases.  The many appellate decisions affirming summary judgments and directed verdicts for defendants show that surviving a motion to dismiss is not a guarantee of recovery.  *See, e.g.*, *McCabe v. Ernst & Young, LLP*, 494 F.3d 418 (3d Cir. 2007); *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376 (9th Cir. 2010); *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970 (9th Cir. 1999); *Phillips v. Scientific-Atlanta, Inc.*, 489 F. App'x. 339 (11th Cir. 2012); *In re Smith & Wesson Holding Corp. Sec. Litig*, 669 F.3d 68 (1st Cir. 2012); *In re Digi Int'l Inc. Sec. Litig.*, 14 F. App'x. 714 (8th Cir. 2001); *Geffon v. Micrion Corp.*, 249 F.3d 29 (1st Cir. 2001).

98.     Successfully opposing a motion for summary judgment is also not a guarantee that plaintiffs will prevail at trial.  While only a few securities class actions have been tried before a jury, several have been lost in their entirety, such as *In re JDS Uniphase Securities Litigation*, Case No. C-02-1486 CW (EDL), slip op. (N.D. Cal. Nov. 27, 2007), or substantially lost as to the main case, such as *In re Clarent Corp. Securities Litigation*, Case No. C-01-3361 CRB, slip op. (N.D. Cal. Feb. 16, 2005).

99.     Even plaintiffs who succeed at trial may find their verdict overturned on appeal. *See, e.g.*, *Ward v. Succession of Freeman*, 854 F.2d 780 (5th Cir. 1998) (reversing plaintiffs' jury verdict for securities fraud); *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning plaintiffs' verdict obtained after two decades of litigation); *Glickenhaus & Co., et al. v. Household Int'l, Inc., et al.*, 787 F.3d 408 (7th Cir. 2015) (reversing and remanding jury verdict of $2.46 billion after 13 years of litigation on loss causation grounds and error in jury instruction under *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011)); *Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (reversing $81 million jury verdict and dismissing case with prejudice).  Moreover, the path to maintaining a favorable jury verdict can be arduous

34

and time consuming. *See, e.g.*, *In re Apollo Grp., Inc. Sec. Litig.*, Case No. CV-04-2147-PHX-JAT, 2008 WL 3072731 (D. Ariz. Aug. 4, 2008), *rev'd*, No. 08-16971, 2010 WL 5927988 (9th Cir. June 23, 2010) (trial court rejecting unanimous verdict for plaintiffs, which was later reinstated by the Ninth Circuit Court of Appeals) and judgment re-entered (*id.*) after denial by the Supreme Court of the United States of defendants' Petition for Writ of Certiorari (*Apollo Grp. Inc. v. Police Annuity and Benefit Fund*, 562 U.S. 1270 (2011)).

100.    As discussed in greater detail above, this case was fraught with significant risk factors concerning liability and damages. Plaintiffs' success was by no means assured.  Defendants disputed whether Plaintiffs could establish scienter and whether the alleged misstatements were actionable, and would no doubt contend, as the case proceeded to summary judgment, that even if liability existed, the amount of damages was substantially lower than Plaintiffs alleged.  Were this Settlement not achieved, Plaintiffs and Lead Counsel faced potentially years of costly and risky trial and appellate litigation against Defendants, with ultimate success far from certain and the significant prospect of no recovery as a result of rulings or a verdict adverse to Plaintiffs, or due to 2U's inability to satisfy a judgment.  Lead Counsel respectfully submits that based upon the considerable risk factors present, this case involved a very substantial contingency risk to counsel.

### 6.    The Amount Involved and the Results Obtained

101.    Courts in the Fourth Circuit have recognized that the result achieved is an important factor to be considered in making a fee award.  *See* Fee Brief, § II.C.1.  Here, the $37,000,000 Settlement is a very favorable result when considered in view of the substantial risks and obstacles to recovery, the damages issues in this case, and the Company's deteriorating financial condition, if the Action were to continue through class certification and summary judgment to trial, and through likely post-trial motions and appeals.

102.    The recovery was the result of very thorough and efficient prosecutorial and investigative efforts, complicated motion practice, and vigorous settlement negotiations.  As a result of this Settlement, thousands of Class Members will benefit and receive compensation for their losses and avoid the very substantial risk of no recovery in the absence of a settlement.

**B.    Request for Litigation Expenses**

103.    Lead Counsel seeks payment from the Settlement Fund of $198,380.16 in litigation expenses reasonably and necessarily incurred by Plaintiffs' Counsel in connection with commencing and prosecuting the claims against Defendants.

104.    From the beginning of the case, Lead Counsel was aware that they might not recover any of their expenses, and, at the very least, would not recover anything until the Action was successfully resolved.  Thus, Lead Counsel was motivated to take steps to manage expenses without jeopardizing the vigorous and efficient prosecution of the case.

105.    As set forth in the Fee and Expense Schedules, Plaintiffs' Counsel's litigation expenses total $198,380.16.  *See* Exs. 4-C, 5-C, and 6.  These expenses are detailed in Plaintiffs' Counsel's declarations, which identify the specific category of expense—*e.g.*, expert and consultant fees, electronic discovery costs, mediation fees, travel costs, online/computer research, and duplicating.  *See* Exs. 4-6.  As attested to, these expenses are reflected on the books and records maintained by each firm.  These books and records are prepared from expense vouchers, check records, and other source materials and are an accurate record of counsel's expenses.  *Id*.

106.    Of the total amount of expenses, $72,451.01 or approximately 36.57% of the total, was expended on experts, primarily in the fields of market efficiency, damages and loss causation.  These experts were critical to developing Plaintiffs' claims.  For instance, Dr. Cain prepared an expert report in connection with the class certification motion, and the expert firm Stanford Consulting Group Inc.'s ("Stanford") assistance during the Action was essential to the mediation

and settlement negotiations with Defendants. Stanford also assisted Lead Counsel with the development of the proposed Plan of Allocation.

