```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MARYLAND
 2                      SOUTHERN DIVISION

 3   _____
                                    )
     IN RE 2U, INC. SECURITIES      )   Consolidated Case
 4   CLASS ACTION                   )   No. 8:19-cv-03455-TDC
                                    )
 5   _____)

 6                                      Greenbelt, Maryland
                                        December 9, 2022
 7                                      9:39 a.m.

 8

                              FAIRNESS HEARING
 9              BEFORE THE HONORABLE THEODORE D. CHUANG

10

                      A P P E A R A N C E S
11

     ON BEHALF OF THE PLAINTIFFS:
12

           POMERANTZ LLP
13         600 3rd Avenue, Floor 20
           New York, New York  10016
14         BY:   JEREMY ALAN LIEBERMAN, ESQUIRE
                 (212) 661-1100
15               jalieberman@pomlaw.com

16         LABATON SUCHAROW LLP
           140 Broadway
17         New York, New York  10005
           BY:   JAMES WILLIAM JOHNSON
18               (212) 907-0700
                 JJohnson@labaton.com
19
           GOLDMAN AND MINTON PC
20         3600 Clipper Mill Road, Suite 201
           Baltimore, Maryland  21211
21         BY:   THOMAS JOSEPH MINTON, ESQUIRE
                 (410) 783-7575
22               tminton@charmcitylegal.com

23                        (Continued)

24      ***TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION***

25
```

2

```
 1              A P P E A R A N C E S (Cont'd)

 2    ON BEHALF OF THE DEFENDANTS:

 3         LATHAM AND WATKINS LLP
           555 11th Street, N.W., Suite 1000
 4         Washington, D.C.  20004
           BY:  ANDREW CLUBOK, ESQUIRE
 5              (202) 637-2200
                andrew.clubok@lw.com
 6
           PAUL HASTINGS LLP
 7         200 Park Avenue
           New York, New York  10166
 8         BY:  CHARLES A. PATRIZIA, ESQUIRE
                (202) 551-1700
 9              charlespatrizia@paulhastings.com, ESQUIRE
           BY:  KEVIN PAUL BROUGHEL, ESQUIRE
10              (212) 318-6483
                kevinbroughel@paulhastings.com
11
           SKADDEN ARPS SLATE MEAGHER AND FLOM LLP
12         One Manhattan West
           New York, New York  10001
13         BY:  WILLIAM J. O'BRIEN, ESQUIRE
                (212) 735-4128
14              william.obrien@skadden.com

15         SKADDEN ARPS SLATE MEAGHER AND FLOM LLP
           1440 New York Avenue, N.W.
16         Washington, D.C.  20005
           BY:  DAVID EMMETT CARNEY
17              (202) 371-7000
                david.carney@skadden.com
18

19    ALSO PRESENT:  JONATHAN PARK, ESQUIRE, POMERANTZ LLP

20

21

22

23              PATRICIA KLEPP, RMR
                Official Court Reporter
24         6500 Cherrywood Lane, Suite 200
              Greenbelt, Maryland  20770
25                 (301) 344-3228
```

```
1                    P R O C E E D I N G S

2        (Call to order of the Court.)

3            THE COURTROOM DEPUTY:  All rise.  The United States

4   District Court for the District of Maryland is now in session,

5   the Honorable Theodore D. Chuang presiding.

6            THE COURT:  Thank you, everyone.  Please be seated.

7            THE COURTROOM DEPUTY:  The matter now pending before

8   this Court is Civil Action No. TDC-19-3455, In Re 2U, Inc.

9   Securities Class Action.  We are here today for the purpose of a

10  fairness hearing.

11           Counsel, please identify yourselves for the record.

12           MR. LIEBERMAN:  Good morning, Your Honor.  Jeremy

13  Lieberman, Pomerantz LLP, on behalf of the plaintiffs.

14           MR. JOHNSON:  Good morning, Your Honor.  James W.

15  Johnson from Labaton Sucharow LLP.  We're additional counsel,

16  OCERS.

17           MR. MINTON:  Good morning, Your Honor.  Thomas Minton

18  of Goldman and Minton in Baltimore for the plaintiffs.

19           MR. LIEBERMAN:  Your Honor, I have also with me

20  Victoria Waciura and Nicholas Schmidt from Epiq to answer any

21  questions Your Honor might have about the claims administration

22  process.

23           THE COURT:  Okay, thank you.

24           MR. CLUBOK:  Good morning, Your Honor.  Andrew Clubok

25  from Latham and Watkins on behalf of the 2U defendants.
```

```
 1              THE COURT:  Good morning.

 2              MR. PATRIZIA:  Good morning, Your Honor.  Charles

 3   Patrizia from Paul Hastings, representing Goldman Sachs, the

 4   underwriter defendants.  With me is my partner, Mr. Kevin

 5   Broughel, who will be handling the issues as well.

 6              MR. BROUGHEL:  Good morning, Your Honor.

 7              MR. O'BRIEN:  Good morning, Your Honor.  William

 8   O'Brien from the firm of Skadden Arps Slate Meagher and Flom,

 9   and I have with me my colleague, David Carney, and we're also

10   here on behalf of the director defendants.

11              THE COURT:  Okay.  Thank you, everyone.  Welcome.

12              So I think you may have heard, the protocols are,

13   we're asking everyone keep their masks on over their nose and

14   mouth throughout proceedings; however, when you have a speaking

15   role, you can remove it if you're fully vaccinated, and I'll

16   follow that same procedure.

17              So what we have here is a motion to -- well, several

18   motions, but primarily, to have final approval of the

19   class action settlement and approval of the plan of allocation,

20   also the motion for final approval of the -- for an award of

21   attorneys' fees.  Maybe we should start, first, with the

22   class action issue.

23              Am I correct, even though I know there are recent

24   filings on this topic, there remain no objections to it from any

25   class members, and there are two people opting out?  Or maybe
```

1   you can update me on what the specifics are on those issues.

2          MR. LIEBERMAN:  That's exactly correct, Your Honor.

3   There have been no objections to the settlements.  There have

4   been only two exclusions, totaling 54 shares.  Under both

5   scenarios, that's actually a pretty good result and speaks well

6   of the settlements.  Usually, you'll see a few objections from

7   some class members, and 54 shares is quite small.

8          THE COURT:  Okay.  So as I looked at it, it said

9   that -- your paper said that the percentage of shares for who

10  works -- there was some sort of response, was 85 million shares,

11  which was -- I forgot what percentage of the overall universe?

12         MR. LIEBERMAN:  So to be clear -- so, Your Honor,

13  the -- there where -- when the account -- 85 shares, there could

14  be some double-counting, because shares are purchased and sold

15  during the class period.  The two metrics we think are most

16  telling here is, first is the recognized losses for the valid

17  claims.  And the recognized losses for the valid claims here are

18  $1.5 billion.  We had estimated damages based just on modeling,

19  and looking at the float and looking at the pricing during the

20  class period, we had estimate damages at 1.4 billion.

21         So to have that type of -- you know, that type of

22  response so closely match the damages amount is actually quite

23  unique.  Usually, you get about 80 percent, maybe, on the higher

24  level of participation, or maybe 60 to 70 percent.  It's looking

25  here very close to 100 percent.