107. In addition, $32,938.25, or approximately 16.60% of the total, was for investigative services, which were essential to pleading factual allegations sufficient to overcome a motion to dismiss.

108. Plaintiffs' Counsel was also required to travel in connection with the litigation and incurred costs related to working meals and transportation, which total $3,815.22 or approximately 1.92% of aggregate expenses.

109. Another significant category of expenses was for document management and litigation support, which total $23,652.34, or approximately 11.92% of the total amount of expenses.

110. The costs of electronic factual and legal research total $28,173.69 or approximately 14.20% of total expenses. These are the costs of services such as LEXIS/Nexis, Westlaw, BNA, and Pacer. It is standard practice for attorneys to use LEXIS/Nexis and Westlaw to assist them in researching legal and factual issues.

111. The costs of mediation totaled $16,167.50, or approximately 8.15% of the total expenses.

112. The other expenses for which Plaintiffs' Counsel seek payment are the types of expenses that are necessarily incurred in litigation and regularly charged to clients. These expenses include, among others, filing fees, copying/printing costs, long distance telephone costs, and postage and delivery expenses.

113. All of the litigation expenses, which total $198,380.16, were necessary to the successful prosecution and resolution of the claims against Defendants.

**X.  THE REACTION OF THE SETTLEMENT CLASS TO THE FEE AND EXPENSE APPLICATION**

114.  As mentioned above, consistent with the Preliminary Approval Order, a total of 45,753 Notice Packets have been mailed to potential Class Members advising them that Lead Counsel would seek an award of attorneys' fees not to exceed 33.4% of the Settlement Amount, plus accrued interest, and payment of expenses in an amount not greater than $425,000.  *See* Ex. 3 at ¶12.  Additionally, the Summary Notice was published in *Investor's Business Daily* and disseminated over *PR Newswire*.  *Id*. at ¶14.  The Notice and the Stipulation have also been available on the settlement website maintained by the Claims Administrator.  *Id.* at ¶17.[7]  While the deadline set by the Court for Class Members to object to the requested fees and expenses has not yet passed, to date no objections have been received.  Lead Counsel will respond to any objections received in their reply papers, which are due on November 25, 2022.

**XI.  REIMBURSEMENT TO PLAINTIFFS IS FAIR AND REASONABLE**

115.  Additionally, in accordance with 15 U.S.C. §78u-4(a)(4), Lead Plaintiff Fiyyaz Pirani and Additional Named Plaintiff OCERS seek reimbursement of their reasonable costs and expenses (including lost wages) incurred in connection with their work representing the Settlement Class in the aggregate amount of $35,121.65, consisting of $30,000 for Lead Plaintiff and $5,121.65 for OCERS.  The amount of time and effort devoted to the Action by Pirani is detailed in his accompanying Declaration, attached hereto as Exhibit 1.  The amount of time and effort devoted to this Action by OCERS is detailed in the accompanying Declaration of Paul Bronson, attached hereto as Exhibit 2.  Lead Counsel respectfully submits that the amount requested is consistent with Congress's intent, as expressed in the PSLRA, of encouraging institutional

---

[7] Plaintiffs' motion for approval of the Settlement and Lead Counsel's motion for an award of attorneys' fees and expenses will also be posted on the Settlement website.

investors to take an active role in commencing and supervising private securities litigation. Further, it is significantly less than the potential total reimbursement of $60,000 set forth in the Notice. *See* Ex. 3-A at 2, 14.

116. As discussed in the Fee Brief and in Plaintiffs' supporting declarations, Plaintiffs have been committed to pursuing the Settlement Class's claims since they became involved in the litigation. Plaintiffs have actively and effectively fulfilled their obligations as representative of the Settlement Class, complying with all of the demands placed upon them during the litigation and settlement of the Action, and providing assistance to Lead Counsel. For instance, Plaintiffs monitored the progress of the Action through communications with counsel, worked with counsel to respond to discovery requests, including producing documents, were kept informed concerning the mediation session that preceded the proposed Settlement, and evaluated and approved the proposed Settlement. These efforts required Plaintiffs to dedicate time and resources to the Action that they would have otherwise devoted to their regular duties.

117. The efforts expended by Plaintiffs during the course of the Action are precisely the types of activities courts have found to support reimbursement to lead plaintiffs, and they support Plaintiffs' request for reimbursement here.

## XII. MISCELLANEOUS EXHIBITS

118. Attached hereto as Exhibit 8 is a compendium of cases, in alphabetical order, that are not found in a reporter or Westlaw or Lexis and are cited in the accompanying Fee Brief or Memorandum of Law in Support of Motion for Final Approval of Class Action Settlement and Approval of Plan of Allocation of the Net Proceeds of the Settlement ("Final Approval Brief").

## XIII. CONCLUSION

119. In view of the significant recovery for the Settlement Class and the substantial risks of this litigation, as described above and in the accompanying Final Approval Brief, Plaintiffs and

Lead Counsel respectfully submit that the Settlement should be approved as fair, reasonable, and adequate, and that the proposed Plan of Allocation should likewise be approved as fair, reasonable, and adequate.  In view of the significant recovery in the face of substantial risks, the quality of work performed, the contingent nature of the fee, and the standing and experience of Lead Counsel, as described above and in the accompanying Final Approval Brief, Lead Counsel respectfully submits that a fee in the amount of 33.4% of the Settlement Amount, plus accrued interest, be awarded and that litigation expenses, including an award to Plaintiffs, be granted in full.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this 28th day of October, 2022.


*/s/ Jeremy A. Lieberman*
JEREMY A. LIEBERMAN