 1                THE COURT:  Maybe you can clarify that for me.  So --

 2                MR. LIEBERMAN:  Sure.

 3                THE COURT:  There's two steps here.

 4           So what does the 85 million shares number represent,

 5      if you --

 6                MR. LIEBERMAN:  That's if you just count the shares of

 7      purchases and sales during the class period.  And you'll see

 8      85 million shares purchased and sold, but one could be

 9      purchasing from another during the class period and sign from

10      another --

11                THE COURT:  No, I understand, and these are not

12      precise numbers, but is there some number of or percentage of

13      that 85 million shares that are represented by the claims?

14                MR. LIEBERMAN:  Sure.  Well, there's a -- 53 million

15      shares actually have a recognized loss.  And so that's -- and we

16      had estimated during the -- in our analysis, we had estimated

17      between 50 to 60 million actually damaged shares.  So again,

18      that's coming right within the range of our estimates by our

19      experts.

20                THE COURT:  The 53 million is how many shares suffered

21      a loss versus -- I'm asking how many people, you know -- I mean,

22      how many claim respondents -- I don't know what the right term

23      is -- responded out of that universe?

24                MR. LIEBERMAN:  There were -- okay.  So we received

25      about 15,000 claims submitted.

```
1              THE COURT:  Right.
2              MR. LIEBERMAN:  Those 15,000 claims submitted
3    represents 53 million damaged shares that actually will
4    participate in the recovery here.  And that aligns very closely
5    with what we assessed prior, just based on expert analysis of a
6    range of 50 to 60 million damaged shares.  So that's one very
7    positive metric.
8              THE COURT:  Okay.  And you're saying that to the
9    extent that there was another 30 million shares in that period,
10   you don't think those are ones that took a loss?
11             MR. LIEBERMAN:  Exactly right, or -- exactly; they
12   don't have a recognized loss, Your Honor.
13             THE COURT:  Okay.  And then the 1.5 billion, this is
14   the loss of these -- effectively of these 53, 55 million shares.
15   Their total loss was about 1.5 billion, and then you're saying
16   that looking at these 15,000 claims, the estimate is how much in
17   losses for those 15,000 claims?
18             MR. LIEBERMAN:  So for first, to be clear, of the
19   15,000 claims, right now, we have 9,000 claims that were --
20   around 9,000 that were actually valid, not deficient.
21             THE COURT:  Okay.
22             MR. LIEBERMAN:  And about 6,000 that are deficient.
23   Of the 9,000 that were -- are valid, it's -- the recognized loss
24   is 1.5 billion that we assess.
25             THE COURT:  Okay.
```

1          MR. LIEBERMAN:  And before getting any claims and just

2     looking, modeling, which our experts do, we had modeled damages,

3     class-wide damages, at 1.54 billion.  That is a very close

4     number.  And in our experience, if you get 80 percent of your

5     modeling, you've done very well.

6          THE COURT:  So what is the -- generally the reason why

7     these 6,000 claims are invalid?

8          MR. LIEBERMAN:  Insufficient documentation.  So we --

9     and we are -- we're going to go through a process of sending out

10    deficiency letters, and there'll be an opportunity to cure --

11    there may not be a recognized loss for a number of these claims,

12    and that would also be deficient, and issues like that.  There

13    could be duplicate claims, or it appears to be a duplicate

14    claim.  You have sometime institutional investors, and you have

15    also third-party filers, and sometimes they're filing on behalf

16    of the same entity.

17         And so we've marked 6,000 as deficient, but there's

18    always an opportunity to cure.  And we'll mail out a deficiency

19    notice that's usually 45 days to cure, and then we assume that

20    there will be a fair percentage that are able to cure, then the

21    fair percentage that can't.

22         THE COURT:  So as a practical matter in this instance,

23    with this company, when you're talking the whatever, 15,000 or

24    9,000 claims, I mean, what -- the folks who invested in this

25    company who fall under this class category, are they primarily

1    institutional investors, individuals, some other category?  How

2    would you characterize this pool of claimants?

3             MR. LIEBERMAN:  A large percentage are institutional

4    investors.  I don't have the breakdown.

5             THE COURT:  Like the OCER type of entities?

6             MR. LIEBERMAN:  Exactly, exactly.  That's --

7    typically, in a case like this, that's what you'll find.

8    Whether the percentage is 75 percent or 50 percent, I don't have

9    that number handy.

10            THE COURT:  Okay.  So then, just doing the math, it

11   seems as if, if you thought there was about 1.5 billion in

12   losses from these claimants, the pool of resources for them is

13   37 million minus the attorneys' fees.  So I mean, they're

14   getting a pretty small recovery of their actual losses, correct?

15            MR. LIEBERMAN:  Fair enough, Your Honor.

16            THE COURT:  A few pennies here on the dollar.

17            MR. LIEBERMAN:  Fair enough, Your Honor, but we were

18   in a scenario where we've been looking at the financial -- it

19   was -- a key guiding force in our settlement discussions was

20   that from the time we started this case till the time that we're

21   settling this case, we see nothing but bad financial news for

22   the company.  And there's a depleting insurance asset that's

23   available, and we took a fair chunk of that as far as this

24   settlement.  And we were concerned, if we litigate for another

25   six months, that's an easy $15 million that are spent in

1    insurance, and all of a sudden, you may -- you know, (a) you may

2    not settle then, you'll settle at lower amounts, and you may

3    have a company that's not available to fund the settlement.

4          That was a key component in the settlement.  I don't

5    think our posture would be much different if we didn't see this

6    very deteriorating financial condition.

7          THE COURT:  No, I understand that.

8          MR. LIEBERMAN:  Yeah.

9          THE COURT:  What is the current state of the company,

10   not just on the numbers, but just -- I mean, what are they doing

11   now?  And I don't know if that's you or if it's defense counsel

12   in terms of being able tell me.  I mean, I had a sense of what

13   they were doing during this time period, the kind business they

14   were running, they had all these different deals with colleges

15   and universities.

16         Leaving aside the market cap numbers and so forth, I

17   mean, do they have -- I mean, how many different universities

18   are they still working with, have they closed down some those

19   operations, or are they still expanding?  Can you characterize

20   the state of business just from a business side, not from a

21   share price side or market value side?

22         MR. CLUBOK:  Good morning, Your Honor.  Again,

23   Andrew Clubok from Latham & Watkins.

24         Unfortunately, I'm not prepared to give a detailed

25   analysis.  We're a public company, we have public filings.

1    You know, there's a rhythm to the disclosures, and the company

2    is -- has, you know, continued to make those filings.

3         THE COURT:  Right.  And I confess, I haven't looked

4    those up either, I thought you might have better knowledge of

5    those than I do, so just looking for a high level, not looking

6    for details.

7         MR. CLUBOK:  At a high level, Your Honor, to be

8    clear -- and I have to be careful, because I don't want say

9    anything here off the cuff that's inconsistent with the

10   disclosures we make to investors, and so I'm -- I guess, I'll

11   pick my words carefully.  But I think it's our -- the company's

12   business is, you know, the best, the company's ability, fully

13   described in its ongoing financial statements and its

14   disclosures.

15        It is -- but let me put it this way.  The plaintiffs

16   have speculated about the company's potential financial

17   distress.  We certainly have not said anything in the record

18   here that would be inconsistent in any way with our continued

19   public filings.  You know, the company is -- like all companies

20   it is at the stage that they're in, you know, I'm sure has

21   optimism, right, in the sense that optimistic statements,

22   frankly, which were at the heart of this case, are made all the

23   time, and people believe they're going to succeed.

24        I think one important thing for Your Honor to

25   understand and to keep in mind as you think about this

1    settlement is that we fully believed and we presented a mountain

2    of evidence during extensive mediation proceedings, spanning

3    months, that there was not going to be any realistic chance of

4    proving liability.

5           It was going to be an expensive proposition, but at

6    the core, this case is about statements that the company made at

7    most with optimistic assumptions, or as they say, puffery, no

8    evidence at all of scienter or intentional securities fraud,

9    nothing said, we believe, that was inconsistent with internal

10   documents, which we ultimately shared with the plaintiffs, and

11   inability to prove loss causation, and numerous other defenses.

12          So to be clear, I mean -- but companies settle all the

13   time, securities cases, 90-some percent, probably, and one judge

14   said to me once, 99.9 with a lot of 9 percents are settled.  So

15   we, you know, settled, but it, at least from our view, was not a

16   reflection of a belief that we would lose the case or that any

17   class member has been damaged even by a penny due to some

18   sort of securities fraud.

19          THE COURT:  So let me just stop you there.  I mean,

20   I'm not asking you to admit liability; I didn't ask anything

21   like that.  I just asked you to tell me what's the state of the

22   company.  And if you're saying we're going to make optimistic

23   statements, then we're back to where we started from in this

24   case, which is evaluating statements on subjective beliefs and

25   so forth.

1          All I'm asking for is -- and again, I mean, I

2   apologize if I was supposed to read all the SEC filings; I did

3   not realize that you expected that I had that knowledge.  I

4   assumed you did, since it's your client.  But I'm just asking,

5   you know, in the original complaint and in the motion to

6   dismiss, there were -- I mean, at that time, there were

7   significant deals the companies had to have online educational

8   programming for the University of Southern California and other

9   major universities, and I'm asking, is that the same -- is that

10  continuing to be the state, did they lose any of those

11  contracts, or did any of them end?  Are there more or fewer than

12  there were at that time, with these major universities versus

13  for-profit universities?

14          I'm just trying to understand to evaluate the

15  settlement which you support, supposedly, even begrudgingly, as

16  is always the case.  I'm just trying to evaluate, is it correct

17  that, you know, the company, you know, potentially is not in as

18  good a state as it was at the time this all happened?  And

19  that's one of the reasons why I would accept a settlement where

20  people are getting pennies on the dollar for their losses or

21  alleged losses, and I just want know that.

22          I don't want hear an argument about how you were right

23  the whole time; I already know that argument.

24          MR. CLUBOK:  Your Honor, I did not mean to -- that's

25  not really my argument.  The company is objectively --

```
 1              THE COURT:  It sounded like it was.

 2              MR. CLUBOK:  Well, the company is objectively -- the

 3   stock price is lower than it was when the case was filed.  It's

 4   objectively the stock price.  And I -- you know, it's a long

 5   class period, so I guess I can't say for every single purchaser,

 6   but I would presume that the purchasers who loss money bought

 7   the stock at a higher price than it now finds itself.  You know,

 8   of course, you can't prove fraud by hindsight, and so the state

 9   of the company today is not, respectfully, terribly germane to

10   the merits of the case as they existed, and really --

11              THE COURT:  Well, I'm interested -- and again, it's --

12   I'm not asking for a prediction or stock prices; I just want to

13   know -- for example, do they still do business with USC?  Is

14   that still happening?  Is it bigger or smaller than it was at

15   the time of these events?

16              MR. CLUBOK:  Your Honor, I would just tell you, I

17   don't know the answers to those questions.

18              THE COURT:  Okay.

19              MR. CLUBOK:  They were not, you know, raised as

20   objections or --

21              THE COURT:  So are the numbers of employees the same,

22   higher, or lower than it was then?

23              MR. CLUBOK:  I believe the number of employees -- I

24   would be speculating.  We did not brief that issue, and I

25   apologize.  I could -- if it's necessary, I could take a recess,
```

1    and I could speak to my client and try to get some of that

2    information.

3             If that's germane to these proceedings, I'll happily

4    do that, but I can't tell you the total number of employees

5    today versus the number of employees in 2019.  I can't tell you

6    the exact prospects of the business.  It's very readily knowable

7    from reading the financial statements, or if Your Honor --

8             THE COURT:  Again, I didn't read them; I assumed you

9    would know this information.

10            MR. CLUBOK:  No, no.  I'm --

11            THE COURT:  How do you expect me to know this

12   information if you don't?

13            MR. CLUBOK:  I'm not, Your Honor -- I mean to say, we

14   did not expect it to be germane to assessing the settlement

15   which is to be judged from the lens of -- not by hindsight as to

16   what's happened today but what was known back then.

17            THE COURT:  Okay.  Let me turn to another lawyer who

18   might have some answers.

19            Mr. Lieberman, I mean, do you know anything about

20   this?  And I know you're not inside the company, so -- I'm

21   just -- you're trying defend this settlement, and you're trying

22   explain why it's pennies on the dollar, the other side's

23   argument is, well, they were going to win anyways on

24   liabilities, so of course, it's pennies on the dollar.  I assume

25   that's not your position.

1          So your position on why this settlement's appropriate

2    in part is based on the fact that the company -- just again, the

3    broad impression you're trying to convey is that the company is

4    not doing as well as it was at the time of these events, there's

5    a potential that it'll do even worse, and therefore, let's take

6    the deal we can get now because there may not be this money

7    around later.

8          MR. LIEBERMAN:  Precisely.

9          THE COURT:  I'm just trying understand that, and other

10   than saying the stock price is down -- which I understand is a

11   significant metric -- I just want understand, you know, whether

12   it's this case or whether it's just the circumstances that you

13   argued were present at the time but they weren't disclosing that

14   the model wasn't going to work in the future, I'm just trying to

15   understand, is that correct, that a few years later, is it the

16   case that they can't expand anymore because of either the

17   reasons you raised in your case or otherwise?

18          You know, on the one hand, online education seems to

19   perhaps still be out there, but the need to do it during a

20   pandemic may be dissipating.

21          I'm just trying get broad understanding, and no one

22   seems to have an answer.  Maybe you can help.

23          MR. LIEBERMAN:  Your Honor, we understand they have

24   lost a number of partners, also understand that 2U --

25          THE COURT:  Partners, meaning like the universities?

1        MR. LIEBERMAN:  Universities.  Also understand that

2    universities have gotten wise to say, hey, we can offer this

3    ourselves, we don't need 2U to make these offerings to our

4    customers.  Generally, there's been a big blowback on the cost

5    of education, cost of online education.

6        The federal government has put a lot of scrutiny into

7    that, and that's hurt the stock price, but just looking at some

8    objective metrics -- because I don't have the metrics on how

9    many partners they've lost.  There's been a number of articles

10   unfavorable about 2U and their business model since we've

11   started the litigation that have hurt the share price, but just

12   some metrics that are just objective, they had $400 million in

13   cash when we started the case, that's down to about $200 million

14   in cash.  They've lost $188 million in the past six months.

15   There had been speculation in the marketplace as to what the

16   future of 2U is.  And so when we --

17       THE COURT:  What is that speculation?  Just reporting

18   on what people are saying.

19       MR. LIEBERMAN:  That either 2U will not make it, or

20   they'll need to be acquired and do something to right the boat.

21       And so we saw this, and -- this is through discovery,

22   and we saw this as we were litigating our case, and as I was in

23   discussions with Mr. Clubok about where this might land, we did

24   get very concerned when these bad metrics came out and said, we

25   can continue to litigate this.  We know that a settlement

1   offered would be pennies on the dollar, but let's take 37 now,

2   or I might be taking $12 million in the bankruptcy scenario in a

3   year and a half and presenting a much less favorable settlement.

4          That is very much what guided us.  You had a stock

5   that was at $98 per share at the beginning of the class period,

6   it went down to 6, now it's at about 7 or so, and so the market

7   capitalization has gotten hammered.  They're experiencing severe

8   losses, and they are losing their cash.  Their cash is halved.

9          THE COURT:  And I'm just trying to understand -- I

10  mean, obviously, those statistics are favorable to your

11  position, but just trying to understand, again, to give me the

12  confidence in saying that's not a temporary downturn for other

13  reasons, that it is something that is significant enough that it

14  causes the concern that makes the decision you've made a

15  reasonable one to accept this, I mean, again, is it that -- how

16  much of that is negative publicity from this case versus,

17  you know, the universities don't want to work with them anymore,

18  either because this case or because as you said, they were

19  cutting out the middleman?  Is there any way or any data that --

20  or even just specific examples that would help to answer some of

21  those questions even in part?

22         MR. LIEBERMAN:  Yeah, I can state specific examples at

23  this moment.  I know there are clearly negative articles in the

24  Wall Street Journal since we've -- since the Court's order on

25  the motion to dismiss.  Negative articles are coming to the

```
 1    extent these are very bloated costs for consumers, you've got
 2    this middleman coming in here and charging a lot of money, a lot
 3    scrutiny in general -- generally, on online education and the
 4    cost, there's been articles.  The Wall Street Journal has a
 5    whole series of this, as Your Honor might have seen, on kind of
 6    people paying for degrees that they don't really need and paying
 7    hundreds of thousands of dollars.
 8            And so our understanding is -- and no offense to
 9    Mr. Clubok's client -- is that 2U is very much in that market,
10    and that market now is -- there's a lot of scrutiny on the
11    universities of why are you costing so much, and the way that
12    they're getting away from this is saying, well, maybe we don't
13    need this middleman, let's try to cut costs and do this
14    ourselves.  2U, as I understand it, takes a very fair percentage
15    of about 30 percent or so of the tuition.  And so that's kind of
16    gotten hammered.
17            And then, you -- and then -- that's just kind of the
18    story anecdotally.  I'm just looking at the hard facts.  Look at
19    the cash; it's been halved.  Look at the losses they are
20    experiencing.  They're losing -- it's a cash burn every quarter
21    and every year.  And then, as Mr. Clubok is talking to me and
22    we're talking about the case, and, hey, do you want resolve it,
23    I say to myself -- you know, I might be -- I might do very -- I
24    thought we would do very --
25            THE COURT:  No, I understand, I understand what you're
```

```
 1    saying.  Maybe one additional question, just, again, trying get
 2    to some detail.  You said that you know they've lot some
 3    partners.  Do you know any specifics on which ones?  Again, this
 4    is probably publicly known information --
 5              MR. LIEBERMAN:  Oh, yeah.
 6              THE COURT:  -- or at least it would be in the
 7    statements that I haven't read, but --
 8              MR. LIEBERMAN:  It may be.  I understand -- I don't
 9    have a name on hand, Your Honor.
10              THE COURT:  Okay.
11              MR. LIEBERMAN:  That's not the way -- I guess, when we
12    were presenting this, we were looking more at the financial
13    metrics.
14              THE COURT:  No, I understand.  And again, I'm not
15    quarreling with those; I'm just trying to understand.  So -- and
16    maybe another question is, I don't remember who exactly the
17    competitors were in this marketplace, but would it be fair to
18    say that the whole industry is in trouble, of the private,
19    you know, online providers, or is it that this company in
20    particular is sort of losing to those other companies for
21    various reasons?
22              MR. LIEBERMAN:  My understanding is that the industry
23    generally is under a lot of scrutiny.  People are saying,
24    education costs are soaring, and then, they're going back to --
25    everyone's looking at the colleges, why are you costing so much
```

1    money, and saying, oh, we've got to do something, let's cut out

2    the middleman.

3            And so -- but 2U is one of the largest if not the

4    largest provider of this type of middleman service, and so they

5    are getting particularly hammered.

6            It was never -- I mean, our theory of the case is, it

7    was never really a viable business model and that as -- in

8    contrast of what they are touting to investors, and that's

9    coming to bear, is that they can't -- they were never going to

10   be as great as they said they were, it just didn't work, it

11   didn't economically make a whole lot of sense for folks, and

12   they ultimately couldn't get the growth that they were

13   achieving, and they're going to major slide.

14           I might be wrong; I might turn around in a year from

15   now, and more likely, the two scenarios from what we've seen in

16   our experience is, either the company goes bankrupt or they get

17   acquired by somebody.  And then maybe the successor comes up and

18   has a lot of money and we could have gotten money from them.  I

19   don't know what the result would be, but we've doing this

20   awhile, I've been in a lot of situations where I've got the

21   greatest case in the world, and then, a year from now, I'm an

22   idiot, because I got the greatest case against a nonfunctioning

23   entity.  And I was very concerned about that as part of these

24   negotiations.

25                   THE COURT:  Okay.  Is there anything you want to add

 1    now, Mr. Clubok, on this topic, or not?

 2             MR. CLUBOK:  Yes, Your Honor; I've sort of phoned a

 3    friend, here, as they say, and gotten some information.  So

 4    again, I'm not referring Your Honor to the public statements;

 5    I'm really referring anyone who might be listening to me so that

 6    they don't take my word for this.  I'm trying to very briefly

 7    summarize it; it's very detailed.  That's all I was saying.

 8             But I believe -- it's my understanding that the recent

 9    financials reported revenues of approximately $232 million, year

10    over year, through September of 2022, with a net income, though,

11    of negative $121 million, so diluted the negative earnings per

12    share and a net profit margin of negative 52.39 percent.

13             THE COURT:  What's the time frame for that?

14             MR. CLUBOK:  I believe that is the results of --

15    through the third quarter, 2022.  Revenue, 232 million, was

16    flat, degree program segment revenue decreased, I believe, by

17    7 percent, although again, I strongly encourage anyone who might

18    be listening to this, as it's public, to double-check these with

19    the public filings.

20             But it does say --

21             THE COURT:  I mean, nobody's actually listening now;

22    they're not allowed to just call in.  I mean, they can order the

23    transcript, they can do that.

24             MR. CLUBOK:  I'm saying it a bit tongue in cheek,

25    Your Honor.  But there -- maybe Law360, there's often

1    court reporters that follow these, and so I'm just being careful

2    and mindful.

3                THE COURT:  Right.  No, I understand, I understand.

4                MR. CLUBOK:  Okay.  So the net loss reported was

5    negative $121.7 million.  Now, you know, adjusted, even

6    increased by 17.8 million and adjusted net loss improved by

7    13.9 million in the third quarter of 2022, perhaps, compared to

8    its similar -- so there's -- like with every company, there's,

9    you know, challenging headwinds, there is optimistic

10   indications.  I'm sure the company and its leaders believe that

11   they will do well.  I can understand why plaintiffs --

12               THE COURT:  So you're disagreeing with him, then, I

13   take it?

14               MR. CLUBOK:  Well, it's always going to be the case.

15   I mean, Your Honor, it's -- and frankly --

16               THE COURT:  Well, you don't have to agree on the -- I

17   understand you disagree on liability.  I mean, you don't have to

18   always agree that the company is doing really well, or doing

19   poorly.  I mean, if a company's doing poorly, that -- to some

20   degree, you're giving me some data that might, at least,

21   arguably support that.  But to say, look, you know, these guys

22   were saying the company's in trouble, that's why we're making

23   the deal, and you're saying, well, we're all very optimistic

24   over here.  I mean, that's a contradiction.

25               MR. LIEBERMAN:  Your Honor, my colleague and I -- just

1  reminded me --

2          THE COURT:  This is a joint settlement proposal, or at

3  least everyone signed off on it, so -- so again --

4          MR. CLUBOK:  Correct, but we do have --

5          THE COURT:  But -- so again, for me to accept

6  Mr. Lieberman's position, I have to sort of disagree with you is

7  all I'm saying.

8          MR. CLUBOK:  But -- I understand, but if you think

9  about it, almost -- in a settlement, we're always going to have

10 diametrically -- almost always, diametrically opposing views.

11 If you think about it this way --

12         THE COURT:  So do we need more fact-finding on this

13 issue before I can -- because I thought that would be somewhat

14 undisputed, that the company is not doing as well as it was

15 before, so this is a good reason to do this, even though your

16 main argument is that we are not -- we never had any liability

17 in the first instance, but -- so I understand, that's always a

18 dispute, but it sounds like there is -- you know, you're

19 disagreeing with Mr. Lieberman, the company is not doing that

20 well.  And I'm interested to know the answer to that, just sort

21 of in broad terms, but we don't have agreement on that, it

22 sounds like.

23         MR. CLUBOK:  If I may, Your Honor.  I don't think we

24 will disagree on the facts.  When I say the company has lost

25 121.7 million, there's no disagreement on that.  Now --

1          THE COURT:  So why do you need to tell me that they're

2    all optimistic?  It doesn't matter.  I didn't ask for their

3    subjective views; I just asked, you know, are they taking on new

4    clients, are they losings clients?  Those are objective facts.

5    I don't need the executive's optimistic views, which is what got

6    us into trouble here in the first place.

7          MR. CLUBOK:  I understand.  But I also can't say

8    something in this Court that is going to sig- -- and I get it --

9          THE COURT:  You're attorney, you're not an officer of

10   the company.

11         MR. CLUBOK:  I understand, but these do get -- often,

12   get they reported.  You're right, I don't see anyone -- I don't

13   think these three are from a media source.

14         THE COURT:  They just told us who they were; they're

15   from the class -- administration -- claims administration.

16         MR. CLUBOK:  Understood.  There's a transcript here,

17   there are lots of outlets that follow securities cases extremely

18   closely and mine them for things that are said.  So I am being,

19   appropriately, I think, careful.  I'm not going to say --

20   someone -- one person can look at a loss of 121 and totally

21   reasonably think, oh, my gosh, that company is going down the

22   tubes.  Another person can say, we're going to turn it around

23   and we're going to do well.  That -- our subjective --

24         THE COURT:  That seems to be what your client said at

25   some point in time, again, which is why we're here.

```
 1              MR. CLUBOK:  Well, so --

 2              THE COURT:  Now, if --

 3              MR. CLUBOK:  Okay --

 4              MR. LIEBERMAN:  Your Honor, there --

 5              MR. CLUBOK:  Not exactly, Your Honor; we would

    disagree with that.  That is claim that was made, but it -- that

    doesn't rise to the level of securities fraud; that's the nature

    of pretty much every company where there are believers and

    doubters.

10              THE COURT:  Here we go again.

11              So Mr. Lieberman, what were you going to say?

12              MR. LIEBERMAN:  I do have a relevant fact in answer to

13    Your Honor's questions.

14              THE COURT:  Okay, thank you.

15              MR. LIEBERMAN:  In July of 2022, the company announced

16    it would lay off 20 percent of its work force.

17              THE COURT:  July of 2022?

18              MR. LIEBERMAN:  Yeah.

19              THE COURT:  Okay.

20              MR. LIEBERMAN:  So that was actually, you know, right

21    at the time that we agreed to the settlement.  And again, as

22    part of the whole perspective, I don't have the data on which

23    customers they were losing.

24              THE COURT:  I understand.  You would be less likely to

25    know that, obviously, and --
```

```
1              MR. LIEBERMAN:  Right.

2              THE COURT:  But I understand that.

3              MR. LIEBERMAN:  But the data that we have cited in our

4    briefs and also just cited by the Mr. Clubok, I think, all tell

5    the same story; this is company that's hemorrhaging cash and

6    hemorrhaging money, and there's a real risk that this company's

7    going to end up, you know, insolvent, unworkable, et cetera.

8    And I wish them the best, and I may turn out to be a fool in

9    two years from now when they announce a merger and have

10   $5 billion in cash, but I was looking at that very likely

11   prospect.

12             I've been doing this a while, and I've been made a

13   fool before the other way, where I continue to litigate what

14   I think is a great case, which I do think so, and then it turns

15   out that I have no money to give anyone because there was just

16   nothing there.

17             THE COURT:  Okay, I understand.  I understand.

18             Is there anything else you want to add or not?

19             I'm not asking you if you need to, but you're standing

20   up, so I assume you want say something, that's all.

21             MR. CLUBOK:  Well, there is a little bit -- in a case

22   like this -- if a case is about optimistic predictions, right,

23   if the optimistic predictions come true, let's say that's

24   relevant, maybe that proved the optimistic projections are

25   right.  So if the company was doing great now or better than
```

1   they claimed, that kind of defeats liability.

2           On the other hand, if the optimistic predictions prove

3   not to be true and the company's going down the drain as

4   Mr. Lieberman is predicting now, that -- I can understand why

5   there'd be a reason to settle a case maybe lower than you might

6   have hoped to get if you kept litigating for two years.

7           That's why it's a little bit -- I would say it's --

8   there are perfectly valid reasons either way to justify the

9   settlement from their perspective, and then of course, we --

10  because we're on the other side of it -- may have the opposite

11  reason, right?  We may think, hey, the company's going to do

12  great, that's why we should settle low, because this --

13  you know, the optimistic projections were right all along.

14          They might think the company's going down the tubes,

15  that's why we'd better settle, because the company's going down

16  the tubes and we better get what we can get now, as opposed to

17  other cases where I know Mr. Lieberman has been left holding the

18  bag for some of his clients, because that's what happens.

19          That's why I say it doesn't -- we don't need to agree

20  on that reason for there to have been a meeting of the minds,

21  you know, moderated by one of the top mediators in the country,

22  months of very heavy negotiations -- and that I can certainly --

23  that, both sides will agree to -- where we very much disagreed,

24  until we were finally forced, with the mediator's proposal, to

25  say either -- Do you want to do this or not?

1      THE COURT:  Okay, that's helpful.

2      So we've talked about effectively the notice, we've

3  talked about the amount.  The plan of allocation formula,

4  Mr. Lieberman, just remind me -- and I don't know if it -- just

5  as a practical scenario, now that we're dealing with sort of a

6  known universe of claimants, although I'm not presupposing that

7  you've already -- or the team has done all these calculations

8  and so forth, but can you give me a general sense of, in

9  practical terms, how does the formula that was proposed earlier,

10 how is it going play out in practice, in terms of -- you know,

11 are we talking about as simple as saying, well, here's the

12 24-whatever million that you're proposing be the pot, and then,

13 each of these claimants is effectively going to get the same

14 thing per share, or does it play out differently given the

15 formula?

16     And give me a sense of what we can expect to see

17 actually happening in terms of the actual numbers of who gets

18 what.

19     MR. LIEBERMAN:  More or less -- it was nuance,

20 Your Honor.  It is a pro rata distribution of the net settlement

21 funds.  The calculation goes as follows.  We have two alleged

22 corrective disclosures, and based on the recognized loss for

23 each disclosure, the plaintiff then -- and so you have -- that

24 gives you the core number of what the recognized loss is.

25     If there's a -- the first disclosure, let's say for

```
1    example -- I don't have it in front of me -- but had an $11

2    decline and the next one had a $30 decline, so then your

3    recognized loss if you held for both disclosures would $40, or

4    $41.

5             There's a cap on your recognized loss based on the

6    PSLRA, which says, the different -- your loss can't be any more

7    than the difference between your purchase price and the

8    amount -- and if you held your shares to the end of the class

9    period, the 90-day average.  So there's a statutory cap on

10   damages, and that gets reflected in the recognized loss.

11            But every claimant has a recognized loss pursuant to

12   the plan of allocation, which is -- has two factors, the actual

13   stock drop loss on the corrective disclosure and then this PSLRA

14   cap, which tells you -- you know, there's a certain cap if your

15   shares kind of recovered in share price, basically.  We apply

16   that to everybody.  Everybody then has recognized loss, and

17   obviously, they're not going to get their full recognized

18   loss -- the full recognized loss looks like it's 1.5 billion or

19   so -- and then they get their pro rata share of that.

20            THE COURT:  Okay.

21            Okay.  Let me see if I have anything else on that

22   topic.

23            Okay.  So then, there is the attorneys' fee issue,

24   which I think I understand the arguments.  I also understand

25   that there are examples in the past where this has been done as
```

1    a -- both the percentage approach, the lodestar multiplier

2    argument.  I mean, I -- am I correct, though, in terms of --

3    I think, you came up with that multiplier of 1.8.

4            MR. LIEBERMAN:  Yeah, that's correct.

5            THE COURT:  And that was based on the actual fees --

6    actual hourly rates that you all apply, correct, it wasn't based

7    on, for example, the district local rules rates or anything like

8    that; is that correct?

9            MR. LIEBERMAN:  That's correct, yeah.

10           THE COURT:  Did you try do that calculation or not?

11           MR. LIEBERMAN:  We didn't, Your Honor.  My

12   understanding was -- and I don't have the local rule in front of

13   me -- it didn't apply to a securities class action, and so --

14   no, we didn't do that.

15           THE COURT:  Okay.  But just in terms of, like, an

16   illustrative point about even with that set of rates, it's still

17   a multiplier of "x," you didn't try to do that?

18           MR. LIEBERMAN:  I didn't do that.  If our -- but if

19   are rates are 30 percent more, I mean, we could just do a rough

20   calculation --

21           THE COURT:  Yeah, I know, there's probably a way to do

22   that.

23           MR. LIEBERMAN:  Yeah.

24           THE COURT:  Okay.  So I did notice, in some of the

25   cases that were cited -- I mean, for example, one of my

1  colleagues in this district, I think, in an unopposed, you know,

2  joint motion for approval of the settlement, did take a

3  33 percent type award and cut it down to 25 or something like

4  that, so there is precedent for that sort of thing.  Why isn't

5  that appropriate in a case like this, given, you know, there is

6  this multiplier effect that still takes you above what you

7  actually put into it?

8          MR. LIEBERMAN:  Sure.  I mean, the multiplier is

9  standardly applied.  It's nothing unique, in any case, and

10 particularly is a relatively low multiplier, and the reason is,

11 is because we've, you know, been working on this case

12 uncompensated for three years, or three-plus years, and so not

13 to get multiplier would be somewhat unfair.  My adversary has

14 been, you know, getting paid every month, and I have not.  And

15 so we would respectfully submit, there should be a multiplier.

16         And -- but really, just the full view, the -- is the

17 percentage correct, and then, does the lodestar multiplier work,

18 and we would respectfully submit that, you know, both them do

19 support the award here, you know.  It's always -- it is always,

20 at the end of the day, well, you know, why should you, you know,

21 get so much, but there's always -- you know, the work that was

22 put in, there should be --

23         THE COURT:  I know there's a risk element to this that

24 you're pushing --

25         MR. LIEBERMAN:  Yeah.

1          THE COURT:  -- so I'm not quarreling with the idea of

2    a multiplier at all; I'm just trying to understand what it

3    should be --

4          MR. LIEBERMAN:  Yeah.  Yeah, risk and time, risk and

5    time, Your Honor.

6          THE COURT:  Right.

7          MR. LIEBERMAN:  Because there's risk, and there's

8    also, you're just not getting paid, and you have mouths to feed

9    while here, yeah.

10         THE COURT:  Right, okay.

11         There is -- there are two orders here.  There's the

12   motion -- there's the order granting the motion to approve the

13   settlement, and then, there's the proposed final judgment order.

14   And perhaps you can just -- and I understand there's two

15   different concepts.  There's a motion and then there's final

16   judgment, but it seems as if there's some redundancies between

17   those two orders.

18         MR. LIEBERMAN:  I think that's right, Your Honor.

19         THE COURT:  I think they're largely consistent, but I

20   don't know if I did a side-by-side to make sure that that's the

21   case.  So can you just tell me the rationale for why we have the

22   language we have in both of those and why it does seem like

23   there's some overlap rather than just having one that sort of

24   kind of covers it and the other one just sort of checks the box

25   to grant whatever needs to be granted.

1          MR. LIEBERMAN:  I agree wholeheartedly, I agree

2    wholeheartedly, Your Honor, and what we did was, in our reply

3    papers, we put in a proposed final judgment order of dismissal

4    that also has the fee and expense and the plaintiffs' award

5    requests.  We think they should be consolidated.  And however it

6    was submitted initially, they were using, you know, the wrong

7    form.  We think there should be one order, and so we submitted

8    that in our reply papers.

9          THE COURT:  The final judgment order?

10         MR. LIEBERMAN:  Final judgment, yeah, and approval of

11   the settlement and approval of --

12         THE COURT:  So do you think the original proposed

13   order is not -- you're not no longer asking for that to be

14   separately approved, so that we just have the one order?

15         MR. LIEBERMAN:  Makes sense to us, Your Honor.

16         THE COURT:  So -- actually, I should look at it to be

17   sure, because this was with your replay materials, even though

18   there was really nothing to reply to, but this most recent

19   filing, final judgment with an order of dismissal with

20   prejudice, you believe this covers -- if I were to agree with

21   the language, it would cover the motion, the judgment, and also

22   the attorneys' fees?

23         MR. LIEBERMAN:  Everything, Your Honor.  And it should

24   be that way, yeah.

25         THE COURT:  Okay.

1              Do you agree with that, Mr. Clubok, that that's the

2    only -- you know, to the extent that I agree with all that, that

3    sort of takes care it, that no one's looking for a separate

4    ruling on the attorneys' fees or the two different motions that

5    exist?

6              MR. CLUBOK:  We're certainly not looking for a

7    separate ruling, Your Honor.

8              THE COURT:  Okay.  The last question I just wanted to

9    ask -- and this is more of a housekeeping thing, Mr. Lieberman,

10   but I just wanted to get some clarification on something I

11   noticed in the papers, here, both in the original filing back at

12   the conditional stage and now.

13             On the various arguments about whether or not -- I

14   mean, there's -- whether it's adequacy during the -- on the

15   class revocation issue, whether it's here, where -- I mean, all

16   the plaintiffs' firms have submitted what appear to be firm

17   resumes, sort of touting their ability to handle this kind of

18   case, which is a finding I need to make, of course.  Is the

19   materials you submitted, is that the standard form résumé, or

20   was it created for this case?

21             MR. LIEBERMAN:  Form résumé, Your Honor.

22             THE COURT:  So what's it used for besides a case like

23   this; is it sent as sort of a marketing material thing, is it on

24   the website, is it --

25             MR. LIEBERMAN:  I think it's also for lead plaintiff

1    appointments.  So we would also submit our résumé -- basically,

2    for lead -- to be appointed lead plaintiff, or class

3    certification, or settlement as well, which is class

4    certifications --

5            THE COURT:  Is it available on your website, or is

6    it -- I mean, if someone -- I don't know who, but if someone was

7    just interested or maybe like someone who wanted to work at your

8    firm or something, could they just find it, or is it only used

9    in litigation?

10           MR. LIEBERMAN:  I think that information -- I don't --

11   that particular document I don't think is available on the

12   website, but it certainly -- I think all the information is --

13   it's reflecting what's on our website.

14           THE COURT:  So do you consider it sort of a public

15   document, or is it a litigation-prepared -- a document prepared

16   for litigation?

17           MR. LIEBERMAN:  It's a document that -- it's a

18   standard document that we're using repeatedly for purposes of

19   being appointed as lead counsel, class certification, and final

20   approval of settlement, which includes the class certification.

21   I don't believe we publish it publicly, but only because it's a

22   somewhat unwieldy document.

23           THE COURT:  So this is ECF 243-4.  What about the

24   other counsel -- the other firms also submitted what I would

25   call firm résumés, with, you know, photos of all the lawyers,

1    and bios, and everything else.  So for example, 243-5, that's

2    from Labaton, is that the same type of document, or is it a

3    publicly available document?

4                MR. LIEBERMAN:  Same type of document.  I think it

5    also just gives the Court a sense of -- you know, we're asking

6    for our lodestar to be recognized and also to understand the

7    experience and background of everybody who's, you know, involved

8    in the case.

9                THE COURT:  Okay.  So in yours, Mr. Lieberman, I

10   notice there's a section on the comments from the court, with

11   quotes from judges --

12               MR. LIEBERMAN:  Yes.

13               THE COURT:  -- in cases.  I assume you drew those from

14   transcripts.  And I'm also assuming you sort of asked those

15   judges if they would approve of being directly quoted by name in

16   this document; is that correct?

17               MR. LIEBERMAN:  Your Honor, it would be a public

18   record; I don't know that -- how much --

19               THE COURT:  Well, again, it doesn't just say this was

20   an opinion or this was a statement; it actually says,

21   Judge Jed Rakoff said this, and Judge William Young, somebody I

22   know, said this.  So you don't see any problem -- it sounds like

23   you don't ask -- you don't tell them, hey, we're putting this in

24   our materials, you just publish it.

25               MR. LIEBERMAN:  Your Honor -- I mean, that's a -- I'll

 1    look into that, Your Honor, but by the -- basically, if it was

 2    said in a public record, on a public document, then I'm not sure

 3    that we would, you know, need that type of permission.

 4          THE COURT:  Okay.  Well --

 5          MR. LIEBERMAN:  But fair enough, Your Honor.

 6          THE COURT:  -- it really struck me wrong way,

 7    honestly.

 8          MR. LIEBERMAN:  Really?

 9          THE COURT:  Because this looks like a marketing

10    material.

11          MR. LIEBERMAN:  Yeah.

12          THE COURT:  Whether it's to the general public, to

13    some broader -- a more narrow universe of the legal community,

14    or cases like this -- which as Mr. Clubok said, these are all

15    very public proceedings; this isn't sort of a private

16    communication -- it sure looks as if Judge Hillman, Judge Young,

17    and everyone's there, saying, your guys are a great firm, and

18    they're basically endorsing you as a matter of marketing or

19    advertising, which -- I would be surprised if they said that,

20    and it sounds like they didn't; you just -- you chose -- rather

21    than even just to say here's language from an opinion, or -- I

22    mean, you named them by name.

23          You don't even say, this is -- in a case like this --

24    that a judge or the court said this.  So it seems to imply that

25    they are endorsing you as a law firm.

1      MR. LIEBERMAN:  Your Honor, fair enough, and I think

2  that's something to look back at, to make it more clear, but the

3  statements were made in publicly filed documents, and we're

4  culling them from them.  I can understand, now that we're

5  talking here, why it could be perceived as off-putting, and fair

6  enough.

7      THE COURT:  Are you planning to quote anything from me

8  in this -- in any future documents?  Because I would actually

9  ask you not to do that.

10      MR. LIEBERMAN:  Your Honor, fair -- and Your Honor --

11      THE COURT:  And I'm scrupulously not going to say

12  things like, I commend you for hard work, or, you've done

13  extraordinary work, I'm not going to say anything like that,

14  because I don't want to be quoted in any of your marketing

15  materials; I don't want any part of that.

16      MR. LIEBERMAN:  Your Honor, you won't be, and we're

17  going to discuss it.  This is the first time in decades that

18  we've been called out on it, and it's a fair point.

19      THE COURT:  Okay.

20      MR. LIEBERMAN:  And so sometimes, you do things and

21  you don't always --

22      THE COURT:  Okay.  Well, I think it's worth looking

23  at.

24      MR. LIEBERMAN:  Yes, Your Honor, I agree.

25      THE COURT:  I mean, I just -- you know, we're told not

1    to sort of support law firms, and I mean -- and again, I don't

2    think any these judges said they wanted to help you out here.

3              MR. LIEBERMAN:  No.

4              THE COURT:  And I understand they're public

5    statements; I'm not saying there's anything unethical or -- I

6    just don't think it's a great practice; I'd ask you not to

7    include me on marketing materials.  And if you're going look at

8    it, I think that's a great idea, so --

9              MR. LIEBERMAN:  Yeah, on both counts, Your Honor,

10   agreed, and I understand.

11             THE COURT:  Okay.  Anything anyone from the defense

12   side wants to add regarding the settlement or otherwise?

13             Okay.  So a lot of materials were submitted, and I am

14   prepared to rule on this.  I do note from the outset, again,

15   there's no objections to this proposed settlement.  There

16   were -- I had previously approved the notice process and the

17   plaintiff allocation at least conditionally.  Based on what

18   we're finding now, I will approve the settlement.

19             First off, I did approve the process going forward up

20   to now.  The notices were issued; the class members were given

21   an opportunity to submit claims, to object to the settlement, to

22   opt out; no objections were filed; only two class members have

23   opted out; and the claims submitted basically appear, at least

24   from the representations by Mr. Lieberman, to provide a

25   relatively robust response under the circumstances, whether you

1   measure it by the estimated loss associated with the claims that

2   were submitted or otherwise.  It is significant enough or

3   sufficient enough that I can conclude that the notice was

4   adequate.  The plan of allocation as we discussed then and we

5   discussed now is also a reasonable approach to allocate among

6   the claimants.

7          I also will reaffirm, based on the findings

8   previously, the various requirements for class certification and

9   make a final determination on class certification here, for the

10  record.  And then -- the main issue then is whether the

11  settlement itself, particularly the $37 million figure, is fair

12  and reasonable and adequate, although as I pointed out, the

13  amount recovery for any given class member is limited, that is

14  not unusual in a case like this, given the volume of shares

15  and -- but that was perhaps the only thing that gave me pause in

16  all of this.

17         I agree that the overall number relative to other

18  class cases is significant and sufficient, although it's hard to

19  draw comparisons, because companies come in different shapes and

20  sizes and claims and so forth, but my biggest concern, again,

21  given the -- as in many cases, the recovery's low per share, per

22  claimant, what have you -- is the argument or the issue of

23  whether the company -- you know, the primary argument from the

24  plaintiff's side was, the company has issues with the business

25  going forward.  They're concerned about whether or not they can

1    provide the recovery later that they are seeking or that they

2    would seek after trial.

3          I do find there's at least sufficient facts to support

4    that view, among others.  As Mr. Lieberman pointed out, is,

5    there have been layoffs recently.  Obviously, we heard about

6    share price reductions and otherwise.

7          I don't have great clarity on whether the number of

8    clients or the business is expanding or contracting at this

9    point other than those metrics, but there are enough to at least

10   support the view, plus the commonsense notion based on general

11   news about this industry, obviously, the negative press,

12   presumably, about this case, that it's at least a reasonable

13   position to take, from the plaintiff's side, which is an

14   optimistic view of their case, obviously, that even with that,

15   that there's significant risk to the ability to recover more

16   than this amount after trial, purely just as a matter of the

17   resources of the company.

18         From the defense side, obviously, they don't agree

19   with that as a reason to reach this agreement, but they,

20   of course, have vigorously opposed the view that there's any

21   liability at all.  I think both sides in the papers have

22   established, both at the motion to dismiss stage and now, that

23   there are legitimate arguments on both sides, that the defense

24   has a lot of different avenues that they would pursue at the

25   various future stages of the case.

1          So even if they don't agree that the company has

2   financial issues, which is the plaintiff's reasons for

3   reaching -- primary reason for agreeing to a settlement of this

4   amount, they would argue that the liability issues or the risk

5   of not defining liability would be a reason why the plaintiffs

6   might agree to this, and that's at least a fair argument to

7   include in that analysis.

8          So for all of those reasons, I do find that the

9   settlement amount, despite, obviously, the limitations it always

10  presents to any individual claimant, is fair and reasonable

11  under the circumstances.

12         As for the attorneys' fees, that is -- the plaintiff

13  is seeking approximately 33.4 percent of the overall amount as

14  attorneys' fees.  The factors set forth in Barber v. Kimbrell's,

15  Inc., 577 F.3d [sic] 216 (4th Cir. 1978), those apply in this

16  case.  Not all of them, of course, are relevant in any given

17  circumstance; I'll just focus on some of the main ones.

18         First off, the time and labor expended, we did hear, a

19  substantial amount of time went into this case from the

20  plaintiff's side.  This amount effectively constitutes a 1.8

21  multiplier, which is within the range if not on the lower end of

22  what's typical in a case like this.  I know from the motion to

23  dismiss, there is -- obviously, a lot of work that went into

24  that.  There were some efforts at discovery.  They didn't go all

25  the way through the process, but that's always a time-consuming

1   process.  And obviously, the investigation stage of a case like

2   this is always going to be particularly labor-intensive.  The

3   novelty and difficulty of the issues involved and the skill

4   required, these types of cases, obviously, involve a certain

5   amount of legal expertise no matter what.

6         This one I wouldn't say was necessarily overly complex

7   or simple by these standards, but the nature of this type of

8   case, the need to understand the legal framework, the PSLRA and

9   so forth; understand what kind of evidence needs to be pulled

10  together to at least move through the process, here, both from

11  an investigative standpoint and a legal standpoint, does require

12  a level of skill that's not available at every firm or in every

13  set of attorneys.  So that's certainly a positive factor in

14  terms of the amount.

15        Some of these issues about the risk, as to what --

16  you know, having no recovery up to this point of fees, that's

17  addressed to some degree in the category of the opportunity cost

18  for attorneys.  And the expectations at the outset, there's

19  always an expectation that you could get a large recovery, but

20  also a legitimate expectation you'll get nothing.  And so that

21  risk factor does need to be built into the calculation.

22        And then, the amount in controversy and the result

23  obtained, given the limitations we talked about, whether it's

24  the liability risk or the business risk of what is going to be

25  available, with the settlement amount being a reasonable amount

1    at the end, there is a positive result for the clients on the

2    plaintiff's side, and so the percentage here is not unreasonable

3    in that sense.

4         And then, some of these other categories, experience

5    and reputation of the attorneys, obviously, these are

6    well-experienced firms.  Leaving out whatever comments judges

7    may have said, there's ample other evidence that they've got

8    significant experience in this area.

9         And so for all of those reasons, I do find that at

10   least under the Barber factors, there's a sufficient basis to

11   support this.

12        Now, on the general question, again, of how we do the

13   calculation, the 33.4 percent is something that -- first of all,

14   the percentage share approach is a legitimate approach, it's

15   followed in many of these cases.  That percentage is within the

16   range of the kind of percentage that does occur in cases like

17   this, including with this multiplier that I just described

18   earlier.

19        And so recognizing the difficulty of the issues, the

20   skills required to advance this kind of case, the expectations

21   at the outset, and the risk of receiving no recovery at all, and

22   the generally positive result, I will approve the 33.4 percent

23   percentage and find that the attorneys' fee requested is fair

24   and reasonable.

25        There's been no objection or complaint about the

1    litigation expenses.  Obviously, it's a pretty large number, but

2    when you talk about the experts involved and so forth, I'm going

3    to find those to be fair and reasonable.  And then, finally, the

4    reimbursement to the plaintiffs, I haven't heard any contrary

5    evidence to the fact that the payments to them are fair and

6    reasonable as well, and so I will approve those as well.

7            So with all of that, I will grant the motion for final

8    approval of the class action settlement and of the planned

9    allocation of the net proceeds, also grant the motion for an

10   award of attorneys' fees, and payment of litigation expenses,

11   and reimbursement of the plaintiffs.

12           My understanding then is, if I enter a document

13   similar to the final judgment, a document proposed by the

14   plaintiffs, that that will wrap up all those issues together,

15   and so that is something that you should probably expect either

16   today or perhaps on Monday, depending on how many adjustments I

17   want to make to the proposed order, although, I think, again,

18   we're in the realm of this close enough, I will work largely

19   from that document rather than creating my own, which I know

20   some judges have done that in cases, but I think the materials

21   submitted are reasonably sufficient that it will be pretty close

22   to that, if not exactly that.

23           Any comments or questions from either side?

24           MR. LIEBERMAN:  Nothing from Plaintiffs.  Thank you,

25   Your Honor.

1          MR. CLUBOK:  Nothing further.  Thank you, Your Honor.

2          THE COURT:  Okay.  Well, thank you all very much.

3   Have a good afternoon.

4          MR. LIEBERMAN:  Thank you.

5          MR. CLUBOK:  Thank you.

6          THE COURTROOM DEPUTY:  All rise.  This Honorable Court

7   now stands in recess.

8       (The proceedings were recessed at 10:33 a.m.)

1                  CERTIFICATE OF OFFICIAL REPORTER

2          I, Patricia Klepp, Registered Merit Reporter, in and for

3    the United States District Court for the District of Maryland,

4    do hereby certify, pursuant to 28 U.S.C. § 753, that the

5    foregoing is a true and correct transcript of the

6    stenographically-reported proceedings held in the above-entitled

7    matter and the transcript page format is in conformance with the

8    regulations of the Judicial Conference of the United States.

9                              Dated this 16th day of January, 2024.

10

11

12                    _____/s/_____
                      PATRICIA KLEPP, RMR
13                    Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25